1                IN THE UNITED STATES DISTRICT COURT

2                    NORTHERN DISTRICT OF GEORGIA

3                         ATLANTA DIVISION

4     JAWANZA SMITH, CARLOS BURNEY,

5     BRIAN WYNN, CARLON LEWIS,

6     And STANLEY HILL,

7             Plaintiffs,

8     VS.                        CIVIL ACTION

9                               FILE NO:  1:16-CV-0139-TWT

10    IDEAL TOWING, LLC,

11    MICHAEL JAMES and TISHJA

12    JAMES,

13            Defendants.

14    _____/

15

16            The deposition of JAWANZA SMITH, taken

17    pursuant to agreement of counsel; all formalities

18    waived, excluding the reading and signing of the

19    deposition before Tamika Burnette, Certified Court

20    Reporter, in and for the State of Georgia, commencing at

21    10:05 a.m., on May 2, 2017, at 3100 Centennial Tower,

22    101 Marietta, Atlanta, Georgia.

23

24

25

ON BEHALF OF THE PLAINTIFF:

DELONG, CALDWELL, BRIDGERS, FITZPATRICK & BENJAMIN, LLC

MR. MITCHELL D. BENJAMIN, ESQUIRE

3100 Centennial Tower

101 Marietta Street

Atlanta, Georgia  30303

(888) 680-0416

Benjamin@dcbflegal.com


ON BEHALF OF THE DEFENDANT:

THE BURKE LAW GROUP, LLC

MR. E. EARLE BURKE, ESQUIRE

MR. JORDAN M. MAHONEY, ESQUIRE

199 Peters Street, Southwest

Suite A

Atlanta, Georgia  30313

Eburke@burkelawatl.com

(404) 688-1210

```
1                        INDEX PAGE

2    WITNESS:            EXAMINATION:          PAGE:

3    JAWANZA SMITH       MR. BURKE               4

4                        MR. BENJAMIN          127

5                        MR. BURKE             130

6

7    EXHIBIT:            DESCRIPTION:          PAGE:

8    EXHIBIT NO. 1       APPLICATION            45

9    EXHIBIT NO. 2       AGREEMENT              81

10   EXHIBIT NO. 3       1099                   83

11   EXHIBIT NO. 4       1099                   90

12   EXHIBIT NO. 5       2014 1099              92

13   EXHIBIT NO. 6       1099                   97

14   EXHIBIT NO. 7       AGREEMENT              98

15   EXHIBIT NO. 8       DRIVER'S LICENSE      102

16

17

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S

 2              *    *    *

 3              (Witness sworn.)

 4              JAWANZA SMITH,

 5         After having been first duly sworn to tell the

 6         Whole truth in this matter, was examined and

 7                   Testified as follows:

 8              MR. BURKE:  All right.  This will be the

 9    deposition of Jawanza Smith, taken by notice and

10    agreement of counsel, taken for all purposes allowed

11    under the Federal Rules of Civil Procedures.

12              If it's okay with counsel, can we agree to

13    reserve all objections except as to the form of the

14    question or responsiveness of the answer until first use

15    of the deposition?

16              MR. BENJAMIN:  And application of privilege,

17    yes.

18              MR. BURKE:  Of course.

19                        EXAMINATION

20    Q.    (By Mr. Burke)  Mr. Smith, please state your

21    name for the record, your full name, please.

22    A.      Jawanza Jamal Smith.

23    Q.      All right.  Mr. Smith, my name is Earl Burke, I

24    just introduced myself to you.  I'm sure your lawyer

25    went over some of the things I'm going to say to you,
```

1  but I want to make sure the record is clear that you and

2  I agree to how this deposition is going to proceed.

3      My purpose today is to find out what you know,

4  facts.  I'm not trying to trick you or confuse you.  If

5  I ask a question and it's not clear, ask me to repeat

6  it, and I'll be glad to repeat the question.  I'm going

7  to ask you to allow me to finish my question before you

8  answer it.  In human nature we can expect, sometimes,

9  what someone is going to say.  And I'm going to extend

10 the same courtesy to you.  I'm going to allow you to

11 finish your answer, before I ask another question.

12      If you answer a question, will you agree with

13 me that you understood it and you're answering

14 truthfully?

15 A.     I agree.

16 Q.     The other thing that you're going to need to do

17 is what you're doing now, which is to verbally respond.

18 The court reporter is taking down what we say.  Nodding

19 of the head, shaking it, making sounds like uh-huh,

20 uh-uh, it's hard for her to record those kind of

21 responses.  And any time you want to take a break,

22 that's fine.  If you do want to take a break, I'm going

23 to ask that you answer my question first before you

24 leave the room and then take a break.

25      MR. BURKE:  Did you guys talk about signature?

```
 1           MR. BENJAMIN:  We'll reserve signature.

 2    Q.      (By Mr. Burke)  All right.  Mr. Smith, have you

 3    ever given a deposition before?

 4    A.      No, I haven't.

 5    Q.      Have you ever testified under oath before?

 6    A.      No, I haven't.

 7    Q.      You never appeared in any case as a witness or

 8    as a party?

 9    A.      No, I haven't.

10    Q.      When did you know about your deposition today?

11    A.      About a month ago.

12    Q.      And since that time that you knew that you were

13    going to be deposed, what did you look at in

14    preparation, if anything, for the deposition today?

15    A.      I just went over my paperwork, that's it.

16    Q.      What paperwork?

17    A.      My paperwork that's from my deposition.

18    Q.      For your depositions?

19    A.      My deposition paperwork.  Right.  My court date,

20    my deposition dates and documents, I'm pretty sure you

21    have.

22    Q.      All right.  What kind of documents did you look

23    at?

24    A.      About the job.

25    Q.      What about the job?
```

```
1    A.      Not knowingly that I should have been W-2 and

2    not 1099.  I should have been an employee instead of an

3    independent contractor.

4    Q.      All right.  I understand your response, but what

5    I'm asking you is to tell me what documents you looked

6    at in particular.  You said your paperwork?

7    A.      Yes.

8    Q.      Did you look at a contract?  Did you look at any

9    e-mails?  Document-specific is what I'm trying to find

10   out?

11   A.      The documents you sent me.

12   Q.      So you looked at documents I sent you?

13   A.      Right.

14   Q.      Okay.  Any particular documents?

15   A.      No, sir.

16   Q.      Okay.  Did you look at timesheet?  Did you look

17   at any written agreements that you might have signed?

18   A.      No, I didn't.

19   Q.      Did you look at any W-2s or 1099s?

20   A.      No, I didn't.

21   Q.      Other than conversations with your attorney,

22   which I'm not trying to invade, those conversations are

23   privileged.  Did you have any discussions with anybody

24   else about your deposition today?

25   A.      No, sir.
```

```
 1   Q.      You didn't talk to your girlfriend?

 2   A.      No, sir.

 3   Q.      Brother or sister?

 4   A.      No, sir.

 5   Q.      Is there any reason why you wouldn't be able to

 6   answer my questions -- understand my questions and

 7   answer my questions today?

 8   A.      I'm answering them truthfully.

 9   Q.      Okay.  You're not on any medication or anything

10   like that?

11   A.      No, sir.

12   Q.      Have you ever been arrested before?

13   A.      Yes, I have.

14   Q.      Okay.  What for?

15   A.      Child support.

16   Q.      Do you know what it is to be arrested, what that

17   means?

18   A.      Yes, I know what it is.

19   Q.      Okay.  You were arrested for child support, not

20   paying child support?

21   A.      In arrears.  Yes, I was in arrear.

22   Q.      And where was that?

23   A.      DeKalb County.

24   Q.      When was that?

25   A.      I don't know the exact date.
```

```
1   Q.      Ten years ago, five years ago?

2   A.      I'll say within between -- probably within

3   between five -- between now and seven years.  Right,

4   between seven years ago.

5   Q.      Is that the only time you've been arrested?

6   A.      No, that's not the only time I've been

7   arrested.

8   Q.      What else were you arrested for?

9   A.      Traffic tickets.  That's it.

10  Q.      When you were arrested for arrears in a child

11  support case, did you have to testify in court?

12  A.      No.

13  Q.      Where do you live?

14  A.      1867 Sahara Drive.

15  Q.      Where is that?

16  A.      Southeast Atlanta.

17  Q.      Is that Atlanta, Georgia?

18  A.      Yes.

19  Q.      And who lives at that resident with you?

20  A.      Me and my parents.

21  Q.      What are your parents' name?

22  A.      Audrey Johnson.

23  Q.      What?

24  A.      Audrey Johnson, Howard Johnson.

25  Q.      Anybody else?
```

```
 1   A.      No.

 2   Q.      Have you ever been married?

 3   A.      No, I haven't.

 4   Q.      How old is your child?

 5   A.      Sixteen, 13 and 9.

 6   Q.      Are you from the Atlanta, Georgia area?

 7   A.      Yes, I am.

 8   Q.      Do you have family that lives in either Fulton

 9   County, Dekalb County, Cobb County, Henry County?

10   A.      All over.

11   Q.      So you have family who lives --

12   A.      All over.

13   Q.      -- in the metropolitan area?

14   A.      All over.

15   Q.      What would their last names be?  Would it be

16   Smith or they have different last names?

17   A.      Different.

18   Q.      Tell me what those last names would be.

19   A.      Stewart, Harper, Singletary, Heard.

20   Q.      How do you spell Heard.

21   A.      H-E-A-R-D.

22   Q.      Okay.

23   A.      Johnson's.

24   Q.      Other than this lawsuit that we're here about,

25   have you ever filed a lawsuit before?
```

```
1    A.      No, I haven't.

2    Q.      Never been a party to a lawsuit --

3    A.      No.

4    Q.      -- other than this one?

5    A.      No, I haven't.

6    Q.      Have you ever filed bankruptcy?

7    A.      No, I haven't.

8    Q.      And you've never been in federal prison before?

9    A.      No, I haven't.

10   Q.      All right.  Tell me a little bit about your

11   educational background.

12   A.      I went to McNair High School in Dekalb County.

13   I graduated --

14   Q.      What year?

15   A.      '96.

16   Q.      Did you go to college or take any kind of

17   vocational classes?

18   A.      No.

19   Q.      Courses?

20   A.      No, I didn't.

21   Q.      I'm sorry?

22   A.      No.

23   Q.      Did you get a diploma, high school diploma?

24   A.      No.

25   Q.      So did you actually graduate or --
```

```
 1   A.      Well I started my GED and I never finished it.

 2   Q.      Have you ever been suspended or kicked out of

 3   high school?

 4   A.      Of course, yes.

 5   Q.      For what?

 6   A.      Suspended?  Just probably tardiness, constant

 7   tardiness.  Probably fighting.

 8   Q.      You said probably?

 9   A.      Fighting, I can recall once.  That was my

10   younger days, junior high days.  What normal kids get

11   suspended for.

12   Q.      Have you taken any sort of vocational classes

13   related to any sort of professional occupation since

14   graduating from high school?

15   A.      No, I haven't.

16   Q.      When you graduated from -- when you got your GED

17   -- well, strike that.

18          You told me you graduated from high school;

19   you didn't, in fact, graduate, correct?

20   A.      Right.  I -- right.

21   Q.      You left in 1996?

22   A.      In '96 -- it was either in '95 or '96.

23   Q.      What did you do after you left high school?

24   A.      Worked.

25   Q.      Where?
```

```
 1   A.      Wayfield, I used to stock grocery.  Warehouses.

 2   Q.      Let's start with Wayfield and then I'll ask you

 3   questions about what you did?

 4   A.      Okay.

 5   Q.      So your first job was at Wayfield?  Is that

 6   grocery?

 7   A.      Actually my first job was with Rallies.

 8   Q.      Was what?

 9   A.      Was with Rallies.  I was 14 when I started

10   working there?

11   Q.      I'm talking about --

12   A.      After school?

13   Q.      Yes, after you left high school in '96?

14   A.      After I left high school in '96, I worked for

15   Ingles.

16   Q.      And what year was that?

17   A.      I don't know.

18   Q.      Would it have been some time in '96 or the

19   following year?

20   A.      Probably about '97, '8.  It wasn't too far.

21   I've always been employed.

22   Q.      And what did you do for Ingles?

23   A.      Stock grocery.

24   Q.      All right.  And what was your hours?

25   A.      Ten to six in the morning.
```

```
1    Q.     10:00 p.m.?

2    A.     10:00 p.m. to 6:00 a.m.

3    Q.     How many days a week did you work?

4    A.     Five.

5    Q.     And you were paid hourly?

6    A.     Right.

7    Q.     Do you recall how much you were paid?

8    A.     11.

9    Q.     $11 an hour?

10   A.     $11 an hour.

11   Q.     And why did you leave Ingles?

12   A.     I wanted a better job.

13   Q.     And where did you go after Ingles?

14   A.     After Ingles, I probably spent like two, three

15   years at Ingles.  I left Ingles and probably worked at

16   the post office for casual, for about a year.

17   Q.     Which post office?

18   A.     Hapeville, Crown Road.

19   Q.     Did you work for the U.S. Postal Service?

20   A.     It was a temp service, during the Holidays.

21   That's what we call a casual, Christmas casual.

22   Q.     What was the name of the temp service?

23   A.     It actually wasn't a temp service, it was

24   through the post office.

25   Q.     All right.  So the post office was hiring --
```

A.        Hiring people for the holidays.

Q.        Let me finish the question.

          The post office were hiring temporary
employees.  You made an application to be employed
during the holiday season?

A.        Correct.

Q.        And what year was this?

A.        In between the years of about '90 -- probably
'98 to 2000 or '99, 2000.

Q.        And you said you worked for them a year?

A.        Probably so.

Q.        How did you end up working for them a year, if
it was a temporary job?

A.        They have a choice to assign you -- to keep
reassigning you the job if they like your work.

Q.        So after the holiday, the Christmas Holiday
period that you were initially hired for, they kept you
on or did they hire you again for the following year?

A.        I just continued.  I just continued my
employment until it was over with.  I guess they didn't
need anymore help.

Q.        So were you terminated or did the work just
finish?

A.        The work finished.

Q.        What were you paid an hour?

```
1    A.      About $10 an hour.

2    Q.      And where did you go after the post office?

3    A.      After the post office, Super Value.

4    Q.      And what is Super Value?

5    A.      It's a grocery store.

6    Q.      What year did you start working with them?

7    A.      I don't remember.

8    Q.      All right.  Do you recall how long you were

9    working at the Super Value.

10   A.      Yes.  I worked at Super Value for about two

11   years?

12   Q.      So if you left the post office in 2000, was

13   there a long gap between leaving the post office and

14   working with Super Value or did you start working --

15   A.      Probably about a month or two-gap in between,

16   enough time to find another job.

17   Q.      And what did you do at Super Value?

18   A.      Stock.

19   Q.      Hours, what were your hours?

20   A.      It was in the morning, 8:00 to 4:00.

21   Q.      8:00 a.m.?

22   A.      Eight to four in the morning.

23   Q.      And how did you get paid?  What was your hourly

24   rate?

25   A.      Then, probably 8.25.
```

```
 1    Q.      You said 8.25?

 2    A.      Yes.  Like 8.  Something like that.  Eight or

 3    nine dollars.

 4    Q.      Next job?

 5    A.      My next job, I'm not sure.

 6    Q.      Okay.  Can you remember what you did -- other

 7    than working at Super Value, before you started working

 8    with Ideal Tow, did you have any other jobs in between?

 9    A.      Out of school?  When I got out of school?

10    Q.      No.  What I'm asking you is:  After you left

11    Super Value, and before you started working for Ideal

12    Towing, did you work any other jobs during that time

13    period?

14    A.      Right.  Yes, I did.  I used to work for KAM,

15    another toe truck company.

16    Q.      It's called what?

17    A.      KAM, K-A-M.

18    Q.      Is the that the name just KAM or KAM Towing?

19    A.      KAM Towing.

20    Q.      And where were they located?

21    A.      Snellville.

22    Q.      When did you start working for them?

23    A.      I'm not sure.  It's probably -- I know it's been

24    over probably over ten years ago, probably.

25    Q.      How long did you work for KAM Towing?
```

```
1    A.      About three years.  Before KAM I was with --
2    before KAM I was with DJV, DJV Towing.  I was with them
3    about two years.
4    Q.      Do you remember what year you started working
5    DJV?
6    A.      No, I don't remember.
7    Q.      So you worked with them for two years?
8    A.      Right.
9    Q.      And then --
10   A.      Before DJV, I was working for CSI.  It's a
11   Kroger Warehouse.
12   Q.      And do you recall when you started working for
13   Kroger's Warehouse?
14   A.      I don't remember.
15   Q.      Okay.  What did you do at the Kroger's
16   Warehouse?
17   A.      I used to pull orders for grocery stores.
18   Q.      What does that mean?
19   A.      Pull orders meaning for different grocery store
20   orders.  Like, I worked at Ingles and we had to order
21   grocery for the stores, and they would send it to the
22   warehouse I was working at and we'll pull orders and
23   send them to the grocery stores.
24   Q.      And were you paid hourly then?
25   A.      Hourly.
```

```
1    Q.      What was your rate?

2    A.      11.50.

3    Q.      And why did you leave Kroger?

4    A.      I left Kroger and went to Kraft.

5    Q.      I said why did you leave Kroger?

6    A.      Why?  I left Kroger to go to Kraft.

7    Q.      What's Kraft?

8    A.      Another warehouse doing the same thing.

9    Q.      And you don't remember what area that was?

10   A.      No, I don't.

11   Q.      And how were you paid?

12   A.      Hourly.

13   Q.      Do you recall the rate?

14   A.      Like 12.

15   Q.      And why did you leave Kraft?

16   A.      I left Kraft -- I was terminated from Kraft.

17   Q.      Why were you terminated?

18   A.      A funeral I went to and possibly, I guess, I'm

19   not sure the proper word, but I took off work for a

20   funeral and I was terminated for that.

21   Q.      And how long did you work for Kraft?

22   A.      About a year-and-a-half.

23   Q.      And what did you do after you left Kraft?

24   A.      After I left Kraft, I went to Ideal Towing.

25   Q.      So let me just make sure I understand the
```

```
1    sequence of events.  You worked at Kroger Warehouse, and

2    then you left there and went to Kraft, right?

3    A.      Right.

4    Q.      And then you worked for DJV Towing?

5    A.      Right.

6    Q.      And then you worked for KAM Towing?

7    A.      Right.

8    Q.      And then you went to Ideal Towing?

9    A.      Right.

10   Q.      Now with the exception of the towing jobs that

11   you're telling me about, when you went to work for any

12   of the companies you've listed, you punched a clock,

13   correct, time clock?

14   A.      For my jobs, hourly jobs, yes.

15   Q.      And you were there for the period of whatever

16   your schedule was?  If it was eight to four you were

17   there the entire time?

18   A.      Right.

19   Q.      Correct?

20   A.      Correct.

21   Q.      You couldn't leave and come back or anything

22   like that --

23   A.      No.

24   Q.      -- at those jobs?

25   A.      No.
```

```
 1   Q.      The job at DJV, do you recall who your
 2   supervisor was?
 3   A.      No, I do not -- yes, Isaac.
 4   Q.      Isaac?
 5   A.      Yes.
 6   Q.      Is there a last name?
 7   A.      Pete, P-E-T-E.
 8   Q.      P-E-T-E-S?
 9   A.      That's all.  That's what it was.  That's his
10   last name.
11   Q.      P-E-T-E?
12   A.      Right.  He wasn't -- he's -- he was African.
13   I'm not sure what he was, Nigerian.
14   Q.      And they were located where?
15   A.      On Northside Drive.
16   Q.      And what did you do for DJV Towing.
17   A.      Drive a tow truck, Triple A.
18   Q.      When you say Triple A --
19   A.      I drive tow trucks.
20   Q.      So you drove tow trucks for DJV Towing?
21   A.      Yes, I did.
22   Q.      And what were your hours?
23   A.      Seven to seven.
24   Q.      7:00 a.m.?
25   A.      7:00 a.m. to 7:00 p.m.
```

```
1    Q.      How many days a week?

2    A.      Six -- five or six.

3    Q.      And how were you paid by DJV Towing?

4    A.      Percentage.

5    Q.      A percentage of what?

6    A.      Thirty percent of whatever I did.

7    Q.      And when you say whatever you did, are you

8    talking about towing?

9    A.      We're still on DJV, right?

10   Q.      Yes.  Are you talking about towing?

11   A.      Yes, I'm talking about towing the cars.  Each

12   car I towed, I got paid 30 percent of whatever I made

13   for the week.

14   Q.      All right.  So how would you know what you made

15   for the week?

16   A.      That's -- I wouldn't know, unless I calculated

17   it.

18   Q.      Well how would you calculate it?

19   A.      What I was told.

20   Q.      So did you actually get money from the people

21   whose cars you were towing?

22   A.      No, I didn't.

23   Q.      At some point the people would pay for the

24   towing.  The towing would be paid for and whatever the

25   total amount of work that you did, it's your
```

1  understanding that you would get 30 percent of that for

2  the week?

3  A.      Correct.

4  Q.      You didn't get paid hourly?

5  A.      No, I didn't.

6  Q.      And when you clocked in -- well did you clock

7  in?

8  A.      No, I didn't.

9  Q.      You didn't clock in at all when you were at DJV?

10 A.      No.

11 Q.      Tell me how you would start your day, you said

12 you started at 7:00 a.m.?

13 A.      I started my day with a tablet.  I logged in

14 with a DJV computer in the vehicle, and we would have to

15 log in under a certain account and take our jobs like

16 that and call routes to the closet route.

17 Q.      So you had a tablet that was provided by DJV?

18 A.      Correct.

19 Q.      And that tablet --

20 A.      It's was a DDS.  It wasn't a tablet then.  They

21 called them DDS.  It's like a TV screen.

22 Q.      I understand.  Is that in the truck or was that

23 something manual?

24 A.      In the truck.

25 Q.      And did you have the truck with you or did

```
1    you --
2              MR. BENJAMIN:  Objection to form.
3              MR. BURKE:  I'll rephrase it.
4    Q.      (By Mr. Burke)  How did you get the truck each
5    day?
6    A.      After I got to work.
7    Q.      So you'd go to work, and you didn't have to tell
8    anybody what time you got there, right?
9    A.      Yes, I had a time.
10   Q.      You did?
11   A.      I had a time to be there.
12   Q.      At seven o'clock?
13   A.      Right.
14   Q.      Well how did they know that you were there at
15   seven o'clock?
16   A.      They were there.
17   Q.      They were there?
18   A.      Yes.  You had to sign the truck out to you.
19   Q.      So you had to sign something for the truck when
20   you got there?
21   A.      Correct.
22   Q.      And you were telling me something about the DDS
23   that was in the truck?
24   A.      Right.
25   Q.      And you would enter your information?
```

```
 1    A.      Yes.  Correct.

 2    Q.      And you would do that as soon as you got to

 3    work?

 4    A.      Correct.

 5    Q.      Regardless of whether or not you were going on a

 6    tow, as soon as you got to work and got in the tow truck

 7    you had to --

 8    A.      As soon as I got in the tow truck, I had to log

 9    in.

10    Q.      Now when you got there and got in the truck, you

11    would just take a truck out, correct, you wouldn't

12    necessarily just be going directly to tow somebody?

13    A.      Correct.  I take the truck out and go on to my

14    initiated area.

15    Q.      So you had a specific area?

16    A.      Correct.

17    Q.      Where was that?

18    A.      Then?  Probably downtown, Northside Drive area.

19    Q.      And what would you do, just drive around until

20    you got a call?

21    A.      Sit.

22    Q.      You would sit where?

23    A.      Wherever I feel I needed to sit, if I didn't

24    feel like driving, as long as it's in the area.

25    Wherever I felt like sitting until I was called, no
```

```
 1   specific area.

 2   Q.      And you said it was --

 3   A.      As long as it was in our designated area, I had

 4   to sit and wait on the next call.

 5   Q.      And while you were sitting you were free to do

 6   other things like run errands, for example, right?

 7   A.      No.

 8   Q.      You couldn't --

 9   A.      Not errands I needed to run, no.  Stop by the

10   store, get a drink, have lunch, yes.

11   Q.      Okay.

12   A.      Errands, no.

13   Q.      You couldn't go home, for example --

14   A.      No.

15   Q.      -- while you were in the truck?

16   A.      No.

17   Q.      So you just would sit?

18   A.      Sit in the truck and wait on the call.  That's

19   it.

20   Q.      So if you never got a call for the day, you

21   would just be sitting in the truck?

22   A.      Yes, sir.

23   Q.      You said you guess so?

24   A.      Yes, sir, I would just be sitting in the truck.

25   Q.      Tell me what happens when you got a call, walk
```

1   me through the process.

2   A.      You get a call through the computer, you accept

3   it, you go on the route, and you call your job.  You see

4   what type of location they are in, and let them know

5   you're on your way.

6   Q.      So how would you get the call?

7   A.      Through the DDS.

8   Q.      So you would have to be looking at the screen

9   and it would make a noise to alert you --

10  A.      Correct.

11  Q.      -- that you have a --

12  A.      Yes.

13  Q.      So you got notification via the computer,

14  correct?

15  A.      Correct.

16  Q.      And it will tell where you the location of the

17  vehicle was, correct?

18  A.      Correct.  All the information, pick up location,

19  the member's name, phone number, what kind of vehicle,

20  and where I'm dropping it off to.

21  Q.      Did it also tell you how much the tow was going

22  to be?

23  A.      It indicated how many miles we were getting

24  paid.  It indicated how many miles it would take for me

25  to pick up and get to the car versus me picking up the

1   car and taking it where I needed to.  It always

2   indicated that.  It had all the information I needed on

3   there.

4   Q.     And what?  So it told you how many miles it was

5   to pick the car up?

6   A.     Yes.

7   Q.     And it told you how many miles it would be to

8   take --

9   A.     However many miles it was to get to the car, to

10  the vehicle, it indicated those miles.

11  Q.     And were you paid to drive to the pick up point

12  to pick up the vehicle or after you got to the vehicle?

13  A.     That's what I was told.

14  Q.     You were told what?

15  A.     That I was paid en route miles.

16  Q.     En route?

17  A.     En route.  I was told I was paid en route, tow

18  miles and hookup miles, but it was never in writing.

19  Q.     How long would it take you -- from the time you

20  got to a vehicle to tow it, how long would it take you

21  to put the vehicle on the tow?

22  A.     I'm not understanding your question.

23  Q.     When you got to a vehicle that needed to be

24  towed, how long did it take you to hook the vehicle up

25  to your tow truck?

```
1   A.      It depends on what was wrong with the vehicle.

2   Q.      What would be the longest -- what would cause

3   you to take the longest time to tow a vehicle to pick a

4   vehicle up?

5   A.      The average vehicle, about seven minutes.

6   Q.      And you said it depends on what's wrong with the

7   vehicle, give me an example of something that would take

8   longer than seven minutes?

9   A.      The tire come off.

10  Q.      So you would have to replace the tire?

11  A.      I would have to do other things instead of just

12  picking it up.  It's other jobs I have to do instead of

13  just dragging a vehicle.

14  Q.      So sometimes you have to actually repair --

15  A.      I would have to --

16  Q.      Is that a yes?

17  A.      Basically, put it on my boards.  I'd have to do

18  this before I load it up on my truck.

19  Q.      All right.

20  A.      That's to avoid damaging the vehicle.

21  Q.      So if a vehicle had tire problems, you would

22  have to repair the tire and then --

23  A.      Not repair it.  I would have to get it set up if

24  it was able to be loaded on my truck.  I'm not repairing

25  it.
```

```
 1              MR. BENJAMIN:  Earl, all of your questions are
 2     still DJV at this point?
 3              MR. BURKE:  Yes.
 4              THE WITNESS:   Correct.
 5              MR. BENJAMIN:  Yes, yes.
 6     Q.      (By Mr. Burke)  And after you got the car on the
 7     tow truck, what would you do then?
 8     A.      Take it to its designated area.
 9     Q.      Would you have to tell DJV that you got the car
10     on the tow truck and that you were heading to --
11     A.      No, I wouldn't have to tell DJV anything.  It's
12     all on my DDS.  When I load the car up -- it's a process
13     I go through.  When I get on location, I go on location.
14     When I go on tow, I go on the computer and change my
15     status to tow.  When I get to my drop location, I close
16     my job out with the miles I towed.  I didn't have to
17     report to DJV for anything.  Everything is in the
18     computer.
19     Q.      So when you say you got there, did you notify
20     them that you were on location?
21     A.      I didn't notify DJV nothing.  I put everything I
22     needed to in the computer.
23     Q.      And who was this information going to?
24     A.      Whoever I logged in to it every morning.
25     Q.      You mentioned Triple A.  Was this a Triple A
```

1    device --

2    A.      Once again --

3            MR. BENJAMIN:  Let him finish the questions.

4    Q.      (By Mr. Burke)  Was this a Triple A device that,

5    you know, all of these calls were Triple A customers and

6    Triple A was sending you out?

7    A.      It was a device that was connected to the

8    company I worked for, which was DJV.

