IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

JAWANZA SMITH, CARLOS BURNEY,

BRIAN WYNN, CARLON LEWIS,

And STANLEY HILL,

     Plaintiffs,

VS.                    CIVIL ACTION

                       FILE NO:  1:16-CV-0139-TWT

IDEAL TOWING, LLC,

MICHAEL JAMES and TISHJA

JAMES,

     Defendants.

_____/

 

     The deposition of CARLOS BURNEY, taken

pursuant to agreement of counsel; all formalities

waived, excluding the reading and signing of the

deposition before Tamika Burnette, Certified Court

Reporter, in and for the State of Georgia, commencing at

10:07 a.m., on May 3, 2017, at 3100 Centennial Tower,

101 Marietta, Atlanta, Georgia.

```
 1                        APPEARANCES

 2    ON BEHALF OF THE PLAINTIFF:

 3    DELONG, CALDWELL, BRIDGERS, FITZPATRICK & BENJAMIN, LLC

 4    MR. MICHAEL A. CALDWELL, ESQUIRE

 5    3100 Centennial Tower

 6    101 Marietta Street

 7    Atlanta, Georgia  30303

 8    (888) 680-0416

 9    Michael@dcbflegal.com

10

11    ON BEHALF OF THE DEFENDANT:

12    THE BURKE LAW GROUP, LLC

13    MR. E. EARLE BURKE, ESQUIRE

14    MR. JORDAN M. MAHONEY, ESQUIRE

15    199 Peters Street, Southwest

16    Suite A

17    Atlanta, Georgia  30313

18    Eburke@burkelawatl.com

19    (404) 688-1210

20

21

22

23

24

25
```

```
 1                      INDEX PAGE

 2   WITNESS:            EXAMINATION:              PAGE:

 3   CARLOS BURNEY       MR. BURKE                   4

 4                       MR. CALDWELL              127

 5                       MR. BURKE                 130

 6

 7   EXHIBIT:            DESCRIPTION:              PAGE:

 8   EXHIBIT NO. 1       1099                       65

 9   EXHIBIT NO. 2       DIESEL CARD                78

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                 P R O C E E D I N G S
 2                    *    *    *
 3                  (Witness sworn.)
 4                  CARLOS BURNEY,
 5          After having been first duly sworn to tell
 6          The whole truth in this matter, was examined
 7                  And testified as follows:
 8                  EXAMINATION
 9   Q.     (By Mr. Mahoney)  Can you please state your full
10   name for the record.
11   A.     Carlos Patrick Burney.
12   Q.     Thank you.  My name is Jordan Mahoney.  I'm a
13   lawyer for the defendants in this case, Michael James --
14   A.     Okay.
15   Q.     -- Ideal Towing, I-Towing and Tishja James.
16          Have you ever taken part in a deposition
17   before?
18   A.     No.
19   Q.     Have you ever testified or been a witness?
20   A.     No.
21   Q.     Okay.  So I'd like to go above a few ground
22   rules.
23   A.     Okay.
24   Q.     The court reporter is here taking down
25   everything that we say, so it's very important that you
```

1    verbalize all of your answers.  Often we may shake our

2    head or nod our head, but it's very important for the

3    court reporter to take that down.  So please try to make

4    sure you say "yes" or "no" to the questions.

5    A.      All right.

6    Q.      Also, it's common for people to anticipate

7    questions.  That's also hard to take down.  So I ask

8    that you let me finish my full question before you start

9    answering, and I'll try to extend the same courtesy to

10   you, let you do your full answer before I start my next

11   question.

12   A.      Okay.

13          MR. MAHONEY:  Mr. Caldwell, do we agree to

14   reserve all objections until first use, except form and

15   responsiveness of the witness?

16          MR. CALDWELL:  Yes.

17          MR. MAHONEY:  And did you have a chance to

18   speak with your client about signature?

19          MR. CALDWELL:  We will read and sign.

20          MR. MAHONEY:  All right.  Thanks.

21   Q.      (By Mr. Mahoney)  Mr. Burney, are you under any

22   medications today?

23   A.      Not at all.

24   Q.      Anything whatsoever that could impact your

25   ability to tell the truth and honestly and fully to the

1   best of your recollection?

2   A.      Not at all.

3   Q.      Thanks.  When did you learn about this

4   deposition?

5   A.      When did I learn about this deposition?

6   Q.      Yes?

7   A.      I don't recall.  Last week sometime.

8   Q.      How did you find out about it?

9   A.      A phone call.

10  Q.      I'm sorry.  Please don't tell me about any

11  conversations that happened with your attorney.  You can

12  tell me that you received a phone call from a friend,

13  but don't tell me the substance of that conversation.

14  A.      I received a phone call and an e-mail.

15  Q.      Thanks.  Did you review any documents in

16  preparation for today?

17  A.      Yes.

18  Q.      What did you review?

19  A.      Paperwork.

20  Q.      What paperwork?

21  A.      My answers, pretty much.

22  Q.      Answers to what?

23  A.      To questions that you-all asked previously.

24  Q.      Did you review any other documents?

25  A.      No.

```
1   Q.      Did you speak with anyone other than your
2   attorney about your deposition today or the facts of
3   this case?
4   A.      No.
5   Q.      Have you ever been arrested before?
6   A.      Yes, I have.
7   Q.      When?
8   A.      1997.
9   Q.      For what?
10  A.      Theft by taking.
11  Q.      Anything else?
12  A.      No.
13  Q.      Were you convicted of that crime?
14  A.      Yes.
15  Q.      Have you ever had any traffic tickets before?
16  A.      Yes.
17  Q.      In the last three years?
18  A.      No.
19  Q.      Where did you currently live?
20  A.      3708 Milliken Court, Decatur.
21  Q.      And what county is that in?
22  A.      That's Dekalb County.
23  Q.      Who do you live there with?
24  A.      Me and my stepfather.
25  Q.      What's your stepfather's name?
```

```
1    A.      Andrew Jackson.

2    Q.      Do you have other family in the Atlanta area?

3    A.      Yes.

4    Q.      What area do they live in?

5    A.      Atlanta, Decatur, Covington.  Pretty much all

6    over.

7    Q.      Can you tell me their names?

8    A.      No.

9    Q.      You said no?

10   A.      No.

11   Q.      You don't know their names?

12   A.      I know their names, but what does that have to

13   do with it?

14           MR. CALDWELL:  Tell him their names.

15           THE WITNESS:  Let me confer.

16   Q.      All right.

17   A.      Ellen Campbell, Julie Campbell, Kathy Smith,

18   Brittany Smith, Jasmine Smith, Erica Burney, Collie

19   Burney, Aubrey, Lester Burnet, Carmen Burney, Jasmine

20   Burney, Nelly Pierce.  That's about it in the

21   surrounding area.

22           MR. CALDWELL:  You can run for office, you

23   know.  You got enough people to vote.

24   Q.      (By Mr. Mahoney)  That's it?

25   A.      Yes.
```

```
 1    Q.      Have you ever been a party to a lawsuit before?
 2    A.      No.
 3    Q.      Can you tell me all of the degrees you've earned
 4    education-wise?
 5    A.      High school diploma and PC Support Tech.
 6    Q.      Where did you go to high school?
 7    A.      Avondale High School.
 8    Q.      Do you know what years you attended?
 9    A.      '94 to '99.
10    Q.      Did you require a GED?
11    A.      No.
12    Q.      Where did you get your PC support tech?
13    A.      Computer Ed Institute, Norcross.
14    Q.      You said what Institute?
15    A.      Computer Ed.
16    Q.      Do you have any other professional or vocational
17    training?
18    A.      CDL; that's about it.
19    Q.      You said CDL?
20    A.      A Class A CDL license.  That's it.
21    Q.      And what does that permit you to do?
22    A.      Drive 18-wheelers.  Anything under 26,000
23    pounds.
24    Q.      When did you obtain that?
25    A.      2011.
```

```
 1    Q.       And when did you get your degree from Computer

 2    Ed Institute?

 3    A.       2003.

 4    Q.       Okay.  What was your first job after high

 5    school?

 6    A.       After high school?

 7    Q.       Yes.

 8    A.       My first job after high school, Target.

 9    Q.       How long did you work there?

10    A.       Approximately a year-and-a-half.

11    Q.       And what were your duties at Target?

12    A.       What do they call it?  Stocker, truck stocker.

13    Q.       What were your hours?

14    A.       I'm not sure what the hours was, but it was

15    third shift.  I don't know.  It's been a while.

16    Q.       Were you an hourly employee?

17    A.       Yes.

18    Q.       How much were you paid per hour?

19    A.       That was a long time ago, Man.  I don't recall.

20    Q.       Do you know what years you worked at Target?

21    A.       I would say '99, 2000.

22    Q.       Did you punch a clock?

23    A.       Yes.

24    Q.       After you punched a clock, were you permitted to

25    leave the premises?
```

```
 1    A.        Not at all.

 2    Q.        Why did you leave Target?

 3    A.        I found a better job.

 4    Q.        What was that job?

 5    A.        U-Haul.

 6    Q.        What were your duties at U-Haul?

 7    A.        PS maintenance.

 8    Q.        And what does that --

 9    A.        Preventive maintenance, oil change, tune ups,

10    brakes.

11    Q.        How long did you work there?

12    A.        Maybe a year, approximately.

13    Q.        And do you know when you worked there?

14    A.        I don't recall.  It was 2001 to something.  I'm

15    not sure.

16    Q.        Were you hourly?

17    A.        Yes.

18    Q.        What were your hours?

19    A.        It was morning shift.  I think it was at seven

20    or eight, something.

21    Q.        How much were you paid per hour?

22    A.        I don't recall.

23    Q.        Did you punch a clock?

24    A.        Yes.

25    Q.        Once you punched a clock, were you permitted to
```

1    leave?

    2    A.      No.

    3    Q.      Why did you leave U-Haul?

    4    A.      Because they tried to change my position and

    5    change my pay, which would have made me lose money.

    6    Q.      What did they try to change you to?

    7    A.      I'm not sure, but it was lower than what I was

    8    getting paid.

    9    Q.      Was the only difference less money per hour?

   10    A.      Yes.

   11    Q.      Did U-Haul offer you any training on being a PM

   12    Specialist?

   13    A.      I don't really know -- well, casual.

   14    Occasionally, we did, yes.

   15    Q.      You said you already knew how to do the job

   16    duties?

   17    A.      Yes.

   18    Q.      How did you know?

   19    A.      They trained me on certain things like brakes.

   20    I did it in high school, so...

   21    Q.      How to change oil?

   22    A.      What you mean?

   23    Q.      That's what you learned in high school, how to

   24    change oil?

   25    A.      Basically OEC taught you how to fix on cars,

basic maintenance.

Q.    And what was the training called at U-Haul?

A.    I don't recall.  It was just training.

Q.    Okay.  It didn't have no specific name?

A.    It was just training.

Q.    Did they train you on anything other than brakes?

A.    No.

Q.    What did you do after U-Haul?

A.    After U-Haul, I attended -- that's right, I enrolled in Computer Ed.

Q.    What was your first job after graduating from Computer Ed?

A.    It was a temp service.  I'm not sure the name of it, but some of the --

Q.    What were your duties?

A.    PC support, break down or rebuild computers.

Q.    And what was the duration of the temp service?

A.    I don't recall.

Q.    Were you paid hourly?

A.    Yes.

Q.    What were your hours?

A.    Seven to three.

Q.    How much were you paid per hour?

A.    I don't recall.

```
1    Q.      Did you punch a clock?

2    A.      Yes.

3    Q.      Once you punched a clock, were you permitted to

4    leave?

5    A.      No.

6    Q.      Why did you end up leaving?

7    A.      The assignment was over.

8    Q.      Where was the assignment?

9    A.      Lithonia.

10   Q.      What were you doing in Lithonia?

11   A.      Excuse me?

12   Q.      What did they have you doing in Lithonia?

13   A.      PC support, fixing on computers, rebuilding

14   computers.

15   Q.      Were you in any type of --

16   A.      We was in a house.  I was in a house.

17   Q.      In a house?

18   A.      Yes.

19   Q.      Do you know who owned the house?

20   A.      No.

21   Q.      What did you do after that?

22   A.      Unemployed.

23   Q.      How long?

24   A.      Until 2004.

25   Q.      And when did the temp service end, what year, do
```

```
1    you know?

2    A.      I'm not sure.

3    Q.      What did you do in 2004?

4    A.      Cintas, the uniform -- Cintas Corporation.

5    Q.      Can you spell that, please?

6    A.      C-I-N-T-A-S.

7    Q.      And what did you do there?

8    A.      Multiple jobs.  Flat roller to sales service

9    representative to tile carpet specialist.  Multiple

10   jobs.

11   Q.      Did you receive any training to perform those

12   jobs?

13   A.      Yes, extensive.  It was 30 days -- every 90

14   days, and it's based on position.

15   Q.      Were you hourly?

16   A.      Yes.

17   Q.      What were your hours?

18   A.      I mean it's multiple positions, multiple shifts.

19   I mean for a couple of years it was six -- no, 9:30 to

20   6:00 a.m., and it was 4:00 to 2:00 a.m. -- 4:00 a.m. to

21   12:00 noon.  And then the last, it was various hours,

22   based on where the work was needed.

23   Q.      How much were you paid per hour?

24   A.      At what time?  From the beginning to the end?

25   Q.      Yes.
```

```
1    A.      They may ranged from 9.63 to 14.50.

2    Q.      Did you punch a clock?

3    A.      Yes.

4    Q.      Once you punched in, were you allowed to leave?

5    A.      In the last two positions, SSR and tile carpet

6    specialist, yes.

7    Q.      Under what circumstances were you permitted to

8    leave?

9    A.      I mean, you had to leave the premises to go do

10   the job, go run your route.

11   Q.      Tell me what running your route entailed, and go

12   by each position.

13           So what was the first position?

14   A.      The first position was mat roller, just

15   basically rolling matts.

16   Q.      And what did running that route entail?

17   A.      That was inside.

18   Q.      Okay.  So what was the first position that --

19   A.      Outside?

20   Q.      Yes.

21   A.      SSR, sales service representative.

22   Q.      All right.  And what did that entail?

23   A.      Picking up the dirty, counting the -- basically

24   keeping inventory and restock the customer to what their

25   weekly inventory should be.
```

Q.    And how long were those routes?

A.    They varied by the day.  It depended on how many stops you had that day.

Q.    Okay.  Was there down time between the stops?

A.    No.

Q.    After you finished your last stop, did you return to the shop?

A.    Yes.

Q.    Was there a GPS in the truck that you used?

A.    I'm not sure.

Q.    Who provided the vehicle?

A.    The company, Cintas.

Q.    So tell me what your daily routine was while you were a self-service rep?

A.    That's what I just gave you.

Q.    That was it?

A.    Yes.

Q.    So you punched in and then you'll go on your route?

A.    Punch in, make sure your truck is loaded, and go on all of your routes, pick up your dirty.

Q.    Okay.  What was your next position, and how much did that pay?

A.    That was 16.73 for -- during the training, and then it was based on commission and a base.  The base

pay was --

Q.    And what was the commission?

A.    It was eight percent of the route volume.

Q.    And what was the base?

A.    The base was 14.

Q.    The base was $14 per hour?

A.    410.

Q.    410 a week?

A.    Yes, plus whatever you sold; 16 percent of what you sold.

Q.    So it's 410 per week, plus 16 percent sales, plus four percent of route volume?

A.    Yes.  And then once a month you got a bonus based on your delinquent removers.  As long as it was over three, and it -- delinquent movers was 446.25; 446.25.

Q.    What was the next position that required you to leave?

A.    Tile and carpet specialist?

Q.    And were you trained for that?

A.    Yes.

Q.    And how much were you paid for training?

A.    It was 14.50.  They sent you to Cincinnati for a week to do training.

Q.    Why did you go from sales service rep to tile

1   and carpet?

2   A.      Just a change of responsibilities.

3   Q.      Did you want to change?

4   A.      Yes.

5   Q.      You preferred the responsibilities of tile and

6   carpet?

7   A.      Yes.

8   Q.      And tell me what your daily routine was with

9   tile and carpet?

10  A.      Clock in, check your truck out, make sure it's

11  stocked with chemicals needed for that day, hoses, et

12  cetera, equipment.  You have your jobs, and then just go

13  in route.

14  Q.      And what did you do at the jobs?

15  A.      You first of all came to a job, moved around

16  tile and carpet.  You did mostly commercial, so moving

17  desk or anything.  You know, you got to move those out

18  first, and basically prep, and then clean the carpet.

19  Put up all your safety.

20  Q.      Was there down time in between those jobs?

21  A.      Occasionally.

22  Q.      What did you do during your down time?

23  A.      Eat lunch, wait, go near the next customer and

24  wait.  Let them know you're there, and let them know you

25  can start earlier or if they wanted to start at the

1    time.

2    Q.       If they wanted you to wait, what would you do?

3    A.       Pretty much wait on them.

4    Q.       How were you compensated for that position?

5    A.       14.50 an hour.

6    Q.       What were your hours?

7    A.       They varied.

8    Q.       Give me an example.

9    A.       Sometimes we started at eight.  Sometimes we may

10   not start until noon, two o'clock, six o'clock, I mean.

11   Q.       If you started at noon, how long would you go?

12   A.       Until the job finished.  Most jobs, like a four

13   to six hours top.  Occasional jobs may take 10 hours.

14   Q.       And you would do multiple jobs in one day?

15   A.       Yes.

16   Q.       Did you?

17   A.       No.

18   Q.       Bonuses?

19   A.       No.  Just straight hourly pay.

20   Q.       What was your next job?

21   A.       Temp service out in Norcross.  I'm sorry, after

22   there I went to Swift, what was required by CDL.

23   Q.       Okay.  So what year did you leave Cintas?

24   A.       2010.

25   Q.       When did you start at Cintas?

```
1    A.      '04.

2    Q.      And why did you leave?

3    A.      I was actually laid off from like lack of work,

4    no work.

5    Q.      So there wasn't enough jobs?

6    A.      It just kind of slowed down.  Basically it

7    wasn't enough jobs for everybody, so they pretty much

8    laid you off.

9    Q.      When did you start the temp service in Norcross?

10   A.      That was after I got back from Swift.  I started

11   Swift in -- it was in 2011.  I'm not sure of the month.

12   No, July.  July of 2011.

13   Q.      Describe Swift?

14   A.      Swift?

15   Q.      Swift?

16   A.      Swift Transportation.

17   Q.      All right.

18   A.      They sent you out to San Antonio for five weeks

19   of training.

20   Q.      You worked for a month?

21   A.      Yes, after the training.

22   Q.      This wasn't a temp job?

23   A.      No.

24   Q.      Why did you leave?

25   A.      Just away from the kids, wife, marital problems,
```

1    problems at the house.  I never was home.

2    Q.      What were your duties there?

3    A.      Driving loads.  Drive to a location, pick up a

4    trailer, drop it off at another location.

5    Q.      And what was the -- where were you when you were

6    driving this, what was the area?

7    A.      Everywhere.  It was over-the-road.  It was

8    stationed out of Decatur.  But wherever we needed to

9    load, Alabama, Cincinnati, everywhere.

10   Q.      Were you hourly?

11   A.      Was I hourly?  No.  I was paid on the road.

12   Q.      So how were you compensated?

13   A.      In training, it was five-something a week.

14   Q.      And how were you compensated when you were

15   actually traveling?