9    Q.      Okay.

10   A.      However they systems worked, they were connected

11   to the tablets we had in our trucks.  When the calls

12   came through, they came through the DJV first, and it

13   was dispatched out to the drivers.

14   Q.      And you mentioned that once you pick the vehicle

15   up, you would notify them or put it in a computer that

16   the vehicle was in tow.  And then when you got to the

17   destination, you would notify via the DDS that you had

18   dropped the vehicle off at a particular designation?

19   A.      Correct.

20   Q.      And that would indicate to DJV that you were

21   ready or available for another job, right?

22   A.      Right.  It would show my status was clear.

23   Q.      And is it fair to say that this would happen--

24   the same thing you just described would happen if you

25   got another call for a pick up with another vehicle?

A.      Right.

Q.      And you would do this for the entire time that you were logged in?

A.      Correct.

Q.      Now you mentioned that the machine would tell you the mileage.  Did the DDS also tell you how much they were being -- the person was being charged per mile?

A.      No, it didn't tell you miles.  It just showed the miles.  It didn't tell you the price, no price.

Q.      All right.  When you say showed the miles, what do you mean?

A.      If like from here, up the street, it would show me I'm 10 miles from it, your en route miles are 10 miles.  It would just indicate 10 miles.  It don't show me no dollar signal or how much I get paid per mile.

Q.      You didn't own the tow truck that you were using, did you?

A.      No, I didn't.

Q.      What about any equipment, did you have your own personal equipment?

A.      No, I didn't.

        MR. BENJAMIN:  Earl, can you be more clear when you say equipment?

        MR. BURKE:  Yes.

```
 1   Q.      (By Mr. Burke)  Let me be more specific.  Did
 2   you have tools that you had, your personal tools that
 3   you carried with you to work, to help you with the
 4   towing jobs that you had?
 5   A.      No personal tools.
 6   Q.      Okay.  There are tools, but those tools belong
 7   to the company, DJV?
 8   A.      The tools I had it wasn't really tools.  It was
 9   just a tow truck.
10   Q.      So you didn't have --
11   A.      The tow truck came with everything.  So it
12   really wasn't no individual tools.  Everything I used
13   was attached to the truck.
14   Q.      All right.  Have you told me everything that you
15   did for DJV?
16   A.      Yes, I have.
17   Q.      And I think you told me you worked there for two
18   years?
19   A.      Approximately.  I don't know the exact date,
20   just a roundabout ball figure, yes.
21   Q.      And did I understand you correctly that you
22   would go to DJV's location and pick up the truck?
23   A.      Correct.
24   Q.      And after you were finished working, would you
25   take the truck back?
```

```
 1    A.      Take the truck back to DJV and get in my
 2    personal vehicle and go home.
 3    Q.      And you told me you started working for another
 4    tow company, is it KAM?
 5    A.      Correct.
 6    Q.      Do you recall what year?
 7    A.      No.
 8    Q.      Okay.  What did you do for KAM Towing?
 9    A.      Drive tow trucks, Triple A.
10    Q.      When you say Triple A, what do you mean?
11    A.      I worked for the company, KAM, and they had a
12    contract with Triple A.  It was the same process that
13    DJV had.
14    Q.      So all of the calls that you received while you
15    were on duty at DJV and KAM, were those Triple A calls?
16    A.      Correct.
17    Q.      You never got calls from the police department,
18    for example --
19    A.      No, sir.
20    Q.      -- to move a vehicle?
21    A.      No, sir.
22    Q.      You never got private individuals call you and
23    say, hey, I need a tow?
24    A.      If I did it was through the company.
25    Q.      So sometimes that would happen?
```

A.      Periodically.

Q.      And when you say through the company, you would do what?

A.      Whoever the individual was that needed the tow, would call -- contact the company and the company would contact a driver to go do it.

Q.      So you never saw somebody that needed a tow and agreed to tow their vehicle, for example?

A.      After I spoke with my company.

Q.      If somebody approached you while you were out on the road, you would contact the company first and say, hey, I got someone that needs a tow?

A.      Correct.

Q.      And then you would get approval for that?

A.      Right.

Q.      And then the other thing you described is that if there was an individual other than Triple A, they could call the tow company, and the tow company would call you and let you know the price?

A.      Right.

Q.      What were your hours at KAM Towing?

A.      Seven to seven.  7:00 a.m. to 7:00 p.m.

Q.      And did you clock in?

A.      No clock.

Q.      So how did they know that you were available for

towing?

A.    Log in.  It showed your time when you logged in there.

Q.    And where would you log in?

A.    On the DDS.

Q.    Just so the record is clear, this is the second time you have referred to or used the term DDS; what does that stand for, do you know?

A.    I'm not sure.

Q.    What is your understanding of this device?

A.    From my understanding it's just a little -- I wouldn't say tablet.  It's just a little screen, I guess, connected to some kind of way to the Internet for us to be available.  It's like a GPS tracker.  So where we are located for calls, that's how the calls get routed to the closest route.  That's all I can tell you about it.  As far as -- versus logging in and it's connected to the Internet?

Q.    Where is KAM Towing located?

A.    Snellville.

Q.    So how would you get to KAM Towing?

A.    My personal vehicle.

Q.    So you drove there, parked your vehicle, got in the truck, logged into the DDS?

A.    Yes.

```
1    Q.      And would you sit on the property at KAM Towing
2    and wait to get a call or would go out on the road?
3    A.      I would go to my designated area.
4    Q.      Where was that?
5    A.      Wherever.  We had a wide range area, anywhere
6    within that area.
7    Q.      What's wide range?  Is it in Snellville?  Is it
8    downtown Atlanta?
9    A.      Probably the Snellville area, Lilburn area.
10   Anywhere between the Perimeter of the zone.
11   Q.      So you would drive off the lot, the tow truck,
12   go to your designated area; would you park?  Would you
13   drive around?  Park the car, tow truck?
14   A.      Park.  I would park the truck.
15   Q.      And you would sit there and wait --
16   A.      Yes, I sit.
17   Q.      -- until you got a call?
18   A.      Correct.
19   Q.      And after you got a call, pretty much what you
20   described to me earlier, you told me you were working
21   for DJV, you'll be doing the same exact thing?
22   A.      Correct.
23   Q.      How did you get paid?
24   A.      Thirty percent of whatever I made for the week.
25   Q.      Now this 30 percent that you told me about, is
```

1    that something you negotiated or asked for?

2    A.    No.  That's nothing that I negotiated.  That's

3    what it was.

4    Q.    So the towing company would tell you that we're

5    going to give you 30 percent of all the work that you

6    do?

7    A.    Correct.

8    Q.    And the only way you would be able to monitor is

9    just miles?  You told me you didn't know what the rate

10   was per mile?

11   A.    I didn't know exactly.  No rate, what no rate

12   was.

13   Q.    Well how would you verify that you were getting

14   --

15   A.    Would go along --

16   Q.    Let me finish the question.

17   A.    Okay.  I'm sorry.

18   Q.    How would you verify whether or not you were

19   actually getting 30 percent?

20   A.    There was no way to verify it.

21   Q.    So you just was trusting the employer to pay you

22   30 percent of whatever work you did?

23   A.    Correct.  There was no proof.

24   Q.    And how many days a week did you work for KAM?

25   A.    Five.

```
 1   Q.      And how long did you work for KAM Towing?

 2   A.      I worked for KAM about three years.

 3   Q.      Why did you leave DJV?

 4   A.      I left DJV to go to KAM.

 5   Q.      Why did you go to KAM?

 6   A.      Because I left DJV.  It was better.  The pay was

 7   better.

 8   Q.      The pay was better at KAM?

 9   A.      Right.

10   Q.      What was different?

11   A.      The difference was the volume difference.

12   Q.      And what do you mean?

13   A.      The areas they were in weren't getting much

14   calls.

15   Q.      When you say they, you're talking about DJ --

16   A.      DJV.  The area -- the call volume was low.

17   Q.      So the more work you did, the more money you

18   made?

19   A.      Correct.

20   Q.      And that's why you went to KAM?

21   A.      Correct.

22   Q.      How did you know KAM's volume was more than DJV?

23   A.      It's a bigger area.

24   Q.      How did you know their area?

25   A.      I knew someone that worked there.
```

```
 1   Q.      So somebody at KAM told you they're very busy?

 2   A.      Right.

 3   Q.      They got a broader area?

 4   A.      Right.

 5   Q.      And you thought you could make more money based

 6   on the volume?

 7   A.      Right.

 8   Q.      And did you, in fact, make more money working at

 9   KAM?

10   A.      Yes, I did.

11   Q.      On an average day, how many tows would you be

12   able to do?

13           MR. BENJAMIN:  At KAM?

14   Q.      (By Mr. Burke)  At KAM?

15   A.      Between five to 10 a day.

16   Q.      And that's between 7:00 a.m. and 7:00 p.m.?

17   A.      Correct.

18   Q.      And why did you leave KAM?

19   A.      I was terminated from KAM.

20   Q.      Why were you terminated?

21   A.      He say insurance purposes.

22   Q.      He say, who is that?

23   A.      My supervisor.

24   Q.      Who is that?

25   A.      Mike, the person I was working for at the time.
```

```
 1    Q.      You don't know his last name?

 2    A.      I'm not sure at this time.  I'm not sure.

 3    Q.      Did he explain what he meant by insurance

 4    purposes?

 5    A.      No.  He never went into explanation.  He just

 6    said insurance purposes.  That was the reason I was

 7    given -- and I was given a two weeks notice.

 8    Q.      You didn't ask him what he meant by insurance

 9    purposes?

10    A.      I mean I really didn't understand.  No, I didn't

11    ask.  Insurance reasons, that's all that was told to me.

12    Q.      Did you have any kind of special license to be

13    able to drive tow trucks?

14    A.      No special license.

15    Q.      You just had a regular driver's license?

16    A.      Correct.

17    Q.      Had your license ever been suspend?

18    A.      Yes, my license been suspend.

19    Q.      When?

20    A.      I don't know the exact date.

21    Q.      How long ago?

22    A.      Ten -- in between, what, probably ten years.

23    Q.      Ten years ago?

24    A.      Probably ten years.

25    Q.      Is that yes, ten years ago?
```

```
 1   A.      Probably ten years ago, yes.

 2   Q.      How many times have your license been

 3   suspended?

 4   A.      Maybe once.

 5   Q.      And this is the one that was ten years ago?

 6   A.      Correct.

 7   Q.      All right.  Where did you go after you were

 8   terminated from KAM?

 9   A.      From KAM, I left KAM.  I'm not sure.

10   Q.      How long did you work with them?

11   A.      For who?

12   Q.      KAM?

13   A.      About three years.

14   Q.      When did you start working for Ideal Towing?

15   A.      Probably six years ago maybe.  Maybe six, seven

16   years ago.

17   Q.      And how did you learn of Ideal Towing?

18   A.      I learned about Ideal Towing through Mike from

19   KAM.

20   Q.      Mike, your supervisor?

21   A.      Correct.

22   Q.      Okay.  What did he tell you about Ideal Towing?

23   A.      I tried to get a job back with Mike and he

24   suggested Ideal Towing, gave him a call and that's how I

25   proceeded to Ideal.
```

Q.      So you actually -- after you were terminated you
went back to Mike and asked him to let you work for KAM
again?

A.      Correct.

Q.      And he said no, I presume?

A.      Well actually he made a suggestion because it
was closer to where I lived.

Q.      Made what suggestion?

A.      The suggestion that I go to Ideal so I won't
have to drive so far to Snellville.

Q.      Had --

A.      Ideal Towing was closer to my home.

Q.      Had --

A.      I guess he knew someone that worked there.  He
called them, made a phone call, and I then proceeded
there.  And that's how I got employed with Ideal.

Q.      Had you heard of Ideal Tow before you had a
conversation with Mike?

A.      No.

Q.      You never saw any of their trucks on the road?

A.      No.

Q.      So how did you make contact with Ideal Towing?

A.      Phone call.

Q.      And who did you talk to?

A.      Mike.

Q.      Mike Smith?

A.      No.  Michael James.

Q.      And tell me about the conversation you had with
Mr. James?

A.      Yes.  It was real simple.  I gave him a call.  I
guess Mike from Snellville had spoke with him.  He had
already -- he was expecting my call, and I continued on
and he told me to come see him.  I came to see him,
filled out an application and went from there.

Q.      Is Mike James the only person you talked to
related to employment at Ideal Towing?

        MR. BENJAMIN:  Before being hired?

        MR. BURKE:  Yes.

        THE WITNESS:  Before being hired, Mike James
was the only one I spoke with.

Q.      (By Mr. Burke)  How did you get Mike -- Mike
James's number -- name, I'm sorry?

A.      From Mike at Snellville.

Q.      So Mike at Snellville told you to call Mike at
Ideal Towing?

A.      Correct.

Q.      And you knew that he called Mr. James at Ideal
Towing and that he was the owner of Ideal Towing,
correct?

A.      I'm not sure who I was speaking to.  No, I don't

1    know.

2    Q.     He didn't tell you that he owned the company?

3    A.     No, he didn't.

4    Q.     Did you ever find out after you spoke to him

5    whether or not he owned the company?

6           MR. BENJAMIN:  At anytime?

7           THE WITNESS:  Later on down the line.

8    Q.     (By Mr. Burke)  You did?

9    A.     Yes, I did.

10   Q.     So you eventually found out that Mike James

11   owned Ideal Towing?

12   A.     Over the years.  Over me working for him.

13   Q.     And you found that out how?

14   A.     I'm not sure.

15   Q.     Did he ever tell you -- did Mike ever tell you

16   that he owns Ideal Towing?

17   A.     It has come out of his mouth.

18   Q.     And you didn't have any reason to doubt him, did

19   you?

20   A.     No, I didn't.

21          (Exhibit 1 marked for identification.)

22   Q.     I'm going to hand you what's been marked

23   Plaintiff's Exhibit 1.  Take a look at that and let me

24   know when you're done.

25   A.     (Witness complying.)

1      MR. BENJAMIN:  Did you say Plaintiff's Exhibit

2   1?

3      MR. BURKE:  I'm sorry, defendant.  I'm usually

4   the one on the other side.

5   Q.     (By Mr. Burke)  All right.  Let me hand you

6   again, what's this time correctly marked, Defendant's

7   Exhibit 1.

8   A.     (Witness examining document.)

9      MR. BENJAMIN:  Go off the record for a moment.

10          (Off the record.)

11  Q.     (By Mr. Burke)  Are you finish?

12  A.     Yes, I'm good.

13  Q.     Do you recognize this document?

14  A.     Yes, I recognize it.

15  Q.     And what is this?

16  A.     It's an application.

17  Q.     If you turn to the second page of this document,

18  is that your signature?

19  A.     Yes, it is.

20  Q.     And the date on here says June 29, 2012; is that

21  the date you signed this application?

22  A.     That's what it says.  Yes, it is.

23  Q.     All right.  Let's look at the previous

24  employment section?

25  A.     (Witness complying.)

```
 1    Q.      You didn't list DJV Towing on this application;
 2    why not?
 3    A.      DJV Towing no longer existed.
 4    Q.      Why didn't you list them on this application
 5    when you filled it out back in 2012?
 6    A.      I'm not sure.  They no longer existed.  That's
 7    why I didn't list them.  At the time I was leaving, they
 8    was closed.
 9    Q.      At the time you were leaving where?
10    A.      At the time DJV -- when I was leaving DJV, they
11    was in the process of closing, losing their contract
12    anyway.
13    Q.      So you --
14    A.      So I didn't list it.
15    Q.      You understood, though, that this was asking --
16    this application was asking for your previous
17    employment?
18    A.      I understand that.
19    Q.      I mean you understood that when you filled this
20    out, right?
21    A.      I understood that.
22    Q.      And did you read this application?
23    A.      Yes, I did.
24    Q.      And when it says down there, disclaimer
25    signature, I certify that all of the information
```

```
1    provided in this employment application is true and

2    complete to the best on my knowledge.  You read that,

3    correct?

4    A.      Correct.

5    Q.      And you understood what that meant, correct?

6    A.      Correct.

7    Q.      And it was -- the question was not whether or

8    not the company was in business, but whether or not you

9    worked for a company, you understood that, when it asked

10   for previous employment?

11   A.      Okay.

12   Q.      Is that a yes?

13   A.      I'm not understanding.

14   Q.      Okay.  When you filled this application out, you

15   understood that the application was asking you to list

16   your previous employers, correct?

17   A.      Correct.

18   Q.      And DJV was one of your previous employers,

19   wreck?

20   A.      DJV was one, correct.

21   Q.      And you didn't list them on here?

22   A.      I never gave you a time period on -- I didn't

23   give it to you in chronological order.  At the time I

24   filled this application out, this was my previous job.

25   Q.      So are you saying that you had not started
```

working for DJV at the time you filled this application

out?

A.      I mean what I'm saying is, at the time I was

with DJV, I didn't give you an exact date.  At the time

I filled this application out, what you see is what my

work history was before then.

Q.      And I'm not trying to trick you or confuse you,

and I'm a little confused, but when you filled this out

in June of -- June 29, 2012, it asked you to list your

previous employers.  You list KAM Towing, what you just

told me about?

A.      I listed --

Q.      But you also told me about DJV Towing, and DJV

Towing is not listed on this application.  Do you see

that?

A.      I understand what you're asking me.

Q.      Right?

A.      But what I'm telling you is as to my previous

history, past, right?

Q.      Right.

A.      That's what you see.  At the time I filled out

the application.

Q.      So you hadn't worked for DJV before you filled

this application out in 2012?

A.      I worked for DJV before I came to KAM, before I

1     came to Ideal Towing.

2     Q.      All right.

3     A.      The exact date, I don't know.

4     Q.      On here you list a Mike Demessa as your

5     supervisor; is that the person whose name you couldn't

6     remember earlier?

7     A.      For what job?

8     Q.      The KAM?

9     A.      Okay.

10    Q.      Is that the same --

11    A.      That's who I was working for.  No, that's not

12    the Mike.  That's a different Mike.  That's his father.

13    Q.      So Mike Demessa is the person father that you

14    were working for?

15    A.      Correct.

16    Q.      Why did you put Mike Demessa's name on here?

17    A.      Because that's whose truck I was driving.

18    Q.      So the father owned the company?

19    A.      No.  The father had a truck through his son's

20    company.  So that's who I got my check from, but I

21    didn't get hired through him.

22    Q.      So you got a check -- Mike Demessa wrote you a

23    check?

24    A.      Correct.  My check was getting from -- came from

25    Mike Demessa.

```
1   Q.      And not KAM Towing?

2   A.      Not KAM Towing.

3   Q.      But you listed KAM Towing as your employer?

4   A.      That's who hired me.

5   Q.      But you weren't actually working for them?

6   A.      It was KAM Towing.

7   Q.      Well you said you were --

8   A.      Once again, I worked for Mike, which was his

9   son.  His father had a truck through his company, which

10  the same name was on the truck.  I worked for KAM

11  Towing.  I was hired through Mike Demessa.

12  Q.      But you just told me that Mike Demessa paid you,

13  you would get paid by KAM Towing?

14  A.      Can I explain something?

15  Q.      Sure.

16  A.      Okay.  Once again this is Triple A.  The check

17  is cut through KAM Towing.  Whoever the check may be,

18  whoever the name may be, it goes through them.  Mike

19  Demessa, which is his father, has a truck through his

20  son.  So however the money went through and between them

21  -- whatever it went through before it got to me, I don't

22  know.

23  Q.      But your testimony is you got a check from Mike

24  Demessa?

25  A.      Yes.
```

```
 1    Q.      Not --

 2    A.      Yes, he gave me my check in an envelope.  He

 3    sure did.

 4    Q.      And on here, your job title, you list field

 5    tech?

 6    A.      Yes.

 7    Q.      What is that?

 8    A.      It's a driver, a road back driver.

 9    Q.      A what?

10    A.      A road back driver, a tow truck driver.

11    Q.      Is that what they call tow truck, a road back --

12    A.      They call them field techs, right.

13    Q.      And next to salary, it doesn't have any salary

14    there?

15    A.      Correct.

16    Q.      Is that because you were working on a commission

17    basis?

18    A.      That's because I didn't know.  I was told 30

19    percent, so I didn't know what to put down.  It wasn't

20    hourly pay.

21    Q.      And you understand the difference between hourly

22    pay and working on a commission, right?

23    A.      I understand.  I understand that 30 percent.  I

24    understand that.  I understand at the time, I didn't

25    know the rules.
```

```
1    Q.      And the reason for leaving you put LIC, what
2    does that stand for?
3    A.      License.
4    Q.      What happened to your license?
5    A.      Suspended.
6    Q.      Is that why they terminated you because your
7    license was suspended and you couldn't drive?
8    A.      No.  That's basically -- that's probably the
9    reason.  I'm not sure.
10   Q.      You understood that if you didn't have a valid
11   driver's license, you couldn't --
12   A.      I couldn't drive, right.
13   Q.      Did you tell them --
14   A.      It was my driver's license.  Yes, it was.
15   Q.      Did you tell them that your license --
16   A.      I told them my license was suspended and I had
17   to take -- I had to get off at the time.
18   Q.      So you told KAM Towing that your license was
19   suspended?
20   A.      Right.
21   Q.      You list Kroger on this job application and you
22   have a starting salary of $11.25, and then an ending
23   salary of $11.45; do you see?
24   A.      Yes, I do.
25   Q.      And a that's different from what you have down
```

1    on KAM Towing, right, which is nothing?

2    A.      Correct.

3    Q.      But you understood the difference between being

4    paid hourly and being paid on commission?

5    A.      No.

6    Q.      You did not?

7    A.      No.

8    Q.      Did you see a difference between the two?

9    A.      A difference between what, the two jobs?

10   Q.      Yes, in pay?

11   A.      Yes, I see a difference.

12   Q.      And was there a difference, in your mind, in

13   being paid hourly and being paid on commission?

14   A.      Yes, it was.

15   Q.      And you would agree with me that the Kroger job,

16   for example, you would be paid for a certain amount of

17   hours each week at a specific rate, you understood that?

18   A.      Correct.

19   Q.      And that the tow job that you had a DJV and at

20   KAM, you were going to be paid a percentage?

21   A.      Correct.

22   Q.      You told me earlier that's one of the reasons

23   you went to KAM is that you wanted to work for them

24   because you could make more money?

25   A.      Correct.

```
 1    Q.      How many years would you say you've been

 2    working as a tow truck driver?

 3            MR. BENJAMIN:  To date?

 4            MR. BURKE:  Yes.

 5            MR. BENJAMIN:  How many years have you been a

 6    tow truck driver ever in your life?

 7            THE WITNESS:  About -- I'll say about 12

 8    years.  Twelve, 13 years of my life.

 9    Q.      (By Mr. Burke)  Is it fair to say that's your

10    occupation?

11    A.      Yes.

12    Q.      That's the kind of business you are in?

13            MR. BENJAMIN:  Objection to form.

14    Q.      (By Mr. Burke)  Turn back to the first page of

15    this document for me.

16    A.      (Witness complying.)

17    Q.      What does that number mean there, do you know?

18    A.      Which number?

19    Q.      There is a number down at the bottom of the

20    page?

21    A.      Correct.

22    Q.      Do you know that number?

23    A.      I do.

24    Q.      Okay.  What is that?

25    A.      Cell phone number.
```

```
 1    Q.      Whose cell phone?

 2    A.      Mine.

 3    Q.      Under the education section it says that you did

 4    graduate; that's not true, is that?

 5    A.      No.

 6    Q.      So have you told me today all of the companies

 7    that you can recall that you worked for prior to

 8    becoming a tow truck driver for Ideal Towing?

 9    A.      Repeat that.

10    Q.      Have you told me about all of the companies that

11    you've worked for prior to becoming a tow truck driver

12    for Ideal Towing?

13    A.      Yes, I have.

14    Q.      So when you spoke to Mike Jones at Ideal Towing

15    over the phone, did he tell you that you needed to come

16    in and fill out an application and be interviewed?

17    A.      Yes, he did.

18    Q.      And do you recall when he -- you went in to meet

19    with him?

20    A.      I don't know.

21    Q.      Would it have been at the same time you filled

22    out this application?

23    A.      When I filled out -- that's when I spoke to him,

24    when I filled out the application.  It was 30 minutes

25    prior to the phone call.
```

```
1    Q.      What was 30 minutes prior to the phone call?

2    A.      Me filling the application out for Mike.

3    Q.      So you filled the application out first?

4    A.      I talked to Mike and he told me come in and fill

5    out an application.

6    Q.      Did Mike ask you about your prior employment?

7    A.      No.

8    Q.      He never asked you what you did before --

9    A.      He knew what I did.  He spoke with Mike at the

10   other tow truck company for me.

11   Q.      So you think Mike told him that you were a tow

12   truck driver?

13   A.      Yes.

14   Q.      And this was your occupation?  You were looking

15   for another tow truck driving job?

16   A.      I like what I do.

17   Q.      Is that a yes?

18   A.      I like what I do, yes.

19   Q.      Did you and Mike talk about compensation?

20   A.      As far as how I got paid for the job.

21   Q.      If you came and worked for Ideal Towing?

22   A.      Yes.  It was mentioned, 30 percent of my calls.

23   Q.      Same thing you were getting at KAM?

24   A.      Yes.

25   Q.      And the same thing you were negotiating at DJV?
```

```
 1   A.       Same thing.
 2            MR. BENJAMIN:  Objection to form.
 3   Q.       (By Mr. Burke)  Did you tell him Mike James that
 4   you had some experience towing for Triple A customers?
 5   A.       Correct.
 6   Q.       Okay.  You didn't put that on the application,
 7   though, but you just told him that?
 8   A.       Mike James?  Correct.  He -- he knew I had prior
 9   experience.
10   Q.       And how did he know that?
11   A.       Through the phone calls.
12   Q.       So you told him over the phone that you were --
13   A.       I didn't tell him anything.  I worked for KAM
14   Towing.  Once again, KAM Towing called him and told him
15   about me.
16   Q.       Were you present when KAM Towing was talking to
17   Mike about you?
18   A.       No, I wasn't.
19   Q.       You don't know what they were talking about?
20   A.       I don't know exact, but I was given the number
21   to call him for a job.  He knew my experience.  He know
22   I had prior experience.
23   Q.       Towing cars?
24   A.       Towing cars.
25   Q.       In terms of your schedule, did you set your
```

```
 1    schedule or did Mike set your schedule?

 2              MR. BENJAMIN:  Mike James?

 3    Q.      (By Mr. Burke)  Yes, we're talking about Ideal

 4    Towing now?

 5    A.      Mike -- the company set the schedule.

 6    Q.      The company?

 7    A.      Correct.

 8    Q.      When you say the company, who do you mean?

 9    A.      I'm not sure who in the office set the schedule.

10    Someone makes the schedule and it's on the wall.

11    Q.      So someone at Ideal Towing makes the schedule?

12    A.      Correct.

13    Q.      Do you have any input in terms of the schedule;

14    in other words, could you say I don't want to work, I'm

15    not available on this date?

16    A.      If I had days I needed to take off, it wouldn't

17    be a problem.

18    Q.      Were you required to go into the office at Ideal

19    Towing to clock in?

20    A.      No.

21    Q.      How do you start?

22    A.      Log in.

23    Q.      To?

24    A.      Okay.  At the time it wasn't DDS then.

25    Q.      You said it wasn't?
```

A.      No.  They changed to tablets.  We had toot

around tablets that we took to our house, when we got

off work.

Q.      So when you got to Ideal Towing, you would get a

tablet?

A.      Yes, a tablet.

Q.      And what would you do with the tablet?  Would

you punch in the time that you got there?

A.      I would punch in.  I'll log into the computer,

into the Triple A area.  I mean to whatever the log in

was for the truck.  I would log in and go to my

designated area and wait on calls.

Q.      Same thing you did with the previous toe

companies?

A.      Right.  Just a slight change.

Q.      What was different?

A.      The tablets.

Q.      So other than that, everything else was the

same?

A.      Everything else was the same.

Q.      And how many hours a week did you work for Ideal

Towing?  Let's start with 2012?

A.      2012, about 72.

Q.      I'm sorry?

A.      About 72.

```
 1    Q.      Seventy-two hours?

 2    A.      Yes.

 3    Q.      And how did you calculate that?

 4    A.      It was on the night shift.  It was from like

 5    seven to seven in the morning.

 6    Q.      From 7:00 p.m. to 7:00 a.m.?

 7    A.      Correct.

 8    Q.      And how many days a week?

 9    A.      Six.

10    Q.      What days was Ideal Tow open?

11    A.      Twenty-four hours.

12    Q.      And which days of the week did you work, you

13    said six days?

14    A.      Six days.  I'm not sure of the off days.

15    Q.      Did it fluctuate?

16    A.      I'm not sure of what the off days was.  It

17    didn't fluctuate.  I'm not sure of what my off days was.

18    Q.      Was it a weekend?

19    A.      I'm not sure what my off day was.

20    Q.      You told me once you got to Ideal Tow, you would

21    get the tablet, punch in your information and get in a

22    tow truck and drive to your designated area?

23    A.      Correct.

24    Q.      And where was your designated area?

25    A.      It was southeast Atlanta, north area, the north
```

1    Atlanta area.  That's a big area.

2    Q.      And how many tows would you say you would do on

3    average, a day, at Ideal Tow, back in 2012?