16   A.      I never made it to that part because at that

17   point it was a lot of time away from home, not enough

18   money.

19   Q.      So you left after training?

20   A.      Pretty much.

21   Q.      During that month were you compensated at all?

22   A.      Yes.

23   Q.      How were you compensated?

24   A.      500 a week.

25   Q.      Where did you work after that?

A.      Then I went to the temp service.

Q.      Okay.  Describe your duties there.

A.      Well the site they had you -- I think they had me at some production warehouse in Duluth.  I don't know the name of it but.

Q.      Was it hourly?

A.      Yes.

Q.      Did you punch a clock?

A.      Yes.

Q.      What were your hours?

A.      2:00 to 11:30.  2:00 p.m. to 11:30 p.m.

Q.      What was your rate?

A.      I don't remember.

Q.      Once you punched the clock, were you allowed to leave?

A.      No.

Q.      Did you leave at the end of the assignment or before?

A.      Before.

Q.      Why did you leave?

A.      It had a death in the family and they just -- it didn't work out.  We had the confrontation between me and management.

Q.      Did you quit or were you fired?

A.      I quit.

```
1    Q.      And what years did you or what span of time did
2    you work in?
3    A.      I'm not sure when I started, but I ended in
4    March 2012.
5    Q.      What did you do after that?
6    A.      All American Road.
7    Q.      When did you start there?
8    A.      May 2012.
9    Q.      And when did you stop working there?
10   A.      I'm not sure of the month, but I went through
11   training and started doing tow truck driving.
12   Q.      When did you leave All American and go down
13   there?
14   A.      I'm not sure of the date, but it was in 2012,
15   summer 2012.
16   Q.      Why did you switch the from Ideal to All
17   American?
18   A.      Because I wanted to tow.
19   Q.      Why did you want to tow?
20   A.      Just something I liked, physical work.
21   Q.      Did you have any experience in towing?
22   A.      No.
23   Q.      Was it not like driving the hook?
24   A.      What?
25   Q.      Was it not like driving the hook?
```

```
1    A.       Drive the hook?

2    Q.       You said you previously drove hook, picking up

3    trailers, right?

4    A.       That was dropping hooks.

5    Q.       Dropping?

6    A.       Yes.

7    Q.       Okay?

8    A.       Like dropping it off and picking it up, the next

9    one.

10   Q.       Right.

11   A.       There is a difference in that.

12   Q.       Did you --

13   A.       Anytime --

14   Q.       I'm sorry.  Go ahead.

15   A.       No, I was just going to say some time I wasn't

16   away from home.  I came home every night.

17   Q.       Where were you living at the time?

18   A.       Same location 1708 Milliken.

19   Q.       And that's in Decatur?

20   A.       Yes.

21   Q.       And you were also towing in that same area?

22   A.       Yes.

23   Q.       What was your designated area?

24   A.       It was a lot of areas.  It was from Decatur, all

25   the way to Northeast Atlanta.  Let's see.  Stockbridge;
```

```
 1    I mean, it was a huge area.

 2    Q.      And were you hourly?

 3    A.      No.

 4    Q.      How were you compensated?

 5    A.      Commission.

 6    Q.      What was the commission?

 7    A.      It was supposed to be 30 percent of the truck

 8    volume.

 9    Q.      You understood the difference between being paid

10    a commission and being paid hourly, correct?

11    A.      Yes.

12    Q.      When did you work for South Metro Towing?

13    A.      2015.  August 2015 to April '16, and I'm back

14    there currently now.

15    Q.      Why did you start working there?

16    A.      Better pay.  They pay by the hour.

17    Q.      What were your duties?

18    A.      Towing cars, APD.  Towing state patrol in

19    Hapeville.

20    Q.      Why did you leave between April '16 -- I mean

21    April 2016, and when you went back?

22    A.      Me and the owner had -- we didn't see eye to

23    eye.  We bumped heads on some big towing, and it was

24    better for me to just walk away.

25    Q.      What's the name of that owner?
```

1    A.      Greg Greeson and Bonnet Greeson.

2    Q.      How do you spell Greeson?

3    A.      G-R-E-E-S-O-N.

4    Q.      How long have you been a tow truck driver in

5    total?

6    A.      Since 2012, so that's five years.

7    Q.      Do you consider it your occupation?

8    A.      Yes.

9    Q.      You would say you're in the business of being a

10   tow truck driver?

11   A.      Yes.

12   Q.      Have you ever owned your own business before?

13   A.      No.

14   Q.      Have you ever promoted yourself as a business?

15   A.      No.

16   Q.      Have you ever advertised yourself as a tow truck

17   driver?

18   A.      Yes.

19   Q.      How so?

20   A.      Business cards.

21   Q.      Who did you advertise yourself to?

22   A.      I was -- not too many people.  I had cards with

23   Ideal Towing, and the guy that made them, he just made a

24   typo on there and put their phone number on them, and it

25   just had my number.  So what I would do is, I would

```
 1    staple their cards to my card.

 2    Q.      Who made them?

 3    A.      I have no idea of the guy's name.

 4    Q.      Did you pay him?

 5    A.      Yes.

 6    Q.      How much did you pay him?

 7    A.      Like $20 for 250.

 8    Q.      Twenty dollars for 250 cards?

 9    A.      Yes.

10    Q.      Did you receive calls based on that business

11    card?

12    A.      One.

13    Q.      What kind of towing did Ideal Towing do?

14    A.      Mostly roadside assistance, Triple A.

15    Q.      Did Triple A have different departments, meaning

16    towing versus light services?

17    A.      Both of them had different sides.  It was a

18    towing service and light service at Ideal.

19    Q.      What side were you on?

20    A.      When I first started, it was light service, and

21    then I went to towing.

22    Q.      When did you do light service, what year?

23    A.      Like I said, I started in 2010, but I'm not sure

24    when I switched over.

25    Q.      Isn't it your testimony that you started in May
```

```
 1    2012 --

 2    A.      Yes.

 3    Q.      -- and you switched to Ideal in the summer of

 4    2012?

 5    A.      Yes.

 6    Q.      So you did light service for about a month?

 7    A.      Roughly.  It could have been, so it had to be

 8    fall and --

 9    Q.      And when you did towing, that's when you worked

10    for Ideal Towing?

11    A.      Yes.

12    Q.      Did you ever promote yourself for light

13    services?

14    A.      No.

15    Q.      What is light service work?

16    A.      It's --

17    Q.      Excuse me.  What does light service mean?

18    A.      Basically jump starts, tire change, fuel

19    delivery.

20    Q.      Anything else?

21    A.      No.

22    Q.      Lock out?

23    A.      Yes.

24    Q.      Did Ideal Towing perform light services?

25    A.      Not that I recall.
```

```
1    Q.       At Southwest Towing --

2    A.       Yes.

3    Q.       -- tell me what your routine is on a daily

4    basis?

5    A.       Clock in, dispatch calls, sit and wait on the

6    next one.

7    Q.       Who provides the instructions?

8    A.       Southwest Towing.

9    Q.       Do they provide you with tools as well?

10   A.       Chains.  Pretty much chains and straps, and a

11   jack, lock out kit.

12   Q.       Do you own any of those things personally?

13   A.       The only thing I own is a drill, a compact drill

14   for changing police cars tires.

15   Q.       What are your hours?

16   A.       Seven to seven.  7:00 a.m. to 7:00 p.m.

17   Q.       How much are you paid per hour?

18   A.       $15 an hour.

19   Q.       Do you earn any bonuses?

20   A.       No.

21   Q.       Commissions?

22   A.       No.

23   Q.       Is there a GPS in the truck that you use?

24   A.       Yes.

25   Q.       What type?
```

A.      I think it's a Magellan.

Q.      Repeat that.

A.      Magellan.  It's hooked to the -- we have a
system, a tracking device, where they can send you the
location where it is from one location to the truck.
I'm not sure what that's called.

Q.      And what does that tracking system tell you?

A.      I mean, what do you mean by that?

Q.      Does it tell you the miles to the designation?

A.      Yes, turn by turn.  That's what it tells you.

Q.      Does it tell you the cost of the job?

A.      No.  You already know the cost.

Q.      What's the cost?

A.      What's the cost?  I can't say that because it's
confidential information with their business.

Q.      And where do they operate out of?

A.      What do you mean, what city or the address?

Q.      Yes.  General address?

A.      Atlanta.

Q.      What do you do while waiting for calls at South
Metro?

A.      Sit in the yard.

Q.      Are you permitted to leave?

A.      Only to go get something to eat.

Q.      Do you have a set lunch time?

```
 1   A.      No.

 2   Q.      So you have to clock out when you leave to get

 3   food?

 4   A.      No.  Clock out for lunch.  I mean you can go get

 5   your food and come back and clock out.

 6   Q.      Are there any other rules for what you can or

 7   cannot do while waiting?

 8   A.      What you mean by that?  I mean, that's about it.

 9   You're just sitting at the yard.  You really can't --

10   you're not doing anything.  Or you can go sit at Lot 2

11   and wait, just in case a customer come pick up, you just

12   go approximately two miles up the street.

13   Q.      What does loading a car onto the tow truck

14   entail?

15   A.      Safety first.  Entirely no damage, hooking it up

16   and wrenching it up, strapping it down.

17   Q.      About how long does that take?

18   A.      It depends on the scene.  Between three and

19   seven minutes.

20   Q.      What could cause it to take longer than seven

21   minutes?

22   A.      A rollover.  You may have to wait on GSP or APD

23   to fingerprint it, to pull a customer out, I mean, the

24   member out.  Whoever car it is, they may need jaws to

25   cut them out.  Basically just wait time.
```

```
 1    Q.      Okay.  How many tows are you required to
 2    perform?
 3    A.      There is no set amount.  It's based on whatever
 4    city calls.  If we don't have no calls that day, we
 5    don't tow no cars.
 6    Q.      What do you do with the vehicle once you load
 7    it?
 8    A.      Safe and secure it and bring it back to the
 9    yard, right, take the paperwork in.
10    Q.      Can an individual request a tow job in your
11    current position?
12    A.      Excuse me?
13    Q.      Can an individual request a tow job in your
14    current position?
15    A.      Can an individual -- somebody -- just a walk up?
16    Q.      Yes?
17    A.      Yes.  You have to call it in.
18    Q.      Who would they call it in to?
19    A.      To the shop.  Pretty much back at the office.
20    Q.      Okay.  What was your routine at Ideal Towing?
21    A.      Come in, check out the truck, go sit in the
22    area, wait on a call.  Log into the tablet.
23    Q.      Didn't you keep the truck?
24    A.      Occasionally.
25    Q.      Didn't you have an issue with your daughter that
```

```
 1    required you to be home at a certain time and sometimes
 2    on weekends?
 3    A.      Yes, sir.
 4    Q.      Was that, in fact, most weekends that you --
 5    A.      That's what I requested, to work Monday through
 6    Friday.  That was in 2015, and pretty much just about
 7    the end of my tenure there.  So I'd say about the last
 8    six months.
 9    Q.      Because of that responsibility, what -- how did
10    that impact your beginning and ending time of work?
11    A.      It didn't impact it because I still had to do
12    the same schedule.  I did 12 hours, either from 7:00 to
13    7:00 or 5:00 to 5:00.
14    Q.      So you didn't have to be somewhere to pick up
15    your daughter?
16    A.      I had to be at the house --
17    Q.      Or be there when she gets home?
18    A.      At the house, yes.
19    Q.      And what time did she get home?
20    A.      I didn't have to be there right when she got
21    home.  It was just I couldn't leave her there alone at
22    home.  She probably got home, roughly -- right before I
23    switched my schedule, roughly an hour, hour-and-a-half
24    before I got there.
25    Q.      So about 5:30 to 6:00?
```

1    A.       She got home roughly about 5:30, yes.

2    Q.       And did you have to be in when she left in the

3    morning?

4    A.       No.  The bus stop right down the street.

5    Q.       So what time did you have to see to it that your

6    daughter left home?

7    A.       What you mean left home?

8    Q.       What time did she leave in the morning?

9    A.       She had to be at the bus stop roughly about

10   7:30.  Between 7:30 and 7:45, something like that.

11   Q.       And you didn't have to be there --

12   A.       No.

13   Q.       -- when she left?

14   A.       No.

15   Q.       How did you record your hours?

16   A.       On the log in, on the tablet, basically.

17   Q.       You weren't required to do a sign in sheet?

18   A.       A sign in sheet?

19   Q.       Yes?

20   A.       We would have to sign in for a while.  That

21   didn't last long.  We just basically come in, you state

22   you're here, and you go out, log in and go.

23   Q.       Didn't you fail to use the sign in sheet?

24   A.       I don't recall.

25   Q.       Where are the employee's files kept at Ideal

Towing?

A.      I'm not sure.

Q.      Is there some kind of GPS in the trucks that you
used?

A.      It's GPS on the tablet.

Q.      Did you ever use DDS?

A.      Yes.

Q.      Is there a difference between DDS and the
tablets?

A.      DDS was mounted in the truck.

Q.      When did you use a DDS?

A.      When I started, DDS -- approximately six months
or so, and then they went to the tablets.

Q.      And how does a DDS work?

A.      Log in just like the tablets, pretty much,
driver's number, log in.

Q.      Is there select drivers that respond to calls?

A.      No, the dispatcher does.  They pretty much
dispatch the drivers.

Q.      Okay.  So how does that work?  A dispatcher
calls you and tells you how that works?

A.      They send it to your truck, send it to your DDS
and -- they pretty much know where you are.  You let
them know, I'm at such and such, I'm sitting here.  And
they have a GPS where they can pull up where your truck

1    is located, where you were.

2    Q.      And who does the dispatch work for?

3    A.      There are several dispatchers.

4    Q.      Say that again.

5    A.      I said there were several dispatchers.

6    Q.      And who did they work for?

7    A.      Ideal Towing.

8    Q.      And --

9    A.      And some with Triple A also.

10   Q.      Did you know the difference between Triple A

11   dispatchers and Ideal's dispatchers?

12   A.      Not when they send -- well when Triple A send

13   you a call, they'll call you and say, hey, can you run

14   this.  And Ideal know where you are, and they just send

15   it straight to you.

16           Triple A, if they send you a call, it would be

17   could you help in this area right here.  It may be out

18   of zone.  Like, hey, I don't know.  I need to call and

19   find out can I run it, you know, let me call the shop

20   right quick and see if I can run it.  If they say you

21   can run it, run it.

22   Q.      Well this is done by the DDS or tablet or --

23   A.      Both.

24   Q.      So do you generally get calls to go to a job or

25   do you generally have it sent directly to --

```
1    A.       It's directly sent to --

2    Q.       -- to the DDS or tablet?

3    A.       Directly to the tablet or the DDS.

4    Q.       Okay.  When a job is sent directly to the DDS,

5    how do they choose the driver?

6    A.       They look on their computer and see who is

7    closest to the call.

8    Q.       The same with the tablet?

9    A.       Yes.

10   Q.       Do your jobs ever require you to leave your

11   designated area?

12   A.       Occasionally.

13   Q.       How so?

14   A.       The demand.  I don't know how to answer that

15   question.

16   Q.       Could you give me an example of what could cause

17   you to leave a designated area on a job?

18   A.       Yes.  They may not have an area and they don't

19   have no driver out in that area to pick up from that

20   area.

21   Q.       Sometimes when you pick up a vehicle in your

22   area, could you have it dropped off outside of your

23   designated area?

24   A.       Yes.

25   Q.       When you're outside of your designated area, do
```

1    calls get dropped to your DDS?

2    A.      On the way back.  If you come in, and they know

3    you're coming in that way, they'll send you a file.

4          MR. CALDWELL:  Objection to the question.  I

5    know he's already started it.  I'm trying to figure out

6    what you mean do calls get dropped to your DDS?  What

7    are you talking about?

8    Q.      (By Mr. Mahoney)  Did you understand the

9    question?

10         THE WITNESS:  I mean he was saying, first of

11   all, basically, will they drop the car in your box?

12         MR. CALDWELL:  Okay.  I just wanted to be

13   clear with the answer and the question.

14   Q.      (By Mr. Mahoney)  Were there rules at Ideal

15   Towing for what you can do while waiting?

16   A.      You just have to be ready, whenever a call come.

17   Q.      Did you have to be sober?

18   A.      Of course, you're driving.

19   Q.      So it wouldn't be against the rules for you to

20   grab a drink?

21   A.      It would definitely be against the rules.

22   Q.      It would be against the rules to grab a drink?

23   A.      What kind of drink?

24   Q.      Non-alcoholic?

25   A.      You can grab a Coke if you're out, you're in the

```
 1   area.

 2   Q.      How about something to eat?

 3   A.      Yes, you can grab something to eat.  But if you

 4   grab something to eat, and they have a call, you still

 5   got to run that call.

 6   Q.      Say you didn't get a call for an hour, during

 7   that hour, could you run an errand?

 8   A.      I mean, pretty much.  You still -- like I say,

 9   you have to be available.

10   Q.      And you wouldn't get in trouble for that, would

11   you?

12   A.      No.

13   Q.      As long as you're available?

14   A.      As long as you're available.  If a call drop, go

15   run the call, no matter what you're doing.

16   Q.      Could you visit a friend as long as you could

17   respond to a call promptly?

18   A.      As long as you're in the area.

19   Q.      Could you sleep as long as you could respond to

20   a call promptly?

21   A.      I don't know.  I guess, as long as you're

22   available and hear the call.  You got to go get it.

23   Q.      Was there any downtime between the tow jobs?

24   A.      Yes.

25   Q.      What's the most tow jobs you could possibly do
```

1   in a day, to your knowledge?

2   A.      I've done 12 to 15 a day, depending on how the

3   load is going and how far it's going.

4   Q.      And what's the least amount you recall doing a

5   day?

6   A.      Five.

7   Q.      Did you ever take your truck home?

8   A.      Yes.

9   Q.      Did you ever take your truck home after work

10  hours?

11  A.      Yes.

12  Q.      During work hours?

13  A.      Yes.

14  Q.      Did you ever keep the truck overnight?

15  A.      Occasionally.

16  Q.      Were you ever punished for doing any of those

17  things?

18  A.      Sometimes.  If they say bring the truck back to

19  the yard, and you don't, you get suspended for a couple

20  of days.

21  Q.      So if they asked you to bring it back?

22  A.      Yes.

23  Q.      Is that when you had it outside of work hours?

24  A.      Yes.  If somebody need the truck -- if I needed

25  the truck, bring it to the yard.

Q.     At the time you were working for Ideal, did you
have any children living with you?

A.     My oldest daughter.

        MR. CALDWELL:  Can we take a break?  We've
been going for over an hour.

        MR. MAHONEY:  Yes, absolutely.

             (Off the record.)

Q.     (By Mr. Mahoney)  So why did the company stop
using time sheets, Mr. Burney?

A.     I have no idea.

        MR. CALDWELL:  You're asking why did the
company do something?

        MR. MAHONEY:  Yes.

Q.     (By Mr. Mahoney)  I'm asking why did the company
stop using time sheets?

A.     I have no idea.

Q.     Okay.  And why did you stop using the time
sheets?

A.     I don't recall.

Q.     Did anyone tell you you didn't have to do time
sheets?

A.     No.

Q.     Did you do any time sheets in 2014?

A.     I don't recall.  I don't recall.

Q.     Do you recall ever doing time sheets?

A.      One time.  Most of it was, like I say, logging
in the tablets.

Q.      That one time that you remember doing a time
sheet, was that in 2012, when you first started working?

A.      No, it was in '13.

Q.      In '13?

A.      Yes.

Q.      All right.  Now that you've taken a break, is
there anything in your testimony that you want to
correct for the record?