4    A.      In between the average of probably five to ten.

5    Q.      Five to ten tows?

6    A.      Five to ten tows daily.

7    Q.      Were all those tows Triple A-related?

8    A.      Correct.

9    Q.      And how would you get notification that you

10   needed to go somewhere to tow a vehicle?

11   A.      Tablet.

12   Q.      What would happen on the tablet?

13   A.      It would beep.

14   Q.      The tablet would beep?

15   A.      It would beep.  It would come through and then I

16   would have to accept my call.

17   Q.      So you click a button that says accept?

18   A.      Touch the screen and accept my calls.

19   Q.      What would the tablet show you then?

20   A.      It would show me the time the call drops, pick

21   up location, how many miles to the call, how many miles

22   it would take for me to take calls to the destination.

23   And it shows me the drop off location, the member and

24   the phone number.

25   Q.      When you say drop, the call drop, what do you

1    mean by that?

2    A.      Wherever the number is going.  When I pick it up

3    and load it up, wherever they decide to go to, that's my

4    drop location.  From the pick up point to the point

5    where I'm loading the vehicle.

6    Q.      And all that would be on the tablet?

7    A.      My miles.  The miles, it would indicate the

8    miles from my location.

9    Q.      But the tablet would also have on there where

10   you're taking the vehicle, correct?

11   A.      Correct.

12   Q.      And you told me the member's name and number --

13   A.      Correct.

14   Q.      -- would be on the tablet?

15   A.      Correct.

16   Q.      And how did you keep track of the number of tows

17   that you did, you said you did five to ten?

18   A.      We had log sheets.

19   Q.      What kind of log sheets?

20   A.      Sheets we had to turn in.

21   Q.      Did you have log sheets when you worked at the

22   other two companies towing?

23   A.      That's correct.

24   Q.      And you would actually fill out a log sheet, and

25   that log sheet would show the number of tows you did?

```
 1   A.      I would write down each call and individual and
 2   turn it in at the end of the week manually.
 3   Q.      You would manually --
 4   A.      (Nodding yes.)
 5   Q.      And while you were working for Ideal Tow back in
 6   2012, you had the truck, you would go to your designated
 7   area and you would sit there until you got a call?
 8   A.      Correct.
 9   Q.      Did you ever use the tow truck and drive to take
10   care of personal matters?
11   A.      Incorrect.  No, I didn't.
12   Q.      Never?
13   A.      No.
14   Q.      But you could, you understood that?
15   A.      No, I couldn't.
16   Q.      Why not?
17   A.      It wasn't my truck.
18   Q.      They told you that you couldn't take the truck
19   while you were on call?
20   A.      I didn't want to handle personal matters in the
21   tow truck.
22   Q.      Did they ever tell you that you couldn't --
23   A.      Yes.
24   Q.      They told you that?
25   A.      Yes.
```

```
 1   Q.      Who told you?

 2   A.      My supervisor at the time.

 3   Q.      Who is that?

 4   A.      I'm not sure.

 5   Q.      It wasn't Michael Smith -- I'm sorry, Michael

 6   James?

 7   A.      I'm not sure.

 8   Q.      And you understood that when you were getting

 9   paid by Ideal Towing, it would be 30 percent of jobs

10   that you did, correct?

11   A.      I understood, correct.

12   Q.      And it was not based on hours, but just based on

13   the number of jobs you actually did?

14   A.      Right.

15   Q.      So if you sat there for eight hours, for

16   example, and never got a call, you wouldn't get paid?

17   A.      Correct.

18   Q.      And your only responsibility, back in 2012, with

19   Ideal Towing was just towing cars, correct?

20   A.      Yes.

21   Q.      The same thing you did with the other two tow

22   companies?

23   A.      Correct.

24   Q.      When you started the tow truck or towed vehicles

25   for Ideal Towing, you were told that you had to have
```

1   your own equipment, correct?

2   A.      Incorrect.

3   Q.      You were never told that?

4   A.      No.

5   Q.      Were you provided with equipment?

6   A.      Most of the -- the equipment we used were

7   attached to the truck.

8   Q.      What about tools?

9   A.      Tools were never needed really.

10  Q.      Did you have to wear a uniform with Ideal Tow?

11  A.      Yes, I did.

12  Q.      And did Ideal Tow provide those uniforms for

13  you?

14  A.      Yes, they did.

15  Q.      They paid for those uniforms or did you have to

16  pay for them?

17  A.      They took them out of our checks.

18  Q.      So you had to pay for them?

19  A.      I had to pay for them.

20  Q.      According to your application you started -- or

21  you applied to work for Ideal Tow in June of 2012, did

22  you start that same day or did you start a few days or a

23  week later.

24  A.      Probably a couple days later.

25  Q.      So you would have started some time in July?

```
1   A.      Yes, I started in July.  Probably two, three
2   days later.
3   Q.      And you told me that you couldn't remember your
4   off day but you worked six days a week?
5   A.      Correct.
6   Q.      Is that every day -- I'm sorry, every week you
7   worked six days?
8   A.      Correct.
9   Q.      You never took any time off?
10  A.      No.  I did that for like a year-and-a-half, six
11  days a week.  No time, night shift.
12  Q.      Is that during the holidays as well you worked?
13  A.      Correct.
14  Q.      Do you know if there was a GPS on the tow truck
15  that you were using for Ideal?
16  A.      Actually the GPS was on the tablet that we had.
17  As long as we had them on hand, they would know where
18  our location was.
19  Q.      So you would keep the GP -- the tablet with you
20  anywhere you went?
21  A.      Had to.
22  Q.      And this tablet was not mounted to the vehicle?
23  A.      No, it wasn't mounted to the vehicle.  No, no.
24  Q.      Did you ever take the tow truck home?
25  A.      Maybe once or twice.
```

```
 1    Q.      Do you recall when that was?

 2    A.      No, I do not.

 3    Q.      Do you recall the circumstances that led you to

 4    take the truck home?

 5    A.      A long call.  I may had a call that went out of

 6    Georgia.

 7    Q.      So you had a call that required you to go out of

 8    Georgia?

 9    A.      Correct.

10    Q.      What would prevent you from taking the truck

11    back?  I thought they were open 24 hours a day?

12    A.      Closer to my home.

13    Q.      And the two times that you think you took the

14    truck home, was that in 2012?

15    A.      I'm not sure.

16    Q.      2013, did you work the same hours?

17    A.      2013?  Yes.

18    Q.      7:00 p.m. to 7:00 a.m.?

19    A.      Same hours, yes.

20    Q.      Same number of days?

21    A.      Same hours, same days, nothing changed.

22    Q.      And you were still getting paid 30 percent?

23    A.      Nothing changed.

24    Q.      You were only getting paid if you towed the

25    vehicles --
```

```
1    A.      Nothing change.

2    Q.      You --

3    A.      Same.

4    Q.      Let me finish.  You wouldn't get paid for

5    sitting, waiting for a call?

6    A.      I wouldn't get paid for sitting.  I wasn't

7    getting paid hourly.

8    Q.      I'm sorry?

9    A.      I wasn't getting paid hourly.

10   Q.      Did you take any time off in 2013 while you were

11   working for Ideal Towing?

12   A.      I'm not sure.

13   Q.      You could have?

14   A.      Possibly.  I'm not sure.

15   Q.      Did you ever get sick in 2013 while you were

16   working for Ideal Towing?

17   A.      I don't get sick often.  I don't recall.

18   Q.      You could have, but you don't recall?

19   A.      I'm not sure.

20   Q.      Would you agree with me that Ideal Tow would

21   have records of if you did take time off and you were on

22   call?

23           MR. BENJAMIN:  Objection to form.

24   Q.      (By Mr. Burke)  Do you understand my question?

25   A.      No.
```

1    Q.      Okay.  You just told me you're not sure whether

2    or not you took time off?

3    A.      (Nodding yes.)

4    Q.      And my question to you is would you agree that

5    Ideal Tow would have a record, if you don't recall, of

6    whether or not you took time off?

7                MR. BENJAMIN:  Objection to form.

8                THE WITNESS:  I can't recall.

9    Q.      (By Mr. Burke)  You can't recall?

10   A.      No.

11   Q.      Well tell me what you recall.  What time did you

12   take off in 2013?

13   A.      I don't know.

14   Q.      But you took time off?

15   A.      I don't know.  I can't recall.  I'm not sure.

16   Q.      Is it your testimony that you worked, except for

17   your one day off, the entire year, six hours -- I'm

18   sorry, six days a week from 7:00 p.m. to 7:00 a.m.?

19                MR. BENJAMIN:  Objection to form.

20   Q.      (By Mr. Burke)  Is that your testimony?

21   A.      Yes, sir.  I worked.

22   Q.      2014, did anything change, whether it be your

23   schedule, the hours you worked --

24   A.      Schedule.  The schedule changed.

25   Q.      Tell me what changed.

A.    I went to day shift, 7:00 a.m. to 7:00 p.m.  I
went to six hours a week, two days off.

Q.    Did your duties change, responsibilities?

A.    Responsibilities did not change.

Q.    Nobody at Ideal Tow taught you how to or showed
you how to tow vehicles, correct?

A.    Correct.

Q.    You brought that skill set to them when you
started working there?

A.    Correct.

Q.    They didn't train you or anything like that
on --

A.    I didn't hear you.

Q.    They didn't train you at Ideal Towing, no one
trained you?

A.    No.

Q.    And the tows that you were -- the calls that you
were responding to, were they all Triple A calls in
2013?

A.    Majority, correct.

Q.    What other kinds of calls were you --

A.    Like I said, we would periodically get calls
from privates, to people wanting calls.  They will call
the company, they might need a private tow.  Once again
they would call whichever driver is available to do it.

1    I mean that happened periodically, not often, but it

2    happens.

3    Q.      And how did you keep track of the hours that you

4    worked?

5    A.      From my time schedule from the week.  From the

6    time I logged in from the time I logged out.

7    Q.      And you said you went from evening shift to day

8    shift, was that something that you wanted to do?

9    A.      Yes.

10   Q.      So you asked them -- you told them that you'll

11   be available during the day?

12   A.      Yes.

13   Q.      What happened that prevented you from being

14   available in the evening?

15   A.      I didn't want to work at night anymore.

16   Q.      Were there basically two shifts at Ideal Towing?

17   A.      Two shifts.

18   Q.      So there was a day and a night shift?

19   A.      Correct.

20   Q.      Is that true for the other tow companies that

21   you worked for, they only had two shifts?

22   A.      Correct.

23   Q.      And as I understand your testimony, in 2014 you

24   worked 60 hours a week, and you had two days off, you

25   don't recall what days those were?

```
1    A.      If I can recall, it was Thursday and Sunday.

2    Q.      You said Thursday and Sunday?

3    A.      Correct.

4    Q.      And you selected these days that you were off?

5    A.      Correct.

6    Q.      2015, were you working for Ideal Towing?

7    A.      2000 when?

8    Q.      '15?

9    A.      Was I working for Ideal Towing?  Yes.

10   Q.      What was your schedule?

11   A.      Same schedule, 7:00 a.m. to 7:00 p.m.

12   Q.      As 2014?

13   A.      Correct.

14   Q.      Nothing changed?

15   A.      Nothing changed.

16   Q.      Two days off?

17   A.      Two days off.

18   Q.      You were still being compensated by percentage?

19   A.      Right.

20   Q.      And based on the jobs, tows?

21   A.      Right.

22   Q.      What about 2016, were you working for Ideal Tow

23   in 2016?

24   A.      Ideal Towing, the same.  '16, what changed?

25   Things started slowing down towards the end of '16.
```

```
1    Q.      When you say things started slowing down --
2    A.      Call volume.
3    Q.      What did it slow down to?
4    A.      For example, probably from 500 calls to 300
5    calls.
6    Q.      When you say -- I'm sorry?
7    A.      It was like from 500 calls to 200 calls.  I
8    mean, like the money got short.  The less calls we did,
9    the less money we made.  The call volume got smaller.
10   Q.      And when you say the call volume decreased, was
11   that your call volume or the company's call volume?
12   A.      The company's call volume.
13   Q.      How did you know that the call volumes --
14   A.      Because we lost an area.
15   Q.      What area?
16   A.      I'm not sure what area.
17   Q.      How do you know you lost an area?
18   A.      We no longer received calls in that area.
19   Q.      And that was an indication to you that Ideal Tow
20   had lost that area?
21   A.      That was the indication and it was told to us in
22   meetings that we would lose areas.
23   Q.      So other than the volume changing, call volumes
24   for the company, nothing else changed?
25   A.      Basically, no.  Nothing else changed.
```

1    Q.      You were still getting paid on a percentage

2    basis?

3    A.      The pay still the same, everything was still the

4    same.  Nothing changed.

5    Q.      Now you told me when you started working for

6    Ideal Towing, you were doing about five to ten tows a

7    day; is that the same in 2013?

8    A.      The same in '13, five or ten calls.  Yes,

9    correct.

10   Q.      And '14, the volume was still the same?

11   A.      Correct.

12   Q.      And what did it drop to in 2016?

13   A.      Probably in between three to eight.  Three to

14   eight calls a day.

15   Q.      When you say "calls" those are calls to you?

16   A.      Correct.

17   Q.      Now is that one of the reasons or the reason you

18   went to Mike James and ask asked him to be paid hourly?

19   A.      Well I mentioned it, because I thought that was

20   the correct form to get paid hourly.  I mean once we

21   work 72 hours a week and the call volume is dropping, I

22   mean we should be compensated.  I feel like it's -- I

23   mean, what's the purpose of being out there 12 hours a

24   day, if I don't get no calls, I don't get paid.

25   Q.      So you --

1    A.      So I made a suggestion.

2    Q.      It was affecting your bottom line, your

3    pocketbook?

4    A.      I made a suggestion to Mike about hourly pay.

5    Q.      That you wanted to get paid hourly?

6    A.      Correct.

7    Q.      And you understood the difference between being

8    paid hourly and being paid on a percentage?

9            MR. BENJAMIN:  Objection.  Asked and answered.

10   You can answer again.

11           THE WITNESS:  Once again, we should be

12   compensated for the hours a day were out there.  If I'm

13   out there 12 hours a day and don't receive a call, I

14   shouldn't have to spend 12 hours a day out in a truck.

15   And if I don't do a call, I don't get paid for my 12

16   hours.

17   Q.      But you were okay with that as long as the

18   volume was there, because you were getting paid?

19   A.      From my understanding, right.

20   Q.      And then once the volume decreased, you decided

21   that you wanted to be compensated a different way?

22   A.      I made a suggestion.

23   Q.      Is that a yes?

24   A.      I made a suggestion.

25   Q.      And Mike eventually agreed to pay you hourly?

```
1    A.      He didn't agree.

2    Q.      You never got paid hourly?

3    A.      No.

4    Q.      When did you stop working at Ideal Tow?

5    A.      I don't know the exact date.  I don't know.

6    Q.      But you didn't work an entire year with Ideal

7    Tow, though?

8    A.      The entire year of '16?

9    Q.      Correct.

10   A.      I don't think I worked the entire -- I think it

11   was towards the end of '16 that I started working for

12   Ideal Tow.

13   Q.      Why did you stop working for Ideal Towing?

14   A.      Well I stopped working for Ideal Towing because

15   I was taken out of a truck.  I was being bounced around.

16   Q.      What does that mean?

17   A.      I was put into someone else's truck to work for

18   someone else.  I mean, in so many words he was trying to

19   help somebody else get off their feet.  So I was the

20   chosen one, I don't know why, to go drive for somebody

21   else, and he didn't have no call volume period.

22           So I went to not making no money at all, so I

23   ended up finding me another job.  That's why I left

24   Ideal Towing.

25   Q.      All right.  So at some point in 2016, you
```

1  started working for another tow company?

2  A.      No -- yes, I -- first -- yes, I sure did.  In

3  2016 I started working for a company that he suggested

4  that I drive for.  It was somebody he was affiliated

5  with that he suggested I drive for them.  And I drove

6  for them for a while, and I wasn't making no money, so I

7  then proceeded on and found me another job.

8  Q.      Do you remember when this was?

9  A.      No, I don't remember what -- exact dates.  But I

10  was still reporting to Ideal Towing, getting in this

11  truck?

12  Q.      So you were driving Ideal Tow truck, but you

13  were making tows for somebody else?

14  A.      I wasn't driving Ideal tow truck at that time.

15  I was taken out of Ideal tow truck, put into someone

16  else's tow truck with another name on it.  I worked for

17  him for a couple weeks and decided I didn't want to do

18  that and found another job.

19  Q.      And you don't remember when that happened as you

20  sit here today?

21  A.      It was prior to me with Ideal Towing.  That's

22  why I left Ideal Towing, they was still affiliated.  I

23  still had to go to Ideal Towing and pick this truck up .

24  So I still didn't report to nobody else.  I was still

25  reporting to Ideal Towing.

```
1    Q.      But it wasn't an Ideal towing truck?

2    A.      No, it wasn't an Ideal towing truck.

3    Q.      Do you know if that person was getting Triple A

4    phone calls, the person you were towing for?

5    A.      I don't know.

6    Q.      And you understood you were free to do that kind

7    of thing, go work for another tow company, right?

8    A.      I'm not understanding your question.

9    Q.      It was nothing stopping you from going to move

10   over and work for this other tow company you said Mike

11   told you about?

12   A.      Well it was somebody he knew.  It was somebody

13   that was still affiliated with him.  I was still having

14   to answer to Mike.

15   Q.      When you say "affiliated," how do you know they

16   were affiliated, in what way?

17   A.      Someone he knew, someone reported to him.

18   Q.      Okay.  How do you know that?

19   A.      Because I've had meetings with him.

20   Q.      Who is this other person?

21   A.      I didn't work for him long.  I'm not even sure

22   what his name was, but I moved on.

23   Q.      Did this other person pay you?

24   A.      Once.  I got paid once.

25   Q.      And you don't remember the name of the person or
```

```
 1   the company?

 2   A.      Action Towing, if I can recall who it was.

 3   Q.      Where were they located?

 4   A.      At Ideal Towing.  I had to report to Ideal

 5   Towing to get in the truck.

 6   Q.      So you would report to Ideal truck location --

 7   A.      Yes.

 8   Q.      -- and pick --

 9   A.      Park my --

10   Q.      Let me finish.

11   A.      Okay.

12   Q.      And then pick up this truck that belonged to

13   another person?

14   A.      Right.

15   Q.      And go to a specific area?

16   A.      Right.

17   Q.      Was the area the same area that Ideal --

18   A.      No.

19   Q.      -- Towing was operating under?

20   A.      No.

21   Q.      It was a totally different area?

22   A.      Totally different.

23   Q.      And after you left this person, not towing for

24   them anymore and you stopped towing for Ideal Tow, where

25   did you go?
```

```
 1   A.      I left there and I went to South Dekalb.  I went
 2   to another company.
 3   Q.      What, a towing company?
 4   A.      Correct.
 5   Q.      What did you do for them?
 6   A.      I towed cars.  It was for the county, no longer
 7   Triple A.
 8   Q.      You towed cars for Dekalb County?
 9   A.      Right.
10   Q.      So you were responding to --
11   A.      Impounds and --
12   Q.      Police calls?
13   A.      And police calls.
14   Q.      And how were you getting paid?
15   A.      Minimum wage, plus our calls.
16   Q.      You said calls?
17   A.      Yes, the City calls.  There wasn't a lot of
18   county calls, so we got paid hourly, plus whatever we
19   called -- pulled in.
20   Q.      And how did you get paid based on what you
21   pulled in?
22   A.      Minimum wage and like a percentage, 10 percent
23   of what we made, what we brought in.
24              (Exhibit Number 2 marked for identification.)
25   Q.      (By Mr. Burke)  Can you take a look at
```

```
 1   Defendant's Exhibit Number 2, and tell me when you're

 2   finished?

 3   A.      (Witness complying.)

 4   Q.      Do you recognize that document?

 5   A.      Yes, I recognize it.

 6   Q.      What is that?

 7   A.      It's a document.

 8   Q.      Is that your signature on the last page of it?

 9   A.      Yes, it is.

10   Q.      Nobody forced you to sign this agreement,

11   correct?

12   A.      No, I wasn't forced.

13   Q.      Did you read it before you signed it?

14   A.      Correct.

15   Q.      It has a date of September 7, 2012?

16   A.      Yes.

17   Q.      Is that the date you started actually towing for

18   Ideal Towing?

19   A.      September 2012, it's probably around the date.

20   I wouldn't say it's the exact date.

21   Q.      But sometime in September?

22   A.      I didn't fill this document out upon hire,

23   though.

24   Q.      So when you met with Mike, when you filled out

25   the application, you didn't fill this particular --
```

1    A.    No, I didn't get this.

2    Q.    -- document out?

3    A.    I didn't get this document then.

4    Q.    But you would have got it sometime in September

5    2012?

6    A.    Yes, September.  That's when it was filled out.

7    That's when I dated it.  I was hired in June, July.

8    Q.    Were you working, doing tows, in July of 2012

9    for Ideal Towing?

10   A.    Yes.  I started probably a couple of days later.

11   I probably started at seven.  It was probably like a

12   couple of days after this date from me filling out my

13   application.

14        MR. BENJAMIN:  Just for the record, it's clear

15   he's pointing to his application and the date of

16   6/29/2012.

17   Q.    (By Mr. Burke)  Did you ever receive any checks

18   from Triple A for towing that you were doing?

19   A.    Directly from Triple A or from Ideal Towing?

20   Q.    Did you ever receive any checks from Triple A?

21   A.    No.

22        (Exhibit 3 marked for identification.)

23   Q.    (By Mr. Burke)  Take a look at Defendant's

24   Exhibit 3.

25   A.    (Witness complying.)

```
 1   Q.      Have you seen this document before today?

 2   A.      Yes, I have.

 3   Q.      And what is this document?

 4   A.      It's a 1099.

 5   Q.      And you received this from Ideal Towing?

 6   A.      Correct.

 7   Q.      It says compensation was $9,971.18; do you see

 8   that?

 9   A.      Yes.

10   Q.      You don't have any reason to dispute that that's

11   what you were paid?

12   A.      No.  It was a lot more than that.

13   Q.      You received more than this?

14   A.      Yes.

15   Q.      How much more did you receive?

16   A.      I'm not sure to be exact, but it's a lot more.

17   I made a lot more money than that in probably seven

18   months, I was there.  I know I did.

19   Q.      As you sit here --

20   A.      I average probably $2,500 a week, $2,000 a week.

21   Q.      And how do you know that's what you averaged?

22   A.      Because I calculated.

23   Q.      How do you calculate?

24   A.      Off of what I was told, percentage per mile and

25   my 30 percent for the week.  Once I add it up and get
```

1    what I made a week, that's how I calculate it.

2    Q.      All right.  So you actually would calculate the

3    miles for each job that you did, correct?

4    A.      Correct.

5    Q.      And multiply that by what, dollar amount?

6    A.      Multiply it by my dollar amount versus my tow

7    miles, my en route miles and my hook-up fee.  I did that

8    daily, on all of my calls.  And at the end of the week,

9    I would add all my calls up I did daily, plus my 30

10   percent, and that's what was the bottom line to me.

11   Q.      Well let's go back to how you calculated things.

12   Tell me everything you were expected to be paid for when

13   you were with Ideal Towing?

14   A.      I was expected to be paid for my miles, to going

15   to pick it up, my hook-up fee, and my tow miles from

16   where I'm dropping it off.

17   Q.      What were you getting for each mile?

18   A.      I probably got like $2.15 a mile.

19          MR. BENJAMIN:  I'm going to object to form

20   that the two of you are not speaking about the same

21   thing.  You said what you're getting.

22          MR. BURKE:  Okay.

23   Q.      (By Mr. Burke)  Do you understand my question,

24   first of all?

25   A.      Repeat it.

Q.     Well --

A.     I understand it but just repeat it for me.

Q.     Okay.  Well what I'm trying to find out is, you told me that you were getting paid for pick up miles, hook-up miles and tow fee?

A.     Right.

       MR. BENJAMIN:  You're -- who is your -- him or Ideal?

Q.     (By Mr. Burke)  Okay.  You?  I asked you how you were getting compensated, how did you calculate your compensation?  And you're telling me that you calculated your compensation --

A.     I calculated what I did.

Q.     Let me finish.  Based on the pick up miles, did I understand that correctly?

A.     Right.

Q.     Based on the hook-up miles?

A.     Right.

Q.     And based on the tow miles?

A.     Right.

Q.     And then I asked you, how much were you supposed to get per mile; you, not the company?  How much did they tell you you were going to get for each of these miles?

A.     Okay.  I should have been getting like -- in the

tow miles, I should have been getting like 15 cents a
mile.

Q.      For tow miles?

A.      Right.  I should have been getting like $11 a
hook-up, and something like a dollar -- $1.50 tow miles
-- I mean en route miles?

Q.      Now you say "you should have been getting,"
where did you come up with these numbers?

A.      That's what was told to us.

Q.      So someone told you that this is the amount that
you will be compensated?

A.      Correct.

Q.      For --

A.      Yes.

Q.      And in addition to this you were supposed to get
the 30 percent of each tow as well?

A.      Whatever it added up to.

Q.      I'm sorry?

A.      Whatever the call added up to.

Q.      What do you mean "whatever the call added up
to"?

A.      Whatever -- how many miles or however many tow
miles that I did, whatever that call added up to, it was
30 percent, 30 percent of what I did.  So whatever that
added up to, that's what I got paid, 30 percent of.

```
 1    Q.      So these figures that you gave me, these were

 2   figures that, numbers that Ideal Tow was charging or

 3   getting paid per mile?

 4   A.      Correct.

 5    Q.      And that you would add up the total miles, based

 6   on these figure that Ideal Toe was getting paid, and

 7   multiply it by 30 percent?

 8   A.      Correct.

 9    Q.      And your testimony is that this 1099 from 2012

10   is not accurate, it doesn't show what you actually

11   received from Ideal Towing?

12   A.      No, it doesn't.

13    Q.      Did you ever get paid cash with Ideal Towing?

14   A.      No cash.

15    Q.      You always got a check?

16   A.      Correct.

17    Q.      And how much do you believe this amount should

18   have been for 2012?

19           MR. BENJAMIN:  That you actually received?

20           THE WITNESS:  Probably about 15 probably,

21   maybe, 15 probably.

22    Q.      And as you sit here today, you don't know the

23   exact amount?

24   A.      I don't know the exact amount.

25    Q.      You think you should have been paid 15,000 for
```

```
1    2012?

2    A.      Correct.

3    Q.      And that's based on the calculations you just

4    gave me?

5    A.      Correct.  But each call is different.

6            MR. BENJAMIN:  Whenever is a good time for a

7    break, we've been going two hours.

8                    (Off the record.)

9            MR. BURKE:  All right.  We're back on the

10   record.

11   Q.      (By Mr. Burke)  All right, Mr. Smith, we took a

12   short little break.  Is there anything that you've

13   testified so far in your deposition that you need to

14   change or correct?

15   A.      No, there isn't.

16   Q.      Okay.  And you've understood my questions,

17   correct?

18   A.      So far, yes.

19   Q.      All right.  Let's take a look at Defendant's

20   Exhibit Number 3.  And this $9,971 you said that you

21   believe you should have received more than that,

22   correct?

23   A.      That's -- I'm not sure.

24   Q.      Okay.  Now I understood your testimony that you

25   were going to get compensated by a percentage of the
```

1    totals that you did, did I understand that correctly?

2    A.      Right.

3    Q.      And that was based on the monies that Ideal Tow

4    received for tows that you performed, correct?

5    A.      Correct.

6    Q.      All right.  So if, for example, Ideal Tow got

7    paid $30,000, you would expect that you would get 30

8    percent of that as far as your compensation?  And this

9    is attributable to tows that you did?  Do you follow me?

10   A.      Correct.

11   Q.      You would expect that you would get 30 percent

12   of that $30,000?

13   A.      Correct.  Now let me ask you this:  The $30,000

14   you're referring, is that just a ballpark figure you're

15   throwing out?

16   Q.      That's just an example.

17   A.      That's just an example?

18   Q.      Correct.  So we're both on the same page in

19   terms of doing the math?

20   A.      Okay.

21           (Exhibit Number 4 marked for identification.)

22   Q.      (By Mr. Burke)  Take a look at Defendant's

23   Exhibit 4.  And this is a 1099 from Ideal Tow.  And it

24   says you receive $24,180.54 of compensation; do you see

25   that?

A.      Yes, I see it.

Q.      Does this accurately reflect the compensation
that you were supposed to received based on your --

        MR. BENJAMIN:  Did he receive or supposed to?

        MR. BURKE:  Okay.  I'll rephrase it.