A.      No.

Q.      At Ideal Towing, how many tows were you required
to do per shift?

A.      There was no set number.

Q.      Did you have a quote of any sort?

A.      No.  Based on demand.

Q.      Did you have the ability to reject or accept
calls that were given to you?

A.      The only calls you could -- it's not rejecting.
I'm in a flatbed, and a member request a wheel lift, you
can't, you know.  Because of Triple A, everything has to
be loaded in neutral.

Q.      So you can reject jobs that you can't physically
do?

A.      Right.

```
1    Q.     Can you reject jobs that are inappropriate?

2    A.     Meaning?

3    Q.     Is there any situation where you can reject a

4    job?

5    A.     No.

6    Q.     And who told you that?

7    A.     Management.  All calls must be ran.

8    Q.     Who told you that?

9    A.     The driver management, whoever that may have

10   been at the time.  There were multiple.

11   Q.     Unless the job was wrong, it wasn't supposed to

12   go to you?

13   A.     Right.

14   Q.     Isn't there a feature on the tablet that allows

15   you to accept the call?

16   A.     Yes.

17   Q.     Is there a feature for declining the call?

18   A.     Yes.

19   Q.     If there's a situation where you had to decline

20   a call, what did you do?

21   A.     Call in.  Let them know, hey, I called the

22   member.  The member said the car won't go in neutral,

23   and then Triple A will take it away.

24   Q.     Did you decline them first and then call them

25   and tell them what happened?
```

```
A.      No.

Q.      Or did you accept the call?

A.      No.

Q.      Okay.

A.      You accept the calls because you don't know
nothing about it until you accept it.  You accept the
call.  You receive the details, see what's coming in,
call such and such, what's going on with your vehicle.
I'm stuck in a parking garage.  A flatbed can't get in a
garage or any car stuck in neutral, can't drag it.

Q.      And then after you speak with the customer
that's when you call the company?

A.      Call the shop, yes.  Whoever this customer is, a
wheel -- a flatbed, whatever.  Or if they need a wheel
lift, and a vehicle may just be too heavy for a wheel
lift, like a truck.

Q.      After you called into the company, did anyone
contact that customer to verify what you said?

A.      Yes.  I mean, you -- they would have to do that
anyway.  You'd have to call and verify.  Then the next
driver would do the same.

Q.      And who would call and verify?

A.      Both.  The driver would call first and -- I
mean, the dispatcher would call and verify, and then the
driver would have to call anyway, because you have to do
```

1  your S7, basically, asking them what's going on with the

2  vehicle, where are they located, get all that

3  information.

4  Q.      Just to make sure that I'm clear, I'm now

5  talking about after you find out that the call has to be

6  declined?

7  A.      Yes.

8  Q.      And you call in and tell the company?

9  A.      Yes.

10  Q.      That, you know, this call has to be declined

11  because you can't physically perform it?

12  A.      It can't be -- it's not declined it's just -- I

13  can't accept it.  I mean, I can accept it.  You accept

14  it anyway.

15  Q.      Right?

16  A.      But physically, I can't get it.

17  Q.      Right?

18  A.      Someone else is going to have to do it.

19  Q.      Right?

20  A.      You call the shop.  The shop calls the member to

21  verify it and then they send it to another driver.

22  Q.      Okay.  What did you do with the vehicles once

23  they were loaded onto the tow truck?

24  A.      Secure them, four-point tie down.

25  Q.      And then what?

```
 1    A.      Take it to the location where the member needs

 2    it to go.

 3    Q.      And then what?

 4    A.      Drop it off and close it out.

 5    Q.      How do you close it out?

 6    A.      In the tablet.  You -- I don't remember the

 7    exact thing.  You have to basically close it out.  It's

 8    a step, a series of steps you have to go to through to

 9    close it out on the tablet.

10    Q.      Okay?

11    A.      Or DDS, whichever one.

12    Q.      And then what did you do?

13    A.      Sit and wait on the next call.

14    Q.      And return to the designated area?

15    A.      Yes.

16    Q.      That you have to --

17    A.      If it's delivered outside the area, you go back

18    to your area.

19    Q.      Were there instances --

20            MR. CALDWELL:  Can we take a quick break?  I

21    left my pad back in the room.

22            MR. MAHONEY:  Yes, that's fine.  We'll take a

23    short break.

24                         (Off the record.)

25    Q.      (By Mr. Mahoney)  Were there instances where you
```

```
1   could help a customer without towing their vehicle,
2   while working at Ideal Towing?
3   A.      I mean if you jump start it, if you put it on
4   the go.
5   Q.      Were there instances where you could help a
6   customer without towing their vehicle?
7   A.      Yes.  You can jump start some members.  You can
8   tap their starter and start it, tighten up the cable.
9   Q.      Could you help them if they were locked out?
10  A.      Yes.
11  Q.      If they had a tire change?
12  A.      Yes.  If you're there already, yes.  That's what
13  they would call on-the-go.  You get them on-the-go.
14  Q.      Okay.  Even though that wasn't your department?
15  A.      I mean roadside is roadside.  If you pull up and
16  they need a tire change, they prefer their tire to be
17  changed, then you have a tow.  And if they have a spare,
18  that's in there, change the tire and get them on-the-go.
19  Q.      But you were part of the towing department then?
20  A.      Yes.
21  Q.      And not light services?
22  A.      Not light services.
23  Q.      And you learned those specific skills prior to
24  working at Ideal Towing, didn't you?
25  A.      Everything except for lock out.
```

```
 1    Q.      Have you ever performed mechanic services
 2   before?
 3    A.      Yes, U-Haul.
 4    Q.      Have you ever perform mechanic services for
 5   anyone else?
 6    A.      Yes.
 7    Q.      Friends and family?
 8    A.      Yes.
 9    Q.      Have you ever charged anyone for mechanic
10   services you did?
11    A.      Of course.
12    Q.      How much did you charge?
13    A.      It depends on what the job was.
14    Q.      How much would you charge for doing oil changes?
15    A.      Oil changes?  Roughly, $20.
16    Q.      How about tires?
17    A.      I ain't never done tires.  I don't have the
18   machine for all of that.
19    Q.      What's the most you ever charged for mechanic
20   services?
21    A.      Like $500.
22    Q.      Was that before or after you worked for Ideal?
23    A.      Before.
24    Q.      So you were required to have a lockout kit?
25    A.      Yes.
```

```
 1    Q.       And did you personally own it?

 2    A.       Yes.

 3    Q.       Did you own it before you started working for

 4    Ideal?

 5    A.       No.

 6    Q.       Did you have a jump box?

 7    A.       Yes.

 8    Q.       And did you personally own it?

 9    A.       Yes.

10    Q.       How about -- well that include jumping cables,

11    I'm guessing?

12    A.       I didn't do jumping cables.

13    Q.       Okay.

14    A.       Jumping cables were already on the truck.

15    Q.       Were there any other tools?

16    A.       That I needed?

17    Q.       Yes?

18    A.       No.  A drill and a drop box and a lockout kit.

19    Q.       So can you identify all of the different types

20    of customer you can serve at Ideal?

21    A.       What do you mean?

22    Q.       Like, were they the members of a specific --

23    A.       They had to be in the Auto Club.

24    Q.       Right?

25    A.       Yes.
```

```
 1   Q.        So Auto Club members?

 2   A.        Yes.

 3   Q.        Who else?

 4   A.        Private.

 5   Q.        And Auto Club is through Triple A?

 6   A.        Triple A, Lexus.  They basically did it through

 7   Triple A.

 8   Q.        What's the process for an individual, a private

 9   individual receiving a tow service at Ideal?

10   A.        Privately paid money.

11   Q.        Do they give you the money?

12   A.        Yes.  You mean the customers?

13   Q.        Yes.

14   A.        Yes.  You write it up on your paperwork and you

15   bring it in.

16   Q.        Did you ever perform tow services for

17   individuals that paid you money?

18   A.        That's the same question you just asked.

19   Q.        I asked you how, and now I'm asking did you

20   personally do it?

21   A.        And I said yes.  If you get a tow, you tow them

22   and you bring the money in.  Same question.

23   Q.        Okay.

24   A.        Different words.

25   Q.        And how much money did you handle in that
```

section?

A.    It depends on how much the tow was.  He asked me
a variety of questions.  I mean that's a road question.
That could be $50, $85, depending on where they're
going.

Q.    How many individuals did you perform tow
services for?

A.    Private?

Q.    Yes?

A.    The one on my own, you know.  Somebody I pulled
up on, but other privates, they called me and said I got
a private over here at such and such, could you go over
there and get it.

Q.    And you were expected to turn that money into
the company?

A.    Yes.

Q.    Weren't the customers supposed to call the
company first, before you?

A.    No.

Q.    Weren't you supposed to call the company before
you provided a service?

A.    No.

Q.    So how would the company know if you provided a
service to an individual customer?

A.    Turn it in.  Write it on your paperwork and turn

it in.

Q.     And if you didn't turn it in?

A.     I never had that problem.  I turned it in.

       MR. CALDWELL:  We had a term for that when I
was a cab driver in New York, when you're picking up
customers that you weren't dispatched to, and I was
trying too remember what it was.  It was so long ago.
It was probably over 50 years ago.

       THE WITNESS:  And it's still going on.

       MR. CALDWELL:  I forget -- there was a word
for it, though.

Q.     (By Mr. Mahoney)  So what's your understanding
of what happens when a customer car breaks down?  Do
they call you, the company, Triple A or go through the
process as you understand it?

A.     Rephrase.

Q.     What happens when a customer car has an issue
from start to finish?

A.     What kind of customer?

Q.     An individual that's a Triple A member?

A.     If they're a Triple A member, they call Triple
A.

Q.     And then what does Triple A do?

A.     Triple A gets all their information and dispatch
the call.

```
 1   Q.      To?

 2   A.      To the shop and the shop dispatches to the

 3   driver.  And like I said before, if it's out of the

 4   area, Triple A would dispatch it to you, and then call

 5   and ask you could you run it, and then verify, hey, I

 6   got to call the shop.  If the shop say okay, run the

 7   call.

 8   Q.      What does DDS stand for?

 9   A.      I have no idea.

10          MR. CALDWELL:  I was going to ask you that

11   question.

12          THE WITNESS:  Digital Dispatch System.

13          MR. CALDWELL:  Okay.

14          MR. MAHONEY:  There we go.

15          MR. CALDWELL:  Actually, I thought it was a

16   dentist.  I couldn't figure out what you were doing with

17   a dentist.

18   Q.      (By Mr. Mahoney)  If you were not selected by

19   the DDS, what would you do?

20   A.      You wouldn't know about the call.

21   Q.      And then what would you end up doing?

22   A.      Sitting, waiting on a call.  You don't know when

23   somebody else has dispatched a call.  It's like you get

24   this tablet.  You're the only one that have that tablet.

25   That's who gets the call when the call goes up on that
```

```
1    tablet.  It's not like it goes to every one.

2    Q.      Have your driver's license ever been suspended?

3    A.      Yes.

4    Q.      When?

5    A.      Child support, 2015.

6    Q.      Were you still working at Ideal at the time?

7    A.      Yes.

8    Q.      Did you report that to Ideal?

9    A.      I didn't know.  They called me and told me.

10   Q.      When you say "they," you mean Ideal informed

11   you?

12   A.      Ideal called me and said, hey, your driver's

13   license is suspended, you need come in.  So I came in,

14   parked the truck, and went and handled it at child

15   support.  The next day, I was back at work.

16   Q.      Any other times they were suspended?

17   A.      No.

18   Q.      How did you learn about Ideal Towing?

19   A.      My friend.

20   Q.      Who?

21   A.      Phillip Jackson.

22   Q.      And how did he know about Ideal Towing?

23   A.      He worked for them.

24   Q.      And what did he tell you?

25   A.      They was hiring.  I said, hey, Man, y'all doing
```

1    any hiring, and he said, yes.  And I started with light

2    service first, and then towing.

3    Q.      When you called, who did you speak with?

4    A.      I spoke to Vic.

5    Q.      How do you --

6    A.      He said --

7    Q.      Go ahead.

8    A.      Fine.  No, I was just going to say he said come

9    up here and talk to me.

10   Q.      And he gave you a job?

11   A.      No.

12   Q.      Who gave you the job?

13   A.      Mike.

14   Q.      How did you meet Mike?

15   A.      Through Phil, when I came in to apply.  I gave

16   him my application.  I spoke to Phil, Mike, and that was

17   it.

18   Q.      Is Mike the owner of Ideal Towing?

19   A.      As far as I know of, yes.

20   Q.      And how did you know?

21   A.      They tell you, it's Mike's company.

22   Q.      Did he control the day-to-day operations of the

23   company?

24   A.      Tishja.

25   Q.      She told you that?

```
 1    A.      What?

 2    Q.      That she controlled the day-to-day operations.

 3    A.      It's obvious.

 4            MR. MAHONEY:  You want them to sit in on the

 5    deposition?

 6            MR. CALDWELL:  Yes.

 7            MR. MAHONEY:  I'd like to request that they

 8    not be.

 9            MR. CALDWELL:  There is no reason for them not

10    to be.  They have a right to be here.  They're

11    co-plaintiffs.

12            MR. MAHONEY:  Okay.

13    Q.      (By Mr. Mahoney)  And how do you know Mike

14    doesn't make all of the decisions?

15    A.      I don't know.

16    Q.      And as you sit here today, do you have any

17    evidence that he doesn't approve all of the decisions

18    that are made?

19    A.      Rephrase.

20    Q.      As you sit here today do you have any

21    evidence --

22    A.      It's the same question.  Rephrase.

23    Q.      It's not the same question.  I haven't finished

24    my question.  Please let me finish.  Thanks.

25            As you sit here today, do you have any
```

evidence --

        MR. CALDWELL:  Can we take a break, get off the record for a moment?

                 (Off the record.)

        MR. MAHONEY:  It's approximately 12:13. During the deposition of Carlos Burney two co-plaintiffs have just entered the deposition room.

        Can you identify yourselves, please?

        MR. WYNN:  Brian Wynn.

        MR. LEWIS:  Carlos Lewis.

        MR. MAHONEY:  The two plaintiffs are scheduled to be deposed tomorrow.  Defendants and defendant's counsel request that they not be present during the deposition.  And plaintiff --

        MR. CALDWELL:  Our position is the plaintiffs have a right to be present during the deposition.  This is not a secret proceeding.  It's a court proceeding and they have a right to be present.  They are co-plaintiffs in the same action.

        MR. MAHONEY:  Again, defendant's counsel called this deposition.  It's being held at defendant's counsel request, and we're deposing the plaintiff.  It's not a deposition that was requested and scheduled by plaintiff.  Based on that, defendants believe that the plaintiffs should not be present in the deposition room.

MR. CALDWELL:  We understand your position,

and we respect it, we disagree with it.

Q.     (By Mr. Mahoney)  Did Tishja James handle

clerical matters at Ideal Towing?

A.     Yes.

Q.     To your knowledge who had the ultimate

decision-making authority at Ideal Towing?

A.     Mike and Tishja.

         MR. CALDWELL:  Did you say Mike and Tishja?

         THE WITNESS:  Yes.

         MR. CALDWELL:  I'm having trouble hearing.

         THE WITNESS:  Mike and Tishja.

Q.     (By Mr. Mahoney)  What evidence do you have to

support that, that Tishja James have the ultimate

decision-making authority?

A.     She signed -- that's where we get the checks

from.  That's who we talk to about everything.  That's

who we go to, Mike and Tishja.

Q.     Do you have any documents to support that?

A.     I have conversations, no documents.

Q.     And Mike told you he was the owner?

A.     Yes.

Q.     Did Tishja ever tell you she was the owner?

A.     Yes, co-owner.

Q.     She told you she was an owner?

A.      Both of them.

Q.      When did she tell you that?

A.      In one of the several meetings that we had.

Q.      And who all was present at that meeting?

A.      Many drivers.

Q.      Did Mike determine how much you were paid?

A.      Yes.

Q.      Why did you switch from your hourly job to a
commission-based job?

A.      Like I said before, it was a new something like
that.  I didn't -- like, it didn't have nothing to do
with commission.

Q.      How many hours did you work per week?

A.      It varies.

Q.      What days per week did you work?

        MR. CALDWELL:  At what time?

        THE WITNESS:  Up until January 15, seven to
seven, six days a week.

Q.      (By Mr. Mahoney)  Of what year?

A.      Occasionally -- what do you mean?

Q.      What year?  You said January 15, you didn't say
what year?

        MR. CALDWELL:   I think he's saying January
2015.