Q.      (By Mr. Burke)  You don't have any dispute that
you were paid $24,180.54, do you, by Ideal -- from Ideal
Towing?

A.      Do I have any dispute?

Q.      Yes, that you received this compensation?

        MR. BENJAMIN:  That this is what you were
actually paid?

        THE WITNESS:  I'm not sure.

Q.      (By Mr. Burke)  Do you think you were entitled
to more or less?

A.      I'm not sure.  I think I was entitled to more.

Q.      But based on the agreement that you had with
Ideal Tow that you would be paid a percentage -- excuse
me -- do you have any reason to dispute that this does
not represent 30 percent of the tows that were
attributed to you, by you with Ideal Tow?

A.      My 30 percent was done biweekly.  It was done
weekly of my tows.

Q.      I understand that, but this is a -- you
understand that this amount is for the entire year?

```
 1   A.      Okay.  So I'm not sure what -- if the 30 percent

 2   would still be the 30 percent of this entire year cost.

 3   I did my 30 percent based off of what I did weekly.

 4   Q.      And does your numbers, when you did your 30

 5   percent, was it different than the $24,184.54 that's on

 6   this document?

 7   A.      I'm not sure.

 8           (Exhibit 5 marked for identification.)

 9   Q.      (By Mr. Burke)  Take a look at Defendant's

10   Exhibit 5.

11   A.      (Witness complying.)

12   Q.      Do you recognize this document?

13           MR. BENJAMIN:  He's asked you whether you

14   recognize that document?

15           THE WITNESS:  Oh, yes.  I recognize it.

16   Q.      (By Mr. Burke)  What is this document?

17   A.      A 1099.  It's a 2014 1099.

18   Q.      That you received from Ideal Tow?

19   A.      Correct.

20   Q.      And it says compensation was $23,559.53; do you

21   see that?

22   A.      I see that.

23   Q.      As you sit here today do you know if this

24   represents 30 percent of the tows that you did for Ideal

25   Tow that you should have been compensated for?
```

```
1    A.      I'm not sure.

2    Q.      Could it be more or less?

3    A.      It could be more.

4    Q.      But not less?

5    A.      I doubt if it was less.  It could be more.

6    Q.      And what is that made on -- based on, when you

7    say it could have been more?

8    A.      What is it based on?

9    Q.      Yes.

10   A.      What I've done, the work.

11   Q.      So you think you're entitled to more money, to

12   be compensated more?

13   A.      Correct.

14   Q.      And how do you calculate that?

15   A.      Based on what I calculate a week.

16   Q.      Based on what you told me?

17   A.      Correct.  Based on what I calculate a week.  My

18   30 percent a week of what I do weekly.

19   Q.      And you kept your own records of what you did

20   and how much you were supposed to be paid?

21   A.      At that time, I did.

22   Q.      When you say "at that time," what year?

23   A.      The week I was working.

24   Q.      So every week you would keep your own records

25   and you would compare it to the records or the amount
```

1  that you received from Ideal Tow?

2  A.      I would do my numbers, add it up, and at the end

3  of the week, my pay, to see what I get paid, my 30

4  percent.  That's how I did my 30 percent.

5  Q.      Was there ever a time that your calculation was

6  more than Ideal Tow's calculation?

7  A.      No.

8  Q.      So you got paid --

9  A.      I mean well, yes.  It was plenty of times that

10  my time was more, right.

11  Q.      Okay.  Tell me about that.  What did you do?

12  A.      What was done, I'm not sure.

13  Q.      Did you tell anybody that they calculated

14  incorrectly?

15  A.      We've had conversations about pay, yes.

16  Q.      All right.  Tell me what you told anybody at

17  Ideal Tow about miscalculation.

18  A.      I just bring up calls that I wasn't paid for.

19  Specific calls that they would have that Triple A didn't

20  pay for.

21  Q.      All right.  When you say "Triple A didn't pay

22  for," was it your expectation to get paid if a Triple A

23  call was not paid for?

24  A.      I feel if I did the call, I should have been

25  paid any way, if I ran the call.  It shouldn't have been

1  a call I did and I didn't get compensated for it.  There
2  were several calls like that.
3  Q.      How do you know that Triple A didn't pay?
4  A.      Because it was documented.  It was showed by the
5  office.  They would have a list, a printout of files
6  that weren't paid.
7  Q.      And you expected to be paid on those because you
8  did them?
9  A.      Correct.
10  Q.      Now earlier I asked you about being paid by
11  cash, and you said, no, you never received any cash from
12  Ideal Tow, correct?
13  A.      Correct.
14  Q.      Were there times that you would have received
15  cash from a Triple A customer?
16  A.      We received cash from Triple A customers, over
17  mileage.
18  Q.      In other words, you took their vehicle beyond
19  the coverage miles that Triple A would pay?
20  A.      Correct.
21  Q.      And that person would be responsible for paying
22  for that overage?
23  A.      Correct.
24  Q.      And at that time they would give you cash?
25  A.      Correct.

```
 1   Q.      What were you supposed to do with the cash?

 2   A.      Document it and turn it in.

 3   Q.      To?

 4   A.      Whatever was the head supervisor at the time in

 5   the office.

 6   Q.      So you would turn the cash in to Ideal Tow?

 7   A.      Correct.

 8   Q.      You were never allowed to take that cash and put

 9   it in your pocket?

10   A.      It didn't belong to me.

11   Q.      And is it fair to say that when you were in your

12   area, waiting for a call, that you would also be

13   required to go outside of the area to drop the vehicle

14   off?

15   A.      Yes.  We was allowed to go wherever the member

16   wanted their vehicle to go.  We only picked up in the

17   coverage area.

18   Q.      So you couldn't pick up a vehicle on your way

19   back to your coverage area in another area?

20   A.      I could if Triple A called and asked our shop if

21   it was okay.  That was once upon a time, but they

22   stopped that.

23   Q.      Now you told me earlier that Ideal Tow was

24   located close to where you live, your particular area

25   was close to where you live; is that right?
```

```
 1    A.      I told you I wasn't living in the area.  I told

 2    you I went home.  It was closer to home, yes, but it's

 3    not in the area.

 4    Q.      So Ideal Tow was closer to --

 5    A.      It was closer to my home, but it wasn't in my

 6    area.

 7    Q.      So the area that you were required to go and

 8    patrol was different from where Ideal Tow was located?

 9    A.      Correct.

10    Q.      And Ideal Tow was close to where you lived?

11    A.      It was close, correct.

12    Q.      Were there occasions that you would go home, and

13    once you got to Ideal Tow you would just go back home?

14    A.      No.

15    Q.      You never went home?

16    A.      No.

17    Q.      Before your shift was over?

18    A.      No.

19            (Exhibit 6 marked for identification.)

20    Q.      (By Mr. Burke)  Now take a look at Defendant's

21    Exhibit 6.  Tell me if you recognize this document.

22    A.      (Witness examining document.)

23            Yes, it's my 1099.

24    Q.      You received from Ideal Tow?

25    A.      Correct.
```

```
 1   Q.      And this says you received $22,536.81; do you
 2   see that?
 3   A.      Yes, I see that.
 4   Q.      Is it your contention that you should have
 5   received more compensation from Ideal Tow from this time
 6   period?
 7   A.      I think it should have been more.
 8   Q.      How much?
 9   A.      I'm not sure.
10   Q.      You don't know how you calculated that amount in
11   your --
12   A.      I'm not sure.  I think it should have been more.
13               (Exhibit 7 marked for identification.)
14   Q.      (By Mr. Burke)  Take a look at Defendant's
15   Exhibit 7.
16   A.      (Witness examining document.)
17   Q.      Is that your signature down there?
18   A.      Yes, it is.
19   Q.      And you don't have any reason to dispute the
20   dates on this?
21   A.      No, I have no reason.
22   Q.      And just below your signature I see the word
23   "I'll purchase"; do you see that?
24   A.      Correct.
25   Q.      Is that your handwriting?
```

```
 1   A.      Yes, that's mine.

 2   Q.      What are you saying you'll purchase?

 3   A.      I'm saying I'll purchase my own tools.

 4   Q.      What about safety vest?

 5   A.      Cooler bag.  A lot of these are personal items I

 6   already had; a jack, a cooler.

 7   Q.      So you had your own --

 8   A.      A jump box.  I mean this is stuff I have around

 9   the house.  This has nothing to do with the job.  It

10   didn't make no sense for me to purchase it and I've

11   already had it on my hand.

12   Q.      So you had a lot of these things on here?

13   A.      Correct.

14   Q.      Battery jump box, what is that?

15   A.      A battery jump box, just what it says.

16   Q.      I don't know what it is.

17   A.      Jump the battery or a jump box for a vehicle.

18   Q.      So it's like a charger to help charge the

19   battery?

20   A.      Right.  It helps jump your car off when it won't

21   start.

22   Q.      And that was something you were required to

23   have?

24   A.      I wouldn't say I was -- yes, we were required to

25   have all of this.  Yes.
```

```
 1    Q.      Okay.

 2    A.      But we didn't use it much.

 3              (Exhibit Number 8 marked for identification.)

 4    Q.      (By Mr. Burke)  Take a look at Defendant's

 5    Exhibit 8.

 6    A.      (Witness examining document.)

 7    Q.      Is that your signature down at the bottom?

 8    A.      Yes, it is.

 9    Q.      Okay.  And what is this document?

10    A.      A contract to mandatory tools list.

11    Q.      What is your understanding of this document?

12    A.      What's required.  What's required on the truck.

13    Q.      On the truck or contractor?

14    A.      What the contractors were required to have on

15    the company's truck.

16    Q.      And that was you?

17    A.      I'm the contractor.  I'm the employee.

18    Q.      Did you purchase these items?

19    A.      Did I purchase a cell phone, a flash light, and

20    a jack?

21    Q.      Yes, sir?

22    A.      Yes, sir, I purchased them.  I couldn't work

23    without a cell phone.  I worked at night, so I needed a

24    flashlight.  If I had to tow a car that didn't have a

25    tire on it, I would have to use a jack.  If I had got to
```

a vehicle and it wouldn't start, that's where a jump box

would come in.  If I came to a vehicle and it was

locked, I needed my lock out key.  And, of course, I

needed the four-way to put the tire back on.

Q.      And you needed these tools and equipment when

you worked for the other tow companies, correct?

A.      I needed to have them on hand, if I needed them.

Q.      But you needed them in order to be able to

operate the tow truck?

A.      No, I didn't.

Q.      You did not?

A.      No.

Q.      So how would you get into a vehicle if the owner

was locked out?

A.      With the lockout kit.

Q.      So you would need a lockout kit?

A.      You asked me how would I get into it.

Q.      Right.  So --

A.      And I answered you with a lockout kit.

Q.      So you would need that?

A.      Right.  But let me stop you right there.  We had

two departments.  Triple A had a light service

department and a tow truck department.  The light

service department carried all of the tire changes and

lockout duties, so we didn't often get those calls.

```
1    Q.       But if you did get one of those calls you would
2    be required to help the customer get inside their
3    vehicle, correct?
4    A.       If I did.  I didn't get them often, so I didn't
5    really have to use them.
6             (Exhibit Number 9 marked for identification.)
7    Q.       (By Mr. Burke)  Take a look at Defendant's
8    Exhibit 9.
9    A.       (Witness examining document.)
10   Q.       Did you fill this form out?
11   A.       Did I fill it out?
12   Q.       Yes, sir.
13   A.       No.
14   Q.       That's not your handwriting on there?
15   A.       No, it isn't.
16   Q.       If you look on the second line, it says driver's
17   license and expiration date.  It says September 25, 2015
18   it expires.  Is that when your driver's license expired?
19   A.       I didn't fill this out.
20   Q.       But do you know if that's when your driver's
21   license expired?
22   A.       No.
23   Q.       Did it expire then?
24   A.       I'm not sure.
25   Q.       And you were required to have a valid driver's
```

1   license, right, to operate a tow truck?

2   A.      To operate a tow truck, correct.

3   Q.      And if your license had expired in 2015 of

4   September, you would have been required to get the

5   license renewed, in order to operate the tow truck,

6   correct?

7   A.      Correct.

8   Q.      Do you know what a tax identification number is?

9   A.      No.  Explain it to me.

10  Q.      Tax ID numbers are numbers you get from the IRS

11  when you have a company.

12  A.      Okay.

13  Q.      Did you ever apply to the IRS for a tax ID

14  number?

15  A.      Have I applied?  No, I haven't applied with the

16  IRS for a tax ID.

17  Q.      Have you ever operated a business using your

18  name or any other name?

19  A.      No, I haven't.

20  Q.      Michael Smith --

21  A.      Who is that?

22  Q.      I'm sorry, James -- ran the day-to-day

23  operations of Ideal Tow, correct?

24  A.      Repeat that.

25  Q.      Michael James ran the day-to-day operations of

```
1    Ideal Tow, correct?

2    A.      Correct.

3    Q.      You never worked for I-Tow, a company called

4    I-Tow, did you?

5    A.      No, I never worked for I-Tow.

6    Q.      Have you heard of I-Tow when you were working

7    for Ideal?

8    A.      Yes, I heard of it.  It was mentioned to me.

9    Q.      Okay.  When?

10   A.      I don't know the exact day.

11   Q.      You filed tax returns for the last four years?

12   A.      You say what now?

13   Q.      Have you filed tax returns for the last four

14   years?

15   A.      No, I haven't.

16   Q.      Why not?

17   A.      From my understanding I should have had W-2s and

18   not 1099s, so right now I'm paying a penalty.

19   Q.      So you did not file tax returns because you

20   understood that you were supposed to have W2s?

21   A.      Right.  Right.

22   Q.      Did you ever receive a W-2?

23   A.      I received --

24           MR. BENJAMIN:  From anywhere?

25   Q.      (By Mr. Burke)  Have you ever received a W-2?
```

1    A.      Have I ever received from where?

2    Q.      Have you ever received -- do you understand my

3    question?

4    A.      I understand what you're saying.  Have I ever

5    received a W-2?  From what company?  From Ideal Towing?

6    From where?

7    Q.      Have you ever received a W-2, sir?

8    A.      I received --

9            MR. BENJAMIN:  I'm going to object to the form

10   of the question.  You can answer.

11           THE WITNESS:  I received a W-2.

12   Q.      (By Mr. Burke)  In fact, you received a W-2 when

13   you worked for Kroger, for example?

14   A.      Correct.

15   Q.      Did you file taxes then?

16   A.      I filed taxes.  I filed taxes.

17   Q.      But you didn't file taxes when you received a

18   1099?

19   A.      Right.  I was told otherwise.  I didn't know the

20   rules of a 1099 when I got it at the time.

21   Q.      You were told otherwise?  You were told --

22   A.      I was told that wasn't correct.  I shouldn't

23   have been on 1099.

24   Q.      I understand that.  I understand that's why

25   you're suing.  But nobody at Ideal Tow ever told you

1    that you didn't have to file tax returns?

2    A.       Nobody at Ideal Towing ever told me anything.

3    Q.       They never told you that you didn't have to file

4    tax returns?

5    A.       Uh-huh.

6    Q.       Is that a yes?

7    A.       No.

8    Q.       Ideal Tow doesn't manufacture anything, do they?

9    A.       Excuse me?

10   Q.       Do they make anything at Ideal Tow?

11   A.       The receipt books.

12   Q.       They make their own receipt books?

13   A.       The receipt books are printed through Ideal

14   Towing.

15   Q.       Okay.  Do they sell them?

16   A.       No, they don't sell them.

17   Q.       That's just for use --

18   A.       For the company.

19   Q.       Would you agree with me that Ideal Tow is a

20   service provider that provide a service?

21   A.       From my understanding, yes.

22   Q.       In 2012 when you started working for Ideal Tow,

23   do you recall the name of the other employees that were

24   there?

25   A.       Yes, I can recall a few employees.

```
 1   Q.      Did any of the individuals that are in this
 2   lawsuit with you work for Ideal Tow in 2012?
 3   A.      In 2012, no.  Not in '12, maybe the following
 4   year.  I'm not sure.
 5   Q.      2013?
 6   A.      Maybe towards the end.
 7   Q.      Who was that?
 8   A.      Probably Stanley Hill.
 9   Q.      Anybody else?
10   A.      Maybe Carlo Burney.
11   Q.      When you say "maybe," you're not sure?
12   A.      Carlos Burney, I'm sure.  These individuals I'm
13   sure.
14   Q.      Started in 2013?
15   A.      Started by -- between the end of '12, the
16   beginning of '13.  Between the two time periods.  I'm
17   not sure what their exact dates were.
18   Q.      What about Carlon Lewis?
19   A.      Maybe the following year.
20   Q.      '14?
21   A.      '13.  Probably towards '13, '14.  I'm not sure.
22           MR. BENJAMIN:  Just to correct the record, I
23   think we do have a typo.  It's Carlon Lewis, and not
24   Carlton.
25           MR. BURKE:  Carlon?
```

```
 1              MR. BENJAMIN:  Yes.

 2              MR. BURKE:  How do you spell that;

 3    C-A-R-L-O-N?

 4              MR. BENJAMIN:  Yes.

 5              MR. BURKE:  Okay.

 6    Q.      (By Mr. Burke)  What about Carlon Lewis, when

 7    did he start working with Ideal Towing?

 8    A.      In between the years, probably '13, '14.  Not

 9    too long after that.  I don't have the exact dates.

10    Q.      You understood that Tishja James's

11    responsibility was clerical in the office?

12    A.      I understand.

13    Q.      And she was doing the clerical work?

14    A.      I understand that.

15    Q.      How did you keep track of your time, the time

16    that you were working?

17    A.      Log in.

18    Q.      Just based on the log in?

19    A.      Yes.  It shows what time you log in until the

20    time you log out.

21    Q.      And that's what you told me about the tablet,

22    that's what the tablet was for?

23    A.      Correct.

24    Q.      How far was the drive from Ideal Tow's office to

25    the territory of the area that you were responsible for?
```

A.      Just to get within the zone maybe probably five miles.

Q.      Were there times that you would go back to the office of Ideal Tow once you were in the zone?

A.      That's if I had a problem on my truck, I would return back to base.

Q.      And how often did that happen that you would have a problem?

A.      Not often.

Q.      So once you picked up the truck and went to the zone, as you described it, you were there for the time period that --

A.      Right.

Q.      -- you told me about?

A.      Correct.

Q.      And the time that you would clock out on the tablet, would that be when you got back to Ideal Tow's office or at a certain time of the day?

A.      It would be if I'm out, away from the shop, at the time I get off I log off while I'm out.  If I return back at the time I get off, I log out at the time I get back.

        Whenever seven o'clock come or whenever I'm completed with that last call.  So if I pick up a call at 6:30, and it take me to 7:30, that's when I log out.

1    Q.      And when you say --

2    A.      No matter where I'm at.

3    Q.      I understand.  When you say "shop" you're

4    talking about Ideal Tow's place.

5    A.      Correct.

6    Q.      According to your complaint that you filed in

7    this lawsuit, you claim that you were paid $400 a week,

8    a flat fee; is that correct?

9    A.      On night shift.  That was just night -- that was

10   just for working the night shift.

11   Q.      Did you ask to be paid $400?

12   A.      It was a suggestion made.

13   Q.      By you?

14   A.      Correct.  Me and the other drivers, right.  It

15   was a suggestion made to be compensated because the call

16   volumes at night, it wasn't really no Triple A members

17   that were needed at night.

18          So, yes, we brought up that, to be compensated

19   for us being out at night.  Yes.

20   Q.      And that wasn't based on the calls that you

21   responded to?

22   A.      No.

23          MR. BENJAMIN:  Object to the form.  You can

24   answer.

25   Q.      (By Mr. Burke)  What was the $400 for, do you

know?

A.      Work, just for the week.  Just working at night.

Q.      Do you know if the day crew got $400 as well?

A.      I don't know what the day crew got.

Q.      And you worked on the day shift at some point?

A.      That was later on down the line.

Q.      And you never got the $400 --

A.      I didn't receive that when I was working day
shift.

Q.      And you're not claiming that you weren't paid or
classified correctly in 2016, were you?

A.      I don't understand the question.

Q.      Okay.  Well you brought a lawsuit saying -- and
I've heard you say during the deposition testimony that
you shouldn't have been an independent contractor.

         My question to you is, are you claiming that
you were improperly classified and paid in 2016?

A.      In all the years I was there, not just '16.

Q.      I understand, but I'm just asking about '16?

A.      Correct.

Q.      So in 2016 you believe you were not compensated
correctly?

A.      Correct.

Q.      Tell me why you think you weren't compensated
correctly in 2016.

```
1   A.      Why I wasn't compensated correctly?

2   Q.      Compensated, yes?

3   A.      As far as my pay the difference, the prior

4   years.  The same '15, '14, '13.

5   Q.      All right.  I'm not asking you about '15, '14.

6   I'm asking you about 2016?

7   A.      Okay.  I'm not understanding what you're saying.

8   Q.      Were you paid correctly in 2016?

9           MR. BENJAMIN:  Objection to form.

10          THE WITNESS:  I'm not sure.

11  Q.      (By Mr. Burke)  In this lawsuit are you

12  contending that Ideal Towing didn't classify you

13  correctly?

14  A.      Correct.

15  Q.      Did you read the lawsuit that was filed on your

16  behalf before it was filed?

17  A.      Did I read it?

18  Q.      Yes, sir?

19  A.      Yes, I read it.

20  Q.      And you provided the information, some of the

21  information contained in your lawsuit to your lawyer,

22  correct?

23  A.      Correct.

24  Q.      You weren't paid for sick days, were you?

25  A.      No.
```

```
1    Q.      How about vacation?

2    A.      No.

3    Q.      Now you told me earlier that you didn't take any

4    vacations.  Is it your testimony that you worked during

5    Christmas holidays, Thanksgiving holidays?

6    A.      If -- the only way I was off on that day is if

7    it rolled around on the off day.  That was the only day

8    I took a vacation off.  Other than that, I was working.

9    Q.      So your testimony is that if your off day was

10   not a holiday, you'd be at work?

11   A.      Correct.

12   Q.      Do you know what it means to be on-call, when

13   someone is on-call?

14   A.      I know what it means.  Yes, sir.

15   Q.      What does that mean?

16   A.      That means you're always available, available

17   for when someone needs to be towed.  You're always

18   available.

19   Q.      Somebody can call you if they need you?

20   A.      Right.

21   Q.      And that's different then when you were working

22   at Kroger, for example, where you actually went into the

23   Kroger's facility and you stayed there until it was time

24   to go?

25   A.      Correct.
```

1    Q.      You weren't on call then, when you worked for
2    Kroger?
3    A.      No, I wasn't on call then.
4    Q.      How long after you left Ideal Tow was it before
5    you began working for South Dekalb?
6    A.      Maybe -- probably a week.
7    Q.      Had you been looking for a job with somebody
8    else?
9    A.      While I was employed with Ideal?
10   Q.      Yes?
11   A.      Yes.
12   Q.      And that was in part because they --
13   A.      Yes.
14   Q.      Let me finish the question.  - the volume had
15   decreased, you weren't getting the kind of calls that
16   you wanted to get?
17   A.      Right.  I had started feeling a little
18   uncomfortable, so I had to find me another job.
19   Q.      Did you take any lunch while you were working at
20   Ideal Tow anytime during your --
21   A.      In between times.
22   Q.      -- shift?
23   A.      In between times we had time to eat.
24   Q.      When you say "in between times," you didn't have
25   a set lunch?

1    A.      It wouldn't a set lunchtime.  We didn't have a

2    set lunchtime.  The calls wasn't always consistent, so

3    if I had 15 minutes in between a call, I would get a

4    bite to eat and sit until I get a call.  I kind of used

5    my time in between time.

6    Q.      And what could you typically do when you were

7    sitting?

8    A.      Sit.  Nothing.

9    Q.      You wouldn't get on the phone?  You wouldn't

10   make personal phone calls?

11   A.      Whatever I decided to do while I was sitting and

12   waiting.

13   Q.      Yes, but you were --

14   A.      I'm not sure.

15   Q.      Yes, but you were free to do whatever you wanted

16   to do at time period?

17   A.      As long as I was sitting in this area.  I

18   couldn't leave my zone.  I couldn't leave my coverage

19   area.  So I had to sit either on the side of the

20   highway, a grocery store parking lot.  It was never no

21   one's home.  I was always sitting on the side of the

22   road somewhere.

23   Q.      But you didn't -- you weren't required to sit on

24   the side of the road?

25   A.      I was required to sit in the area.  Wherever I

```
 1   decided to sit.
 2   Q.      And the area we're talking about is what?
 3   A.      I'm not -- whatever area, the coverage area the
 4   company had.
 5   Q.      Well you knew, and you had to go to it?  What
 6   area in 2012 were you responsible for?
 7   A.      Stone Mountain, Southeast Atlanta, some north
 8   East Atlanta.  We had a big area.  Anywhere within the
 9   Perimeter, within that area.  That was the only way our
10   calls come through that zone.  Once I log in to that
11   tablet, I had to leave the shop and go to the designated
12   area.
13   Q.      And your zone didn't change the entire time you
14   that worked for Ideal Towing?
15   A.      No, it didn't change.
16   Q.      The only changes that occurred, you would have
17   told me about in your deposition?
18   A.      Correct.
19           MR. BURKE:  Let's go off the record for a
20   little bit, please.
21                   (Off the record.)
22           MR. BURKE:  We're back on the record.
23   Q.      (By Mr. Burke)  All right.  Mr. Smith, we took
24   another break.  Is there anything you want to correct or
25   change in your deposition at this point?
```

A.      No.

Q.      Everything you've told me has been truthful and
honest?

A.      Yes, sir.

Q.      You told me that your area zone was Dekalb; is
that the entire DeKalb County?

A.      Not the entire, no.

Q.      Okay.  Why weren't you responsible for the
entire county of Dekalb?

A.      Why?

Q.      Yes, why weren't you?

A.      Because I wasn't -- that wasn't my
responsibility.

Q.      It wasn't your responsibility?

A.      It wasn't the company I worked for
responsibility to be responsible for that.

Q.      It wasn't Ideal Towing --

A.      No, it wasn't.

Q.      -- zone?

A.      No.

        MR. BENJAMIN:  Let him finish the question.

Q.      (By Mr. Burke)  Okay.  You weren't the only
driver in that particular territory, right?

A.      No, I wasn't.

Q.      You were?

```
 1    A.       No, I wasn't.

 2    Q.       Okay.  There were others.  How many other

 3    drivers?

 4    A.       I'm not sure.  How many other drivers total with

 5    the company or in that area?

 6    Q.       In that area?

 7    A.       I'm not sure.  I don't know.

 8    Q.       And there were times that you would reject a

 9    call, correct?

10    A.       No, incorrect.

11    Q.       You never turned down a call to pick up a tow?

12    A.       Incorrect.

13    Q.       You never turned down a call?

14    A.       Incorrect.  I never turned down a call.

15    Q.       So every time you got a call from Triple A to

16    pick up a vehicle or go respond to somebody that needs

17    help, you took that call?

18    A.       Correct.  I took a call unless it was a light

19    service.  If I turned down a call -- if I turned down a

20    call, it wasn't for me.  It was for the light service

21    department.

22    Q.       So you have turned down a call?

23    A.       I could have turned down a call.  If I turned

24    down a call, I wasn't able to tow it, so that would be a

25    call I would turn down.  Like I say, we had two
```

```
1    different departments.  We had a light service
2    department and a tow department.  If they sent me a call
3    where it had a battery issue or a tire change, and they
4    sent it to me, my box in the tow truck, yes, I would
5    turn it down because I'm not able.  I'll have them send
6    it to the correct truck.
7    Q.      Why weren't you be able?
8    A.      Because I'm not -- that's not my department.  I
9    tow cars.  The department -- they was paying the light
10   service department to do that.
11   Q.      Well why would they call you in the first
12   place --
13   A.      I'm --
14   Q.      -- if they knew that you were not the right
15   department to call?
16   A.      Well it's going to start back with dispatch with
17   Triple A.  If they took the call, incorrect, not
18   understanding the customer when they called in, the call
19   would drop to the wrong driver's box.  So that was the
20   reason.
21   Q.      And --
22   A.      The reason it come to my box.  I'm not sure why
23   it come to my box, but then I correct it.
24   Q.      And if that happened, what would you do?
25   A.      I would call the shop and let them know a light
```

1    service truck needs to be dispatched to this call.

2    Q.    So when you say "shop," you would call Ideal

3    Towing?

4    A.    Correct.

5    Q.    And let them know?

6    A.    Correct.

7    Q.    You would just not show up?

8    A.    No.

9    Q.    Now every time you took a tow from your area,

10   outside of the area, you would have to come back to the

11   area, correct?

12   A.    Correct.

13   Q.    Did you have a set amount of jobs or tows that

14   you had to do every day like a quota?

15   A.    In between the numbers I gave you?  In between

16   the five or ten a day?

17          MR. BENJAMIN:  No.  He's asking did you have

18   to?

19          THE WITNESS:  Did I have to have -- was it

20   mandatory that I did the calls?

21   Q.    (By Mr. Burke)  No.  Was it mandatory that you

22   did five or ten calls per day?