Q.      (By Mr. Mahoney)  2015?

```
1    A.      Yes.

2    Q.      Okay.

3    A.      Up until January 2015 I worked seven to seven,

4    occasionally, whenever the call would get finished.  So

5    it could have varied from 70 to 80 a week.  And as of

6    January '15, I let them know I needed to work five days

7    a week, Monday through Friday, five to five,

8    occasionally, five to seven, eight, whatever time the

9    last call was finished.

10   Q.      5:00 a.m. to 5:00 p.m.?

11   A.      Yes.

12   Q.      What hours was Ideal Towing open?

13   A.      24/7.

14   Q.      What were your off days prior to January '15?

15           MR. CALDWELL:  January 2015?

16   Q.      (By Mr. Mahoney)  2015?

17   A.      All, Man.  It was -- I don't even recall.  It

18   was one weekday.

19   Q.      And how about after?

20   A.      After, it was Monday through Friday.  After

21   January 2015, Monday through Friday.

22   Q.      Did you ever take time off?

23   A.      Of course.

24   Q.      When?

25   A.      One, when my mom passed, and when I went on
```

```
 1   vacation, whenever I went on vacation.

 2   Q.      How many vacations did you take per year?

 3   A.      One.

 4   Q.      How about holidays?

 5   A.      I worked just about every holiday.

 6   Q.      Christmas?

 7   A.      Yes.

 8   Q.      Okay.

 9   A.      Thanksgiving.  New year.

10   Q.      How about sick days?

11   A.      No sick days.

12   Q.      None in 2013?

13   A.      Oh, you're saying like how many days I was out

14   prior -- for being sick?

15   Q.      Yes?

16   A.      Maybe three.

17   Q.      What year?

18   A.      I'd just say each year, because I'm not sure on

19   that number.

20   Q.      So three days per year?

21   A.      Right.

22   Q.      How did you keep track of the tows you

23   performed?

24   A.      Log in sheets.

25   Q.      Were there any restrictions on where you can
```

```
1    drive the tow?

2    A.      Within the tow zone.

3    Q.      Within --

4    A.      Within your tow zone, wherever you toe at.

5    Q.      So there were no restrictions?

6    A.      As long as you're in zone.

7    Q.      Didn't you testify that you could leave the

8    zone --

9    A.      Yes.

10   Q.      If your job took you there?

11   A.      If you tow it out, yes.

12   Q.      And who set the -- that restriction?

13   A.      Mr. James and Ms. James.

14   Q.      They told you that?

15   A.      Yes.

16   Q.      Is it written down anywhere?

17   A.      No.

18   Q.      When did they tell you that?

19   A.      Every year.

20   Q.      Why did they both have to tell you?

21   A.      Like I said before, they were the owners.  If

22   you leave the meeting, everybody is there.  It's just a

23   meeting.

24   Q.      Which one of them said that specifically?

25   A.      Both.
```

```
1   Q.      At the same time?

2   A.      No, not at the same time.

3   Q.      Was it --

4   A.      Within the same meeting.

5   Q.      Who said it first?

6   A.      Mike.

7   Q.      And then Tishja said it again after him?

8   A.      Yes.  And then if you come in within that week,

9   on that Friday, she make sure she said it again, and

10  make sure you know it.

11  Q.      And during this time, you understood that you

12  were being paid based on the commission for tows

13  performed, correct?

14  A.      Yes.

15  Q.      Okay.

16  A.      Based on what the truck made.

17  Q.      Did you ever get food during your downtime?

18  A.      Of course.

19  Q.      What else did you do?

20  A.      Sit and wait on a call.

21  Q.      Anything else?

22  A.      No.

23  Q.      Can you testify that you went home?

24  A.      That's all -- I mean as long as you're in your

25  zone.  And where I live at was in the zone, so
```

```
1    technically, yes, I went home and still was required to
2    run a call when it called.
3    Q.      Did you pay for your own uniform?
4    A.      I don't recall.
5    Q.      But you did pay for your own business cards,
6    correct?
7    A.      Yes.
8    Q.      When did you stop working at Ideal Towing?
9    A.      July of 2015.
10   Q.      Do you know what month in the fall of 2012 you
11   started?
12   A.      I'm not sure.
13   Q.      (By Mr. Mahoney)  I'd like to show you what's
14   being marked as Defendant's Exhibit Number 1.
15           (Exhibit Number 1 marked for identification.)
16           MR. CALDWELL:  Thank you.
17   Q.      (By Mr. Mahoney)  Take a look at that.
18   A.      (Witness complying.)
19   Q.      Do you recognize it?
20   A.      Yes.  It's a 1099.
21   Q.      And did you receive that 1099?
22   A.      Yes, I did.
23   Q.      Okay.  Does this represent all the compensation
24   you received in 2014 from Ideal Towing?
25   A.      I'm not sure, because I don't know.  I mean this
```

```
 1   is what they gave me.  I don't know if that's actually
 2   what I was supposed to be paid.
 3   Q.      Did you do any calculations on your own?
 4   A.      No.
 5   Q.      When did you receive that?
 6   A.      2015.
 7   Q.      Did you file taxes in 2015?
 8   A.      2015, no.
 9   Q.      How about on 2014?
10   A.      2014, yes.
11   Q.      2013?
12   A.      No.
13   Q.      Do you claim that you're entitled to more than
14   the amount listed here?
15   A.      I would say yes.
16   Q.      Why?
17   A.      Because I don't think I received 30 percent of
18   what the truck made.
19   Q.      How do you know?
20   A.      Based on -- I'm unsure of exactly what, but I
21   think it should have been more than that.
22   Q.      Do you know how many jobs you performed?
23   A.      I don't have a count.  They have a count,
24   though.
25   Q.      Do you have any evidence that you can point to
```

1   or think of that would tend to establish that you earned

2   more commissions than that in 2015?

3   A.      No, I don't, but we will be requesting a

4   printout of what the truck made.  We never got the

5   printout.

6   Q.      And when did you request that?

7   A.      Several times.

8   Q.      You continued to work in 2015?

9   A.      Continued to work where?

10  Q.      At Ideal Towing?

11  A.      Yes, up until July.

12  Q.      Why did you leave?

13  A.      Because I found a better job.

14  Q.      Do you have a 1099 for the other years you

15  worked at Ideal Towing?

16  A.      I don't have them.  I misplaced them.  Because

17  when I went down to the tax place, they said they have

18  no record.

19  Q.      What tax place?

20  A.      The Summit Building.

21  Q.      I'm sorry, could you repeat that?

22  A.      The Summit Building, the IRS.

23  Q.      And you said you didn't file taxes in 2015 or

24  2013, correct?

25  A.      To the best of any knowledge, yes.

```
 1   Q.      Have you ever had a tax ID number other than

 2   your social security number?

 3   A.      No.

 4   Q.      Did you have a flashlight with you when you

 5   performed your tow service at Ideal?

 6   A.      If I worked at night, yes.

 7   Q.      And whose flashlight was that?

 8   A.      It was my flashlight.

 9   Q.      Did you have a jack?

10   A.      No -- well there was a jack, but it wasn't mine.

11   It was already on the truck.

12   Q.      How about a wrench?

13   A.      I had that.

14   Q.      Was it yours?

15   A.      Yes.

16   Q.      I have here what I'll like to mark as

17   Defendant's Exhibit Number 2.

18           (Exhibit Number 2 marked for identification.)

19   Q.      (By Mr. Mahoney)  Take a look at that.

20   A.      I already know what it is.

21           MR. CALDWELL:  I need to look at it.

22           THE WITNESS:  It's the card.

23   Q.      What is that document?

24   A.      That's a diesel card.  As I stated before the

25   guy who made the cards was supposed to put their company
```

phone number on there.

Q.     Is this your business card?

A.     My name is on it, yes.

Q.     Is it an accurate representation of what the
business cards looked like?

A.     Yes.

     MR. CALDWELL:  When you're saying it's a
business card in black and white, you're not contending
it's black and white, are you?

     MR. MAHONEY:  No.

Q.     (By Mr. Mahoney)  And what did you mean by
satisfaction guaranteed on this business card?

A.     As I said before, satisfaction guaranteed.  I
don't -- I mean, I didn't put -- it was a based off of
what he had already.  He was supposed to put my name, my
phone number and their phone number.

Q.     Who authorized you to make these business cards?

A.     No one.

Q.     It is your phone number that's is depicted,
correct?

A.     Yes.

Q.     And it's your testimony that he was supposed to
put --

A.     Their company.

Q.     -- the company's number?

```
 1    A.      On it also, yes.

 2    Q.      Is there anything else changed on the business

 3    card?

 4    A.      What do you mean?

 5    Q.      Is there anything else changed on the business

 6    card other than that number?

 7    A.      I don't get what you're asking.

 8    Q.      Other than the number, is the rest of the

 9    business card as it appears that you received from Ideal

10    Towing?

11    A.      I still don't understand what you're saying.

12    Q.      Okay.  How was this card generated?

13    A.      As I said before, the guy who I got to do the

14    cards made them from just the general information, and

15    he just said I'll put your number and their number and

16    your name on it.

17    Q.      So it was made from scratch?

18    A.      I don't know where it's made from.  Like I said,

19    the guy had already made it up.

20    Q.      Okay.  So this is a template that the guy

21    already had?

22    A.      Yes, yes.

23    Q.      And you told him the name of the company?

24    A.      Yes, yes.

25    Q.      And you told him to put satisfaction guaranteed?
```

A.      I didn't tell him to put anything but my name,

number, and their phone number.

Q.      So how did he know to put jump start on there?

A.      Like I said before, there was a template that he

had, and all I asked was to put my name, my number, and

it was supposed to have been their phone number on there

also.

Q.      Okay.  The business card guy, how did you meet

him?

A.      Through another guy that works there, an

employee that works there.

Q.      That works where?

A.      That was at Ideal Towing also.

Q.      What's the name of that defendant?

A.      Brian Wynn.

Q.      And the guy that made the cards already had his

template, walk out, tire changes, jump starts?

A.      I just went off what the other employees had.

He said, Man, we already got these.  Just add your name,

company's name, phone number.

Q.      Did the employee give you the card or did the

guy making the cards have cards already?

A.      No.  The guy who I -- the employee, he

introduced me to the guy.  The guy said he would put my

name, their phone number and my phone number on it.  But

```
 1   that was a way to generate business, not for me but for
 2   everybody.  It would benefit everybody.
 3   Q.      Did you tell Ideal Towing that you were trying
 4   to generate business for them?
 5   A.      No.
 6   Q.      Did you have the cards reprinted with Ideal
 7   Towing's number on it?
 8   A.      No.  As I said before, I stapled them together.
 9   Q.      And where did you get the Ideal Towing business
10   cards?
11   A.      From Ideal Towing.
12   Q.      Do you have any of those business cards in your
13   possession?
14   A.      No, but I can definitely go look and see if I
15   can find it.
16   Q.      About how many cards did you generate?
17   A.      What do you mean?
18   Q.      How much cards did you end up having in total?
19   A.      I don't understand the question.
20   Q.      You testified that you spent $20 for 250 cards?
21   A.      So that's your answer.
22   Q.      That's all the cards you ever had?
23   A.      Yes.
24   Q.      And you got another 250 cards and stapled them
25   to the back of those 250 cards?
```

A.      No.  I would staple so many.  And it just so
happened the day that I was off, they found this card in
the truck, but they didn't find the ones that was
stapled to the back of it.  Both of them were stapled
together.

Q.      Okay.  So how many cards did you alter by
stapling the Ideal cards together?

A.      I have no idea.

Q.      But it wasn't 150, was it?

A.      No.

Q.      Did you do it for 100 cards?

A.      No.  Probably 25.  Probably less than 30.

Q.      And where are the 30 stapled cards or so?

A.      Do you mean where are they now?

Q.      Yes?

A.      Trash.  I threw them away, along with the other
200 or so.

Q.      Now Ideal Towing, LLC wasn't the light service?

A.      No.

Q.      They weren't light?

A.      No.

Q.      So why does your Ideal Towing, LLC card have
lockout service?

A.      Because that's what we did.

Q.      Jump starts?

```
1    A.      It was all the same.

2    Q.      Tire changes?

3    A.      All the same.

4    Q.      Those are services you performed, correct?

5    A.      And me and every other driver.

6    Q.      How about buying used and junk cars?

7    A.      I never bought a used junk car, but if we found

8    them, we would call Mike or whoever was at the shop and

9    say, hey, you want to buy this car; what is it.  They

10   say yay or nay.  No one ever bought one.

11   Q.      And you said you used these cards to enhance

12   business?

13   A.      Yes.

14   Q.      And you were being paid?

15   A.      Thirty percent of what the -- what we made off

16   of tows.

17   Q.      And you didn't give these cards to Triple A

18   members, did you?

19   A.      No.

20   Q.      You gave them to individuals, right?

21   A.      Yes.  Individuals that would walk up and say,

22   hey, y'all do anything.  Here you go.

23   Q.      And those individuals pay you cash, correct?

24   A.      Yes.

25   Q.      Okay.
```

```
 1   A.       As I said before, it was only one.

 2   Q.       Do you have records of the amount of people --

 3   A.       It's somewhere on that paperwork.

 4   Q.       But don't have no personal records?

 5   A.       No.

 6   Q.       Did you ever ask Ideal Towing to reimburse you

 7   for the cost of making the business cards?

 8   A.       No.

 9   Q.       Why not?

10   A.       I just didn't.

11   Q.       The entire Metro area, as it says on this card,

12   that's beyond your personal designated area, isn't it?

13   A.       I mean if they would call, like, you know, like,

14   yes or no.  Like the one tow I did was in Lithonia,

15   literally, up the street.

16   Q.       But based on this card, you were soliciting

17   people to call you from anywhere in the Metro Atlanta

18   area?

19   A.       If that's what it says then, yes.

20   Q.       Can you say that --

21   A.       I mean, if that's what the card says, then I

22   mean, that's what it says.

23   Q.       Is there anything in your testimony up to this

24   point that you want to correct, alter or amend in any

25   way?
```

```
1    A.      No.

2    Q.      How many jobs did you perform out of state?

3    A.      Me?

4    Q.      That you had to leave the state to perform?

5    A.      I don't recall.  A couple.

6    Q.      What year?

7    A.      I don't know.

8    Q.      Did you sign an employment contract when you

9    worked for Mike James?

10   A.      I signed a couple of things.

11   Q.      You signed --

12   A.      A contract -- I mean, a couple of different --

13   sign for this, sign for that.  A lot of times you would

14   be signing something.

15   Q.      But specifically, did you sign an employment

16   contract?

17   A.      Yes.

18   Q.      Did Ideal Towing have a policy in place to keep

19   track of your hours?

20   A.      Based off your tablet.

21   Q.      Is that a yes?

22   A.      Yes.

23   Q.      The time sheets as well, correct?

24   A.      Yes.

25   Q.      How were you paid at Ideal Towing, via check,
```

1  cash?

2  A.    Check.

3  Q.    Were you ever paid via cash?

4  A.    No, not that I recall.

5         MR. CALDWELL:  How much more do you have?

6         MR. MAHONEY:  I'm wrapping up right now.

7         MR. CALDWELL:  Give us a ten minute break.

8         MR. MAHONEY:  After I finish or right now?

9         MR. CALDWELL:  Right now.

10        MR. MAHONEY:  Sure.

11                    (Off the record.)

12 Q.    (By Mr. Mahoney)  Does your designated area

13 changed at any time while you worked for Ideal Towing?

14 A.    We lost a little area.

15 Q.    When?

16 A.    Within the last six months of my employment.

17 Q.    Do you know why you lost an area?

18 A.    Unsure.

19 Q.    What areas were lost?

20 A.    Northeast Atlanta, Peachtree Industrial.

21 Q.    Can you go back and look at Defendant's Exhibit

22 Number 1, please?

23 A.    (Witness complying.)

24 Q.    Now do you dispute that this is the actual

25 amount that you received from Ideal Towing in 2014?

```
 1    A.     I have no way of calculating that.  I don't have

 2    all of my check stubs to calculate it.  I'm not sure.

 3    Q.     Do you have any reason to dispute --

 4    A.     I mean --

 5           MR. CALDWELL:  What do you mean "dispute"?

 6           MR. MAHONEY:  The amount that he actually

 7    received in 2014?

 8           MR. CALDWELL:  The question was is that what

 9    he really got?

10           MR. MAHONEY:  Exactly.

11           MR. CALDWELL:  Okay.

12    Q.     (By Mr. Mahoney)  Not is that what you deserved,

13    but is that what you got in 2013?

14    A.     Unsure.

15    Q.     Okay.  And --

16    A.     If I had check stubs, I could add it up, but I

17    don't.

18    Q.     But as you sit here today, you don't have any

19    reason to dispute it?

20    A.     No.

21           MR. MAHONEY:  No further questions.

22           MR. CALDWELL:  Okay.  I've got a couple.

23                        EXAMINATION

24    Q.     (By Mr. Caldwell)  You said you had those cards

25    that were accidently printed with only your name on them
```

```
 1   and then you stapled the company's card to the back?
 2   A.      Yes.
 3   Q.      If you got a call from outside the area, from
 4   outside of your area, what would you do?
 5   A.      Call the shop.
 6   Q.      You'd call the shop?
 7   A.      Yes.
 8   Q.      You'd get permission from the shop?
 9   A.      Yes.
10   Q.      So you didn't do it without permission?
11   A.      One time, when I brought the money in.
12   Q.      But you brought the money in?
13   A.      Yes.
14   Q.      Okay.
15   A.      The only time.
16   Q.      And did you regularly drive outside the state?
17   A.      No.
18   Q.      Do you know how many times you drove out the
19   state?
20   A.      May be two.
21   Q.      May be two times?
22   A.      Yes.
23   Q.      And that was over the period of all the years?
24   A.      All the years, yes.
25   Q.      And when you -- you testified that you -- when
```

1   you did the mechanics work --

2   A.      Yes.

3   Q.      -- you would charge people?

4   A.      Yes.

5   Q.      Did you ever do mechanics work for which you

6   charged people during the times that you were on duty --

7   A.      No.

8   Q.      -- for the towing company?

9   A.      No.

10  Q.      It was only during your own --

11  A.      The only thing -- I mean, the only thing you

12  would do is tighten up a screw, a negative capable, but

13  that's not --

14  Q.      That was on a call?

15  A.      Yes, that's on a call.

16  Q.      Do you know how much your lockout kit was worth?

17  A.      Roughly between 45 to $65, s depending on where

18  you got it from.

19  Q.      And the only piece of equipment you owned, the

20  jump box?

21  A.      Yes.

22  Q.      Do you know how much that cost?

23  A.      Around 150.

24  Q.      $150?

25  A.      Yes.

```
 1    Q.      And what does your flashlight cost?

 2    A.      My who?

 3    Q.      Your flashlight?

 4    A.      Two dollars, dollar store.

 5    Q.      Okay.  That's it.

 6            MR. CALDWELL:  Those are the questions.  I

 7    have nothing else.

 8            MR. MAHONEY:  Okay.  I have a couple of

 9    redirect or recross.

10                         EXAMINATION

11    Q.      (By Mr. Mahoney)  Did you ever receive tips?

12    A.      Of course.

13    Q.      How many?

14    A.      You mean how many tips?

15    Q.      Yes.

16    A.      It's a lot of customers.  That's a crazy

17    question.

18    Q.      How much in dollars?

19    A.      I'm not sure.

20    Q.      Over 1,000?

21    A.      No.  Not even near a 1,000.

22    Q.      Were you supposed to receive tips?

23    A.      I mean, they was accepted, greatly accepted, but

24    they didn't have to tip.

25    Q.      I mean did -- was there any policy that you're
```

```
1   aware of in all of your jobs of towing --
2   A.      Yes.
3   Q.      That prevented you from taking tips?
4   A.      No.  You can take tips at any time.  Tips is for
5   your service.
6   Q.      Did you ever report how many tips you received
7   to your employer?
8   A.      I didn't have to.
9   Q.      Is that a no?
10  A.      No.
11  Q.      The out of state you did --
12  A.      Yes.
13  Q.      -- did the customer travel with you --
14  A.      Yes.
15  Q.      -- when you towed it?
16  A.      Yes.
17  Q.      Was there a situation where you had to give the
18  customer their money back, when you did one of those
19  out-of-state trips?
20  A.      That I had to give the money back?
21  Q.      Yes?
22  A.      No.
23  Q.      Was there ever an issue with one of the
24  customers that you aided, that was from out-of-state?
25  A.      No.
```

```
 1    Q.      Do the customers regularly travel with you in

 2    the tow truck when you're taking them to a location?

 3    A.      Not all the time.  Occasionally.

 4    Q.      And is there any rule against that?

 5    A.      Any rule against?

 6    Q.      Customers traveling with you?

 7    A.      No.

 8    Q.      Okay.

 9    A.      It's up to two riders.

10    Q.      Is that based on space available in the truck?

11    A.      Triple A.

12    Q.      What dates did you carry customers to?

13    A.      Once to Alabama and once to South Carolina?

14    Q.      And you didn't sell any goods, did you, while

15    you worked for Ideal Towing?

16    A.      Selling any goods, meaning?  I never sold any

17    goods.

18    Q.      Okay.  Just performed services, right?

19    A.      Yes, sir.

20    Q.      All right.

21            MR. MAHONEY:  No further questions.

22            (Whereupon proceedings were concluded at 1:27

23    p.m.)

24

25
```

1          (Pursuant to Rule 30 (e) of the Federal Rules of

2     Civil Procedure and/or O.C.G.A. 91130 (e), signature of

3     the witness has been reserved.)

4

5                              CERTIFICATE

6          STATE OF GEORGIA

7          COUNTY OF FULTON

8          I hereby certify that the foregoing transcript

9     was taken down as stated in the caption, and the

10    questions and answers thereto were reduced to

11    typewriting under my discretion; that the foregoing

12    pages 1 through 83 represent a true, complete and

13    correct transcript of the evidence given upon said

14    hearing.  And I further certify that I am not of kin or

15    counsel to the parties in the case; am not in the

16    regular employ of counsel for any said parties; nor am I

17    in anywise interested in the results of said case.