23   A.    If I wanted to get some money, yes.  I better

24   run between that a day if I wanted to get -- see some

25   change, yes.  Anything less, I mean, ain't no point.

1    Q.      But that was your choice, though?  If you wanted

2    to run those calls, like you just said, in order to make

3    the money, you would do them?

4    A.      If they was -- if they was dropping at the time

5    and I was able to, yes.  That would be my quota a day.

6    My quota a day would be to get five or ten calls a day.

7    Q.      That's a quota you set?

8    A.      That's a quota I set for myself.

9    Q.      Because you needed the money?

10   A.      Right.

11   Q.      Did you file a claim against any of the former

12   employers, the towing companies you told me about?

13   A.      No.

14   Q.      Why not?

15   A.      I wasn't aware of the rules.

16   Q.      When did you become aware of the rules that you

17   were supposed to be classified as an employee versus a

18   contractor?

19   A.      Towards the end of my ending years with Ideal.

20   Q.      So 2015, '16?

21   A.      '15, '16.  I'm not sure.  Around up in that

22   area.

23   Q.      Did you know somebody who had filed a lawsuit

24   against a tow truck company?

25   A.      No.

1   Q.      Other than conversations you had with your

2   lawyer, how did you find out that you were being

3   classified incorrectly?

4   A.      The Department of Labor.

5   Q.      Tell me about that what happened with the

6   Department of Labor.

7   A.      I'm not sure.

8   Q.      When you say "you're not sure --

9   A.      I don't know.

10  Q.      So did you find out from the Department of

11  Labor?

12  A.      Did I find out?

13  Q.      Yes.

14  A.      Explain your question.  Be a little clearer.

15  Q.      I asked you how did you find out that you were

16  not being classified correctly?

17  A.      As far as my taxes, when I got ready to file.

18  When I got ready to file my taxes.  And I know someone

19  that works for the IRS.  So I wouldn't being labeled --

20  I was being labeled incorrectly.  I shouldn't have been

21  labeled an independent contractor.

22  Q.      So what year was this that you --

23  A.      '15, '16.

24  Q.      So 2015 you --

25  A.      '15 or '16.  I'm not sure of the exact date.

1    Q.      I understand.  Someone from the IRS, a friend of
     2    yours, told you that you weren't being classified
     3    correctly?
     4    A.      Correct.
     5    Q.      And you didn't file your tax returns?
     6    A.      No, I didn't.
     7    Q.      That person didn't tell you that you didn't have
     8    to file your tax returns, did they?
     9    A.      That person didn't tell me anything.
    10    Q.      Why didn't you file your tax returns before '14,
    11    '13, '12?
    12    A.      I'm not sure.
    13    Q.      You just told me you didn't know that you didn't
    14    know until '15 or '16 that you weren't being classified
    15    correctly?
    16    A.      Right.
    17    Q.      So prior to that you thought you were being
    18    classified correctly, right?
    19    A.      I didn't know the rules at the time of
    20    employment.
    21    Q.      But you still didn't file your tax returns?
    22    A.      Right.
    23    Q.      Do you have any intention of trying to sue your
    24    former employers that you worked for in the tow
    25    business?

```
 1    A.      No, I do not.

 2    Q.      If you were coming from an area where you

 3    dropped off a car that was not in your particular area,

 4    and you got a call to pick up a tow in your area --

 5    A.      (Nodding yes.)

 6    Q.      -- would that call be dispatched to you or

 7    somebody closest?

 8    A.      It would be dispatched to the available driver.

 9    Q.      And when you say "available driver," is that a

10    driver that's closest to the --

11    A.      No.  When I say "available driver," I mean it

12    would go to the available driver, meaning all of the

13    other drivers are occupied.

14    Q.      All right.  Now if you dropped a vehicle off --

15    and you told me earlier that you logged in you're free,

16    you're available, correct?  Do you understand that

17    correctly?

18    A.      Correct.

19    Q.      But you hadn't yet got back to your zone, would

20    you be able to respond to a call?

21    A.      As long as I have a file in my box, I'm not

22    getting calls.  I won't receive a call if I'm on a call.

23    Q.      And you're not off call until you get back to

24    your area?

25    A.      I'm not off call until I log out at the end of
```

1   the day.

2   Q.      Okay.  Maybe we're not speaking the same

3   language?

4   A.      Yes.  Okay.

5   Q.      You told me earlier, you get a call, you drive

6   to the location, put the car on the tow truck, take the

7   car to wherever it needs to go?

8   A.      Right.

9   Q.      What I'm asking you is, after you drop the car

10  off -- let's say you drop the car off in Austell,

11  Georgia somewhere, okay?

12  A.      Okay.

13  Q.      And you're on your way back to your area?

14  A.      Correct.

15  Q.      Dekalb County and the areas you described

16  earlier?

17  A.      Yes.

18  Q.      Would you get call from Triple A?

19  A.      It depends on how far out of the area I am.

20  Q.      Would you agree with me then that calls would go

21  to the tow truck driver that closest to the person that

22  needs --

23  A.      No, I won't agree with that.

24  Q.      -- towing?

25  A.      No.

1    Q.      So you could potentially get a call while you're

2    still in Austell?

3    A.      While I'm still in Austell, yes.

4    Q.      To pick up a vehicle in your area, in Dekalb,

5    correct?

6    A.      Correct.

7    Q.      And --

8    A.      Once again -- I'm sorry.

9    Q.      Yes?

10   A.      But once again that goes to if all of the trucks

11   are occupied with a customer, the call is going to drop

12   to the available driver.  So if I close my call before

13   any other driver is complete with their call, the call

14   is going to automatically come to me because I'm the

15   only one available.

16   Q.      And you would close your calls when?

17   A.      When I am concluded.  When I drop it off.

18   Q.      So at that point you're complete, you're

19   available for the next one?

20   A.      Right.  Once I close that call, it shows I'm

21   clear.

22   Q.      All right.

23            MR. BURKE:  I think that's all the questions I

24   have.

25            MR. BENJAMIN:  I have a couple of brief

1    questions.

2                    EXAMINATION

3    Q.      (By Mr. Benjamin)  Was there ever a time when

4    Ideal Towing changed you from an independent contractor,

5    receiving a 1099 form, to an employee, receiving a W-2

6    form?

7                MR. BURKE:  Object to the form.

8                THE WITNESS:  Yes, it was.

9    Q.      (By Mr. Benjamin)  When was that?

10   A.      The end of '15, beginning of '16.  My last -- my

11   last income tax form.

12   Q.      Who told you that you were going to be given a

13   W-2 form?

14   A.      Michael James.  We had a meeting, and it was

15   brought to everybody's attention that we will be going

16   to W-2s.

17   Q.      Who was at that meeting besides yourself and

18   Michael James?

19   A.      The employees.

20   Q.      Can you name others who were there?

21   A.      Stanley, Carlos Burney, Carlon, Wayne.  There

22   was a lot of employees.  Brian.  Employees of the

23   company.

24   Q.      Do you recall what else was said about why that

25   was going to happen?

A.     No, I can't recall what else was said.

Q.     Did you work for Ideal Towing after you would be
-- were classified as an employee?

A.     Yes.

Q.     Did your duties change?

A.     No.

Q.     Do you recall in response to one of Mr. Burke's
questions, whether you had heard of I-Tow while you were
employed at Ideal?

A.     I've heard of it.  It was mentioned, but wasn't
nothing put in stone.

Q.     What did you hear about I-Tow, while you were
employed by Ideal?

A.     I just heard it was a name change.  That's it.
That all I heard.  Other than how deep it goes, I don't
know.  I never was employed at I-Tow.  I just -- it was
just mentioned that it would be a transition change, a
name change.  And that's all I know about that.

Q.     Who did you hear that from?

A.     Michael James.

Q.     Under what circumstances?  Was it one on one, in
a meeting or somewhere else?

A.     It was one on one.

Q.     Have you ever seen any trucks that were used by
Ideal, later being used by I-Tow?

```
 1   A.      Yes, I have.

 2   Q.      Tell me the circumstances you've seen that.

 3   A.      You say "circumstances" meaning?

 4   Q.      When did you see an I-Tow truck, that you

 5   believe formally was an Ideal truck?

 6           MR. BURKE:  Object to the form.

 7           THE WITNESS:  Not long after I was employed, not

 8   long after.  Maybe months later; three, four months

 9   later.

10   Q.      (By Mr. Benjamin)  So was this after your

11   employment ended?

12   A.      After.

13   Q.      How do you know it was the same truck?

14   A.      They would have numbers on them.  They got

15   numbers on the trucks.  All of the trucks had numbers on

16   them before I left.  The same number is still on there.

17   Q.      When you were working for Ideal, how would the

18   truck identify as Ideal's trucks?

19   A.      They had Ideal on them.

20   Q.      Was it painted on or a magnet or something else?

21   A.      It was like a sticker on the door.

22   Q.      Okay.  And when you saw a truck saying I-Tow on

23   it, how did it say I-Tow?

24   A.      The same way, stickers.

25           MR. BENJAMIN:  I have no other questions.
```

EXAMINATION

Q.      (By Mr. Burke)  You never got in an I-Tow truck
after you left Ideal Tow, right?

A.      No, sir.

Q.      And you didn't work for I-Tow?

A.      Not at all.

Q.      You haven't been to their office, correct?

A.      No.

Q.      When you were arrested for the child support
issues, who bailed you out?

A.      My company.

Q.      Which company?

A.      Ideal Towing.

Q.      They paid for the bond --

A.      Yes.

Q.      -- for you to get out of jail?

A.      Yes, they did.

Q.      That's all the questions I --

A.      And they got it back.

        MR. BENJAMIN:  Okay.  Read and sign.


        (Whereupon proceedings were concluded at 1:58
p.m.)

1          (Pursuant to Rule 30 (e) of the Federal Rules of

2    Civil Procedure and/or O.C.G.A. 91130 (e), signature of

3    the witness has been reserved.)

4

5                            CERTIFICATE

6         STATE OF GEORGIA

7         COUNTY OF FULTON

8          I hereby certify that the foregoing transcript

9    was taken down as stated in the caption, and the

10   questions and answers thereto were reduced to

11   typewriting under my discretion; that the foregoing

12   pages 1 through 130 represent a true, complete and

13   correct transcript of the evidence given upon said

14   hearing.  And I further certify that I am not of kin or

15   counsel to the parties in the case; am not in the

16   regular employ of counsel for any said parties; nor am I

17   in anywise interested in the results of said case.

18

19              This 10th day of July 2017.

20

21         Tamika M. Burnette, RPR, CCR2870

22

23

24

25

Pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia which states:  "Each court reporter shall tender a disclosure form at the time of the taking of the deposition stating the arrangements made for the reporting services of the certified court reporter, by the court reporter's employer, or the referral source for the deposition, with any party to the litigation, counsel to the parties or other entity. Such form shall be attached to the deposition transcript."  I make the following disclosure:

I am a Georgia Certified Court Reporter.  I am here as a representative of Tamika Burnette.  Tamika Burnette was contacted to provide court reporting services for the deposition.  Tamika Burnette will not be taking this deposition under any contract that is prohibited by O.C.G.A. 91128 (c).

Tamika Burnette has no contract/agreement to provide court reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition.  Tamika Burnette will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to

1    any party to this litigation.

2

3                        Tamika M. Burnette, RPR, CCR2870

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              INSTRUCTIONS TO WITNESS

 2          Please read your deposition over carefully and

 3   make any necessary corrections.  You should state the

 4   reason the in the appropriate space on the errata sheet

 5   for any corrections that are made.

 6          After doing so, please sign the errata sheet and

 7   date it.  You are signing same subject to the changes

 8   you have noted on the errata sheet, which will be

 9   attached to your deposition.

10          It is imperative that you return the original

11   errata sheet to the deposing attorney within thirty (30)

12   days receipt of the deposition transcript by you.  If

13   you fail to do so, the deposition transcript may be

14   deemed to be accurate and may be used in court.