18

19          This 10th day of July 2017.

20

21          Tamika M. Burnette, RPR, CCR2870

22

23

24

25

Pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia which states: "Each court reporter shall tender a disclosure form at the time of the taking of the deposition stating the arrangements made for the reporting services of the certified court reporter, by the court reporter's employer, or the referral source for the deposition, with any party to the litigation, counsel to the parties or other entity. Such form shall be attached to the deposition transcript." I make the following disclosure:

I am a Georgia Certified Court Reporter. I am here as a representative of Tamika Burnette. Tamika Burnette was contacted to provide court reporting services for the deposition. Tamika Burnette will not be taking this deposition under any contract that is prohibited by O.C.G.A. 91128 (c).

Tamika Burnette has no contract/agreement to provide court reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition. Tamika Burnette will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to

1    any party to this litigation.

2

3                     Tamika M. Burnette, RPR, CCR2870

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason the in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it. You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

```
 1              E R R A T A

 2       PAGE          LINE          CHANGE

 3       _____         _____         _____

 4       Reason for

 5       Change:_____

 6

 7       _____       _____        _____

 8       Reason for

 9       Change:_____

10

11       _____       _____        _____

12       Reason for

13       Change:_____

14

15       _____     _____      _____

16       Reason for

17       Change:_____

18

19       _____        _____      _____

20       Reason for

21       Change:_____

22

23       _____       _____    _____

24       Reason for

25       Change:_____
```

ACKNOWLEDGEMENT OF DEPONENT

I, _____, do hereby certify that I have read the foregoing pages _____ to _____ and that the same is a correct transcript of the answers given by me to the questions therein propounded, except for corrections or changes in form or substances, if any, noted in the attached Errata Sheet.


_____          _____
Date                    Signature


Subscribed and sworn before me this _____ day of _____, 2016.


My Commission Expires:_____

_____Notary Public.

## $

**$14** [1] - 18:6
**$15** [1] - 30:18
**$150** [1] - 80:24
**$20** [3] - 28:7, 49:15, 72:20
**$50** [1] - 52:4
**$500** [1] - 49:21
**$65** [1] - 80:17
**$85** [1] - 52:4

## '

**'04** [1] - 21:1
**'13** [2] - 43:5, 43:6
**'15** [2] - 61:6, 61:14
**'16** [2] - 26:13, 26:20
**'94** [1] - 9:9
**'99** [2] - 9:9, 10:21

## 1

**1** [5] - 3:8, 65:14, 65:15, 77:22, 84:12
**1,000** [2] - 81:20, 81:21
**10** [1] - 20:13
**10.B** [1] - 85:2
**100** [1] - 73:11
**101** [2] - 1:22, 2:6
**102** [1] - 3:15
**1099** [8] - 3:8, 3:10, 3:11, 3:12, 3:13, 65:20, 65:21, 67:14
**10:07** [1] - 1:21
**10th** [1] - 84:19
**11:30** [2] - 23:11
**12** [2] - 34:12, 41:2
**127** [1] - 3:4
**12:00** [1] - 15:21
**12:13** [1] - 58:5
**130** [1] - 3:5
**14** [1] - 18:5
**14.50** [3] - 16:1, 18:23, 20:5
**15** [3] - 41:2, 60:17, 60:21
**150** [2] - 73:9, 80:23
**16** [2] - 18:9, 18:11
**16.73** [1] - 17:24
**1708** [1] - 25:18
**18-wheelers** [1] - 9:22
**199** [1] - 2:15
**1997** [1] - 7:8
**1:16-CV-0139-TWT** [1] - 1:9
**1:27** [1] - 83:22

## 2

**2** [4] - 3:9, 32:10, 68:17, 68:18
**200** [1] - 73:17
**2000** [1] - 10:21
**2001** [1] - 11:14
**2003** [1] - 10:3
**2004** [2] - 14:24, 15:3
**2010** [2] - 20:24, 28:23
**2011** [3] - 9:25, 21:11, 21:12
**2012** [9] - 24:4, 24:8, 24:14, 24:15, 27:6, 29:1, 29:4, 43:4, 65:10
**2013** [4] - 62:12, 66:11, 67:24, 78:13
**2014** [7] - 3:12, 42:23, 65:24, 66:9, 66:10, 77:25, 78:7
**2015** [17] - 26:13, 34:6, 55:5, 60:24, 60:25, 61:3, 61:15, 61:16, 61:21, 65:9, 66:6, 66:7, 66:8, 67:2, 67:8, 67:23
**2016** [2] - 26:21, 89:13
**2017** [2] - 1:21, 84:19
**24/7** [1] - 61:13
**25** [1] - 73:12
**250** [5] - 28:7, 28:8, 72:20, 72:24, 72:25
**26,000** [1] - 9:22
**2:00** [2] - 15:20, 23:11

## 3

**3** [2] - 1:21, 3:10
**30** [7] - 15:13, 26:7, 66:17, 73:12, 73:13, 84:1, 87:11
**30303** [1] - 2:7
**30313** [1] - 2:17
**3100** [2] - 1:21, 2:5
**3708** [1] - 7:20

## 4

**4** [2] - 3:3, 3:11
**404** [1] - 2:19
**410** [3] - 18:7, 18:8, 18:11
**446.25** [2] - 18:15, 18:16
**45** [1] - 80:17
**4:00** [2] - 15:20

## 5

**5** [1] - 3:12
**50** [1] - 53:8
**500** [1] - 22:24
**5:00** [4] - 34:13, 61:10
**5:30** [2] - 34:25, 35:1

## 6

**6** [1] - 3:13
**65** [1] - 3:8
**680-0416** [1] - 2:8
**688-1210** [1] - 2:19
**6:00** [2] - 15:20, 34:25

## 7

**7** [1] - 3:14
**70** [1] - 61:5
**7:00** [4] - 30:16, 34:12, 34:13
**7:30** [1] - 35:10
**7:45** [1] - 35:10

## 8

**8** [1] - 3:15
**80** [1] - 61:5
**81** [1] - 3:9
**83** [2] - 3:10, 84:12
**888** [1] - 2:8

## 9

**9.63** [1] - 16:1
**90** [2] - 3:11, 15:13
**91128** [1] - 85:18
**91130** [1] - 84:2
**92** [1] - 3:12
**97** [1] - 3:13
**98** [1] - 3:14
**9:30** [1] - 15:19

## A

**a.m** [6] - 1:21, 15:20, 30:16, 61:10
**ability** [2] - 5:25, 43:17
**absolutely** [1] - 42:6
**accept** [9] - 43:17, 44:15, 45:2, 45:5, 45:6, 46:13
**accepted** [1] - 81:23
**accidently** [1] - 78:25
**accurate** [2] - 69:4, 87:14
**ACKNOWLEDGEME NT** [1] - 89:1
**ACTION** [1] - 1:8
**action** [1] - 58:19
**actual** [1] - 77:24
**add** [2] - 71:19, 78:16
**address** [2] - 31:17, 31:18
**advertise** [1] - 27:21
**advertised** [1] - 27:16
**agency** [1] - 85:22
**ago** [3] - 10:19, 53:7, 53:8
**agree** [1] - 5:13
**AGREEMENT** [2] - 3:9, 3:14
**agreement** [1] - 1:17
**ahead** [2] - 25:14, 56:7
**aid** [1] - 82:24
**ain't** [1] - 49:17
**Alabama** [2] - 22:9, 83:13
**alcoholic** [1] - 39:24
**allowed** [2] - 16:4, 23:14
**allows** [1] - 44:14
**alone** [1] - 34:21
**alter** [2] - 73:6, 75:24
**amend** [1] - 75:24
**American** [3] - 24:6, 24:12, 24:17
**amount** [6] - 33:3, 41:4, 66:14, 75:2, 77:25, 78:6
**Andrew** [1] - 8:1
**answer** [4] - 5:10, 38:14, 39:13, 72:21
**answering** [1] - 5:9
**answers** [5] - 5:1, 6:21, 6:22, 84:10, 89:5
**anticipate** [1] - 5:6
**Antonio** [1] - 21:18
**anytime** [1] - 25:13
**anyway** [3] - 45:20, 45:25, 46:14
**anywise** [1] - 84:17
**APD** [2] - 26:18, 32:22
**APPEARANCES** [1] - 2:1
**application** [1] - 56:16
**apply** [1] - 56:15
**appropriate** [1] - 87:4
**approve** [1] - 57:17
**April** [3] - 26:13, 26:20, 26:21
**area** [31] - 8:2, 8:4, 8:21, 22:6, 25:21, 25:23, 26:1, 33:22, 37:17, 38:11, 38:17, 38:18, 38:19, 38:20, 38:22, 38:23, 38:25, 40:1, 40:18, 47:14,
47:17, 47:18, 54:4, 75:11, 75:12, 75:18, 77:12, 77:14, 77:17, 79:3, 79:4
**areas** [2] - 25:24, 77:19
**arrangements** [1] - 85:6
**arrested** [1] - 7:5
**Article** [1] - 85:2
**assignment** [3] - 14:7, 14:8, 23:17
**assistance** [1] - 28:14
**ATLANTA** [1] - 1:3
**Atlanta** [8] - 1:22, 2:7, 2:17, 8:2, 8:5, 25:25, 31:19, 75:17, 77:20
**attached** [3] - 85:11, 87:9, 89:7
**attended** [2] - 9:8, 13:10
**attorney** [3] - 6:11, 7:2, 87:11
**Aubrey** [1] - 8:19
**August** [1] - 26:13
**authority** [2] - 59:7, 59:15
**authorized** [1] - 69:17
**Auto** [3] - 50:23, 51:1, 51:5
**available** [5] - 40:9, 40:13, 40:14, 40:22, 83:10
**Avondale** [1] - 9:7
**aware** [1] - 82:1

## B

**base** [5] - 17:25, 18:4, 18:5, 18:6
**based** [16] - 15:14, 15:22, 17:25, 18:14, 28:10, 33:3, 43:16, 58:24, 60:9, 64:12, 64:16, 66:20, 69:14, 75:16, 76:20, 83:10
**basic** [1] - 13:1
**basis** [1] - 30:4
**beginning** [2] - 15:24, 34:10
**BEHALF** [2] - 2:2, 2:11
**benefit** [1] - 72:2
**BENJAMIN** [1] - 2:3
**best** [2] - 6:1, 67:25
**better** [4] - 11:3, 26:16, 26:24, 67:13
**between** [11] - 17:4, 19:20, 23:22, 26:9, 26:20, 32:18, 35:10, 36:8, 37:10, 40:23,

1

80:17
**beyond** [1] - 75:12
**big** [1] - 26:23
**black** [2] - 69:8, 69:9
**Board** [1] - 85:3
**Bonnet** [1] - 27:1
**bonus** [1] - 18:13
**bonuses** [2] - 20:18, 30:19
**bought** [2] - 74:7, 74:10
**box** [4] - 39:11, 50:6, 50:18, 80:20
**brakes** [3] - 11:10, 12:19, 13:7
**break** [7] - 13:17, 42:4, 43:8, 47:20, 47:23, 58:2, 77:7
**breaks** [1] - 53:13
**Brian** [2] - 58:9, 71:15
**BRIAN** [1] - 1:5
**BRIDGERS** [1] - 2:3
**bring** [6] - 33:8, 41:18, 41:21, 41:25, 51:15, 51:22
**Brittany** [1] - 8:18
**brought** [2] - 79:11, 79:12
**Building** [2] - 67:20, 67:22
**bumped** [1] - 26:23
**BURKE** [4] - 2:12, 2:13, 3:3, 3:5
**Burnet** [1] - 8:19
**Burnette** [8] - 1:19, 84:21, 85:14, 85:15, 85:16, 85:19, 85:23, 86:3
**Burney** [6] - 4:11, 8:18, 8:19, 8:20, 58:6
**BURNEY** [4] - 1:4, 1:16, 3:3, 4:4
**burney** [2] - 5:21, 42:9
**bus** [2] - 35:4, 35:9
**business** [22] - 27:9, 27:12, 27:14, 27:20, 28:10, 31:15, 65:5, 69:2, 69:5, 69:8, 69:12, 69:17, 70:2, 70:5, 70:9, 71:8, 72:1, 72:4, 72:9, 72:12, 74:12, 75:7
**buy** [1] - 74:9
**buying** [1] - 74:6

## C

**c)** [1] - 85:18
**C-I-N-T-A-S** [1] - 15:6

**cab** [1] - 53:5
**cable** [1] - 48:8
**cables** [3] - 50:10, 50:12, 50:14
**calculate** [1] - 78:2
**calculating** [1] - 78:1
**calculations** [1] - 66:3
**CALDWELL** [38] - 2:3, 2:4, 3:4, 5:16, 5:19, 8:14, 8:22, 39:4, 39:12, 42:4, 42:11, 47:20, 53:4, 53:10, 54:10, 54:13, 54:15, 57:6, 57:9, 58:2, 58:15, 59:1, 59:9, 59:11, 60:16, 60:23, 61:15, 65:16, 68:21, 69:7, 77:5, 77:7, 77:9, 78:5, 78:8, 78:11, 78:22, 81:6
**Caldwell** [2] - 5:13, 78:24
**Campbell** [2] - 8:17
**cannot** [1] - 32:7
**capable** [1] - 80:12
**caption** [1] - 84:9
**car** [9] - 32:13, 32:24, 39:11, 44:22, 45:10, 53:13, 53:17, 74:7, 74:9
**card** [19] - 28:1, 28:11, 68:22, 68:24, 69:2, 69:8, 69:12, 70:3, 70:6, 70:9, 70:12, 71:8, 71:21, 73:2, 73:22, 75:11, 75:16, 75:21, 79:1
**cards** [29] - 27:20, 27:22, 28:1, 28:8, 65:5, 68:25, 69:5, 69:17, 70:14, 71:16, 71:22, 72:6, 72:10, 72:12, 72:16, 72:18, 72:20, 72:22, 72:24, 72:25, 73:6, 73:7, 73:11, 73:13, 74:11, 74:17, 75:7, 78:24
**carefully** [1] - 87:2
**CARLON** [1] - 1:5
**carlos** [1] - 58:10
**Carlos** [2] - 4:11, 58:6
**CARLOS** [1] - 1:4
**Carmen** [1] - 8:19
**Carolina** [1] - 83:13
**carpet** [8] - 15:9, 16:5, 18:19, 19:1, 19:6, 19:9, 19:16, 19:18
**carry** [1] - 80:6
**cars** [5] - 12:25, 26:18, 30:14, 33:5, 74:6

**case** [8] - 4:13, 7:3, 32:11, 84:15, 84:17, 85:21, 85:25
**cash** [3] - 74:23, 77:1, 77:3
**casual** [1] - 12:13
**CCR2870** [2] - 84:21, 86:3
**CDL** [4] - 9:18, 9:19, 9:20, 20:22
**Centennial** [2] - 1:21, 2:5
**certain** [2] - 12:19, 34:1
**CERTIFICATE** [1] - 84:5
**Certified** [2] - 1:19, 85:13
**certified** [1] - 85:7
**certify** [3] - 84:8, 84:14, 89:2
**cetera** [1] - 19:12
**chains** [2] - 30:10
**chance** [1] - 5:17
**CHANGE** [1] - 88:2
**change** [12] - 11:9, 12:4, 12:5, 12:6, 12:21, 12:24, 19:2, 19:3, 29:18, 48:11, 48:16, 48:18
**Change** [6] - 88:5, 88:9, 88:13, 88:17, 88:21, 88:25
**changed** [4] - 48:17, 70:2, 70:5, 77:13
**changes** [6] - 49:14, 49:15, 71:17, 74:2, 87:7, 89:6
**changing** [1] - 30:14
**charge** [4] - 49:12, 49:14, 80:3, 85:24
**charged** [3] - 49:9, 49:19, 80:6
**check** [6] - 19:10, 33:21, 76:25, 77:2, 78:2, 78:16
**checks** [1] - 59:16
**chemicals** [1] - 19:11
**child** [2] - 55:5, 55:14
**children** [1] - 42:2
**choose** [1] - 38:5
**Christmas** [1] - 62:6
**Cincinnati** [2] - 18:23, 22:9
**Cintas** [5] - 15:4, 17:12, 20:23, 20:25
**circumstances** [1] - 16:7
**city** [2] - 31:17, 33:4
**CIVIL** [1] - 1:8

**Civil** [1] - 84:2
**claim** [1] - 66:13
**Class** [1] - 9:20
**clean** [1] - 19:18
**clear** [2] - 39:13, 46:4
**clerical** [1] - 59:4
**client** [1] - 5:18
**clock** [14] - 10:22, 10:24, 11:23, 11:25, 14:1, 14:3, 16:2, 19:10, 23:8, 23:14, 30:5, 32:2, 32:4, 32:5
**close** [4] - 47:4, 47:5, 47:7, 47:9
**closest** [1] - 38:7
**Club** [3] - 50:23, 51:1, 51:5
**co** [4] - 57:11, 58:6, 58:18, 59:24
**co-owner** [1] - 59:24
**co-plaintiffs** [3] - 57:11, 58:6, 58:18
**Coke** [1] - 39:25
**Collie** [1] - 8:18
**coming** [2] - 39:3, 45:7
**commencing** [1] - 1:20
**commercial** [1] - 19:16
**Commission** [1] - 89:15
**commission** [8] - 17:25, 18:2, 26:5, 26:6, 26:10, 60:9, 60:12, 64:12
**commission-based** [1] - 60:9
**commissions** [2] - 30:21, 67:2
**common** [1] - 5:6
**compact** [1] - 30:13
**company** [18] - 17:12, 42:8, 42:12, 42:14, 45:12, 45:17, 46:8, 52:15, 52:18, 52:20, 52:23, 53:14, 56:21, 56:23, 68:25, 69:24, 70:23, 80:8
**company's** [3] - 69:25, 71:20, 79:1
**compensated** [6] - 20:4, 22:12, 22:14, 22:21, 22:23, 26:4
**compensation** [1] - 65:23
**complete** [1] - 84:12
**complying** [2] - 65:18, 77:23

**computer** [3] - 9:13, 9:15, 38:6
**Computer** [3] - 10:1, 13:11, 13:13
**computers** [3] - 13:17, 14:13, 14:14
**concluded** [1] - 83:22
**confer** [1] - 8:15
**confidential** [1] - 31:15
**confrontation** [1] - 23:22
**consider** [1] - 27:7
**contact** [1] - 45:18
**contacted** [1] - 85:15
**contending** [1] - 69:8
**continued** [2] - 67:8, 67:9
**contract** [4] - 76:8, 76:12, 76:16, 85:17
**contract/agreement** [1] - 85:19
**control** [1] - 56:22
**controlled** [1] - 57:2
**conversation** [1] - 6:13
**conversations** [2] - 6:11, 59:20
**convicted** [1] - 7:13
**Corporation** [1] - 15:4
**correct** [12] - 26:10, 43:10, 64:13, 65:6, 67:24, 69:20, 74:4, 74:23, 75:24, 76:23, 84:13, 89:4
**corrections** [3] - 87:3, 87:5, 89:6
**cost** [7] - 31:11, 31:12, 31:13, 31:14, 75:7, 80:22, 81:1
**Council** [1] - 85:4
**counsel** [8] - 1:17, 58:13, 58:20, 58:22, 84:15, 84:16, 85:10, 85:21
**count** [2] - 66:23
**counting** [1] - 16:23
**COUNTY** [1] - 84:7
**county** [1] - 7:21
**County** [1] - 7:22
**couple** [7] - 15:19, 41:19, 76:5, 76:10, 76:12, 78:22, 81:8
**course** [5] - 39:18, 49:11, 61:23, 64:18, 81:12
**COURT** [2] - 1:1, 85:1
**court** [9] - 4:24, 5:3, 58:17, 85:4, 85:7, 85:8, 85:15, 85:20,