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              E R R A T A

 2         PAGE          LINE              CHANGE

 3         _____        _____          _____

 4         Reason for

 5         Change:_____

 6

 7         _____      _____         _____

 8         Reason for

 9         Change:_____

10

11         _____      _____         _____

12         Reason for

13         Change:_____

14

15         _____     _____        _____

16         Reason for

17         Change:_____

18

19         _____       _____         _____

20         Reason for

21         Change:_____

22

23         _____      _____        _____

24         Reason for

25         Change:_____
```

ACKNOWLEDGEMENT OF DEPONENT

I, _____, do hereby certify that I have read the foregoing pages _____ to _____ and that the same is a correct transcript of the answers given by me to the questions therein propounded, except for corrections or changes in form or substances, if any, noted in the attached Errata Sheet.


_____          _____
Date                    Signature


Subscribed and sworn before me this _____ day of _____, 2016.


My Commission Expires:_____

_____Notary Public.

## $

**$1.50** [1] - 87:5
**$10** [1] - 16:1
**$11** [3] - 14:9, 14:10, 87:4
**$11.25** [1] - 53:22
**$11.45** [1] - 53:23
**$2,000** [1] - 84:20
**$2,500** [1] - 84:20
**$2.15** [1] - 85:18
**$22,536.81** [1] - 98:1
**$23,559.53** [1] - 92:20
**$24,180.54** [2] - 90:24, 91:7
**$24,184.54** [1] - 92:5
**$30,000** [3] - 90:7, 90:12, 90:13
**$400** [5] - 110:7, 110:11, 110:25, 111:3, 111:7
**$9,971** [1] - 89:20
**$9,971.18** [1] - 84:7

## '

**'12** [3] - 107:3, 107:15, 123:11
**'13** [7] - 75:8, 107:16, 107:21, 108:8, 112:4, 123:11
**'14** [7] - 75:10, 107:20, 107:21, 108:8, 112:4, 112:5, 123:10
**'15** [8] - 73:8, 112:4, 112:5, 121:21, 122:23, 122:25, 123:14, 127:10
**'16** [12] - 73:24, 73:25, 77:8, 77:11, 111:18, 111:19, 121:20, 121:21, 122:23, 122:25, 123:14, 127:10
**'8** [1] - 13:20
**'90** [1] - 15:8
**'95** [1] - 12:22
**'96** [6] - 11:15, 12:22, 13:13, 13:14, 13:18
**'97** [1] - 13:20
**'98** [1] - 15:9
**'99** [1] - 15:9

## 1

**1** [6] - 3:8, 45:21, 45:23, 46:2, 46:7, 131:12
**10** [5] - 32:14, 32:15, 40:15, 81:22

**10.B** [1] - 132:2
**101** [2] - 1:22, 2:6
**102** [1] - 3:15
**1099** [15] - 3:10, 3:11, 3:12, 3:13, 7:2, 84:4, 88:9, 90:23, 92:17, 97:23, 105:18, 105:20, 105:23, 127:5
**1099s** [2] - 7:19, 104:18
**10:00** [2] - 14:1, 14:2
**10:05** [1] - 1:21
**10th** [1] - 131:19
**11** [1] - 14:8
**11.50** [1] - 19:2
**12** [6] - 19:14, 55:7, 75:23, 76:13, 76:14, 76:15
**127** [1] - 3:4
**13** [2] - 10:5, 55:8
**130** [2] - 3:5, 131:12
**14** [1] - 13:9
**15** [4] - 87:1, 88:20, 88:21, 115:3
**15,000** [1] - 88:25
**1867** [1] - 9:14
**199** [1] - 2:15
**1996** [1] - 12:21
**1:16-CV-0139-TWT** [1] - 1:9
**1:58** [1] - 130:22

## 2

**2** [4] - 1:21, 3:9, 81:24, 82:1
**200** [1] - 74:7
**2000** [4] - 15:9, 16:12, 73:7
**2012** [22] - 46:20, 47:5, 49:9, 49:24, 60:22, 60:23, 62:3, 64:6, 65:18, 66:21, 68:14, 82:15, 82:19, 83:5, 83:8, 88:9, 88:18, 89:1, 106:22, 107:2, 107:3, 116:6
**2013** [9] - 68:16, 68:17, 69:10, 69:15, 70:12, 71:19, 75:7, 107:5, 107:14
**2014** [5] - 3:12, 70:22, 72:23, 73:12, 92:17
**2015** [5] - 73:6, 102:17, 103:3, 121:20, 122:24
**2016** [12] - 73:22, 73:23, 75:12, 77:25, 78:3, 111:11,

111:17, 111:21, 111:25, 112:6, 112:8, 136:13
**2017** [2] - 1:21, 131:19
**24** [1] - 68:11
**25** [1] - 102:17
**29** [2] - 46:20, 49:9

## 3

**3** [4] - 3:10, 83:22, 83:24, 89:20
**30** [34] - 22:12, 23:1, 37:25, 38:5, 38:19, 38:22, 52:18, 52:23, 56:24, 57:1, 72:2, 65:9, 68:22, 84:25, 85:9, 87:16, 87:24, 87:25, 88:7, 90:7, 90:11, 91:20, 91:22, 92:1, 92:2, 92:3, 92:4, 92:24, 93:18, 94:3, 94:4, 131:1, 134:11
**300** [1] - 74:4
**30303** [1] - 2:7
**30313** [1] - 2:17
**3100** [2] - 1:21, 2:5

## 4

**4** [4] - 3:3, 3:11, 90:21, 90:23
**404** [1] - 2:19
**45** [1] - 3:8
**4:00** [1] - 16:20

## 5

**5** [3] - 3:12, 92:8, 92:10
**500** [2] - 74:4, 74:7

## 6

**6** [3] - 3:13, 97:19, 97:21
**6/29/2012** [1] - 83:16
**60** [1] - 72:24
**680-0416** [1] - 2:8
**688-1210** [1] - 2:19
**6:00** [1] - 14:2
**6:30** [1] - 109:25

## 7

**7** [3] - 3:14, 82:15, 98:13, 98:15
**72** [3] - 60:23, 60:25, 75:21

**7:00** [18] - 21:24, 21:25, 23:12, 35:22, 40:16, 61:6, 68:18, 70:18, 71:1, 73:11
**7:30** [1] - 109:25

## 8

**8** [4] - 3:15, 17:2, 100:3, 100:5
**8.25** [2] - 16:25, 17:1
**81** [1] - 3:9
**83** [1] - 3:10
**888** [1] - 2:8
**8:00** [2] - 16:20, 16:21

## 9

**9** [3] - 10:5, 102:6, 102:8
**90** [1] - 3:11
**91128** [1] - 132:18
**91130** [1] - 131:2
**92** [1] - 3:12
**97** [1] - 3:13
**98** [1] - 3:14

## A

**A-related** [1] - 62:7
**a.m** [13] - 1:21, 14:2, 16:21, 21:24, 21:25, 23:12, 35:22, 40:16, 61:6, 68:18, 70:18, 71:1, 73:11
**able** [11] - 8:5, 29:24, 38:8, 40:12, 41:13, 101:8, 118:24, 119:5, 119:7, 121:5, 124:20
**accept** [4] - 27:2, 62:16, 62:17, 62:18
**according** [2] - 66:20, 110:6
**account** [1] - 23:15
**accurate** [2] - 88:10, 134:14
**accurately** [1] - 91:2
**ACKNOWLEDGEME NT** [1] - 136:1
**action** [1] - 80:2
**ACTION** [1] - 1:8
**add** [4] - 84:25, 85:9, 88:5, 94:2
**added** [5] - 87:17, 87:19, 87:20, 87:23, 87:25
**addition** [1] - 87:15
**affecting** [1] - 76:2
**affiliated** [5] - 78:4,

78:22, 79:13, 79:15, 79:16
**African** [1] - 21:12
**agency** [1] - 132:22
**ago** [12] - 6:11, 9:1, 9:4, 17:24, 41:21, 41:23, 41:25, 42:1, 42:5, 42:15, 42:16
**agree** [11] - 4:12, 5:2, 5:12, 5:15, 54:15, 69:20, 70:4, 77:1, 106:19, 125:20, 125:23
**agreed** [2] - 35:8, 76:25
**AGREEMENT** [2] - 3:9, 3:14
**agreement** [4] - 1:17, 4:10, 82:10, 91:17
**agreements** [1] - 7:17
**ain't** [1] - 120:25
**alert** [1] - 27:9
**allow** [2] - 5:7, 5:10
**allowed** [3] - 4:10, 96:8, 96:15
**amount** [12] - 22:25, 54:16, 85:5, 85:6, 87:10, 88:17, 88:23, 88:24, 91:25, 93:25, 98:10, 120:13
**answer** [11] - 4:14, 5:8, 5:11, 5:12, 5:23, 8:6, 8:7, 76:10, 79:14, 105:10, 110:24
**answered** [2] - 76:9, 101:19
**answering** [2] - 5:13, 8:8
**answers** [2] - 131:10, 136:5
**anytime** [1] - 45:6, 114:20
**anyway** [1] - 47:12
**anywise** [1] - 131:17
**APPEARANCES** [1] - 2:1
**appeared** [1] - 6:7
**application** [30] - 4:16, 15:4, 44:9, 46:16, 46:21, 47:1, 47:4, 47:16, 47:22, 48:1, 48:14, 48:15, 48:24, 49:1, 49:5, 49:14, 49:22, 49:24, 53:21, 56:16, 56:22, 56:24, 57:2, 57:3, 57:5, 58:6, 66:20, 82:25, 83:13, 83:15
**APPLICATION** [1] -

1

3:8
applied [3] - 66:21, 103:15
apply [1] - 103:13
approached [1] - 35:10
appropriate [1] - 134:4
approval [1] - 35:14
area [73] - 10:6, 10:13, 19:9, 25:14, 25:15, 25:18, 25:24, 26:1, 26:3, 30:8, 37:3, 37:5, 37:6, 37:9, 37:12, 39:16, 39:23, 39:24, 40:3, 60:10, 60:12, 61:22, 61:24, 61:25, 62:1, 64:7, 74:14, 74:15, 74:16, 74:17, 74:18, 74:20, 80:15, 80:17, 80:21, 96:12, 96:13, 96:17, 96:19, 96:24, 97:1, 97:3, 97:6, 97:7, 108:25, 115:17, 115:19, 115:25, 116:2, 116:3, 116:6, 116:8, 116:9, 116:12, 117:5, 118:5, 118:6, 120:9, 120:10, 120:11, 121:22, 124:2, 124:3, 124:4, 124:24, 125:13, 125:19, 126:4
areas [3] - 39:13, 74:22, 125:15
arrangements [1] - 132:6
arrear [1] - 8:21
arrears [2] - 8:21, 9:10
arrested [8] - 8:12, 8:16, 8:19, 9:5, 9:7, 9:8, 9:10, 130:9
Article [1] - 132:2
assign [1] - 15:14
ATLANTA [1] - 1:3
Atlanta [11] - 1:22, 2:7, 2:17, 9:16, 9:17, 10:6, 37:8, 61:25, 62:1, 116:7, 116:8
attached [5] - 33:13, 66:7, 132:11, 134:9, 136:7
attention [1] - 127:15
attorney [2] - 7:21, 134:11
attributable [1] - 90:9
attributed [1] - 91:21
Audrey [2] - 9:22, 9:24

Austell [3] - 125:10, 126:2, 126:3
automatically [1] - 126:14
available [18] - 31:21, 35:25, 36:14, 59:15, 71:25, 72:11, 72:14, 113:16, 113:18, 124:8, 124:9, 124:11, 124:12, 124:16, 126:12, 126:15, 126:19
average [5] - 29:5, 40:11, 62:3, 62:4, 84:20
averaged [1] - 84:21
avoid [1] - 29:20
aware [2] - 121:15, 121:16

## B

background [1] - 11:11
bag [1] - 99:5
bailed [1] - 130:10
ball [1] - 33:20
ballpark [1] - 90:14
bankruptcy [1] - 11:6
base [1] - 109:6
based [7] - 40:5, 65:12, 73:20, 81:20, 86:14, 86:17, 86:19, 88:5, 89:3, 90:3, 91:3, 91:17, 92:3, 93:6, 93:8, 93:15, 93:16, 93:17, 108:18, 110:20
basis [2] - 52:17, 75:2
battery [5] - 99:14, 99:15, 99:17, 99:19, 119:3
become [1] - 121:16
becoming [2] - 56:8, 56:11
beep [3] - 62:13, 62:14, 62:15
began [1] - 114:5
beginning [2] - 107:16, 127:10
BEHALF [2] - 2:2, 2:11
behalf [1] - 112:16
belong [2] - 33:6, 96:10
belonged [1] - 80:12
below [1] - 98:22
benjamin [1] - 127:3
BENJAMIN [44] - 2:3, 2:4, 3:4, 4:16, 6:1, 24:2, 30:1, 30:5,

31:3, 32:23, 40:13, 44:12, 45:6, 46:1, 46:9, 55:3, 55:5, 55:13, 58:2, 59:2, 69:23, 70:7, 70:19, 76:9, 83:14, 85:19, 86:7, 88:19, 89:6, 91:4, 91:11, 92:13, 104:24, 105:9, 107:22, 108:1, 108:4, 110:23, 112:9, 117:21, 120:17, 126:25, 129:25, 130:20
Benjamin [2] - 127:9, 129:10
Benjamin@ dcbflegal.com [1] - 2:9
best [1] - 48:2
better [5] - 14:12, 39:6, 39:7, 39:8, 120:23
between [31] - 9:2, 9:3, 9:4, 15:8, 16:13, 16:15, 17:8, 37:10, 40:15, 40:16, 41:22, 51:20, 52:21, 54:3, 54:8, 54:9, 62:4, 75:13, 76:7, 107:15, 107:16, 108:8, 114:21, 114:23, 114:24, 115:3, 115:5, 120:15, 120:24
beyond [1] - 95:18
big [2] - 62:1, 116:8
bigger [1] - 39:23
bit [2] - 11:10, 116:20
bite [1] - 115:4
biweekly [1] - 91:22
Board [1] - 132:3
boards [1] - 29:17
bond [1] - 130:14
books [3] - 106:11, 106:12, 106:13
bottom [4] - 55:19, 76:2, 85:10, 100:7
bounced [1] - 77:15
box [10] - 99:8, 99:14, 99:15, 99:17, 101:1, 119:4, 119:19, 119:22, 119:23, 124:21
break [6] - 5:21, 5:22, 5:24, 89:7, 89:12, 116:24
BRIAN [1] - 1:5
Brian [1] - 127:22
BRIDGERS [1] - 2:3

brief [1] - 126:25
bring [1] - 94:18
broader [1] - 40:3
brother [1] - 8:3
brought [5] - 71:8, 81:23, 110:18, 111:13, 127:15
BURKE [24] - 2:12, 2:13, 3:3, 3:5, 4:8, 4:18, 5:25, 24:3, 30:3, 32:25, 44:13, 46:3, 55:4, 85:22, 89:9, 91:5, 107:25, 108:2, 108:5, 116:19, 116:22, 126:23, 127:7, 129:6
Burke [43] - 4:20, 4:23, 6:2, 24:4, 30:6, 31:4, 33:1, 40:14, 44:16, 45:8, 46:5, 46:11, 55:9, 55:14, 58:3, 59:3, 69:24, 70:9, 70:20, 81:25, 83:17, 83:23, 85:23, 86:9, 89:11, 90:22, 91:6, 91:14, 92:9, 92:16, 97:20, 98:14, 100:4, 102:7, 104:25, 105:12, 108:6, 110:25, 112:11, 116:23, 117:22, 120:21, 130:2
burke's [1] - 128:7
Burnette [1] - 1:19, 131:21, 132:14, 132:15, 132:16, 132:19, 132:23, 133:3
Burney [3] - 107:10, 107:12, 127:21
BURNEY [1] - 1:4
business [4] - 48:8, 55:12, 103:17, 123:25
busy [1] - 40:1
button [1] - 62:17

## C

c) [1] - 132:18
calculate [9] - 22:18, 61:3, 84:23, 85:1, 85:2, 86:10, 93:14, 93:15, 93:17
calculated [7] - 22:16, 84:22, 85:11, 86:11, 86:13, 94:13, 98:10
calculation [2] - 94:5, 94:6

calculations [1] - 89:3
CALDWELL [1] - 2:3
caption [1] - 131:9
car [16] - 22:12, 27:25, 28:1, 28:5, 28:9, 30:6, 30:9, 30:12, 37:13, 99:20, 100:24, 124:3, 125:6, 125:7, 125:9, 125:10
care [1] - 64:10
carefully [1] - 134:2
Carlo [1] - 107:10
CARLON [1] - 1:5, 108:3
Carlon [5] - 107:18, 107:23, 107:25, 108:6, 127:21
CARLOS [1] - 1:4
Carlos [2] - 107:12, 127:21
Carlton [1] - 107:24
carried [2] - 33:3, 101:24
cars [8] - 22:11, 22:21, 58:23, 58:24, 65:19, 81:6, 81:8, 119:9
case [6] - 6:7, 9:11, 131:15, 131:17, 132:21, 132:25
cash [10] - 88:13, 88:14, 95:11, 95:15, 95:16, 95:24, 96:1, 96:6, 96:8
casual [3] - 14:16, 14:21
CCR2870 [2] - 131:21, 133:3
cell [4] - 55:25, 56:1, 100:19, 100:23
Centennial [2] - 1:21, 2:5
cents [1] - 87:1
certain [3] - 23:15, 54:16, 109:18
CERTIFICATE [1] - 131:5
Certified [2] - 1:19, 132:13
certified [1] - 132:7
certify [4] - 47:25, 131:8, 131:14, 136:2
change [16] - 30:14, 60:15, 69:1, 70:22, 71:3, 71:4, 89:14, 116:13, 116:15, 116:25, 119:3, 120:25, 128:5, 128:14, 128:17, 128:18

CHANGE [1] - 135:2
Change [6] - 135:5, 135:9, 135:13, 135:17, 135:21, 135:25
changed [12] - 60:1, 68:21, 68:23, 70:24, 70:25, 73:14, 73:15, 73:24, 74:24, 74:25, 75:4, 127:4
changes [4] - 101:24, 116:16, 134:7, 136:6
changing [1] - 74:23
charge [2] - 99:18, 132:24
charged [1] - 32:7
charger [1] - 99:18
charging [1] - 88:2
check [9] - 50:20, 50:22, 50:23, 50:24, 51:16, 51:17, 51:23, 52:2, 88:15
checks [3] - 66:17, 83:17, 83:20
child [6] - 8:15, 8:19, 8:20, 9:10, 10:4, 130:9
choice [2] - 15:14, 121:1
chosen [1] - 77:20
Christmas [3] - 14:21, 15:16, 113:5
chronological [1] - 48:23
circumstances [4] - 68:3, 128:21, 129:2, 129:3
City [1] - 81:17
CIVIL [1] - 1:8
Civil [2] - 4:11, 131:2
claim [2] - 110:7, 121:11
claiming [2] - 111:10, 111:16
classes [2] - 11:17, 12:12
classified [9] - 111:11, 111:17, 121:17, 122:3, 122:16, 123:2, 123:14, 123:18, 128:3
classify [1] - 112:12
clear [7] - 5:1, 5:5, 31:22, 32:23, 36:6, 83:14, 126:21
clearer [1] - 122:14
clerical [2] - 108:11, 108:13
click [1] - 62:17
clock [8] - 20:12,

20:13, 23:6, 23:9, 35:23, 35:24, 59:19, 109:16
clocked [1] - 23:6
close [8] - 30:15, 96:24, 96:25, 97:10, 97:11, 126:12, 126:16, 126:20
closed [1] - 47:8
closer [6] - 43:7, 43:12, 68:12, 97:2, 97:4, 97:5
closest [4] - 36:16, 124:7, 124:10, 125:21
closet [1] - 23:16
closing [1] - 47:11
Cobb [1] - 10:9
college [1] - 11:16
coming [1] - 124:2
commencing [1] - 1:20
commission [4] - 52:16, 52:22, 54:4, 54:13
Commission [1] - 136:15
companies [9] - 20:12, 56:6, 56:10, 60:14, 63:22, 65:22, 72:20, 101:6, 121:12
company [46] - 17:15, 31:8, 33:7, 34:4, 34:11, 34:24, 35:2, 35:5, 35:9, 35:11, 35:18, 38:4, 45:2, 45:5, 48:8, 48:9, 50:18, 50:20, 51:9, 57:10, 59:5, 59:6, 59:8, 71:24, 74:24, 78:1, 78:3, 79:7, 79:10, 80:1, 81:2, 81:3, 86:22, 103:11, 104:3, 105:5, 106:18, 116:4, 117:15, 118:5, 121:24, 127:23, 130:11, 130:12
company's [3] - 74:11, 74:12, 100:15
compare [1] - 93:25
compensated [16] - 73:18, 75:22, 76:12, 76:21, 86:10, 87:11, 89:25, 92:25, 93:12, 95:1, 110:15, 110:18, 111:21, 111:24, 112:1, 112:2
compensation [10] - 57:19, 84:7, 86:11,

86:12, 90:8, 90:24, 91:2, 91:10, 92:20, 98:5
complaint [1] - 110:6
complete [4] - 48:2, 126:13, 126:18, 131:12
completed [1] - 109:24
complying [6] - 45:25, 46:25, 55:16, 82:3, 83:25, 92:11
computer [8] - 23:14, 27:2, 27:13, 30:14, 30:18, 30:22, 31:15, 60:9
concluded [2] - 126:17, 130:22
confuse [2] - 5:4, 49:7
confused [1] - 49:8
connected [4] - 31:7, 31:10, 36:13, 36:18
consistent [1] - 115:2
constant [1] - 12:6
contact [4] - 35:5, 35:6, 35:11, 43:22
contacted [1] - 132:15
contained [1] - 112:21
contending [1] - 112:12
contention [1] - 98:4
continued [3] - 15:19, 44:7
contract [5] - 7:8, 34:12, 47:11, 100:10, 132:17
contract/agreement [1] - 132:19
contractor [7] - 7:3, 100:13, 100:17, 111:15, 121:18, 122:21, 127:4
contractors [1] - 100:14
conversation [2] - 43:18, 44:3
conversations [4] - 7:21, 7:22, 94:15, 122:1
cooler [2] - 99:5, 99:6
correct [167] - 12:19, 15:6, 20:13, 20:19, 20:20, 23:3, 23:18, 24:21, 25:1, 25:4, 25:11, 25:13, 25:16, 27:10, 27:14, 27:15, 27:17, 27:18, 30:4, 31:19, 32:4, 33:23, 34:5, 34:16, 35:13, 37:18, 37:22, 38:7,

38:23, 39:19, 39:21, 40:17, 41:16, 42:6, 42:21, 43:4, 44:21, 44:24, 48:3, 48:4, 48:5, 48:6, 48:16, 48:17, 48:20, 50:15, 50:24, 52:15, 54:2, 54:18, 54:21, 54:25, 55:21, 58:5, 58:8, 59:7, 59:12, 61:7, 61:23, 62:8, 63:10, 63:11, 63:13, 63:15, 63:23, 64:8, 65:10, 65:11, 65:17, 65:19, 65:23, 66:1, 67:5, 67:8, 67:13, 68:9, 71:6, 71:7, 71:10, 71:20, 72:19, 72:22, 73:3, 73:5, 73:13, 75:9, 75:11, 75:16, 75:20, 76:6, 77:9, 81:4, 82:11, 82:14, 84:6, 85:3, 85:4, 87:12, 88:4, 88:8, 88:16, 89:2, 89:5, 89:14, 89:17, 89:22, 90:4, 90:5, 90:10, 90:13, 90:18, 92:19, 93:13, 93:17, 95:9, 95:12, 95:13, 95:20, 95:23, 95:25, 96:7, 97:9, 97:11, 97:25, 98:24, 99:13, 101:6, 102:3, 103:2, 103:6, 103:7, 103:23, 104:1, 104:2, 105:14, 105:22, 107:22, 108:23, 109:15, 110:5, 110:8, 110:14, 111:20, 111:23, 112:14, 112:22, 112:23, 113:11, 113:25, 116:18, 116:24, 118:9, 118:18, 119:6, 119:23, 120:4, 120:6, 120:11, 120:12, 123:4, 124:16, 124:18, 126:5, 126:6, 130:7, 131:13, 136:4
Correct [1] - 125:14
corrections [3] - 134:3, 134:5, 136:6
correctly [15] - 33:21, 46:6, 86:15, 90:1, 111:11, 111:22, 111:25, 112:1, 112:8, 112:13, 122:16, 123:3,

123:15, 123:18, 124:17
cost [1] - 92:2
Council [1] - 132:4
counsel [7] - 1:17, 4:10, 4:12, 131:15, 131:16, 132:10, 132:21
county [3] - 81:6, 81:18, 117:9
County [9] - 8:23, 10:9, 11:12, 81:8, 117:6, 125:15
COUNTY [1] - 131:7
couple [5] - 66:24, 78:17, 83:10, 83:12, 126:25
course [3] - 4:18, 12:4, 101:3
courses [1] - 11:19
COURT [2] - 1:1, 132:1
court [9] - 5:18, 6:19, 9:11, 132:4, 132:7, 132:8, 132:15, 132:20, 134:14
Court [3] - 1:19, 132:3, 132:13
courtesy [1] - 5:10
cover [1] - 132:23
coverage [5] - 95:19, 96:17, 96:19, 115:18, 116:3
crew [2] - 111:3, 111:4
Crown [1] - 14:18
CSI [1] - 18:10
customary [1] - 132:24
customer [4] - 95:15, 102:2, 119:18, 126:11
customers [3] - 31:5, 58:4, 95:16
cut [1] - 51:17

# D

daily [3] - 62:6, 85:8, 85:9
damaging [1] - 29:20
date [20] - 6:19, 8:25, 33:19, 41:20, 46:20, 46:21, 49:4, 50:3, 55:3, 59:15, 77:5, 82:15, 82:17, 82:19, 82:20, 83:12, 83:15, 102:17, 122:25, 134:7
Date [1] - 136:10
dated [1] - 83:7

**dates** [5] - 6:20, 78:9, 98:20, 107:17, 108:9
**day-to-day** [2] - 103:22, 103:25
**days** [33] - 12:10, 14:3, 22:1, 38:24, 59:16, 61:8, 61:10, 61:12, 61:13, 61:14, 61:16, 61:17, 66:22, 66:24, 67:2, 67:4, 67:7, 67:11, 68:20, 68:21, 70:18, 71:2, 72:24, 72:25, 73:4, 73:16, 73:17, 83:10, 83:12, 112:24, 134:12
**DDS** [11] - 23:20, 23:21, 24:22, 27:7, 30:12, 31:17, 32:6, 36:5, 36:7, 36:24, 59:24
**decide** [1] - 63:3
**decided** [4] - 76:20, 78:17, 115:11, 116:1
**decreased** [3] - 74:10, 76:20, 114:15
**deemed** [1] - 134:12
**deep** [1] - 128:15
**DEFENDANT** [1] - 2:11
**defendant** [1] - 46:3
**Defendant's** [10] - 46:6, 82:1, 83:23, 89:19, 90:22, 92:9, 97:20, 98:14, 100:4, 102:7
**Defendants** [1] - 1:13
**Dekalb** [11] - 8:23, 10:9, 11:12, 81:1, 81:8, 114:5, 117:5, 117:6, 117:9, 125:15, 126:4
**DELONG** [1] - 2:3
**Demessa** [8] - 50:4, 50:13, 50:22, 50:25, 51:11, 51:12, 51:19, 51:24
**Demessa's** [1] - 50:16
**Department** [3] - 122:4, 122:6, 122:10
**department** [11] - 34:17, 101:23, 101:24, 118:21, 119:2, 119:8, 119:9, 119:10, 119:15
**departments** [2] - 101:22, 119:1
**DEPONENT** [1] - 136:1
**deposed** [1] - 6:13

**deposing** [1] - 134:11
**deposition** [26] - 1:16, 1:19, 4:9, 4:15, 5:2, 6:3, 6:10, 6:14, 6:17, 6:19, 6:20, 7:24, 89:13, 111:14, 116:17, 116:25, 132:6, 132:9, 132:11, 132:16, 132:17, 132:23, 134:2, 134:9, 134:12, 134:13
**depositions** [1] - 6:18
**described** [5] - 31:24, 35:16, 37:20, 109:11, 125:15
**DESCRIPTION** [1] - 3:7
**designated** [9] - 26:3, 30:8, 37:3, 37:12, 60:12, 61:22, 61:24, 64:6, 116:11
**designation** [1] - 31:18
**destination** [2] - 31:17, 62:22
**device** [4] - 31:1, 31:4, 31:7, 36:10
**difference** [10] - 39:11, 52:21, 54:3, 54:8, 54:9, 54:11, 54:12, 76:7, 112:3
**different** [15] - 10:16, 10:17, 18:19, 39:10, 50:12, 53:25, 60:16, 76:21, 80:21, 80:22, 89:5, 92:5, 97:8, 113:21, 119:1
**diploma** [2] - 11:23
**directly** [2] - 25:12, 83:19
**disclaimer** [1] - 47:24
**DISCLOSURE** [1] - 132:1
**disclosure** [2] - 132:5, 132:12
**discount** [1] - 132:25
**discretion** [1] - 131:11
**discussions** [1] - 7:23
**dispatch** [1] - 119:16
**dispatched** [4] - 31:13, 120:1, 124:6, 124:8
**dispute** [5] - 84:10, 91:6, 91:9, 91:19, 98:19
**DISTRICT** [2] - 1:1, 1:2
**DIVISION** [1] - 1:3
**DJ** [1] - 39:15
**DJV** [44] - 18:2, 18:5,

18:10, 20:4, 21:1, 21:16, 21:20, 22:3, 22:9, 23:9, 23:14, 23:17, 30:2, 30:9, 30:11, 30:17, 30:21, 31:8, 31:12, 31:20, 33:7, 33:15, 34:1, 34:13, 34:15, 37:21, 39:3, 39:4, 39:6, 39:16, 39:22, 47:1, 47:10, 48:18, 49:1, 49:4, 49:13, 49:23, 49:25, 54:19, 57:25
**dJV** [2] - 47:3, 48:20
**DJV's** [1] - 33:22
**document** [24] - 7:9, 46:8, 46:13, 46:17, 55:15, 82:4, 82:7, 82:22, 83:2, 83:3, 84:1, 84:3, 92:6, 92:12, 92:14, 92:16, 96:2, 97:21, 97:22, 98:16, 100:6, 100:9, 100:11, 102:9
**document-specific** [1] - 7:9
**documented** [1] - 95:4
**documents** [6] - 6:20, 6:22, 7:5, 7:11, 7:12, 7:14
**dollar** [4] - 32:16, 85:5, 85:6, 87:5
**dollars** [1] - 17:3
**done** [5] - 45:24, 91:22, 93:10, 94:12
**door** [1] - 129:21
**doubt** [2] - 45:18, 93:5
**down** [24] - 5:18, 45:7, 47:24, 52:19, 53:25, 55:19, 64:1, 73:25, 74:1, 74:3, 98:17, 100:7, 111:6, 118:11, 118:13, 118:14, 118:19, 118:22, 118:23, 118:24, 118:25, 119:5, 131:9
**downtown** [2] - 25:18, 37:8
**dragging** [1] - 29:13
**drink** [1] - 26:10
**Drive** [3] - 9:14, 21:15, 25:18
**drive** [18] - 21:17, 21:19, 25:19, 28:11, 34:9, 37:11, 37:13, 41:13, 43:10, 53:7, 53:12, 61:22, 64:9, 77:20, 78:4, 78:5, 108:24, 125:5

**driver** [20] - 35:6, 52:8, 52:10, 55:2, 55:6, 56:8, 56:11, 57:12, 71:25, 117:23, 124:8, 124:9, 124:10, 124:11, 124:12, 125:21, 126:12, 126:13
**DRIVER'S** [1] - 3:15
**driver's** [8] - 41:15, 53:11, 53:14, 102:16, 102:18, 102:20, 102:25, 119:19
**drivers** [5] - 31:13, 110:14, 118:3, 118:4, 124:13
**driving** [5] - 25:24, 50:17, 57:15, 78:12, 78:14
**drop** [2] - 30:15, 62:23, 62:25, 63:4, 75:12, 96:13, 119:19, 125:9, 125:10, 126:11, 126:17
**dropped** [3] - 31:18, 124:3, 124:14
**dropping** [4] - 27:20, 75:21, 85:16, 121:4
**drops** [1] - 62:20
**drove** [3] - 21:20, 36:23, 78:5
**duly** [1] - 4:5
**during** [8] - 14:20, 15:5, 17:12, 67:12, 72:11, 111:14, 113:4, 114:20
**duties** [3] - 71:3, 101:25, 128:5
**duty** [1] - 34:15

**E**

**e-mails** [1] - 7:9
**Earl** [2] - 4:23, 32:23
**earl** [1] - 30:1
**EARLE** [1] - 2:13
**East** [1] - 116:8
**eat** [2] - 114:23, 115:4
**eburke@burkelawatl.com** [1] - 2:18
**education** [1] - 56:3
**educational** [1] - 11:11
**eight** [6] - 16:22, 17:2, 20:16, 65:15, 75:13, 75:14
**either** [3] - 10:8, 12:22, 115:19

**employ** [1] - 131:16
**employed** [8] - 13:21, 15:4, 43:16, 114:9, 128:9, 128:13, 128:16, 129:7
**employee** [5] - 7:2, 100:17, 121:17, 127:5, 128:3
**employees** [6] - 15:4, 106:23, 106:25, 127:19, 127:22
**employer** [3] - 38:21, 51:3, 132:8
**employers** [5] - 48:16, 48:18, 49:10, 121:12, 123:24
**employment** [9] - 15:20, 44:11, 46:24, 47:17, 48:1, 48:10, 57:6, 123:20, 129:11
**en** [7] - 28:15, 28:16, 28:17, 32:14, 85:7, 87:6
**end** [11] - 15:12, 64:2, 73:25, 77:11, 85:8, 94:2, 107:6, 107:15, 121:19, 124:25, 127:10
**ended** [2] - 77:23, 129:11
**ending** [2] - 53:22, 121:19
**enter** [1] - 24:25
**entire** [12] - 20:17, 32:2, 70:17, 77:6, 77:8, 77:10, 91:25, 92:2, 116:13, 117:6, 117:7, 117:9
**entitled** [1] - 91:14, 91:16, 93:11
**entity** [1] - 132:10
**envelope** [1] - 52:2
**equipment** [7] - 32:20, 32:21, 32:24, 66:1, 66:5, 66:6, 101:5
**errands** [3] - 26:6, 26:9, 26:12
**errata** [4] - 134:4, 134:6, 134:8, 134:11
**Errata** [1] - 136:7
**ESQUIRE** [3] - 2:4, 2:13, 2:14
**evening** [2] - 72:7, 72:14
**events** [1] - 20:1
**eventually** [2] - 45:10, 76:25
**evidence** [1] - 131:13
**exact** [17] - 8:25, 33:19, 37:21, 41:20,

49:4, 50:3, 58:20, 77:5, 78:9, 82:20, 84:16, 88:23, 88:24, 104:10, 107:17, 108:9, 122:25