87:14

**Court** [4] - 1:19, 7:20, 85:3, 85:13

**courtesy** [1] - 5:9

**cover** [1] - 85:23

**Covington** [1] - 8:5

**crazy** [1] - 81:16

**crime** [1] - 7:13

**current** [2] - 33:11, 33:14

**customary** [1] - 85:24

**customer** [16] - 16:24, 19:23, 32:11, 32:23, 45:11, 45:13, 45:18, 48:1, 48:6, 50:20, 52:24, 53:13, 53:17, 53:19, 82:13, 82:18

**customers** [8] - 51:12, 52:17, 53:6, 81:16, 82:24, 83:1, 83:6, 83:12

**cut** [1] - 32:25

### D

**daily** [3] - 17:13, 19:8, 30:3

**damage** [1] - 32:15

**date** [2] - 24:14, 87:7

**Date** [1] - 89:10

**dates** [1] - 83:12

**daughter** [4] - 33:25, 34:15, 35:6, 42:3

**day-to-day** [2] - 56:22, 57:2

**days** [12] - 15:13, 15:14, 41:20, 60:15, 60:18, 61:6, 61:14, 62:10, 62:11, 62:13, 62:20, 87:12

**DDS** [15] - 36:6, 36:8, 36:11, 36:12, 36:14, 36:22, 37:22, 38:2, 38:3, 38:4, 39:1, 39:6, 47:11, 54:8, 54:19

**dDS** [1] - 36:10

**death** [1] - 23:21

**Decatur** [5] - 7:20, 8:5, 22:8, 25:19, 25:24

**decision** [2] - 59:7, 59:15

**decision-making** [2] - 59:7, 59:15

**decisions** [2] - 57:14, 57:17

**decline** [1] - 44:19, 44:24

**declined** [3] - 46:6, 46:10, 46:12

**declining** [1] - 44:17

**deemed** [1] - 87:14

**DEFENDANT** [1] - 2:11

**defendant** [1] - 71:14

**Defendant's** [3] - 65:14, 68:17, 77:21

**defendant's** [3] - 58:12, 58:20, 58:21

**defendants** [3] - 4:13, 58:12, 58:24

**Defendants** [1] - 1:13

**definitely** [2] - 39:21, 72:14

**degree** [1] - 10:1

**degrees** [1] - 9:3

**Dekalb** [1] - 7:22

**delinquent** [2] - 18:14, 18:15

**delivered** [1] - 47:17

**delivery** [1] - 29:19

**DELONG** [1] - 2:3

**demand** [2] - 38:14, 43:16

**dentist** [2] - 54:16, 54:17

**department** [2] - 48:14, 48:19

**departments** [1] - 28:15

**depended** [1] - 17:2

**depicted** [1] - 69:19

**DEPONENT** [1] - 89:1

**deposed** [1] - 58:12

**deposing** [2] - 58:22, 87:11

**deposition** [24] - 1:16, 1:19, 4:16, 6:4, 6:5, 7:2, 57:5, 58:6, 58:7, 58:14, 58:16, 58:21, 58:23, 58:25, 85:6, 85:9, 85:11, 85:16, 85:17, 85:23, 87:2, 87:9, 87:12, 87:13

**describe** [2] - 21:13, 23:2

**DESCRIPTION** [1] - 3:7

**deserved** [1] - 78:12

**designated** [8] - 25:23, 38:11, 38:17, 38:23, 38:25, 47:14, 75:12, 77:12

**designation** [1] - 31:9

**desk** [1] - 19:17

**details** [1] - 45:7

**determine** [1] - 60:6

**device** [1] - 31:4

**diesel** [1] - 68:24

**difference** [5] - 12:9,

25:11, 26:9, 36:8, 37:10

**different** [5] - 28:15, 28:17, 50:19, 51:24, 76:12

**digital** [1] - 54:12

**diploma** [1] - 9:5

**directly** [4] - 37:25, 38:1, 38:3, 38:4

**dirty** [2] - 16:23, 17:21

**disagree** [1] - 59:2

**DISCLOSURE** [1] - 85:1

**disclosure** [2] - 85:5, 85:12

**discount** [1] - 85:25

**discretion** [1] - 84:11

**dispatch** [5] - 30:5, 36:19, 37:2, 53:24, 54:4

**Dispatch** [1] - 54:12

**dispatched** [2] - 53:6, 54:23

**dispatcher** [3] - 36:18, 36:20, 45:24

**dispatchers** [2] - 37:3, 37:5, 37:11

**dispatches** [1] - 54:2

**dispute** [4] - 77:24, 78:3, 78:5, 78:19

**DISTRICT** [2] - 1:1, 1:2

**DIVISION** [1] - 1:3

**document** [1] - 68:23

**documents** [4] - 6:15, 6:24, 59:19, 59:20

**dollar** [1] - 81:4

**dollars** [3] - 28:8, 81:4, 81:18

**done** [3] - 37:22, 41:2, 49:17

**down** [16] - 4:24, 5:3, 5:7, 13:17, 17:4, 19:20, 19:22, 21:6, 24:12, 32:16, 35:4, 46:24, 53:13, 63:16, 64:24, 84:9

**downtime** [2] - 40:23, 64:17

**drag** [1] - 45:10

**drill** [3] - 30:13, 50:18

**drink** [3] - 39:20, 39:22, 39:23

**drive** [5] - 9:22, 22:3, 25:1, 63:1, 79:16

**driver** [13] - 27:4, 27:10, 27:17, 38:5, 38:19, 44:9, 45:21, 45:23, 45:25, 46:21, 53:5, 54:3, 74:5

**DRIVER'S** [1] - 3:15

**driver's** [3] - 36:16, 55:2, 55:12

**drivers** [3] - 36:17, 36:19, 60:5

**driving** [6] - 22:3, 22:6, 24:11, 24:23, 24:25, 39:18

**drop** [5] - 22:4, 39:11, 40:14, 47:4, 50:18

**dropped** [2] - 38:22, 39:1, 39:6

**dropping** [3] - 25:4, 25:5, 25:8

**drove** [2] - 25:2, 79:16

**Duluth** [1] - 23:4

**duly** [1] - 4:5

**duration** [1] - 13:18

**during** [12] - 17:24, 19:22, 22:21, 40:6, 41:12, 58:6, 58:13, 58:16, 64:11, 64:17, 80:6, 80:10

**duties** [7] - 10:11, 11:6, 12:16, 13:16, 22:2, 23:2, 26:17

**duty** [1] - 80:6

### E

**e-mail** [1] - 6:14

**EARLE** [1] - 2:13

**earn** [1] - 30:19

**earned** [2] - 9:3, 67:1

**eat** [5] - 19:23, 31:24, 40:2, 40:3, 40:4

**eburke@burkelawatl .com** [1] - 2:18

**Ed** [5] - 9:13, 9:15, 10:2, 13:11, 13:13

**education** [1] - 9:4

**education-wise** [1] - 9:4

**eight** [4] - 11:20, 18:3, 20:9, 61:8

**either** [1] - 34:12

**ellen** [1] - 8:17

**employ** [1] - 84:16

**employee** [4] - 10:16, 71:11, 71:21, 71:23

**employee's** [1] - 35:25

**employees** [1] - 71:18

**employer** [2] - 82:7, 85:8

**employment** [3] - 76:8, 76:15, 77:16

**end** [7] - 14:6, 14:25, 15:24, 23:17, 34:7, 54:21, 72:18

**ended** [1] - 24:3

**ending** [1] - 34:10

**enhance** [1] - 74:11

**enrolled** [1] - 13:11

**entail** [3] - 16:16, 16:22, 32:14

**entailed** [1] - 16:11

**entered** [1] - 58:7

**entire** [1] - 75:11

**entirely** [1] - 32:15

**entitled** [1] - 66:13

**entity** [1] - 85:10

**equipment** [2] - 19:12, 80:19

**Erica** [1] - 8:18

**errand** [1] - 40:7

**errata** [4] - 87:4, 87:6, 87:8, 87:11

**Errata** [1] - 89:7

**ESQUIRE** [3] - 2:4, 2:13, 2:14

**establish** [1] - 67:1

**et** [1] - 19:11

**everywhere** [2] - 22:7, 22:9

**evidence** [6] - 57:17, 57:21, 58:1, 59:13, 66:25, 84:13

**exact** [1] - 47:7

**exactly** [1] - 66:20

**Exactly** [1] - 78:10

**EXAMINATION** [4] - 3:2, 4:8, 78:23, 81:10

**examined** [1] - 4:6

**example** [2] - 20:8, 38:16

**except** [5] - 5:14, 48:25, 89:6

**excluding** [1] - 1:18

**excuse** [3] - 14:11, 29:17, 33:12

**Exhibit** [3] - 65:14, 68:17, 77:21

**exhibit** [3] - 3:7, 65:15, 68:18

**EXHIBIT** [8] - 3:8, 3:9, 3:10, 3:11, 3:12, 3:13, 3:14, 3:15

**expected** [1] - 52:14

**experience** [1] - 24:21

**Expires** [1] - 89:15

**extend** [1] - 5:9

**extensive** [1] - 15:13

**eye** [2] - 26:22, 26:23

### F

**fact** [1] - 34:4

**facts** [1] - 7:2

**fail** [2] - 35:23, 87:13

**fall** [2] - 29:8, 65:10

**family** [3] - 8:2, 23:21, 49:7
**far** [2] - 41:3, 56:19
**feature** [2] - 44:14, 44:17
**Federal** [1] - 84:1
**few** [1] - 4:21
**figure** [2] - 39:5, 54:16
**FILE** [1] - 1:9
**file** [3] - 39:3, 66:7, 67:23
**files** [1] - 35:25
**financial** [1] - 85:25
**fine** [2] - 47:22, 56:8
**fingerprint** [1] - 32:23
**finish** [4] - 5:8, 53:18, 57:24, 77:8
**finished** [5] - 17:6, 20:12, 57:23, 61:4, 61:9
**fired** [1] - 23:24
**first** [19] - 4:5, 5:14, 10:4, 10:8, 13:12, 16:13, 16:14, 16:18, 19:15, 19:18, 28:20, 32:15, 39:10, 43:4, 44:24, 45:23, 52:18, 56:2, 64:5
**FITZPATRICK** [1] - 2:3
**five** [8] - 21:18, 22:13, 27:6, 41:6, 61:6, 61:7, 61:8
**five-something** [1] - 22:13
**fix** [1] - 12:25
**fixing** [1] - 14:13
**flashlight** [5] - 68:4, 68:7, 68:8, 81:1, 81:3
**flat** [1] - 15:8
**flatbed** [3] - 43:20, 45:9, 45:14
**following** [1] - 85:12
**follows** [1] - 4:7
**food** [3] - 32:3, 32:5, 64:17
**foregoing** [3] - 84:8, 84:11, 89:3
**forget** [1] - 53:10
**form** [4] - 5:14, 85:5, 85:11, 89:6
**formalities** [1] - 1:17
**four** [3] - 18:12, 20:12, 46:24
**four-point** [1] - 46:24
**Friday** [5] - 34:6, 61:7, 61:20, 61:21, 64:9
**friend** [3] - 6:12, 40:16, 55:19
**friends** [1] - 49:7

**fuel** [1] - 29:18
**full** [3] - 4:9, 5:8, 5:10
**fully** [1] - 5:25
**FULTON** [1] - 84:7

**G**

**G-R-E-E-S-O-N** [1] - 27:3
**garage** [2] - 45:9, 45:10
**GED** [1] - 9:10
**general** [2] - 31:18, 70:14
**generally** [2] - 37:24, 37:25
**generate** [3] - 72:1, 72:4, 72:16
**generated** [1] - 70:12
**GEORGIA** [2] - 1:2, 84:6
**Georgia** [6] - 1:20, 1:22, 2:7, 2:17, 85:4, 85:13
**given** [4] - 43:18, 84:13, 85:25, 89:5
**goods** [3] - 83:14, 83:16, 83:17
**GPS** [5] - 17:9, 30:23, 36:3, 36:5, 36:25
**grab** [5] - 39:20, 39:22, 39:25, 40:3, 40:4
**graduating** [1] - 13:12
**greatly** [1] - 81:23
**Greeson** [3] - 27:1, 27:2
**Greg** [1] - 27:1
**ground** [1] - 4:21
**GROUP** [1] - 2:12
**GSP** [1] - 32:22
**guaranteed** [3] - 69:12, 69:13, 70:25
**guess** [1] - 40:21
**guessing** [1] - 50:11
**guy** [12] - 27:23, 68:25, 70:13, 70:19, 70:20, 71:8, 71:10, 71:16, 71:22, 71:23, 71:24

**H**

**half** [2] - 10:10, 34:23
**handle** [2] - 51:25, 59:3
**handled** [1] - 55:14
**Hapeville** [1] - 26:19
**hard** [1] - 5:7
**Haul** [8] - 11:5, 11:6, 12:3, 12:11, 13:2, 13:9, 13:10, 49:3
**head** [2] - 5:2
**heads** [1] - 26:23
**hear** [1] - 40:22
**hearing** [2] - 59:11, 84:14
**heavy** [1] - 45:15
**held** [1] - 58:21
**help** [4] - 37:17, 48:1, 48:5, 48:9
**hereby** [2] - 84:8, 89:2
**high** [7] - 9:5, 9:6, 10:4, 10:6, 10:8, 12:20, 12:23
**High** [1] - 9:7
**HILL** [1] - 1:6
**hiring** [1] - 55:25, 56:1
**holiday** [1] - 62:5
**holidays** [1] - 62:4
**home** [17] - 22:1, 22:17, 25:16, 34:1, 34:17, 34:19, 34:21, 34:22, 35:1, 35:6, 35:7, 41:7, 41:9, 64:23, 65:1
**honestly** [1] - 5:25
**hook** [4] - 24:23, 24:25, 25:1, 25:2
**hooked** [1] - 31:3
**hooking** [1] - 32:15
**hooks** [1] - 25:4
**hoses** [1] - 19:11
**hour** [15] - 10:18, 11:21, 12:9, 13:24, 15:23, 18:6, 20:5, 26:16, 30:17, 30:18, 34:23, 40:6, 40:7, 42:5
**hour-and-a-half** [1] - 34:23
**hourly** [11] - 10:16, 11:16, 13:20, 15:15, 20:19, 22:10, 22:11, 23:6, 26:2, 26:10, 60:8
**hours** [19] - 10:13, 10:14, 11:18, 13:22, 15:17, 15:21, 20:6, 20:13, 23:10, 30:15, 34:12, 35:15, 41:10, 41:12, 41:23, 60:13, 61:12, 76:19
**house** [7] - 14:16, 14:17, 14:19, 22:1, 34:16, 34:18
**huge** [1] - 26:1

**I**

**I-Towing** [1] - 4:15
**ID** [1] - 68:1
**idea** [5] - 28:3, 42:10, 42:16, 54:9, 73:8
**Ideal** [51] - 4:15, 24:16, 27:23, 28:13, 28:18, 29:3, 29:10, 29:24, 33:20, 35:25, 37:7, 37:14, 39:14, 42:1, 43:12, 48:2, 48:24, 49:22, 50:4, 50:20, 51:9, 55:6, 55:8, 55:10, 55:12, 55:18, 55:22, 56:18, 59:4, 59:7, 61:12, 65:8, 65:24, 67:10, 67:15, 68:5, 70:9, 71:13, 72:3, 72:6, 72:9, 72:11, 73:7, 73:18, 73:22, 75:6, 76:18, 76:25, 77:13, 77:25, 83:15
**IDEAL** [1] - 1:10
**Ideal's** [1] - 37:11
**identification** [2] - 65:15, 68:18
**identify** [2] - 50:19, 58:8
**impact** [2] - 5:24, 34:10, 34:11
**imperative** [1] - 87:10
**important** [2] - 4:25, 5:2
**IN** [1] - 1:1
**inappropriate** [1] - 44:1
**include** [1] - 50:10
**INDEX** [1] - 3:1
**individual** [7] - 33:10, 33:13, 33:15, 51:8, 51:9, 52:24, 53:20
**individuals** [5] - 51:17, 52:6, 74:20, 74:21, 74:23
**Industrial** [1] - 77:20
**information** [4] - 31:15, 46:3, 53:24, 70:14
**informed** [1] - 55:10
**inside** [1] - 16:17
**instances** [3] - 47:19, 47:25, 48:5
**Institute** [3] - 9:13, 9:14, 10:2
**instructions** [1] - 30:7
**INSTRUCTIONS** [1] - 87:1
**interested** [1] - 84:17

**introduced** [1] - 71:24
**inventory** [2] - 16:24, 16:25
**IRS** [1] - 67:22
**issue** [3] - 33:25, 53:17, 82:23

**J**

**jack** [3] - 30:11, 68:9, 68:10
**Jackson** [2] - 8:1, 55:21
**JAMES** [2] - 1:11, 1:12
**James** [7] - 4:13, 4:15, 59:3, 59:14, 63:13, 76:9
**January** [8] - 60:17, 60:21, 60:23, 61:3, 61:6, 61:14, 61:15, 61:21
**Jasmine** [2] - 8:18, 8:19
**JAWANZA** [1] - 1:4
**jaws** [1] - 32:24
**job** [26] - 10:4, 10:8, 11:3, 11:4, 12:15, 13:12, 16:10, 19:15, 20:12, 20:20, 21:22, 31:11, 33:10, 33:13, 37:24, 38:4, 38:17, 44:4, 44:11, 49:13, 56:10, 56:12, 60:8, 60:9, 63:10, 67:13
**jobs** [19] - 15:8, 15:10, 15:12, 19:12, 19:14, 19:20, 20:12, 20:13, 20:14, 21:5, 21:7, 38:10, 40:23, 40:25, 43:23, 44:1, 66:22, 76:2, 82:1
**JORDAN** [1] - 2:14
**Jordan** [1] - 4:12
**Judicial** [1] - 85:4
**Julie** [1] - 8:17
**July** [5] - 21:12, 65:9, 67:11, 84:19
**jump** [6] - 29:18, 48:3, 48:7, 50:6, 71:3, 71:17, 73:25, 80:20
**jumping** [3] - 50:10, 50:12, 50:14
**junk** [2] - 74:6, 74:7

**K**

**Kathy** [1] - 8:17
**keep** [4] - 33:23, 41:14, 62:22, 76:18
**keeping** [1] - 16:24

4

**kept** [1] - 35:25
**kids** [1] - 21:25
**kin** [1] - 84:14
**kind** [5] - 21:6, 28:13, 36:3, 39:23, 53:19
**kit** [4] - 30:11, 49:24, 50:18, 80:16
**knowledge** [3] - 41:1, 59:6, 67:25