**exactly** [1] - 38:11

**EXAMINATION** [4] - 3:2, 4:19, 127:2, 130:1

**examined** [1] - 4:6

**examining** [5] - 46:8, 97:22, 98:16, 100:6, 102:9

**example** [13] - 26:6, 26:13, 29:7, 34:18, 35:8, 54:16, 65:16, 74:4, 90:6, 90:16, 90:17, 105:13, 113:22

**except** [3] - 4:13, 70:16, 136:6

**exception** [1] - 20:10

**excluding** [1] - 1:18

**Excuse** [1] - 106:9

**excuse** [1] - 91:18

**exhibit** [10] - 3:7, 45:21, 81:24, 83:22, 90:21, 92:8, 97:19, 98:13, 100:3, 102:6

**Exhibit** [12] - 45:23, 46:1, 46:7, 82:1, 83:24, 89:20, 90:23, 92:10, 97:21, 98:15, 100:5, 102:8

**EXHIBIT** [8] - 3:8, 3:9, 3:10, 3:11, 3:12, 3:13, 3:14, 3:15

**existed** [2] - 47:3, 47:6

**expect** [3] - 5:8, 90:7, 90:11

**expectation** [1] - 94:22

**expected** [3] - 85:12, 85:14, 95:7

**expecting** [1] - 44:7

**experience** [4] - 58:4, 58:9, 58:21, 58:22

**expiration** [1] - 102:17

**expire** [1] - 102:23

**expired** [3] - 102:18, 102:21, 103:3

**Expires** [1] - 136:15

**expires** [1] - 102:18

**explain** [4] - 41:3, 51:14, 103:9, 122:14

**explanation** [1] - 41:5

**extend** [1] - 5:9

# F

**facility** [1] - 113:23

**fact** [2] - 12:19, 40:8, 105:12

**facts** [1] - 5:4

**fail** [1] - 134:13

**fair** [3] - 31:23, 55:9, 96:11

**family** [2] - 10:8, 10:11

**far** [11] - 13:20, 36:17, 43:10, 57:20, 89:13, 89:18, 90:8, 108:24, 112:3, 122:17, 125:19

**father** [6] - 50:12, 50:13, 50:18, 50:19, 51:9, 51:19

**Federal** [2] - 4:11, 131:1

**federal** [1] - 11:8

**fee** [4] - 85:7, 85:15, 86:5, 110:8

**feet** [1] - 77:19

**felt** [1] - 25:25

**few** [2] - 66:22, 106:25

**field** [2] - 52:4, 52:12

**fighting** [2] - 12:7, 12:9

**figure** [3] - 33:20, 88:6, 90:14

**figures** [2] - 88:1, 88:2

**FILE** [1] - 1:9

**file** [13] - 104:19, 105:15, 105:17, 106:1, 106:3, 121:11, 122:17, 122:18, 123:5, 123:8, 123:10, 123:21, 124:21

**filed** [10] - 10:25, 11:6, 104:11, 104:13, 105:16, 110:6, 112:15, 112:16, 121:23

**files** [1] - 95:5

**fill** [8] - 56:16, 57:4, 63:24, 82:22, 82:25, 102:10, 102:11, 102:19

**filled** [6] - 44:9, 47:5, 47:19, 48:14, 48:24, 49:1, 49:5, 49:8, 49:21, 49:23, 56:21, 56:23, 56:24, 57:3, 82:24, 83:6

**filling** [2] - 57:2, 83:12

**financial** [1] - 132:25

**fine** [1] - 5:22

**finish** [12] - 5:7, 5:11,

15:2, 15:23, 31:3, 38:16, 46:11, 69:4, 80:10, 86:14, 114:14, 117:21

**finished** [4] - 12:1, 15:24, 33:24, 82:2

**first** [12] - 4:5, 4:14, 5:23, 13:5, 13:7, 31:12, 35:11, 55:14, 57:3, 78:2, 85:24, 119:11

**FITZPATRICK** [1] - 2:3

**five** [16] - 9:1, 9:3, 14:4, 22:2, 38:25, 40:15, 62:4, 62:5, 62:6, 63:17, 75:6, 75:8, 109:1, 120:16, 120:22, 121:6

**flash** [1] - 100:19

**flashlight** [1] - 100:24

**flat** [1] - 110:8

**fluctuate** [2] - 61:15, 61:17

**follow** [1] - 90:9

**following** [5] - 13:19, 15:18, 107:3, 107:19, 132:12

**follows** [1] - 4:7

**forced** [2] - 82:10, 82:12

**foregoing** [3] - 131:8, 131:11, 136:3

**form** [22] - 4:13, 24:2, 55:13, 58:2, 69:23, 70:7, 70:19, 75:20, 85:19, 102:10, 105:9, 110:23, 112:9, 127:5, 127:6, 127:7, 127:11, 127:13, 129:6, 132:5, 132:11, 136:6

**formalities** [1] - 1:17

**formally** [1] - 129:5

**former** [2] - 121:11, 123:24

**four** [7] - 16:22, 20:16, 61:11, 101:4, 104:11, 104:13, 129:8

**four-way** [1] - 101:4

**free** [4] - 26:5, 79:6, 115:15, 124:15

**friend** [1] - 123:1

**full** [1] - 4:21

**Fulton** [1] - 10:8

**FULTON** [1] - 131:7

**funeral** [2] - 19:18, 19:20

# G

**gap** [2] - 16:13, 16:15

**GED** [2] - 12:1, 12:16

**GEORGIA** [2] - 1:2, 131:6

**Georgia** [11] - 1:20, 1:22, 2:7, 2:17, 9:17, 10:6, 68:6, 68:8, 125:11, 132:4, 132:13

**girlfriend** [1] - 8:1

**given** [8] - 6:3, 41:7, 58:20, 127:12, 131:13, 132:25, 136:5

**glad** [1] - 5:6

**GP** [1] - 67:19

**GPS** [3] - 36:14, 67:14, 67:16

**graduate** [2] - 11:25, 12:19, 56:4

**graduated** [3] - 11:13, 12:16, 12:18

**graduating** [1] - 12:14

**grocery** [2] - 13:1, 13:6, 13:23, 16:5, 18:17, 18:19, 18:21, 18:23, 115:20

**GROUP** [1] - 2:12

**guess** [6] - 15:20, 19:18, 26:23, 36:13, 43:14, 44:6

**guys** [1] - 5:25

# H

**H-E-A-R-D** [1] - 10:21

**half** [2] - 19:22, 67:10

**hand** [5] - 45:22, 46:5, 67:17, 99:11, 101:7

**handle** [1] - 64:20

**handwriting** [2] - 98:25, 102:14

**Hapeville** [1] - 14:18

**hard** [1] - 5:20

**Harper** [1] - 10:19

**head** [2] - 5:19, 96:4

**heading** [1] - 30:10

**hear** [3] - 71:13, 128:12, 128:19

**Heard** [2] - 10:19, 10:20

**heard** [8] - 43:17, 104:6, 104:8, 111:14, 128:8, 128:10, 128:14, 128:15

**hearing** [1] - 131:14

**help** [6] - 15:21, 33:3,

77:19, 99:18, 102:2, 118:17

**helps** [1] - 99:20

**Henry** [1] - 10:9

**hereby** [2] - 131:8, 136:2

**High** [1] - 11:12

**high** [8] - 11:23, 12:3, 12:10, 12:14, 12:18, 12:23, 13:13, 13:14

**highway** [1] - 115:20

**Hill** [1] - 107:8

**HILL** [1] - 1:6

**hire** [2] - 15:18, 82:22

**hired** [7] - 15:17, 44:12, 44:14, 50:21, 51:4, 51:11, 83:7

**hiring** [3] - 14:25, 15:1, 15:3

**history** [2] - 49:6, 49:19

**holiday** [3] - 15:5, 15:16, 113:10

**Holiday** [1] - 15:16

**Holidays** [1] - 14:20

**holidays** [4] - 15:1, 67:12, 113:5

**home** [14] - 26:13, 34:2, 43:12, 67:24, 68:4, 68:12, 68:14, 97:2, 97:5, 97:12, 97:13, 97:15, 115:21

**honest** [1] - 117:3

**hook** [6] - 28:24, 85:7, 85:15, 86:5, 86:17, 87:5

**hook-up** [5] - 85:7, 85:15, 86:5, 86:17, 87:5

**hookup** [1] - 28:18

**hour** [4] - 14:9, 14:10, 15:25, 16:1

**hourly** [2] - 14:5, 16:23, 18:24, 18:25, 19:12, 20:14, 23:4, 52:20, 52:21, 54:4, 54:13, 69:7, 69:9, 75:18, 75:20, 76:4, 76:5, 76:8, 76:25, 77:2, 81:18

**hours** [27] - 13:24, 16:19, 21:22, 35:21, 54:17, 60:21, 61:1, 61:11, 65:12, 65:15, 68:11, 68:16, 68:19, 68:21, 70:17, 70:23, 71:2, 72:3, 72:24, 75:21, 75:23, 76:12, 76:13, 76:14, 76:16, 89:7

**house** [2] - 60:2, 99:9
**Howard** [1] - 9:24
**human** [1] - 5:8

# I

**I-Tow** [13] - 104:3,
104:4, 104:5, 104:6,
128:8, 128:12,
128:16, 128:25,
129:4, 129:22,
129:23, 130:2, 130:5
**ID** [3] - 103:10,
103:13, 103:16
**IDEAL** [1] - 1:10
**ideal** [2] - 43:12, 106:8
**Ideal** [140] - 17:8,
17:11, 19:24, 20:8,
42:14, 42:17, 42:18,
42:22, 42:24, 42:25,
43:9, 43:16, 43:17,
43:22, 44:11, 44:20,
44:22, 44:23, 45:11,
45:16, 50:1, 56:8,
56:12, 56:14, 57:21,
59:3, 59:11, 59:18,
60:4, 60:21, 61:10,
61:20, 62:3, 64:5,
65:9, 65:19, 65:25,
66:10, 66:12, 66:21,
67:15, 69:11, 69:16,
69:20, 70:5, 71:5,
71:14, 72:16, 73:6,
73:9, 73:22, 73:24,
74:19, 75:6, 77:4,
77:6, 77:12, 77:13,
77:14, 77:24, 78:10,
78:12, 78:14, 78:15,
78:21, 78:22, 78:23,
78:25, 79:1, 79:2,
80:4, 80:6, 80:17,
80:24, 82:18, 83:9,
83:19, 84:5, 85:13,
86:8, 88:2, 88:6,
88:11, 88:13, 90:3,
90:6, 90:23, 91:7,
91:18, 91:21, 92:18,
92:24, 94:1, 94:6,
94:17, 95:12, 96:6,
96:23, 97:4, 97:8,
97:10, 97:13, 97:24,
98:5, 103:23, 104:1,
104:7, 105:5,
105:25, 106:2,
106:10, 106:13,
106:19, 106:22,
107:2, 108:7,
108:24, 109:4,
109:17, 110:4,
112:12, 114:4,
114:9, 114:20,

116:14, 117:17,
120:2, 121:19,
127:4, 128:2, 128:9,
128:13, 128:25,
129:5, 129:17,
129:19, 130:3,
130:13
**Ideal's** [1] - 129:18
**identification** [10] -
45:21, 81:24, 83:22,
90:21, 92:8, 97:19,
98:13, 100:3, 102:6,
103:8
**identify** [1] - 129:18
**imperative** [1] -
134:10
**impounds** [1] - 81:11
**improperly** [1] -
111:17
**IN** [1] - 1:1
**income** [1] - 127:11
**incorrect** [6] - 64:11,
66:2, 118:10,
118:12, 118:14,
119:17
**incorrectly** [3] - 94:14,
122:3, 122:20
**independent** [4] - 7:3,
111:15, 122:21,
127:4
**INDEX** [1] - 3:1
**indicate** [3] - 31:20,
32:15, 63:7
**indicated** [4] - 27:23,
27:24, 28:2, 28:10
**indication** [2] - 74:19,
74:21
**individual** [4] - 33:12,
35:4, 35:17, 64:1
**individuals** [3] -
34:22, 107:1, 107:12
**information** [8] -
24:25, 27:18, 28:2,
30:23, 47:25, 61:21,
112:20, 112:21
**Ingles** [8] - 13:15,
13:22, 14:11, 14:13,
14:14, 14:15, 18:20
**initiated** [1] - 25:14
**input** [1] - 59:13
**inside** [1] - 102:2
**instead** [3] - 7:2,
29:11, 29:12
**INSTRUCTIONS** [1] -
134:1
**insurance** [5] - 40:21,
41:3, 41:6, 41:8,
41:11
**intention** [1] - 123:23
**interested** [1] - 131:17

**Internet** [2] - 36:13,
36:18
**interviewed** [1] -
56:16
**introduced** [1] - 4:24
**invade** [1] - 7:22
**IRS** [5] - 103:10,
103:13, 103:16,
122:19, 123:1
**Isaac** [2] - 21:3, 21:4
**issue** [1] - 119:3
**issues** [1] - 130:10
**items** [2] - 99:5,
100:18

# J

**jack** [1] - 99:6, 100:20,
100:25
**jail** [1] - 130:16
**Jamal** [1] - 4:22
**JAMES** [2] - 1:11, 1:12
**James** [16] - 44:2,
44:4, 44:10, 44:14,
44:22, 45:10, 58:3,
58:8, 59:2, 65:6,
75:18, 103:22,
103:25, 127:14,
127:18, 128:20
**James's** [2] - 44:17,
108:10
**Jawanza** [2] - 4:9,
4:22
**JAWANZA** [4] - 1:4,
1:16, 3:3, 4:4
**job** [31] - 6:24, 6:25,
13:5, 13:7, 14:12,
15:13, 15:15, 16:16,
17:4, 17:5, 21:1,
27:3, 30:16, 31:21,
42:23, 48:24, 50:7,
52:4, 53:21, 54:15,
54:19, 57:15, 57:20,
58:21, 77:23, 78:7,
78:18, 85:3, 99:9,
114:7, 114:18
**jobs** [14] - 17:8, 17:12,
20:10, 20:14, 20:24,
23:15, 29:12, 33:4,
54:9, 65:9, 65:13,
73:20, 120:13
**Johnson** [3] - 9:22,
9:24
**Johnson's** [1] - 10:23
**Jones** [1] - 56:14
**JORDAN** [1] - 2:14
**Judicial** [1] - 132:4
**July** [5] - 66:25, 67:1,
83:7, 83:8, 131:19
**jump** [7] - 99:8, 99:14,

99:15, 99:17, 99:20,
101:1
**June** [5] - 46:20, 49:9,
66:21, 83:7
**junior** [1] - 12:10

# K

**K-A-M** [1] - 17:17
**KAM** [54] - 17:14,
17:17, 17:18, 17:19,
17:25, 18:1, 18:2,
20:6, 34:4, 34:8,
34:11, 34:15, 35:21,
36:19, 36:21, 37:1,
38:24, 39:1, 39:2,
39:4, 39:5, 39:8,
39:20, 40:1, 40:9,
40:13, 40:14, 40:18,
40:19, 42:8, 42:9,
42:12, 42:19, 43:2,
49:10, 49:25, 50:8,
51:1, 51:2, 51:3,
51:6, 51:10, 51:13,
51:17, 53:18, 54:1,
54:20, 54:23, 57:23,
58:13, 58:14, 58:16
**KAM's** [1] - 39:22
**keep** [6] - 15:14,
63:16, 67:19, 72:3,
93:24, 108:15
**kept** [2] - 15:17, 93:19
**key** [1] - 101:3
**kicked** [1] - 12:2
**kids** [1] - 12:10
**kin** [1] - 131:14
**kind** [11] - 5:20, 6:22,
11:16, 27:19, 36:13,
41:12, 55:12, 63:19,
79:6, 114:15, 115:4
**kinds** [1] - 71:21
**kit** [3] - 101:15,
101:16, 101:19
**knowingly** [1] - 7:1
**knowledge** [1] - 48:2
**Kraft** [10] - 19:4, 19:6,
19:7, 19:15, 19:16,
19:21, 19:23, 19:24,
20:2
**Kroger** [11] - 18:11,
19:3, 19:4, 19:5,
19:6, 20:1, 53:21,
54:15, 105:13,
113:22, 114:2
**Kroger's** [3] - 18:13,
18:15, 113:23

# L

**labeled** [3] - 122:19,

122:20, 122:21
**Labor** [3] - 122:4,
122:6, 122:11
**language** [1] - 125:3
**last** [12] - 10:15,
10:16, 10:18, 21:6,
21:10, 41:1, 82:8,
104:11, 104:13,
109:24, 127:10,
127:11
**LAW** [1] - 2:12
**lawsuit** [10] - 10:24,
10:25, 11:2, 107:2,
110:7, 111:13,
112:11, 112:15,
112:21, 121:23
**lawyer** [3] - 4:24,
112:21, 122:2
**learn** [1] - 42:17
**learned** [1] - 42:18
**leave** [11] - 5:24,
14:11, 19:3, 19:5,
19:15, 20:21, 39:3,
40:18, 115:18,
116:11
**leaving** [5] - 16:13,
47:7, 47:9, 47:10,
53:1
**led** [1] - 68:3
**left** [23] - 12:21, 12:23,
13:13, 13:14, 14:15,
16:12, 17:10, 19:4,
19:6, 19:16, 19:23,
19:24, 20:2, 39:4,
39:6, 42:9, 77:23,
78:22, 80:23, 81:1,
114:4, 129:16, 130:3
**less** [7] - 74:8, 74:9,
91:15, 93:2, 93:4,
93:5, 120:25
**LEWIS** [1] - 1:5
**Lewis** [3] - 107:18,
107:23, 108:6
**LIC** [1] - 53:1
**LICENSE** [1] - 3:15
**license** [20] - 41:12,
41:14, 41:15, 41:17,
41:18, 42:2, 53:3,
53:4, 53:7, 53:11,
53:14, 53:15, 53:16,
53:18, 102:17,
102:18, 102:21,
103:1, 103:3, 103:5
**life** [2] - 55:6, 55:8
**light** [8] - 100:19,
101:22, 101:23,
118:18, 118:20,
119:1, 119:9, 119:25
**Lilburn** [1] - 37:9
**line** [5] - 45:7, 76:2,

85:10, 102:16, 111:6
**LINE** [1] - 135:2
**list** [13] - 47:1, 47:4, 47:7, 47:14, 48:15, 48:21, 49:9, 49:10, 50:4, 52:4, 53:21, 95:5, 100:10
**listed** [4] - 20:12, 49:12, 49:14, 51:3
**litigation** [2] - 132:10, 133:1
**live** [3] - 9:13, 96:24, 96:25
**lived** [2] - 43:7, 97:10
**lives** [3] - 9:19, 10:8, 10:11
**living** [1] - 97:1
**LLC** [3] - 1:10, 2:3, 2:12
**load** [3] - 29:18, 30:12, 63:3
**loaded** [1] - 29:24
**loading** [1] - 63:5
**located** [7] - 17:20, 21:14, 36:15, 36:19, 80:3, 96:24, 97:8
**location** [15] - 27:4, 27:16, 27:18, 30:13, 30:15, 30:20, 33:22, 62:21, 62:23, 63:4, 63:8, 67:18, 80:6, 125:6
**lock** [1] - 101:3
**locked** [2] - 101:3, 101:14
**lockout** [4] - 101:15, 101:16, 101:19, 101:25
**log** [22] - 23:15, 25:8, 36:2, 36:4, 59:22, 60:9, 60:10, 60:11, 63:18, 63:19, 63:21, 63:24, 63:25, 108:17, 108:18, 108:19, 108:20, 109:20, 109:21, 109:25, 116:10, 124:25
**logged** [8] - 23:13, 30:24, 32:3, 36:2, 36:24, 72:6, 124:15
**logging** [1] - 36:17
**longest** [2] - 29:2, 29:3
**look** [19] - 6:13, 6:22, 7:8, 7:16, 7:19, 45:23, 46:23, 81:25, 83:23, 89:19, 90:22, 92:9, 97:20, 98:14, 100:4, 102:7, 102:16

**looked** [2] - 7:5, 7:12
**looking** [3] - 27:8, 57:14, 114:7
**lose** [1] - 74:22
**losing** [1] - 47:11
**lost** [3] - 74:14, 74:17, 74:20
**low** [1] - 39:16
**lunch** [3] - 26:10, 114:19, 114:25
**lunchtime** [2] - 115:1, 115:2

## M

**machine** [1] - 32:5
**magnet** [1] - 129:20
**MAHONEY** [1] - 2:14
**mails** [1] - 7:9
**majority** [1] - 71:20
**mandatory** [3] - 100:10, 120:20, 120:21
**manual** [1] - 23:23
**manually** [2] - 64:2, 64:3
**manufacture** [1] - 106:8
**Marietta** [2] - 1:22, 2:6
**marked** [11] - 45:21, 45:22, 46:6, 81:24, 83:22, 90:21, 92:8, 97:19, 98:13, 100:3, 102:6
**married** [1] - 10:2
**math** [1] - 90:19
**matter** [2] - 4:6, 110:2
**matters** [2] - 64:10, 64:20
**McNair** [1] - 11:12
**mean** [25] - 18:18, 32:12, 34:10, 39:12, 41:10, 47:19, 49:3, 55:17, 59:8, 60:10, 63:1, 72:1, 74:8, 75:20, 75:22, 75:23, 77:16, 77:18, 87:6, 87:20, 94:9, 99:8, 113:15, 120:25, 124:11
**meaning** [3] - 18:19, 124:12, 129:3
**means** [4] - 8:17, 113:12, 113:14, 113:16
**meant** [3] - 41:3, 41:8, 48:5
**medication** [1] - 8:9
**meet** [1] - 56:18
**meeting** [3] - 127:14,

127:17, 128:22
**meetings** [2] - 74:22, 79:19
**member** [2] - 62:23, 96:15
**member's** [2] - 27:19, 63:12
**members** [1] - 110:16
**mentioned** [8] - 30:25, 31:14, 32:5, 57:22, 75:19, 104:8, 128:10, 128:17
**met** [1] - 82:24
**metropolitan** [1] - 10:13
**Michael** [8] - 44:2, 65:5, 103:20, 103:25, 127:14, 127:18, 128:20
**MICHAEL** [1] - 1:11
**might** [3] - 7:17, 71:24, 132:22
**Mike** [49] - 40:25, 42:18, 42:20, 42:23, 43:2, 43:18, 43:25, 44:1, 44:6, 44:10, 44:14, 44:16, 44:18, 44:19, 45:10, 45:15, 50:4, 50:12, 50:13, 50:16, 50:22, 50:25, 51:8, 51:11, 51:12, 51:18, 51:23, 56:14, 57:2, 57:4, 57:6, 57:9, 57:11, 57:19, 58:3, 58:8, 58:17, 59:1, 59:2, 59:5, 75:18, 76:4, 76:25, 79:10, 79:14, 82:24
**mile** [9] - 32:8, 32:16, 38:10, 84:24, 85:17, 85:18, 86:22, 87:2, 88:3
**mileage** [2] - 32:6, 95:17
**miles** [43] - 27:23, 27:24, 28:4, 28:7, 28:9, 28:10, 28:15, 28:18, 30:16, 32:9, 32:10, 32:11, 32:14, 32:15, 38:9, 62:21, 63:7, 63:8, 85:3, 85:7, 85:14, 85:15, 86:4, 86:5, 86:14, 86:17, 86:19, 86:24, 87:1, 87:3, 87:5, 87:6, 87:22, 87:23, 88:5, 95:19, 109:2
**mind** [1] - 54:12
**mine** [2] - 56:2, 99:1
**minimum** [2] - 81:15,

81:22
**minutes** [5] - 29:5, 29:8, 56:24, 57:1, 115:3
**miscalculation** [1] - 94:17
**MITCHELL** [1] - 2:4
**moment** [1] - 46:9
**money** [15] - 22:20, 39:17, 40:5, 40:8, 51:20, 54:24, 74:8, 74:9, 77:22, 78:6, 84:17, 93:11, 120:23, 121:3, 121:9
**monies** [1] - 90:3
**monitor** [1] - 38:8
**month** [2] - 6:11, 16:15
**months** [3] - 84:18, 129:8
**morning** [5] - 13:25, 16:20, 16:22, 30:24, 61:5
**most** [1] - 66:6
**Mountain** [1] - 116:7
**mounted** [2] - 67:22, 67:23
**mouth** [1] - 45:17
**move** [2] - 34:20, 79:9
**moved** [1] - 79:22
**MR** [67] - 2:4, 2:13, 2:14, 3:3, 3:4, 3:5, 4:8, 4:16, 4:18, 5:25, 6:1, 24:2, 24:3, 30:1, 30:3, 30:5, 31:3, 32:23, 32:25, 40:13, 44:12, 44:13, 45:6, 46:1, 46:3, 46:9, 55:3, 55:4, 55:5, 55:13, 58:2, 59:2, 69:23, 70:7, 70:19, 76:9, 83:14, 85:19, 85:22, 86:7, 88:19, 89:6, 89:9, 91:4, 91:5, 91:11, 92:13, 104:24, 105:9, 107:22, 107:25, 108:1, 108:2, 108:4, 108:5, 110:23, 112:9, 116:19, 116:22, 117:21, 120:17, 126:23, 126:25, 127:7, 129:6, 129:25, 130:20
**multiply** [3] - 85:5, 85:6, 88:7

## N

**name** [25] - 4:21, 4:23, 9:21, 14:22, 17:18, 21:6, 21:10, 27:19, 41:1, 44:17, 50:5, 50:16, 51:10, 51:18, 63:12, 78:16, 79:22, 79:25, 103:18, 106:23, 127:20, 128:14, 128:18
**names** [3] - 10:15, 10:16, 10:18
**nature** [1] - 5:8
**necessarily** [1] - 25:12
**necessary** [1] - 134:3
**need** [8] - 5:16, 15:21, 34:23, 71:24, 89:13, 101:16, 101:20, 113:19
**needed** [21] - 25:23, 26:9, 28:1, 28:2, 28:23, 30:22, 35:4, 35:7, 56:15, 59:16, 62:10, 66:9, 100:23, 101:3, 101:4, 101:5, 101:7, 101:8, 110:17, 121:9
**needs** [6] - 35:12, 113:17, 118:16, 120:1, 125:7, 125:22
**negotiated** [2] - 38:1, 38:2
**negotiating** [1] - 57:25
**never** [32] - 6:7, 11:2, 11:8, 12:1, 26:20, 28:18, 34:17, 34:22, 35:7, 41:5, 43:20, 48:22, 57:8, 64:12, 65:16, 66:3, 66:9, 67:9, 77:2, 95:11, 96:8, 97:15, 104:3, 104:5, 106:3, 111:7, 115:20, 118:11, 118:13, 118:14, 128:16, 130:2
**next** [5] - 17:4, 17:5, 26:4, 52:13, 126:19
**Nigerian** [1] - 21:13
**night** [12] - 61:4, 67:11, 72:15, 72:18, 100:23, 110:9, 110:10, 110:16, 110:17, 110:19, 111:2
**nine** [1] - 17:3
**NO** [9] - 1:9, 3:8, 3:9, 3:10, 3:11, 3:12, 3:13, 3:14, 3:15
**nobody** [5] - 71:5,

78:24, 82:10, 105:25, 106:2
**noise** [1] - 27:9
**normal** [1] - 12:10
**north** [3] - 61:25, 116:7
**NORTHERN** [1] - 1:2
**Northside** [2] - 21:15, 25:18
**Notary** [1] - 136:16
**noted** [2] - 134:8, 136:7
**nothing** [15] - 30:21, 38:2, 54:1, 68:21, 68:23, 69:1, 73:14, 73:15, 74:24, 74:25, 75:4, 79:9, 99:9, 115:8, 128:11
**notice** [2] - 4:9, 41:7
**notification** [2] - 27:13, 62:9
**notify** [4] - 30:19, 30:21, 31:15, 31:17
**Number** [6] - 81:24, 82:1, 89:20, 90:21, 100:3, 102:6
**number** [18] - 27:19, 44:17, 55:17, 55:18, 55:19, 55:22, 55:25, 58:20, 62:24, 63:2, 63:12, 63:16, 63:25, 65:13, 68:20, 103:8, 103:14, 129:16
**numbers** [10] - 87:8, 88:2, 92:4, 94:2, 103:10, 120:15, 129:14, 129:15

# O

**o'clock** [3] - 24:12, 24:15, 109:23
**O.C.G.A** [2] - 131:2, 132:18
**oath** [1] - 6:5
**object** [5] - 85:19, 105:9, 110:23, 127:7, 129:6
**objection** [8] - 24:2, 55:13, 58:2, 69:23, 70:7, 70:19, 76:9, 112:9
**objections** [1] - 4:13
**occasions** [1] - 97:12
**occupation** [3] - 12:13, 55:10, 57:14
**occupied** [2] - 124:13, 126:11
**occurred** [1] - 116:16
**OF** [6] - 1:2, 2:2, 2:11,

131:6, 131:7, 136:1
**office** [18] - 14:16, 14:17, 14:24, 14:25, 15:3, 16:2, 16:3, 16:12, 16:13, 59:9, 59:18, 95:5, 96:5, 108:11, 108:24, 109:4, 109:18, 130:7
**often** [6] - 69:17, 72:1, 101:25, 102:4, 109:7, 109:9
**old** [1] - 10:4
**ON** [2] - 2:2, 2:11
**on-call** [2] - 113:12, 113:13
**once** [24] - 12:9, 31:2, 31:14, 42:4, 51:8, 51:16, 58:14, 61:20, 67:25, 71:24, 75:20, 76:11, 76:20, 79:24, 84:25, 96:21, 97:13, 109:4, 109:10, 116:10, 126:8, 126:10, 126:20
**one** [19] - 11:4, 42:5, 44:15, 46:4, 48:18, 48:20, 54:22, 70:17, 71:14, 75:17, 77:20, 102:1, 126:15, 126:19, 128:7, 128:21, 128:23
**one's** [1] - 115:21
**open** [2] - 61:10, 68:11
**operate** [4] - 101:9, 103:1, 103:2, 103:5
**operated** [1] - 103:17
**operating** [1] - 80:19
**operations** [2] - 103:23, 103:25
**order** [5] - 18:20, 48:23, 101:8, 103:5, 121:2
**orders** [4] - 18:17, 18:19, 18:20, 18:22
**original** [1] - 134:10
**otherwise** [2] - 105:19, 105:21
**outside** [2] - 96:13, 120:10
**overage** [1] - 95:22
**own** [8] - 32:17, 32:20, 66:1, 93:19, 93:24, 99:3, 99:7, 106:12
**owned** [4] - 45:2, 45:5, 45:11, 50:18
**owner** [2] - 44:23, 101:13
**owns** [1] - 45:16

# P

**P-E-T-E** [1] - 21:7
**p.m** [11] - 14:1, 14:2, 21:25, 35:22, 40:16, 61:6, 68:18, 70:18, 71:1, 73:11, 130:23
**page** [5] - 46:17, 55:14, 55:20, 82:8, 90:18
**PAGE** [4] - 3:1, 3:2, 3:7, 135:2
**pages** [2] - 131:12, 136:3
**paid** [78] - 14:5, 14:7, 15:25, 16:23, 18:24, 19:11, 22:3, 22:12, 22:24, 23:4, 27:24, 28:11, 28:15, 28:17, 32:16, 37:23, 51:12, 51:13, 54:4, 54:13, 54:16, 54:20, 57:20, 65:9, 65:16, 66:15, 68:22, 68:24, 69:4, 69:6, 69:7, 69:9, 75:1, 75:18, 75:20, 75:24, 76:5, 76:8, 76:15, 76:18, 77:2, 79:24, 81:14, 81:18, 81:20, 84:11, 85:12, 85:14, 86:4, 87:25, 88:3, 88:6, 88:13, 88:25, 90:7, 91:7, 91:12, 91:18, 93:20, 94:3, 94:8, 94:18, 94:22, 94:23, 94:25, 95:6, 95:7, 95:10, 110:7, 110:11, 111:10, 111:17, 112:8, 112:24, 130:14
**painted** [1] - 129:20
**paperwork** [5] - 6:15, 6:16, 6:17, 6:19, 7:6
**parents** [1] - 9:20
**parents'** [1] - 9:21
**park** [5] - 37:12, 37:13, 37:14, 80:9
**parked** [1] - 36:23
**parking** [1] - 115:20
**part** [1] - 114:12
**particular** [7] - 7:6, 7:14, 31:18, 82:25, 96:24, 117:23, 124:3
**parties** [4] - 131:15, 131:16, 132:10, 132:24
**party** [5] - 6:8, 11:2, 132:9, 132:20, 133:1
**past** [1] - 49:19

**patrol** [1] - 97:8
**pay** [21] - 22:23, 38:21, 39:6, 39:8, 52:20, 52:22, 54:10, 66:16, 66:18, 66:19, 75:3, 76:4, 76:25, 79:23, 94:3, 94:15, 94:20, 94:21, 95:3, 95:19, 112:3
**paying** [4] - 8:20, 95:21, 104:18, 119:9
**penalty** [1] - 104:18
**people** [4] - 15:1, 22:20, 22:23, 71:23
**per** [7] - 32:7, 32:16, 38:10, 84:24, 86:22, 88:3, 120:22
**percent** [33] - 22:6, 22:12, 23:1, 37:24, 37:25, 38:5, 38:19, 38:22, 52:19, 52:23, 57:22, 65:9, 68:22, 81:22, 84:25, 85:10, 87:16, 87:24, 87:25, 88:7, 90:8, 90:11, 91:20, 91:22, 92:1, 92:2, 92:3, 92:5, 92:24, 93:18, 94:4
**percentage** [10] - 22:4, 22:5, 54:20, 73:18, 75:1, 76:8, 81:22, 84:24, 89:25, 91:18
**performed** [1] - 90:4
**Perimeter** [2] - 37:10, 116:9
**period** [8] - 15:17, 17:13, 20:15, 48:22, 77:21, 98:6, 109:12, 115:16
**periodically** [3] - 35:1, 71:22, 72:1
**periods** [1] - 107:16
**person** [16] - 32:7, 40:25, 44:10, 50:5, 50:13, 79:3, 79:4, 79:20, 79:23, 79:25, 80:13, 80:23, 95:21, 123:7, 123:9, 125:21
**personal** [9] - 32:21, 33:2, 33:5, 34:2, 36:22, 64:10, 64:20, 99:5, 115:10
**pete** [1] - 21:7
**PETE** [1] - 21:11
**Peters** [1] - 2:15
**PETES** [1] - 21:8
**phone** [16] - 27:19, 43:15, 43:23, 55:25, 56:1, 56:15, 56:25,

57:1, 58:11, 58:12, 62:24, 79:4, 100:19, 100:23, 115:9, 115:10