## L

**lack** [1] - 21:3
**laid** [2] - 21:3, 21:8
**last** [9] - 6:7, 7:17, 15:21, 16:5, 17:6, 34:7, 35:21, 61:9, 77:16
**LAW** [1] - 2:12
**lawsuit** [1] - 9:1
**lawyer** [1] - 4:13
**learn** [3] - 6:3, 6:5, 55:18
**learned** [2] - 12:23, 48:23
**least** [1] - 41:4
**leave** [27] - 10:25, 11:2, 12:1, 12:3, 14:4, 16:4, 16:8, 16:9, 18:18, 20:23, 21:2, 21:24, 23:15, 23:17, 23:20, 24:12, 26:20, 31:23, 32:24, 34:21, 35:8, 38:10, 38:17, 63:7, 63:22, 67:12, 76:4
**leaving** [1] - 14:6
**left** [6] - 22:19, 35:2, 35:6, 35:7, 35:13, 47:21
**less** [2] - 12:9, 73:12
**Lester** [1] - 8:19
**Lewis** [1] - 58:10
**LEWIS** [2] - 1:5, 58:10
**Lexus** [1] - 51:6
**LICENSE** [1] - 3:15
**license** [3] - 9:20, 55:2, 55:13
**lift** [3] - 43:20, 45:15, 45:16
**light** [14] - 28:16, 28:18, 28:20, 28:22, 29:6, 29:12, 29:15, 29:17, 29:24, 48:21, 48:22, 56:1, 73:18, 73:20
**LINE** [1] - 88:2
**listed** [1] - 66:14
**literally** [1] - 75:15
**Lithonia** [4] - 14:9,

14:10, 14:12, 75:14
**litigation** [2] - 85:10, 86:1
**live** [4] - 7:19, 7:23, 8:4, 64:25
**living** [2] - 25:17, 42:2
**LLC** [5] - 1:10, 2:3, 2:12, 73:18, 73:22
**load** [3] - 22:9, 33:6, 41:3
**loaded** [3] - 17:20, 43:22, 46:23
**loading** [1] - 32:13
**loads** [1] - 22:3
**located** [2] - 37:1, 46:2
**location** [7] - 22:3, 22:4, 25:18, 31:5, 47:1, 83:2
**lock** [3] - 29:22, 30:11, 48:25
**locked** [1] - 48:9
**lockout** [4] - 49:24, 50:18, 73:23, 80:16
**log** [6] - 33:22, 35:16, 35:22, 36:15, 36:16, 62:24
**logging** [1] - 43:1
**look** [6] - 38:6, 65:17, 68:19, 68:21, 72:14, 77:21
**looked** [1] - 69:5
**lose** [1] - 12:5
**lost** [3] - 77:14, 77:17, 77:19
**lower** [1] - 12:7
**lunch** [3] - 19:23, 31:25, 32:4

## M

**machine** [1] - 49:18
**Magellan** [2] - 31:1, 31:3
**MAHONEY** [23] - 2:14, 5:13, 5:17, 5:20, 42:6, 42:13, 47:22, 54:14, 57:4, 57:7, 57:12, 58:5, 58:11, 58:20, 69:10, 77:6, 77:8, 77:10, 78:6, 78:10, 78:21, 81:8, 83:21
**mahoney** [1] - 8:24
**Mahoney** [23] - 4:9, 4:12, 5:21, 39:8, 39:14, 42:8, 42:14, 47:25, 53:12, 54:18, 57:13, 59:3, 59:13, 60:19, 60:25, 61:16,

65:13, 65:17, 68:19, 69:11, 77:12, 78:12, 81:11
**mail** [1] - 6:14
**maintenance** [3] - 11:7, 11:9, 13:1
**Man** [4] - 10:19, 55:25, 61:17, 71:19
**management** [3] - 23:23, 44:7, 44:9
**March** [1] - 24:4
**Marietta** [2] - 1:22, 2:6
**marital** [1] - 21:25
**mark** [1] - 68:16
**marked** [3] - 65:14, 65:15, 68:18
**mat** [1] - 16:14
**matter** [2] - 4:6, 40:15
**matters** [1] - 59:4
**matts** [1] - 16:15
**mean** [46] - 12:22, 15:18, 15:19, 16:9, 20:10, 26:1, 26:20, 29:17, 31:8, 31:17, 32:4, 32:8, 32:23, 35:7, 39:6, 39:10, 40:8, 45:19, 45:24, 46:13, 48:3, 48:15, 50:21, 51:12, 52:3, 55:10, 60:20, 64:24, 65:25, 69:11, 69:14, 70:4, 72:17, 73:14, 75:13, 75:21, 75:22, 76:12, 78:4, 78:5, 80:11, 81:14, 81:23, 81:25
**meaning** [3] - 28:15, 44:2, 83:16
**mechanic** [4] - 49:1, 49:4, 49:9, 49:19
**mechanics** [2] - 80:1, 80:5
**medications** [1] - 5:22
**meet** [2] - 56:14, 71:8
**meeting** [4] - 60:4, 63:22, 63:23, 64:4
**meetings** [1] - 60:3
**member** [8] - 32:24, 43:20, 44:22, 46:20, 47:1, 53:20, 53:21
**members** [4] - 48:7, 50:22, 51:1, 74:18
**Metro** [4] - 26:12, 31:21, 75:11, 75:17
**MICHAEL** [2] - 1:11, 2:4
**Michael** [1] - 4:13
**Michael@dcbflegal. com** [1] - 2:9
**might** [1] - 85:22

**Mike** [14] - 56:13, 56:14, 56:16, 56:18, 57:13, 59:8, 59:9, 59:12, 59:18, 59:21, 60:6, 64:6, 74:8, 76:9
**Mike's** [1] - 56:21
**miles** [2] - 31:9, 32:12
**Milliken** [2] - 7:20, 25:18
**mine** [1] - 68:10
**minute** [1] - 77:7
**minutes** [2] - 32:19, 32:21
**misplaced** [1] - 67:16
**mom** [1] - 61:25
**moment** [1] - 58:3
**Monday** [4] - 34:5, 61:7, 61:20, 61:21
**money** [13] - 12:5, 12:9, 22:18, 51:10, 51:11, 51:17, 51:22, 51:25, 52:14, 79:11, 79:12, 82:18, 82:20
**month** [7] - 18:13, 21:11, 21:20, 22:21, 24:10, 29:6, 65:10
**months** [3] - 34:8, 36:12, 77:16
**morning** [3] - 11:19, 35:3, 35:8
**most** [5] - 20:12, 34:4, 40:25, 43:1, 49:19
**mostly** [2] - 19:16, 28:14
**mounted** [1] - 36:10
**move** [1] - 19:17
**moved** [1] - 19:15
**movers** [1] - 18:15
**moving** [1] - 19:16
**MR** [65] - 2:4, 2:13, 2:14, 3:3, 3:4, 3:5, 5:13, 5:16, 5:17, 5:19, 5:20, 8:14, 8:22, 39:4, 39:12, 42:4, 42:6, 42:11, 42:13, 47:20, 47:22, 53:4, 53:10, 54:10, 54:13, 54:14, 54:15, 57:4, 57:6, 57:7, 57:9, 57:12, 58:2, 58:5, 58:9, 58:10, 58:11, 58:15, 58:20, 59:1, 59:9, 59:11, 60:16, 60:23, 61:15, 65:16, 68:21, 69:7, 69:10, 77:5, 77:6, 77:7, 77:8, 77:9, 77:10, 78:5, 78:6, 78:8, 78:10, 78:11,

78:21, 78:22, 81:6, 81:8, 83:21
**multiple** [6] - 15:8, 15:9, 15:18, 20:14, 44:10
**must** [1] - 44:7

## N

**name** [19] - 4:10, 4:12, 7:25, 13:4, 13:14, 23:5, 26:25, 28:3, 69:3, 69:15, 70:16, 70:23, 71:1, 71:5, 71:14, 71:19, 71:20, 71:25, 78:25
**names** [4] - 8:7, 8:11, 8:12, 8:14
**nay** [1] - 74:10
**near** [2] - 19:23, 81:21
**necessary** [1] - 87:3
**need** [7] - 32:24, 37:18, 41:24, 45:14, 48:16, 55:13, 68:21
**needed** [6] - 15:22, 19:11, 22:8, 41:24, 50:16, 61:6
**needs** [1] - 47:1
**negative** [1] - 80:12
**Nelly** [1] - 8:20
**neutral** [3] - 43:22, 44:22, 45:10
**never** [7] - 22:1, 22:16, 49:17, 53:3, 67:4, 74:7, 83:16
**New** [1] - 53:5
**new** [2] - 60:10, 62:9
**next** [10] - 5:10, 17:22, 18:17, 19:23, 20:20, 25:8, 30:6, 45:20, 47:13, 55:15
**night** [2] - 25:16, 68:6
**NO** [1] - 1:9, 3:8, 3:9, 3:10, 3:11, 3:12, 3:13, 3:14, 3:15
**non** [1] - 39:24
**non-alcoholic** [1] - 39:24
**none** [1] - 62:12
**noon** [3] - 15:21, 20:10, 20:11
**Norcross** [3] - 9:13, 20:21, 21:9
**Northeast** [1] - 25:25
**northeast** [1] - 77:20
**NORTHERN** [1] - 1:2
**Notary** [1] - 89:16
**noted** [2] - 87:8, 89:7
**nothing** [3] - 45:6, 60:11, 81:7

5

**number** [24] - 27:24, 27:25, 36:16, 43:14, 62:19, 68:1, 68:2, 69:1, 69:16, 69:19, 69:25, 70:6, 70:8, 70:15, 71:2, 71:5, 71:6, 71:20, 71:25, 72:7
**Number** [5] - 65:14, 65:15, 68:17, 68:18, 77:22

## O

**o'clock** [2] - 20:10
**O.C.G.A** [2] - 84:2, 85:18
**objection** [1] - 39:4
**objections** [1] - 5:14
**obtain** [1] - 9:24
**obvious** [1] - 57:3
**occasional** [1] - 20:13
**occasionally** [9] - 12:14, 19:21, 33:24, 38:12, 41:15, 60:20, 61:4, 61:8, 83:3
**occupation** [1] - 27:7
**OEC** [1] - 12:25
**OF** [6] - 1:2, 2:2, 2:11, 84:6, 84:7, 89:1
**offer** [1] - 12:11
**office** [2] - 8:22, 33:19
**often** [1] - 5:1
**oil** [5] - 11:9, 12:21, 12:24, 49:14, 49:15
**oldest** [1] - 42:3
**ON** [2] - 2:2, 2:11
**on-the-go** [3] - 48:13, 48:18
**once** [9] - 11:25, 14:3, 16:4, 18:13, 23:14, 33:6, 46:22, 83:13
**one** [24] - 20:14, 25:9, 28:12, 30:6, 31:5, 43:1, 43:3, 47:11, 52:10, 54:24, 55:1, 60:3, 61:18, 61:25, 62:3, 63:24, 69:18, 74:10, 75:1, 75:14, 79:11, 82:18, 82:23
**ones** [1] - 73:3
**open** [1] - 61:12
**operate** [1] - 31:16
**operations** [2] - 56:22, 57:2
**original** [1] - 87:10
**out-of-state** [2] - 82:19, 82:24
**outside** [8] - 16:19, 38:22, 38:25, 41:23,

47:17, 79:3, 79:4, 79:16
**over-the-road** [1] - 22:7
**overnight** [1] - 41:14
**own** [11] - 27:12, 30:12, 30:13, 50:1, 50:3, 50:8, 52:10, 65:3, 65:5, 66:3, 80:10
**owned** [3] - 14:19, 27:12, 80:19
**owner** [7] - 26:22, 26:25, 56:18, 59:21, 59:23, 59:24, 59:25
**owners** [1] - 63:21

## P

**p.m** [5] - 23:11, 30:16, 61:10, 83:23
**pad** [1] - 47:21
**PAGE** [4] - 3:1, 3:2, 3:7, 88:2
**pages** [2] - 84:12, 89:3
**paid** [19] - 10:18, 11:21, 12:8, 13:20, 13:24, 15:23, 18:22, 22:11, 26:9, 26:10, 30:17, 51:10, 51:17, 60:6, 64:12, 66:2, 74:14, 76:25, 77:3
**paperwork** [6] - 6:19, 6:20, 33:9, 51:14, 52:25, 75:3
**parked** [1] - 55:14
**parking** [1] - 45:9
**part** [3] - 4:16, 22:16, 48:19
**parties** [4] - 84:15, 84:16, 85:10, 85:24
**party** [4] - 9:1, 85:9, 85:20, 86:1
**passed** [1] - 61:25
**PATRICK** [3] - 1:16, 3:3, 4:4
**Patrick** [1] - 4:11
**patrol** [1] - 26:18
**pay** [11] - 12:5, 17:23, 18:1, 20:19, 26:16, 28:4, 28:6, 65:3, 65:5, 74:23
**PC** [4] - 9:5, 9:12, 13:17, 14:13
**Peachtree** [1] - 77:20
**people** [7] - 5:6, 8:23, 27:22, 75:2, 75:17, 80:3, 80:6
**per** [13] - 10:18, 11:21, 12:9, 13:24, 15:23,

18:6, 18:11, 30:17, 43:13, 60:13, 60:15, 62:2, 62:20
**percent** [7] - 18:3, 18:9, 18:11, 18:12, 26:7, 66:17, 74:15
**perform** [9] - 15:11, 29:24, 33:2, 46:11, 49:4, 51:16, 52:6, 76:2, 76:4
**performed** [7] - 49:1, 62:23, 64:13, 66:22, 68:5, 74:4, 83:18
**period** [1] - 79:23
**permission** [2] - 79:8, 79:10
**permit** [1] - 9:21
**permitted** [5] - 10:24, 11:25, 14:3, 16:7, 31:23
**personal** [2] - 75:4, 75:12
**personally** [4] - 30:12, 50:1, 50:8, 51:20
**Peters** [1] - 2:15
**Phil** [2] - 56:15, 56:16
**Phillip** [1] - 55:21
**phone** [13] - 6:9, 6:12, 6:14, 27:24, 69:1, 69:16, 69:19, 71:2, 71:6, 71:20, 71:25
**physical** [1] - 24:20
**physically** [3] - 43:23, 46:11, 46:16
**pick** [6] - 17:21, 22:3, 32:11, 34:14, 38:19, 38:21
**picking** [4] - 16:23, 25:2, 25:8, 53:5
**piece** [1] - 80:19
**Pierce** [1] - 8:20
**place** [3] - 67:17, 67:19, 76:18
**plaintiff** [3] - 58:14, 58:22, 58:24
**PLAINTIFF** [1] - 2:2
**plaintiffs** [6] - 57:11, 58:6, 58:11, 58:15, 58:18, 58:25
**Plaintiffs** [1] - 1:7
**plus** [3] - 18:9, 18:11, 18:12
**PM** [1] - 12:11
**point** [4] - 22:17, 46:24, 66:25, 75:24
**police** [1] - 30:14
**policy** [2] - 76:18, 81:25
**position** [13] - 12:4, 15:14, 16:12, 16:13,

16:14, 16:18, 17:22, 18:17, 20:4, 33:11, 33:14, 58:15, 59:1
**positions** [2] - 15:18, 16:5
**possession** [1] - 72:13
**possibly** [1] - 40:25
**pounds** [1] - 9:23
**prefer** [1] - 48:16
**preferred** [1] - 19:5
**premises** [2] - 10:25, 16:9
**prep** [1] - 19:18
**preparation** [1] - 6:16
**present** [5] - 58:13, 58:16, 58:18, 58:25, 60:4
**pretty** [12] - 6:21, 8:5, 20:3, 21:7, 22:20, 30:10, 33:19, 34:6, 36:15, 36:18, 36:23, 40:8
**prevented** [1] - 82:3
**preventive** [1] - 11:9
**previously** [2] - 6:23, 25:2
**printed** [1] - 78:25
**printout** [2] - 67:4, 67:5
**private** [4] - 51:4, 51:8, 52:8, 52:12
**privately** [1] - 51:10
**privates** [1] - 52:11
**problem** [1] - 53:3
**problems** [2] - 21:25, 22:1
**Procedure** [1] - 84:2
**proceeding** [2] - 58:17
**proceedings** [1] - 83:22
**process** [2] - 51:8, 53:15
**production** [1] - 23:4
**professional** [1] - 9:16
**prohibited** [1] - 85:18
**promote** [1] - 29:12
**promoted** [1] - 27:14
**promptly** [2] - 40:17, 40:20
**propounded** [1] - 89:6
**provide** [3] - 30:9, 85:15, 85:20
**provided** [3] - 17:11, 52:21, 52:23
**provides** [1] - 30:7
**PS** [1] - 11:7
**Public** [1] - 89:16
**pull** [3] - 32:23, 36:25, 48:15

**pulled** [1] - 52:10
**punch** [6] - 10:22, 11:23, 14:1, 16:2, 17:20, 23:8
**punched** [6] - 10:24, 11:25, 14:3, 16:4, 17:18, 23:14
**punished** [1] - 41:16
**Pursuant** [1] - 84:1
**pursuant** [2] - 1:17, 85:2
**put** [13] - 19:19, 27:24, 48:3, 68:25, 69:14, 69:15, 69:23, 70:15, 70:25, 71:1, 71:3, 71:5, 71:24

## Q

**questions** [9] - 5:4, 5:7, 6:23, 52:3, 78:21, 81:6, 83:21, 84:10, 89:5
**quick** [2] - 37:20, 47:20
**quit** [2] - 23:24, 23:25
**quote** [1] - 43:15

## R

**ran** [1] - 44:7
**ranged** [1] - 16:1
**rate** [1] - 23:12
**rates** [1] - 85:24
**read** [3] - 5:19, 87:2, 89:3
**reading** [1] - 1:18
**ready** [1] - 39:16
**really** [3] - 12:13, 32:9, 78:9
**Reason** [6] - 88:4, 88:8, 88:12, 88:16, 88:20, 88:24
**reason** [4] - 57:9, 78:3, 78:19, 87:4
**rebuild** [1] - 13:17
**rebuilding** [1] - 14:13
**receipt** [1] - 87:12
**receive** [7] - 15:11, 28:10, 45:7, 65:21, 66:5, 81:11, 81:22
**received** [8] - 6:12, 6:14, 65:24, 66:17, 70:9, 77:25, 78:7, 82:6
**receiving** [1] - 51:9
**recognize** [1] - 65:19
**recollection** [1] - 6:1
**record** [9] - 4:10, 35:15, 42:7, 43:10,