**pick** [24] - 27:18, 27:25, 28:5, 28:11, 28:12, 29:3, 31:14, 31:25, 33:22, 62:20, 63:2, 63:4, 78:23, 80:8, 80:12, 85:15, 86:4, 86:14, 96:18, 109:24, 118:11, 118:16, 124:4, 126:4
**picked** [2] - 96:16, 109:10
**picking** [2] - 27:25, 29:12
**place** [2] - 110:4, 119:12
**PLAINTIFF** [1] - 2:2
**Plaintiff's** [2] - 45:23, 46:1
**Plaintiffs** [1] - 1:7
**plenty** [1] - 94:9
**plus** [3] - 81:15, 81:18, 85:9
**pocket** [1] - 96:9
**pocketbook** [1] - 76:3
**point** [10] - 22:23, 28:11, 30:2, 63:4, 77:25, 111:5, 116:25, 120:25, 126:18
**pointing** [1] - 83:15
**police** [3] - 34:17, 81:12, 81:13
**possibly** [2] - 19:18, 69:14
**post** [9] - 14:16, 14:17, 14:24, 14:25, 15:3, 16:2, 16:3, 16:12, 16:13
**Postal** [1] - 14:19
**potentially** [1] - 126:1
**preparation** [1] - 6:14
**present** [1] - 58:16
**presume** [1] - 43:5
**pretty** [2] - 6:20, 37:19
**prevent** [1] - 68:10
**prevented** [1] - 72:13
**previous** [9] - 46:23, 47:16, 48:10, 48:16, 48:18, 48:24, 49:10, 49:18, 60:13
**price** [3] - 32:10, 35:19
**printed** [1] - 106:13
**printout** [1] - 95:5
**prison** [1] - 11:8
**private** [2] - 34:22,

71:24
**privates** [1] - 71:23
**privilege** [1] - 4:16
**privileged** [1] - 7:23
**problem** [3] - 59:17, 109:5, 109:8
**problems** [1] - 29:21
**Procedure** [1] - 131:2
**Procedures** [1] - 4:11
**proceed** [1] - 5:2
**proceeded** [3] - 42:25, 43:15, 78:7
**proceedings** [1] - 130:22
**process** [4] - 27:1, 30:12, 34:12, 47:11
**professional** [1] - 12:13
**prohibited** [1] - 132:18
**proof** [1] - 38:23
**proper** [1] - 19:19
**property** [1] - 37:1
**propounded** [1] - 136:6
**provide** [4] - 66:12, 106:20, 132:15, 132:20
**provided** [4] - 23:17, 48:1, 66:5, 112:20
**provider** [1] - 106:20
**Public** [1] - 136:16
**pull** [3] - 18:17, 18:19, 18:22
**pulled** [2] - 81:19, 81:21
**punch** [3] - 60:8, 60:9, 61:21
**punched** [1] - 20:12
**purchase** [6] - 98:23, 99:2, 99:3, 99:10, 100:18, 100:19
**purchased** [1] - 100:22
**purpose** [2] - 5:3, 75:23
**purposes** [5] - 4:10, 40:21, 41:4, 41:6, 41:9
**Pursuant** [1] - 131:1
**pursuant** [2] - 1:17, 132:2
**put** [14] - 28:21, 29:17, 30:21, 31:15, 50:16, 52:19, 53:1, 58:6, 77:17, 78:15, 96:8, 101:4, 125:6, 128:11

## Q

**questions** [14] - 8:6, 8:7, 13:3, 30:1, 31:3, 89:16, 126:23, 127:1, 128:8, 129:25, 130:18, 131:10, 136:5
**quota** [5] - 120:14, 121:5, 121:6, 121:7, 121:8

## R

**Rallies** [2] - 13:7, 13:9
**ran** [3] - 94:25, 103:22, 103:25
**range** [2] - 37:5, 37:7
**rate** [7] - 16:24, 19:1, 19:13, 38:9, 38:11, 54:17
**rates** [1] - 132:24
**read** [9] - 47:22, 48:2, 82:13, 112:15, 112:17, 112:19, 130:20, 134:2, 136:3
**reading** [1] - 1:18
**ready** [3] - 31:21, 122:17, 122:18
**real** [1] - 44:5
**really** [6] - 33:8, 33:12, 41:10, 66:9, 102:5, 110:16
**Reason** [6] - 135:4, 135:8, 135:12, 135:16, 135:20, 135:24
**reason** [3] - 8:5, 41:6, 45:18, 53:1, 53:9, 75:17, 84:10, 91:19, 98:19, 98:21, 119:20, 119:22, 134:4
**reasons** [3] - 41:11, 54:22, 75:17
**reassigning** [1] - 15:15
**receipt** [4] - 106:11, 106:12, 106:13, 134:12
**receive** [9] - 76:13, 83:17, 83:20, 84:15, 90:24, 91:4, 104:22, 111:8, 124:22
**received** [3] - 34:14, 74:18, 84:5, 84:13, 88:11, 88:19, 89:21, 90:4, 91:3, 91:10, 92:18, 94:1, 95:11, 95:14, 95:16, 97:24,

98:1, 98:5, 104:23, 104:25, 105:1, 105:2, 105:5, 105:7, 105:8, 105:11, 105:12, 105:17
**receiving** [2] - 127:5
**recognize** [8] - 46:13, 46:14, 82:4, 82:5, 92:12, 92:14, 92:15, 97:21
**record** [14] - 4:21, 5:1, 5:20, 36:6, 46:9, 46:10, 70:5, 83:14, 89:8, 89:10, 107:22, 116:19, 116:21, 116:22
**records** [4] - 69:21, 93:19, 93:24, 93:25
**reduced** [1] - 131:10
**referral** [2] - 132:9, 132:22
**referred** [1] - 36:7
**referring** [1] - 90:14
**reflect** [1] - 91:2
**regardless** [1] - 25:5
**regular** [2] - 41:15, 131:16
**Regulations** [1] - 132:3
**reject** [1] - 118:8
**related** [2] - 12:13, 44:11, 62:7
**remember** [12] - 16:7, 17:6, 18:4, 18:6, 18:14, 19:9, 50:6, 67:3, 78:8, 78:9, 78:19, 79:25
**renewed** [1] - 103:5
**repair** [3] - 29:14, 29:22, 29:23
**repairing** [1] - 29:24
**repeat** [6] - 5:5, 5:6, 56:9, 85:25, 86:2, 103:24
**rephrase** [3] - 24:3, 91:5
**replace** [1] - 29:10
**report** [4] - 30:17, 78:24, 80:4, 80:6
**reported** [1] - 79:17
**Reporter** [2] - 1:20, 132:13
**reporter** [3] - 118:1, 132:5, 132:8, 132:21
**REPORTER** [1] - 132:1
**reporter's** [1] - 132:8
**reporting** [6] - 78:10, 78:25, 132:7, 132:15, 132:20,

132:22
**Reporting** [1] - 132:3
**represent** [2] - 91:20, 131:12
**representative** [1] - 132:14
**represents** [1] - 92:24
**required** [14] - 59:18, 68:7, 96:13, 97:7, 99:22, 99:24, 100:12, 100:14, 102:2, 102:25, 103:4, 115:23, 115:25
**reserve** [2] - 4:13, 6:1
**reserved** [1] - 131:3
**resident** [1] - 9:19
**respond** [3] - 5:17, 118:16, 124:20
**responded** [1] - 110:21
**responding** [2] - 71:18, 81:10
**response** [2] - 7:4, 128:7
**responses** [1] - 5:21
**responsibilities** [2] - 71:3, 71:4
**responsibility** [5] - 65:18, 108:11, 117:13, 117:14, 117:16
**responsible** [5] - 95:21, 108:25, 116:6, 117:8, 117:16
**responsiveness** [1] - 4:14
**results** [1] - 131:17
**return** [3] - 109:6, 109:20, 134:10
**returns** [9] - 104:11, 104:13, 104:19, 106:1, 106:4, 123:5, 123:8, 123:10, 123:21
**Road** [1] - 14:18
**road** [8] - 35:11, 37:2, 43:20, 52:8, 52:10, 52:11, 115:22, 115:24
**rolled** [1] - 113:7
**room** [1] - 5:24
**roundabout** [1] - 33:20
**route** [10] - 23:16, 27:3, 28:15, 28:16, 28:17, 32:14, 36:16, 85:7, 87:6
**routed** [1] - 36:16
**routes** [1] - 23:16

**RPR** [2] - 131:21, 133:3
**Rule** [1] - 131:1
**Rules** [3] - 4:11, 131:1, 132:2
**rules** [5] - 52:25, 105:20, 121:15, 121:16, 123:19
**run** [4] - 26:6, 26:9, 120:24, 121:2

## S

**safety** [1] - 99:4
**Sahara** [1] - 9:14
**salary** [4] - 52:13, 53:22, 53:23
**sat** [1] - 65:15
**saw** [3] - 35:7, 43:20, 129:22
**schedule** [15] - 20:16, 58:25, 59:1, 59:5, 59:9, 59:10, 59:11, 59:13, 70:23, 70:24, 72:5, 73:10, 73:11
**school** [10] - 11:23, 12:3, 12:14, 12:18, 12:23, 13:12, 13:13, 13:14, 17:9
**School** [1] - 11:12
**screen** [4] - 23:21, 27:8, 36:12, 62:18
**season** [1] - 15:5
**second** [3] - 36:6, 46:17, 102:16
**section** [2] - 46:24, 56:3
**see** [21] - 27:3, 44:8, 49:5, 49:14, 49:21, 53:23, 54:8, 54:11, 84:7, 90:24, 91:1, 92:21, 92:22, 94:3, 98:2, 98:3, 98:22, 98:23, 120:24, 129:4
**selected** [1] - 73:4
**sell** [2] - 106:15, 106:16
**send** [3] - 18:21, 18:23, 119:5
**sending** [1] - 31:6
**sense** [1] - 99:10
**sent** [4] - 7:11, 7:12, 119:2, 119:4
**September** [7] - 82:15, 82:19, 82:21, 83:4, 83:6, 102:17, 103:4
**sequence** [1] - 20:1
**Service** [1] - 14:19
**service** [12] - 14:20, 14:22, 14:23,

9

101:22, 101:24, 106:20, 118:19, 118:20, 119:1, 119:10, 120:1
**services** [3] - 132:7, 132:16, 132:20
**set** [12] - 29:23, 58:25, 59:1, 59:5, 59:9, 71:8, 114:25, 115:1, 115:2, 120:13, 121:7, 121:8
**seven** [15] - 9:3, 9:4, 21:23, 24:12, 24:15, 29:5, 29:8, 35:22, 42:15, 61:5, 83:11, 84:17, 109:23
**Seven** [1] - 21:23
**seventy** [1] - 61:1
**seventy-two** [1] - 61:1
**several** [1] - 95:2
**shaking** [1] - 5:19
**shall** [2] - 132:5, 132:11
**sheet** [6] - 63:24, 63:25, 134:4, 134:6, 134:8, 134:11
**Sheet** [1] - 136:7
**sheets** [4] - 63:18, 63:19, 63:20, 63:21
**shift** [12] - 61:4, 67:11, 71:1, 72:7, 72:8, 72:18, 97:17, 110:9, 110:10, 111:5, 111:9, 114:22
**shifts** [3] - 72:16, 72:17, 72:21
**shop** [6] - 96:20, 109:19, 110:3, 116:11, 119:25, 120:2
**short** [2] - 74:8, 89:12
**show** [8] - 31:22, 32:13, 32:15, 62:19, 62:20, 63:25, 88:10, 120:7
**showed** [5] - 32:9, 32:11, 36:2, 71:5, 95:4
**shows** [3] - 62:23, 108:19, 126:20
**sick** [3] - 69:15, 69:17, 112:24
**side** [4] - 46:4, 115:19, 115:21, 115:24
**sign** [5] - 24:18, 24:19, 82:10, 130:20, 134:6
**signal** [1] - 32:16
**signature** [9] - 5:25, 6:1, 46:18, 47:25, 82:8, 98:17, 98:22,

100:7, 131:2
**Signature** [1] - 136:10
**signed** [3] - 7:17, 46:21, 82:13
**signing** [2] - 1:18, 134:7
**simple** [1] - 44:5
**Singletary** [1] - 10:19
**sister** [1] - 8:3
**sit** [20] - 25:21, 25:22, 25:23, 26:4, 26:17, 26:18, 37:1, 37:15, 37:16, 64:7, 78:20, 84:19, 88:22, 92:23, 115:4, 115:8, 115:19, 115:23, 115:25, 116:1
**sitting** [10] - 25:25, 26:5, 26:21, 26:24, 69:5, 69:6, 115:7, 115:11, 115:17, 115:21
**six** [14] - 13:25, 22:2, 42:15, 61:9, 61:13, 61:14, 67:4, 67:7, 67:10, 70:17, 70:18, 71:2
**sixteen** [1] - 10:5
**skill** [1] - 71:8
**slight** [1] - 60:15
**slow** [1] - 74:3
**slowing** [2] - 73:25, 74:1
**smaller** [1] - 74:9
**Smith** [1] - 4:9, 4:20, 4:22, 4:23, 6:2, 10:16, 44:1, 65:5, 89:11, 103:20, 116:23
**SMITH** [4] - 1:4, 1:16, 3:3, 4:4
**snellville** [1] - 36:20
**Snellville** [7] - 17:21, 37:7, 37:9, 43:10, 44:6, 44:18, 44:19
**someone** [16] - 5:9, 35:12, 39:25, 43:14, 59:10, 59:11, 77:17, 77:18, 78:15, 79:17, 87:10, 113:13, 113:17, 122:18, 123:1
**sometime** [2] - 82:21, 83:4
**sometimes** [3] - 5:8, 29:14, 34:25
**somewhere** [4] - 62:10, 115:22, 125:11, 128:22
**son** [2] - 51:9, 51:20

**son's** [1] - 50:19
**soon** [3] - 25:2, 25:6, 25:8
**sorry** [13] - 11:21, 38:17, 44:17, 46:3, 60:24, 65:5, 67:6, 69:8, 70:18, 74:6, 87:18, 103:22, 126:8
**sort** [2] - 12:12, 12:13
**sounds** [1] - 5:19
**source** [1] - 132:9
**South** [2] - 81:1, 114:5
**southeast** [2] - 9:16, 61:25
**Southeast** [1] - 116:7
**Southwest** [1] - 2:15
**space** [1] - 134:4
**speaking** [4] - 44:25, 85:20, 125:2
**special** [2] - 41:12, 41:14
**specific** [7] - 7:9, 25:15, 26:1, 33:1, 54:17, 80:15, 94:19
**spell** [2] - 10:20, 108:2
**spend** [1] - 76:14
**spent** [1] - 14:14
**stand** [2] - 36:8, 53:2
**Stanley** [2] - 107:8, 127:21
**STANLEY** [1] - 1:6
**start** [14] - 13:2, 16:6, 16:14, 17:22, 23:11, 42:14, 59:21, 60:22, 66:22, 99:21, 101:1, 108:7, 119:16
**started** [28] - 12:1, 13:9, 17:7, 17:11, 18:4, 18:12, 23:12, 23:13, 34:3, 48:25, 65:24, 66:20, 66:25, 67:1, 71:9, 73:25, 74:1, 75:5, 77:11, 78:1, 78:3, 82:17, 83:10, 83:11, 106:22, 107:14, 107:15, 114:17
**starting** [1] - 53:22
**state** [2] - 4:20, 134:3
**STATE** [1] - 131:6
**State** [1] - 1:20
**states** [1] - 132:4
**STATES** [1] - 1:1
**stating** [1] - 132:6
**status** [2] - 30:15, 31:22
**stayed** [1] - 113:23
**Stewart** [1] - 10:19
**sticker** [1] - 129:21
**stickers** [1] - 129:24

**still** [20] - 22:9, 30:2, 68:22, 73:18, 75:1, 75:3, 75:10, 78:10, 78:22, 78:23, 78:24, 79:13, 92:2, 123:21, 126:2, 126:3, 129:16
**stock** [3] - 13:1, 13:23, 16:18
**stone** [2] - 116:7, 128:11
**stop** [4] - 26:9, 77:4, 77:13, 101:21
**stopped** [3] - 77:14, 80:24, 96:22
**stopping** [1] - 79:9
**store** [4] - 16:5, 18:19, 26:10, 115:20
**stores** [3] - 18:17, 18:21, 18:23
**Street** [2] - 2:6, 2:15
**street** [1] - 32:13
**strike** [1] - 12:17
**stuff** [1] - 99:8
**subject** [1] - 134:7
**Subscribed** [1] - 136:12
**substances** [1] - 136:7
**sue** [1] - 123:23
**suggested** [3] - 42:24, 78:3, 78:5
**suggestion** [9] - 43:6, 43:8, 43:9, 76:1, 76:4, 76:22, 76:24, 110:12, 110:15
**suing** [1] - 105:25
**Suite** [1] - 2:16
**Sunday** [2] - 73:1, 73:2
**Super** [8] - 16:3, 16:4, 16:9, 16:10, 16:14, 16:17, 17:7, 17:11
**supervisor** [6] - 21:2, 40:23, 42:20, 50:5, 65:2, 96:4
**support** [5] - 8:15, 8:19, 8:20, 9:11, 130:9
**supposed** [8] - 86:21, 87:15, 91:3, 91:4, 93:20, 96:1, 104:20, 121:17
**suspend** [2] - 41:17, 41:18
**suspended** [8] - 12:2, 12:6, 12:11, 42:3, 53:5, 53:7, 53:16, 53:19
**sworn** [3] - 4:3, 4:5, 136:12

**systems** [1] - 31:10

## T

**tablet** [23] - 23:13, 23:17, 23:19, 23:20, 36:12, 60:5, 60:6, 60:7, 61:21, 62:11, 62:12, 62:14, 62:19, 63:6, 63:9, 63:14, 67:16, 67:19, 67:22, 108:21, 108:22, 109:17, 116:11
**tablets** [4] - 31:11, 60:1, 60:2, 60:17
**Tamika** [8] - 1:19, 131:21, 132:14, 132:16, 132:19, 132:23, 133:3
**tardiness** [2] - 12:6, 12:7
**taught** [1] - 71:5
**tax** [14] - 103:8, 103:10, 103:13, 103:16, 104:11, 104:13, 104:19, 106:1, 106:4, 123:5, 123:8, 123:10, 123:21, 127:11
**taxes** [6] - 105:15, 105:16, 105:17, 122:17, 122:18
**tech** [1] - 52:5
**techs** [1] - 52:12
**temp** [3] - 14:20, 14:22, 14:23
**temporary** [2] - 15:3, 15:13
**ten** [19] - 9:1, 13:25, 17:24, 41:22, 41:23, 41:24, 41:25, 42:1, 42:5, 62:4, 62:5, 62:6, 63:17, 75:6, 75:8, 120:16, 120:22, 121:6
**tender** [1] - 132:5
**term** [1] - 36:7
**terminated** [9] - 15:22, 19:16, 19:17, 19:20, 40:19, 40:20, 42:8, 43:1, 53:6
**terms** [3] - 58:25, 59:13, 90:19
**territory** [2] - 108:25, 117:23
**testified** [3] - 4:7, 6:5, 89:13
**testify** [1] - 9:11
**testimony** [9] - 51:23, 70:16, 70:20, 72:23,

88:9, 89:24, 111:14, 113:4, 113:9

**Thanksgiving** [1] - 113:5

**THE** [18] - 1:1, 2:2, 2:11, 2:12, 30:4, 44:14, 45:7, 55:7, 70:8, 76:11, 88:20, 91:13, 92:15, 105:11, 112:10, 120:19, 127:8, 129:7

**therein** [1] - 136:5

**thereto** [1] - 131:10

**thirty** [3] - 22:6, 37:24, 134:11

**three** [8] - 14:14, 18:1, 39:2, 42:13, 67:1, 75:13, 129:8

**throwing** [1] - 90:15

**Thursday** [2] - 73:1, 73:2

**tickets** [1] - 9:9

**timesheet** [1] - 7:16

**tire** [8] - 29:9, 29:10, 29:21, 29:22, 100:25, 101:4, 101:24, 119:3

**Tishja** [1] - 108:10

**TISHJA** [1] - 1:11

**title** [1] - 52:4

**TO** [1] - 134:1

**today** [10] - 5:3, 6:10, 6:14, 7:24, 8:7, 56:6, 78:20, 84:1, 88:22, 92:23

**toe** [2] - 17:15, 60:13

**Toe** [1] - 88:6

**took** [16] - 19:19, 60:2, 66:17, 67:9, 68:13, 70:2, 70:6, 70:14, 89:11, 95:18, 113:8, 116:23, 118:17, 118:18, 119:17, 120:9

**tools** [13] - 33:2, 33:5, 33:6, 33:8, 33:12, 66:8, 66:9, 99:3, 100:10, 101:5

**toot** [1] - 60:1

**total** [3] - 22:25, 88:5, 118:4

**totally** [2] - 80:21, 80:22

**totals** [1] - 90:1

**touch** [1] - 62:18

**tow** [87] - 21:17, 21:19, 21:20, 25:6, 25:8, 25:12, 27:21, 28:17, 28:20, 28:21, 28:25, 29:3, 30:7,

30:10, 30:14, 30:15, 31:16, 32:17, 33:9, 33:11, 34:4, 34:9, 34:23, 35:4, 35:7, 35:8, 35:12, 35:18, 37:11, 37:13, 41:13, 52:10, 52:11, 54:19, 55:2, 55:6, 56:8, 56:11, 57:10, 57:11, 57:15, 61:22, 62:10, 64:9, 64:21, 65:21, 65:24, 67:14, 67:24, 71:6, 71:24, 72:20, 78:1, 78:14, 78:15, 78:16, 79:7, 79:10, 85:6, 85:15, 86:5, 86:19, 87:1, 87:3, 87:5, 87:16, 87:22, 100:24, 101:6, 101:9, 101:23, 103:1, 103:2, 103:5, 118:11, 118:24, 119:2, 119:4, 119:9, 120:9, 121:24, 123:24, 124:4, 125:6, 125:21

**Tow** [63] - 17:8, 43:17, 61:10, 61:20, 62:3, 64:5, 66:10, 66:12, 66:21, 69:20, 70:5, 71:5, 73:22, 74:19, 77:4, 77:7, 77:12, 78:12, 80:24, 88:2, 90:3, 90:6, 90:23, 91:18, 91:21, 92:18, 92:25, 94:1, 94:17, 95:12, 96:6, 96:23, 97:4, 97:8, 97:10, 97:13, 97:24, 98:5, 103:23, 104:1, 104:3, 104:4, 104:5, 104:6, 105:25, 106:8, 106:10, 106:19, 106:22, 107:2, 109:4, 114:4, 114:20, 128:8, 128:12, 128:16, 128:25, 129:4, 129:22, 129:23, 130:2, 130:3, 130:5

**Tow's** [4] - 94:6, 108:24, 109:17, 110:4

**towards** [5] - 73:25, 77:11, 107:6, 107:21, 121:19

**towed** [8] - 22:12, 28:24, 30:16, 65:24, 68:24, 81:6, 81:8, 113:17

**Tower** [2] - 1:21, 2:5

**Towing** [100] - 17:12, 17:18, 17:19, 17:25, 18:2, 19:24, 20:4, 20:6, 20:8, 21:16, 21:20, 22:3, 34:8, 35:21, 36:19, 36:21, 37:1, 39:1, 42:14, 42:17, 42:18, 42:22, 42:24, 43:12, 43:22, 44:11, 44:20, 44:23, 45:11, 45:16, 47:1, 47:3, 49:10, 49:13, 49:14, 50:1, 51:1, 51:2, 51:3, 51:6, 51:11, 51:13, 51:17, 53:18, 54:1, 56:8, 56:12, 56:14, 57:21, 58:14, 58:16, 59:4, 59:11, 59:19, 60:4, 60:22, 65:9, 65:19, 65:25, 69:11, 69:16, 71:14, 72:16, 73:6, 73:9, 73:24, 75:6, 77:13, 77:14, 77:24, 78:10, 78:21, 78:22, 78:23, 78:25, 80:2, 80:4, 80:5, 80:19, 82:18, 83:9, 83:19, 84:5, 85:13, 88:11, 88:13, 91:8, 105:5, 106:2, 106:14, 108:7, 112:12, 116:14, 117:17, 120:3, 127:4, 128:2, 130:13

**TOWING** [1] - 1:10

**towing** [25] - 20:10, 22:8, 22:10, 22:11, 22:21, 22:24, 33:4, 36:1, 38:4, 58:4, 58:23, 58:24, 63:22, 65:19, 79:1, 79:2, 79:4, 80:23, 80:24, 81:3, 82:17, 83:18, 121:12, 125:24

**tows** [18] - 40:11, 62:2, 62:5, 62:6, 62:7, 63:16, 63:25, 71:17, 73:20, 75:6, 78:13, 83:8, 90:4, 90:9, 91:20, 91:23, 92:24, 120:13

**track** [5] - 63:16, 72:3, 108:15

**tracker** [1] - 36:14

**traffic** [1] - 9:9

**train** [2] - 71:11, 71:14

**trained** [1] - 71:15

**transcript** [6] - 131:8,

131:13, 132:12, 134:12, 134:13, 136:4

**transition** [1] - 128:17

**trick** [2] - 5:4, 49:7

**tried** [1] - 42:23

**triple** [1] - 101:22

**Triple** [34] - 21:17, 21:18, 30:25, 31:4, 31:5, 31:6, 34:9, 34:10, 34:12, 34:15, 35:17, 51:16, 58:4, 60:10, 62:7, 71:18, 79:3, 81:7, 83:18, 83:19, 83:20, 94:19, 94:21, 94:22, 95:3, 95:15, 95:16, 95:19, 96:20, 110:16, 118:15, 119:17, 125:18

**truck** [98] - 17:15, 21:17, 23:22, 23:24, 23:25, 24:4, 24:18, 24:19, 24:23, 25:6, 25:8, 25:10, 25:11, 25:13, 26:15, 26:18, 26:21, 26:24, 28:25, 29:18, 29:24, 30:7, 30:10, 32:17, 33:9, 33:11, 33:13, 33:22, 33:25, 34:1, 36:24, 37:11, 37:13, 37:14, 50:17, 50:19, 51:9, 51:10, 51:19, 52:10, 52:11, 55:2, 55:6, 56:8, 56:11, 57:10, 57:12, 57:15, 60:11, 61:22, 64:6, 64:9, 64:17, 64:18, 64:21, 65:24, 66:7, 67:14, 67:24, 68:4, 68:10, 68:14, 76:14, 77:15, 77:17, 78:11, 78:12, 78:14, 78:15, 78:16, 78:23, 79:1, 79:2, 80:5, 80:6, 80:12, 100:12, 100:13, 100:15, 101:9, 101:23, 103:1, 103:2, 103:5, 109:5, 109:10, 119:4, 119:6, 120:1, 121:24, 125:6, 125:21, 129:4, 129:5, 129:13, 129:18, 129:22, 130:2

**trucks** [11] - 21:19, 21:20, 31:11, 34:9, 41:13, 43:20,

126:10, 128:24, 129:15, 129:18

**true** [4] - 48:1, 56:4, 72:20, 131:12

**trusting** [1] - 38:21

**truth** [1] - 4:6

**truthful** [1] - 117:2

**truthfully** [2] - 5:14, 8:8

**trying** [7] - 5:4, 7:9, 7:22, 49:7, 77:18, 86:3, 123:23

**turn** [7] - 46:17, 63:20, 64:2, 96:2, 96:6, 118:25, 119:5

**Turn** [1] - 55:14

**turned** [8] - 118:11, 118:13, 118:14, 118:19, 118:22, 118:23

**TV** [1] - 23:21

**twelve** [1] - 55:8

**Twenty** [1] - 61:11

**Twenty-four** [1] - 61:11

**twice** [1] - 67:25

**two** [26] - 14:14, 16:10, 16:15, 18:3, 18:7, 33:17, 41:7, 54:8, 54:9, 61:1, 63:22, 65:21, 67:1, 68:13, 71:2, 72:16, 72:17, 72:21, 72:24, 73:16, 73:17, 85:20, 89:7, 101:22, 107:16, 118:25

**two-gap** [1] - 16:15

**type** [1] - 27:4

**typewriting** [1] - 131:11

**typically** [1] - 115:6

**typo** [1] - 107:23

## U

**U.S** [1] - 14:19

**uncomfortable** [1] - 114:18

**under** [8] - 4:11, 6:5, 23:15, 56:3, 80:19, 128:21, 131:11, 132:17

**understood** [19] - 5:13, 47:15, 47:19, 47:21, 48:5, 48:9, 48:15, 53:10, 54:3, 54:17, 64:14, 65:8, 65:11, 76:7, 79:6, 89:16, 89:24, 104:20, 108:10

11

**uniform** [1] - 66:10
**uniforms** [2] - 66:12, 66:15
**UNITED** [1] - 1:1
**unless** [2] - 22:16, 118:18
**up** [54] - 15:12, 27:18, 27:25, 28:5, 28:11, 28:12, 28:24, 29:4, 29:12, 29:18, 29:23, 30:12, 31:15, 31:25, 32:13, 33:22, 62:21, 63:2, 63:3, 63:4, 77:23, 78:23, 80:12, 84:25, 85:7, 85:9, 85:15, 86:4, 86:5, 86:14, 86:17, 87:5, 87:8, 87:17, 87:19, 87:20, 87:23, 87:25, 88:5, 94:2, 94:18, 96:16, 96:18, 109:10, 109:24, 110:18, 118:11, 118:16, 120:7, 121:21, 124:4, 126:4
**usual** [1] - 132:24

# V

**vacation** [2] - 113:1, 113:8
**vacations** [1] - 113:4
**valid** [2] - 53:10, 102:25
**Value** [8] - 16:3, 16:4, 16:9, 16:10, 16:14, 16:17, 17:7, 17:11
**vehicle** [44] - 23:14, 27:17, 27:19, 28:10, 28:12, 28:20, 28:21, 28:23, 28:24, 29:1, 29:3, 29:4, 29:5, 29:7, 29:13, 29:20, 29:21, 31:14, 31:16, 31:18, 31:25, 34:2, 34:20, 35:8, 36:22, 36:23, 62:10, 63:5, 63:10, 67:22, 67:23, 95:18, 96:13, 96:16, 96:18, 99:17, 101:1, 101:2, 101:13, 102:3, 118:16, 124:14, 126:4
**vehicles** [3] - 65:24, 68:25, 71:6
**verbally** [1] - 5:17
**verify** [3] - 38:13, 38:18, 38:20
**versus** [4] - 27:25, 36:17, 85:6, 121:17

**vest** [1] - 99:4
**via** [2] - 27:13, 31:17
**vocational** [2] - 11:17, 12:12
**volume** [17] - 39:11, 39:16, 39:22, 40:6, 74:2, 74:9, 74:10, 74:11, 74:12, 74:23, 75:10, 75:21, 76:18, 76:20, 77:21, 114:14
**volumes** [3] - 74:13, 74:23, 110:16
**VS** [1] - 1:8

# W

**W-2** [9] - 7:1, 104:22, 104:25, 105:5, 105:7, 105:11, 105:12, 127:5, 127:13
**W-2s** [3] - 7:19, 104:17, 127:16
**W2s** [1] - 104:20
**wage** [2] - 81:15, 81:22
**wait** [5] - 26:4, 26:18, 37:2, 37:15, 60:12
**waiting** [3] - 69:5, 96:12, 115:12
**waived** [1] - 1:18
**walk** [1] - 26:25
**wall** [1] - 59:10
**Warehouse** [4] - 18:11, 18:13, 18:16, 20:1
**warehouse** [2] - 18:22, 19:8
**warehouses** [1] - 13:1
**wayfield** [1] - 13:1
**Wayfield** [2] - 13:2, 13:5
**Wayne** [1] - 127:21
**wear** [1] - 66:10
**week** [35] - 14:3, 22:1, 22:13, 22:15, 23:2, 37:24, 38:24, 54:17, 60:21, 61:8, 61:12, 64:2, 66:23, 67:4, 67:6, 67:11, 70:18, 71:2, 72:5, 72:24, 75:21, 84:20, 84:25, 85:1, 85:8, 93:15, 93:17, 93:18, 93:23, 93:24, 94:3, 110:7, 111:2, 114:6
**weekend** [1] - 61:18
**weekly** [3] - 91:23, 92:3, 93:18
**weeks** [2] - 41:7,

78:17
**whichever** [1] - 71:25
**whole** [1] - 4:6
**wide** [2] - 37:5, 37:7
**WITNESS** [16] - 3:2, 30:4, 44:14, 45:7, 55:7, 70:8, 76:11, 88:20, 91:13, 92:15, 105:11, 112:10, 120:19, 127:8, 129:7, 134:1
**witness** [14] - 4:3, 6:7, 45:25, 46:8, 46:25, 55:16, 82:3, 83:25, 92:11, 97:22, 98:16, 100:6, 102:9, 131:3
**word** [2] - 19:19, 98:22
**words** [3] - 59:14, 77:18, 95:18
**works** [1] - 122:19
**wreck** [1] - 48:19
**write** [1] - 64:1
**writing** [1] - 28:18
**written** [1] - 7:17
**wrote** [1] - 50:22
**WYNN** [1] - 1:5

# Y

**year** [22] - 11:14, 13:16, 13:19, 14:16, 15:7, 15:10, 15:12, 15:18, 16:6, 18:4, 19:22, 34:6, 67:10, 70:17, 77:6, 77:8, 91:25, 92:2, 93:22, 107:4, 107:19, 122:22
**year-and-a-half** [2] - 19:22, 67:10
**years** [33] - 9:1, 9:3, 9:4, 14:15, 15:8, 16:11, 17:24, 18:1, 18:3, 18:7, 33:18, 39:2, 41:22, 41:23, 41:24, 41:25, 42:1, 42:5, 42:13, 42:15, 42:16, 45:12, 55:1, 55:5, 55:8, 104:11, 104:14, 108:8, 111:18, 112:4, 121:19
**younger** [1] - 12:10
**yourself** [1] - 127:17

# Z

**zone** [10] - 37:10, 109:1, 109:4,

109:11, 115:18, 116:10, 116:13, 117:5, 117:19, 124:19

12