47:24, 58:3, 58:4, 67:18, 77:11

**records** [2] - 75:2, 75:4

**recross** [1] - 81:9

**redirect** [1] - 81:9

**reduced** [1] - 84:10

**referral** [2] - 85:9, 85:22

**regular** [1] - 84:16

**regularly** [2] - 79:16, 83:1

**Regulations** [1] - 85:3

**reimburse** [1] - 75:6

**reject** [4] - 43:17, 43:23, 44:1, 44:3

**rejecting** [1] - 43:19

**remember** [4] - 23:13, 43:3, 47:6, 53:7

**removers** [1] - 18:14

**rep** [2] - 17:14, 18:25

**repeat** [2] - 31:2, 67:21

**rephrase** [3] - 53:16, 57:19, 57:22

**report** [2] - 55:8, 82:6

**REPORTER** [1] - 85:1

**reporter** [5] - 4:24, 5:3, 85:5, 85:8, 85:21

**Reporter** [2] - 1:20, 85:13

**reporter's** [1] - 85:8

**Reporting** [1] - 85:3

**reporting** [4] - 85:7, 85:15, 85:20, 85:22

**represent** [2] - 65:23, 84:12

**representation** [1] - 69:4

**representative** [3] - 15:9, 16:21, 85:14

**reprinted** [1] - 72:6

**request** [7] - 33:10, 33:13, 43:20, 57:7, 58:13, 58:22, 67:6

**requested** [2] - 34:5, 58:23

**requesting** [1] - 67:3

**require** [2] - 9:10, 38:10

**required** [8] - 18:17, 20:22, 33:1, 34:1, 35:17, 43:12, 49:24, 65:1

**reserve** [1] - 5:14

**reserved** [1] - 84:3

**respect** [1] - 59:2

**respond** [3] - 36:17, 40:17, 40:19

**responsibilities** [2] - 19:2, 19:5

**responsibility** [1] - 34:9

**responsiveness** [1] - 5:15

**rest** [1] - 70:8

**restock** [1] - 16:24

**restriction** [1] - 63:12

**restrictions** [2] - 62:25, 63:5

**results** [1] - 84:17

**return** [3] - 17:7, 47:14, 87:10

**review** [3] - 6:15, 6:18, 6:24

**riders** [1] - 83:9

**road** [3] - 22:7, 22:11, 52:3

**Road** [1] - 24:6

**roadside** [3] - 28:14, 48:15

**roller** [2] - 15:8, 16:14

**rolling** [1] - 16:15

**rollover** [1] - 32:22

**room** [3] - 47:21, 58:7, 58:25

**roughly** [7] - 29:7, 34:22, 34:23, 35:1, 35:9, 49:15, 80:17

**route** [7] - 16:10, 16:11, 16:16, 17:19, 18:3, 18:12, 19:13

**routes** [2] - 17:1, 17:21

**routine** [4] - 17:13, 19:8, 30:3, 33:20

**RPR** [2] - 84:21, 86:3

**rule** [2] - 83:4, 83:5

**Rule** [1] - 84:1

**rules** [6] - 4:22, 32:6, 39:14, 39:19, 39:21, 39:22

**Rules** [2] - 84:1, 85:2

**run** [13] - 8:22, 16:10, 37:13, 37:19, 37:20, 37:21, 40:5, 40:7, 40:15, 54:5, 54:6, 65:2

**running** [2] - 16:11, 16:16

## S

**S7** [1] - 46:1

**safe** [1] - 33:8

**safety** [2] - 19:19, 32:15

**sales** [4] - 15:8, 16:21, 18:11, 18:25

**San** [1] - 21:18

**satisfaction** [3] - 69:12, 69:13, 70:25

**scene** [1] - 32:18

**schedule** [2] - 34:12, 34:23

**scheduled** [2] - 58:11, 58:23

**school** [7] - 9:5, 9:6, 10:5, 10:6, 10:8, 12:20, 12:23

**School** [1] - 9:7

**scratch** [1] - 70:17

**screw** [1] - 80:12

**secret** [1] - 58:17

**section** [1] - 52:1

**secure** [2] - 33:8, 46:24

**security** [1] - 68:2

**see** [7] - 25:25, 26:22, 35:5, 37:20, 38:6, 45:7, 72:14

**select** [1] - 36:17

**selected** [1] - 54:18

**self** [1] - 17:14

**self-service** [1] - 17:14

**sell** [1] - 83:14

**selling** [1] - 83:16

**send** [9] - 31:4, 36:22, 37:12, 37:14, 37:16, 39:3, 46:21

**sent** [5] - 18:23, 21:18, 37:25, 38:1, 38:4

**series** [1] - 47:8

**serve** [1] - 50:20

**service** [25] - 13:14, 13:18, 14:25, 15:8, 16:21, 17:14, 18:25, 20:21, 21:9, 23:1, 28:18, 28:20, 28:22, 29:6, 29:15, 29:17, 51:9, 52:21, 52:24, 56:2, 68:5, 73:18, 73:23, 82:5

**services** [16] - 28:16, 29:13, 29:24, 48:21, 48:22, 49:1, 49:4, 49:10, 49:20, 51:16, 52:7, 74:4, 83:18, 85:7, 85:16, 85:20

**set** [4] - 31:25, 33:3, 43:14, 63:12

**seven** [5] - 11:19, 13:23, 30:16, 32:19, 32:20, 60:17, 60:18, 61:3, 61:8

**several** [4] - 37:3, 37:5, 60:3, 67:7

**shake** [1] - 5:1

**shall** [2] - 85:5, 85:11

**sheet** [8] - 35:17, 35:18, 35:23, 43:4, 87:4, 87:6, 87:8, 87:11

**Sheet** [1] - 89:7

**sheets** [8] - 42:9, 42:15, 42:18, 42:21, 42:23, 42:25, 62:24, 76:23

**shift** [3] - 10:15, 11:19, 43:13

**shifts** [1] - 15:18

**shop** [14] - 17:7, 33:19, 37:19, 45:13, 46:20, 54:2, 54:6, 74:8, 79:5, 79:6, 79:8

**short** [1] - 47:23

**show** [1] - 65:13

**sick** [3] - 62:10, 62:11, 62:14

**side** [1] - 28:19

**sides** [1] - 28:17

**sign** [10] - 5:19, 35:17, 35:18, 35:20, 35:23, 76:8, 76:13, 76:15, 87:6

**Signature** [1] - 89:10

**signature** [2] - 5:18, 84:2

**signed** [3] - 59:16, 76:10, 76:11

**signing** [3] - 1:18, 76:14, 87:7

**sit** [11] - 30:5, 31:22, 32:10, 33:21, 47:13, 57:4, 57:16, 57:20, 57:25, 64:20, 78:18

**site** [1] - 23:3

**sitting** [3] - 32:9, 36:24, 54:22

**situation** [3] - 44:3, 44:19, 82:17

**six** [7] - 15:19, 20:10, 20:13, 34:8, 36:12, 60:18, 77:16

**skills** [1] - 48:23

**sleep** [1] - 40:19

**slowed** [1] - 21:6

**SMITH** [1] - 1:4

**Smith** [3] - 8:17, 8:18

**so...** [1] - 12:20

**sober** [1] - 39:17

**social** [1] - 68:2

**sold** [3] - 18:9, 18:10, 83:16

**soliciting** [1] - 75:16

**someone** [1] - 46:18

**sometime** [1] - 6:7

**sometimes** [5] - 20:9, 34:1, 38:21, 41:18

**somewhere** [2] - 34:14, 75:3

**sorry** [4] - 6:10, 20:21, 25:14, 67:21

**sort** [1] - 43:15

**source** [1] - 85:9

**South** [3] - 26:12, 31:20, 83:13

**Southwest** [2] - 2:15, 30:1

**southwest** [1] - 30:8

**space** [2] - 83:10, 87:4

**span** [1] - 24:1

**spare** [1] - 48:17

**Specialist** [1] - 12:12

**specialist** [3] - 15:9, 16:6, 18:19

**specific** [3] - 13:4, 48:23, 50:22

**specifically** [2] - 63:24, 76:15

**spell** [2] - 15:5, 27:2

**spent** [1] - 72:20

**SSR** [2] - 16:5, 16:21

**stand** [1] - 54:8

**STANLEY** [1] - 1:6

**staple** [2] - 28:1, 73:1

**stapled** [6] - 72:8, 72:24, 73:4, 73:13, 79:1

**stapling** [1] - 73:7

**start** [14] - 5:8, 5:10, 19:25, 20:10, 20:25, 21:9, 24:7, 26:15, 48:3, 48:7, 48:8, 53:18, 71:3

**started** [14] - 20:9, 20:11, 21:10, 24:3, 24:11, 28:20, 28:23, 28:25, 36:12, 39:5, 43:4, 50:3, 56:1, 65:11

**starter** [1] - 48:8

**starts** [11] - 4:9, 26:18, 35:21, 76:2, 76:4, 79:16, 79:19, 82:11, 82:19, 82:24, 87:3

**State** [1] - 1:20

**STATE** [1] - 84:6

**STATES** [1] - 1:1

**states** [1] - 85:4

**stating** [1] - 85:6

**stationed** [1] - 22:8

**step** [1] - 47:8

**stepfather** [1] - 7:24

**stepfather's** [1] - 7:25

steps [1] - 47:8
still [7] - 34:11, 40:4, 40:8, 53:9, 55:6, 65:1, 70:11
Stockbridge [1] - 25:25
stocked [1] - 19:11
stocker [2] - 10:12
stop [8] - 17:6, 24:9, 35:4, 35:9, 42:8, 42:15, 42:17, 65:8
stops [2] - 17:3, 17:4
store [1] - 81:4
straight [2] - 20:19, 37:15
strapping [1] - 32:16
straps [1] - 30:10
street [3] - 32:12, 35:4, 75:15
Street [2] - 2:6, 2:15
stubs [2] - 78:2, 78:16
stuck [2] - 45:9, 45:10
subject [1] - 87:7
Subscribed [1] - 89:12
substance [1] - 6:13
substances [1] - 89:7
Suite [1] - 2:16
summer [2] - 24:15, 29:3
Summit [2] - 67:20, 67:22
Support [1] - 9:5
support [7] - 9:12, 13:17, 14:13, 55:5, 55:15, 59:14, 59:19
supposed [10] - 26:7, 44:11, 52:17, 52:20, 66:2, 68:25, 69:15, 69:22, 71:6, 81:22
surrounding [1] - 8:21
suspended [4] - 41:19, 55:2, 55:13, 55:16
Swift [5] - 20:22, 21:10, 21:11, 21:13, 21:16
swift [2] - 21:14, 21:15
switch [2] - 24:16, 60:8
switched [3] - 28:24, 29:3, 34:23
sworn [2] - 4:3, 4:5, 89:12
System [1] - 54:12
system [2] - 31:4, 31:7

## T

tablet [14] - 33:22,
35:16, 36:5, 37:22, 38:2, 38:3, 38:8, 44:14, 47:6, 47:9, 54:24, 55:1, 76:20
tablets [4] - 36:9, 36:13, 36:15, 43:2
Tamika [1] - 1:19, 84:21, 85:14, 85:16, 85:19, 85:23, 86:3
tap [1] - 48:8
Target [4] - 10:8, 10:11, 10:20, 11:2
taught [1] - 12:25
tax [3] - 67:17, 67:19, 68:1
taxes [2] - 66:7, 67:23
Tech [1] - 9:5
tech [1] - 9:12
technically [1] - 65:1
temp [7] - 13:14, 13:18, 14:25, 20:21, 21:9, 21:22, 23:1
template [3] - 70:20, 71:4, 71:17
ten [1] - 77:7
tend [1] - 67:1
tender [1] - 85:5
tenure [1] - 34:7
term [1] - 53:4
testified [4] - 4:7, 4:19, 72:20, 79:25
testify [2] - 63:7, 64:23
testimony [4] - 28:25, 43:9, 69:22, 75:23
Thanksgiving [1] - 62:9
THE [12] - 1:1, 2:2, 2:11, 2:12, 8:15, 39:10, 53:9, 54:12, 59:10, 59:12, 60:17, 68:22
theft [1] - 7:10
therein [1] - 89:5
thereto [1] - 84:10
third [1] - 10:15
thirty [2] - 74:15, 87:11
three [6] - 7:17, 13:23, 18:15, 32:18, 62:16, 62:20
threw [1] - 73:16
tickets [1] - 7:15
tie [1] - 46:24
tighten [1] - 48:8, 80:12
tile [7] - 15:9, 16:5, 18:19, 18:25, 19:5, 19:9, 19:16
tip [1] - 81:24
tips [7] - 81:11, 81:14,
81:22, 82:3, 82:4, 82:6
tire [7] - 29:18, 48:11, 48:16, 48:18, 71:17, 74:2
tires [3] - 30:14, 49:16, 49:17
TISHJA [1] - 1:11
Tishja [10] - 4:15, 56:24, 59:3, 59:8, 59:9, 59:12, 59:14, 59:18, 59:23, 64:7
TO [1] - 87:1
today [7] - 5:22, 6:16, 7:2, 57:16, 57:20, 57:25, 78:18
toe [1] - 63:4
together [3] - 72:8, 73:5, 73:7
tomorrow [1] - 58:12
took [1] - 63:10
tools [2] - 30:9, 50:15
top [1] - 20:13
total [2] - 27:5, 72:18
tow [27] - 24:11, 24:18, 24:19, 27:4, 27:10, 27:16, 32:13, 33:5, 33:10, 33:13, 40:23, 40:25, 46:23, 48:17, 51:9, 51:16, 51:21, 52:2, 52:6, 63:1, 63:2, 63:4, 63:11, 68:5, 75:14, 83:2
towed [1] - 82:15
Tower [2] - 1:21, 2:5
Towing [40] - 4:15, 26:12, 26:18, 27:23, 28:13, 29:10, 29:24, 30:1, 30:8, 33:20, 36:1, 37:7, 39:15, 43:12, 48:2, 48:24, 55:18, 55:22, 56:18, 59:4, 59:7, 61:12, 65:8, 65:24, 67:10, 67:15, 70:10, 71:13, 72:3, 72:9, 72:11, 73:18, 73:22, 75:6, 76:18, 76:25, 77:13, 77:25, 83:15
TOWING [1] - 1:10
towing [15] - 24:21, 25:21, 26:18, 26:23, 28:13, 28:16, 28:18, 28:21, 29:9, 48:1, 48:6, 48:19, 56:2, 80:8, 82:1
Towing's [1] - 72:7
tows [5] - 33:1, 43:12, 62:22, 64:12, 74:16
track [2] - 62:22, 76:19
tracking [2] - 31:4, 31:7
traffic [1] - 7:15
trailer [1] - 22:4
trailers [1] - 25:3
train [1] - 13:6
trained [2] - 12:19, 18:20
training [14] - 9:17, 12:11, 13:2, 13:3, 13:5, 15:11, 17:24, 18:22, 18:24, 21:19, 21:21, 22:13, 22:19, 24:11
transcript [6] - 84:8, 84:13, 85:12, 87:12, 87:13, 89:4
Transportation [1] - 21:16
trash [1] - 73:16
travel [2] - 82:13, 83:1
traveling [2] - 22:15, 83:6
tried [1] - 12:4
triple [2] - 53:24, 83:11
Triple [18] - 28:14, 28:15, 37:9, 37:10, 37:12, 37:16, 43:21, 44:23, 51:5, 51:6, 51:7, 53:14, 53:20, 53:21, 53:23, 54:4, 74:17
trips [1] - 82:19
trouble [2] - 40:10, 59:11
truck [34] - 10:12, 17:9, 17:20, 19:10, 24:11, 26:7, 27:4, 27:10, 27:16, 30:23, 31:5, 32:13, 33:21, 33:23, 36:10, 36:22, 36:25, 41:7, 41:9, 41:14, 41:18, 41:24, 41:25, 45:16, 46:23, 50:14, 55:14, 64:16, 66:18, 67:4, 68:11, 73:3, 83:2, 83:10
trucks [1] - 36:3
true [1] - 84:12
truth [2] - 4:6, 5:25
try [3] - 5:3, 5:9, 12:6
trying [3] - 39:5, 53:7, 72:3
tune [1] - 11:9
turn [6] - 31:10, 52:14, 52:25, 53:2
turned [1] - 53:3
twenty [1] - 28:8
two [9] - 16:5, 20:10, 32:12, 58:6, 58:11, 79:20, 79:21, 81:4, 83:9
type [2] - 14:15, 30:25
types [1] - 50:19
typewriting [1] - 84:11
typo [1] - 27:24

## U

U-Haul [8] - 11:5, 11:6, 12:3, 12:11, 13:2, 13:9, 13:10, 49:3
ultimate [2] - 59:6, 59:14
under [5] - 5:21, 9:22, 16:7, 84:11, 85:17
understood [2] - 26:9, 64:11
unemployed [1] - 14:22
uniform [2] - 15:4, 65:3
UNITED [1] - 1:1
unless [1] - 44:11
unsure [3] - 66:20, 77:18, 78:14
up [36] - 14:6, 16:23, 17:21, 19:19, 22:3, 25:2, 25:8, 32:11, 32:12, 32:15, 32:16, 33:15, 34:14, 36:25, 38:19, 38:21, 48:8, 48:15, 51:14, 52:11, 53:5, 54:21, 54:25, 56:9, 60:17, 61:3, 67:11, 70:19, 72:18, 74:21, 75:15, 75:23, 77:6, 78:16, 80:12, 83:9
ups [1] - 11:9
usual [1] - 85:24

## V

vacation [2] - 62:1
vacations [1] - 62:2
varied [3] - 17:2, 20:7, 61:5
varies [1] - 60:14
variety [1] - 52:3
various [1] - 15:21
vehicle [8] - 17:11, 33:6, 38:21, 45:8, 45:15, 46:2, 48:1, 48:6
vehicles [1] - 46:22
verbalize [1] - 5:1

8

**verify** [6] - 45:18, 45:20, 45:22, 45:24, 46:21, 54:5
**versus** [1] - 28:16
**via** [2] - 76:25, 77:3
**Vic** [1] - 56:4
**visit** [1] - 40:16
**vocational** [1] - 9:16
**volume** [3] - 18:3, 18:12, 26:8
**vote** [1] - 8:23
**VS** [1] - 1:8

# W

**wait** [11] - 19:23, 19:24, 20:2, 20:3, 30:5, 32:11, 32:22, 32:25, 33:22, 47:13, 64:20
**waiting** [4] - 31:20, 32:7, 39:15, 54:22
**waived** [1] - 1:18
**walk** [4] - 26:24, 33:15, 71:17, 74:21
**warehouse** [1] - 23:4
**week** [12] - 6:7, 18:8, 18:11, 18:24, 22:13, 22:24, 60:13, 60:15, 60:18, 61:5, 61:7, 64:8
**weekday** [1] - 61:18
**weekends** [2] - 34:2, 34:4
**weekly** [1] - 16:25
**weeks** [1] - 21:18
**whatsoever** [1] - 5:24
**wheel** [4] - 43:20, 45:14, 45:15
**whichever** [1] - 47:11
**white** [2] - 69:8, 69:9
**whole** [1] - 4:6
**wife** [1] - 21:25
**wise** [1] - 9:4
**WITNESS** [10] - 3:2, 8:15, 39:10, 53:9, 54:12, 59:10, 59:12, 60:17, 68:22, 87:1
**witness** [6] - 4:3, 4:19, 5:15, 65:18, 77:23, 84:3
**word** [1] - 53:10
**words** [1] - 51:24
**works** [4] - 36:21, 71:10, 71:11, 71:12
**worth** [1] - 80:16
**wrapping** [1] - 77:6
**wrench** [1] - 68:12
**wrenching** [1] - 32:16
**write** [2] - 51:14, 52:25

**written** [1] - 63:16
**WYNN** [2] - 1:5, 58:9
**Wynn** [2] - 58:9, 71:15

# Y

**y'all** [2] - 55:25, 74:22
**yard** [5] - 31:22, 32:9, 33:9, 41:19, 41:25
**year** [15] - 10:10, 11:12, 14:25, 20:23, 28:22, 60:19, 60:21, 60:22, 62:2, 62:9, 62:17, 62:18, 62:20, 63:19, 76:6
**year-and-a-half** [1] - 10:10
**years** [10] - 7:17, 9:8, 10:20, 15:19, 24:1, 27:6, 53:8, 67:14, 79:23, 79:24
**York** [1] - 53:5
**you-all** [1] - 6:23
**yourself** [4] - 27:14, 27:16, 27:21, 29:12
**yourselves** [1] - 58:8

# Z

**zone** [7] - 37:18, 63:2, 63:4, 63:6, 63:8, 64:25