1          IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF GEORGIA
2                  ATLANTA DIVISION

3

4   JAWANZA SMITH, CARLO          )
    BURNEY, BRIAN WYNN,           )
5   CARLON LEWIS and              )
    STANLEY HILL,                 )
6                                 )
            Plaintiffs,           )
7                                 )
        vs.                       )    CIVIL ACTIO FILE
8                                 )    NO. 1:16-cv-01359-TWT
    IDEAL TOWING, LLC,            )
9   MICHAEL JAMES and             )
    TISHJA JAMES,                 )
10                                )
            Defendants.           )
11  _____  )

12

13

14              DEPOSITION OF

15              BRIAN WYNN

16              May 4, 2017

17              2:40 p.m.

18

             101 Marietta Street
19           3100 Centennial Tower
               Atlanta, Georgia
20

21       Lamarra George, CCR-2582

22

23

24

25

1              <u>APPEARANCES OF COUNSEL</u>

2

On behalf of the Plaintiff:
3        JAWANZA SMITH, CARLO BURNEY, BRIAN WYNN,
         CARLON LEWIS and STANLEY HILL
4
         MITCHELL D. BENJAMIN, ESQ.
5        Delong Caldwell Bridgers Fitzpatrick & Benjamin
         3100 Centennial Tower
6        101 Marietta Street, N.W.
         Atlanta, Georgia 30303
7        770-859-0754
         Benjamin@dcbflegal.com
8
On behalf of the Defendant:
9        IDEAL TOWING, LLC, MICHAEL JAMES and
         TISHJA JAMES
10
         JORDAN M. MAHONEY, ESQ.
11       The Burke Law Group, LLC
         199 Peters Street, NW
12       Suite A
         Atlanta, Georgia 303013
13       404-688-1210
         Eburke@burkelawatl.com
14       Jordan.mahoney@burkelawatl.com

15

16

17   Also Present:

18            Tishja James

19

20

21

22

23

24

25

# INDEX TO EXAMINATIONS

Examination                              Page

Examination by Mr. Burke                  6

INDEX TO EXHIBITS

| Exhibit | Description | Page |
|---------|-------------|------|
| 1 | Copy of Bryan Wynn's application for employment with All American Towing & Roadside Services | 54 |
| 2 | Copy of the Ideal Towing, LLC and All American Towing 7 Roadside Services Independent Contractor Agreement for Brian Wynn | 65 |

(Exhibits 1 through 2 have been attached to the original transcript.)

1            MR. BURKE:  Mr. Wynn, my name is

2       Earl Burke, and I represent the defendants

3       in this lawsuit.  I am going to ask you

4       some questions today, and before we get

5       started with the questions, I just want to

6       make sure the record is clear that -- sort

7       of set out the ground rules and make sure

8       you understand them going forward.

9            I'm going to ask you to allow me to

10      finish my questions before you answer.  I'm

11      going to extend the same courtesy to you,

12      to allow you to finish your answer before I

13      ask another question.  If I ask a question

14      and you don't understand it, please ask me

15      to repeat it or rephrase.  I'll be glad to

16      do so.  If I ask a question and you answer

17      it, I'm going to assume that you understood

18      the question and you answered it

19      truthfully.  Is that fair?

20            THE WITNESS:  Fair.

21            MR. BURKE:  You are going to be

22      required to give verbal responses.  The

23      court reporter is taking down what we say.

24      She can't take nodding of the head or

25      shaking and making gestures like "uh-huh"

1      and "um-hum."  It's hard for her to record

2      those, so your response has to be verbal.

3      Any time you want to take a break, just let

4      us know.  We'll be glad to take a break.

5          If I ask a question, I expect that

6      you answer it before you taking a break.

7      Fair enough?

8          THE WITNESS:  Fair enough.

9          MR. BURKE:  You -- have you ever

10     given a deposition before?

11          THE WITNESS:  Excuse me.

12          MR. BURKE:  Have you --

13          THE WITNESS:  What's that?

14          MR. BURKE:  Have you ever given a

15     deposition before?

16          THE WITNESS:  No.

17          MR. BENJAMIN:  Earl, are we going to

18     be abiding by the same stipulations?

19          MR. BURKE:  Oh.  Yeah, if it's fine

20     with you, we'll just be reserve objections

21     except as to the form until first use, if

22     that's okay with you.

23          MR. BENJAMIN:  It is.  Thank you.

24                 EXAMINATION

25  BY MR. BURKE:

```
1        Q      And I was asking you had you ever given a
2   deposition before, and I think you said this is the
3   first time.
4        A      Yeah.  I've never given a deposition
5   before.
6        Q      Have you ever testified in court before?
7        A      No.
8        Q      Have you ever been a party to a lawsuit?
9        A      I believe so.
10       Q      Tell me about that.
11       A      Creditor lawsuit.
12       Q      In DeKalb County?
13       A      I believe so.
14       Q      Is that in 2011?
15       A      I'm not certain which year.
16       Q      What happened to that lawsuit?
17       A      There was a judgment against me.
18       Q      Did you ever go to court on that?
19       A      No.
20       Q      Is that the only time you've been a party
21   to a lawsuit?
22       A      I don't believe so.
23       Q      You can't ask your lawyer questions?
24       A      Well, I -- I don't -- I don't understand
25   --
```

```
 1          MR. BENJAMIN:  If you don't

 2      understand the question, you can ask him.

 3          THE WITNESS:  There's a -- I don't

 4      understand.

 5      Q     (By Mr. Burke) I asked you if you had ever

 6   been a party to lawsuit and you told me that you had

 7   been when you were sued by a creditor in DeKalb

 8   County.  I'm asking you if you have been a party to

 9   any other lawsuit, other than the one you just told

10   me about, and the one we're here about today.

11      A     I can't recall to my knowledge, to be

12   certain.

13      Q     You've been arrested a couple of times

14   before, sir; is that correct?

15      A     Yes, sir.

16      Q     Tell me about your prior arrests.

17      A     In 2007, I believe, or '8, not certain, I

18   was arrested for the first time in Gwinnett County.

19      Q     For?

20      A     For suspended license.  Then I was

21   arrested again.  I'm not certain of the year.  Let me

22   think.  I know I was arrested again in Clayton

23   County.

24      Q     For?

25      A     It was a warrant for failure to pay a
```

ticket.  Then I was arrested in Hapeville for a
suspended license, and Lilburn for suspended license,
and in --

    Q    All right.  Hold on.  Hold on.

    A    I'm sorry.

    Q    Hapeville, suspended license.

    A    Lilburn.

    Q    Lilburn.  Do you know when you were
arrested for the suspended license in Hapeville?

    A    In Hapeville.  I can't be certain.  I
can't be certain.  It was in the last few years.

    Q    Was your license suspended at any time
during the time that you were working with Ideal
Towing?

    A    Yes.

    Q    When were you working with Ideal Towing?

    A    I worked with Ideal Towing from November
2104 to last year.

    Q    Last year when?

    A    I believe in March, but I can't be
certain.

    Q    And during the time that your license was
suspended while you were working at Ideal Towing,
were you driving a tow truck?

    A    I -- yeah.  There was a time.

1       Q    When was that?

2       A    The time I got arrested in Lilburn and

3 Decatur.

4       Q    And you knew your license was suspended

5 and you weren't supposed to drive, correct?

6       A    No, I didn't.

7       Q    You didn't know you wasn't supposed to

8 drive when your license was suspended?

9       A    I didn't know my license was suspended.

10       Q    And you said that you drove when your

11 license was suspended in Hapeville and Lilburn.  When

12 you found out that --

13       A    Oh.

14       Q    I'm sorry?

15       A    When I was working for Ideal Towing?

16       Q    Yes.

17       A    Lilburn, Decatur.

18       Q    So your license was suspended by another

19 jurisdiction, Decatur?

20       A    No.  I got arrested while driving, with

21 Ideal Towing in Lilburn and Decatur.  Not in

22 Hapeville.

23       Q    So you --

24       A    I wasn't with Ideal Towing when that

25 happened.

1    Q    Got you.  So you were actually driving an

2    Ideal Towing truck -- tow truck when you got arrested

3    for a suspended license?

4    A    Yes.

5    Q    And after that first arrest and they told,

6    they told you at that point your license was

7    suspended, correct?

8    A    Uh-huh.

9    Q    And did you address that suspension?

10   A    Yes, I did.

11   Q    And then you were subsequently arrested

12   again for suspension of license?

13   A    Yes, sir.

14   Q    And what happened there the second time?

15   A    A discrepancy.  I believe a discrepancy

16   with the addresses.  I moved several times, so

17   certain things didn't get sent to me.  And I believe

18   -- believe I missed the court date.

19   Q    Did you notify anybody at Ideal Towing

20   that your license was suspended after you were towed

21   the first time?

22   A    Yeah.

23   Q    And did you stop driving?

24   A    Yes.  Immediately.

25   Q    What period was that?

1      A      That was about a week, maybe a couple of

2   weeks.  I'm not certain though, to be sure.

3      Q      You don't have any records of that period?

4      A      Not on hand.

5      Q      And the second time it was suspended, you

6   weren't driving a tow truck, correct?

7      A      I'm sorry.  I don't understand the

8   question.

9      Q      The second time your license got

10  suspended, were you driving the tow truck --

11             MR. BENJAMIN:  While you were

12         working for Ideal.

13             THE WITNESS:  Yes.

14     Q      (By Mr. Burke) and did you notify anybody

15  at Ideal?

16     A      When I found out, I found out the same

17  time everybody found out.

18     Q      And you stopped driving?

19     A      Yes.

20     Q      How long?

21     A      I'm not sure of the time frame, but until

22  I got my license back.

23     Q      And as you sit here today, you don't

24  recall when that was?

25     A      No, but it had to be within a week or two.

```
1        Q     What year?

2        A     That had to be 2015, end of 2015.  And/or

3    the beginning of -- very, very beginning of 2016.

4    I'm not -- I'm really not certain.

5        Q     When did you know that you were going to

6    give a deposition in this case?

7        A     When I was informed about it?

8        Q     When?

9        A     I was informed it was supposed to be a

10   deposition back in January, but it never took place.

11       Q     So as early as January of this year, you

12   knew that you had to give a depo?

13       A     Yes.

14       Q     What did you do in preparation for your

15   deposition today?

16       A     Answered the questions given in discovery.

17       Q     In preparation for the dep -- of the

18   deposition today, what did you do?  Look at any

19   documents, did you talk to anybody?

20       A     Yeah.  Went over the answers to the

21   responses to the questions for discovery.

22       Q     So you went over your interrogatory

23   responses?

24       A     Yes, sir.

25       Q     Anything else?
```

1    A    You know, just conferred with my counsel

2    to see what's in respect to a deposition, basic

3    knowledge of what a deposition is.

4         MR. BENJAMIN:  He's not asking you

5         also what you and I discussed, so please

6         don't --

7         THE WITNESS:  Okay.

8         MR. BENJAMIN:  -- discuss that.

9    Q    (By Mr. Burke) So you looked at your

10   interrogatory -- your own interrogatory responses to

11   the questions my office asked you.  Any other

12   documents?

13   A    No.  Whatever's included in the

14   interrogatory responses.

15   Q    Why did you look at those interrogatory

16   responses as opposed to anything else?

17   A    Because those were -- to my understanding,

18   that those were the questions or related to what

19   would be discussed in the deposition.  And I've had

20   so much go on in the last, like, year or so that I

21   wasn't sure of all the dates.

22   Q    I notice that the responses were not

23   verified.  I don't know if Jordan and you had any

24   discussions about that.

25        MR. BENJAMIN:  I have not had any

```
 1          discussions with him about that.  I'm sure

 2          we can still fix that.

 3                  MR. BURKE:  Okay.

 4          Q     (By Mr. Burke) Other than talking to your

 5     attorney, did you talk to anybody about this

 6     deposition today?

 7          A     I don't understand the question.

 8          Q     Did you talk to anybody about your

 9     deposition today?

10          A     The fact that one was going to take place?

11          Q     That you were going to give a deposition,

12     yes.

13          A     Yes.

14          Q     Who did you talk to?

15          A     My family members.

16          Q     Tell me who they are?

17          A     Barbara Wynn, Bruce Wynn.  That's it.

18          Q     What did you tell them?

19          A     That I'm giving a deposition on the 5th.

20          Q     That's all you told them?

21          A     There's nothing much to tell them.  Didn't

22     know anything else.

23          Q     Why did you tell them that?

24          A     Because they're my parents.

25          Q     Do you live with them?
```

1       A     No.

2       Q     Did you talk to anybody that's a part of

3 this lawsuit?

4       A     Yeah.

5       Q     Who did you talk to?

6       A     Oh, well, in -- I don't understand the

7 question.  In regards to the deposition?

8       Q     Yes.  That's what I'm asking.

9       A     Oh.  I mean, I guess my co-plaintiffs, but

10 we really didn't talk about the deposition.

11       Q     Okay.  Who did --

12       A     Other than the fact that there was going

13 to be one.

14       Q     Who did you talk to about te fact that you

15 had --

16       A     The ones who I saw, Mr. Carlon and

17 Mr. Burney.

18       Q     Did you ask them any question about what

19 the questions were that they were asked?

20       MR. BENJAMIN:  Objection.  I'm

21      instructing my client not to -- not to

22      answer that.

23       MR. BURKE:  All right.  Let's get

24      off the record.

25       (Whereupon, a brief discussion was

```
 1          held off the record.)

 2               MR. BURKE:  Let's go back on.

 3               All right.  We had a discussion off

 4          the record regarding appropriateness of

 5          counsel advising his client not to answer a

 6          question related to discussions he may have

 7          had with other parties in this lawsuit.

 8          And it is still your position, Counsel,

 9          that you are instructing him not to answer?

10               MR. BENJAMIN:  I'd like to take a

11          two-minute break and discuss with my

12          co-counsel.

13               MR. BURKE:  Okay.  All right.

14               MR. BENJAMIN:  And make sure I'm on

15          firm ground.

16               (Whereupon, a brief discussion was

17          held off the record.)

18               MR. BURKE:  Back on the record.

19          Q     (By Mr. Burke) Earlier, you told me you

20     had conversations with some of the plaintiffs, the

21     other plaintiffs in this lawsuit.

22          A     Uh-huh.

23          Q     And you gave me a couple of names.

24          A     Uh-huh.

25          Q     Tell me --
```

1          MR. BENJAMIN:  You have to -- you

2      have to say yes.

3          THE WITNESS:  Oh, I'm sorry.  Yes.

4      Q    (By Mr. Burke) -- about the conversations

5  that you had with those plaintiffs.

6          MR. BENJAMIN:  As long as I wasn't

7      there or any of the other plaintiffs -- any

8      of the other attorneys.

9          THE WITNESS:  Oh, we didn't discuss

10      the deposition.

11      Q    (By Mr. Burke) Now, you didn't discuss the

12  deposition.  Is that because of what your counsel

13  just said?

14      A    No, it has nothing to do with what the

15  counsel just said.  Everything we talked about

16  regarding deposition was done here, you know.  After

17  we left, we was just talking about life and what we

18  were doing.

19      Q    So it's you testimony that you have not

20  spoken to any of the other plaintiffs in this lawsuit

21  about this deposition today, outside of this office?

22      A    Mr. Burney contacted me or I contacted him

23  to say that there was going to be a deposition, but

24  we didn't discuss any deposition or any conversation

25  about the deposition.  That was prior to, so.

1     Q     You didn't talk to Mr. Smith, Jawanza

2     Smith about your -- about his deposition?

3     A     I haven't talked to Jawanza Smith in,

4     like, a year.

5     Q     And you didn't talk to Mr. Burney about

6     his deposition?

7     A     No.  I didn't -- I sat in on it, so I

8     didn't need to.

9     Q     I'm sorry?

10    A     No, I did not discuss the deposition.

11    Q     You sat in on it you said?

12    A     Yes.

13    Q     When was that?

14    A     When he had his deposition.

15    Q     A few days ago, a day or so ago?

16    A     Yesterday.

17    Q     So your testimony is you have not spoken

18    to anybody about your deposition outside of this

19    office?

20    A     To my recollection, no.

21    Q     What about the lawsuit, have you spoken to

22    any of the other plaintiffs about this lawsuit?

23    A     Other than the -- yes.  Yeah.  Yes, I

24    have.

25    Q     Tell me about those discussions.

1      A    The only person I've been in contact with

2  is Mr. Burney in the past 12 months about this

3  lawsuit.  And we just -- when we have discussed it,

4  we discussed the fact that it's taking a long time

5  and that we didn't know the status of it.

6      Q    Was it Mr. Burney's idea that you file a

7  lawsuit against Ideal Towing or was it your idea?

8      A    I don't know whose idea it was.

9      Q    Well, why did you decide to file suit

10  against Ideal Towing?

11      A    Because I felt like we weren't done right

12  by Ideal Towing.  And then when I found out there was

13  going to be a lawsuit, I decided to join.

14      Q    When did you find out?

15      A    I believe March or April 2016.

16      Q    And who told you that there was going to

17  be a lawsuit?

18      A    Mr. Smith, initially.

19      Q    Jawanza?

20      A    Yes.

21      Q    He reached out to you?

22      A    Yeah.  Yes, sir.

23      Q    Now, you said you felt like you weren't

24  done right by Ideal Towing.  What do you mean by

25  that?

1    A    I feel like our pay versus the hours

2    worked didn't add up, and that our taxes were

3    completely messed up.  And that's -- that's the

4    majority of it, you know.  There are other things

5    that we couldn't really sue for.

6    Q    I'm sorry?  Say it again.  There are other

7    things what?

8    A    We couldn't really sue for.

9    Q    Are you nervous?

10   A    Me?  No.

11   Q    Do you mind stop rocking, please.  Thank

12   you.

13   A    I guess I am nervous.

14   Q    Okay.  That noise, yeah --

15        MR. BENJAMIN:  Let -- I guess it's

16        the squeaky chair.  Here.

17        THE WITNESS:  Okay.  We're good.

18   Q    (By Mr. Burke) All right.  So as I

19   understand your testimony, the only thing you looked

20   at in preparation for the deposition was your

21   responses to interrogatories, correct?

22   A    Yes, sir.

23   Q    And you only had conversations with the

24   co-plaintiffs was the fact that you were going to

25   give a deposition, correct?

1      A     Yes.

2      Q     And then you just told me also that you

3 sat in a deposition yesterday of one of the

4 co-plaintiffs.

5      A     For a time.  For a time.

6      Q     Period of time.  You didn't sit through

7 the whole deposition?

8      A     No.

9      Q     So you heard what the other person was

10 testifying to and you heard the questions that were

11 being asked?

12     A     Some of them.

13     Q     Is that why you sat in on a deposition?

14     A     No.  Because I had never been in a

15 deposition before.

16     Q     So the reason why you sat in a deposition,

17 so you can learn about what a deposition is like?

18     A     Yes.

19     Q     And also to get information of what the

20 other people were testifying about?

21     A     No.

22     Q     Did you learn anything from sitting in a

23 deposition?

24     A     They're boring.

25     Q     What else?

     A     They're extremely boring, and I wanted to
go to sleep.

     Q     Did you learn any facts about the case?

     A     There's nothing I don't already know.

     Q     So you're going to be able to answer the
questions I ask you today?

     A     To the best of my recollection --

          MR. BENJAMIN:  Objection to form.
     We don't know what the questions are.

          MR. BURKE:  Well, he just said
     there's nothing he doesn't already know.

     Q     (By Mr. Burke) So, I want to be clear that
you are prepared today to answer all the questions
I'm going to ask you --

          MR. BENJAMIN:  Objection to form.
     Take it one at a time.

     Q     (By Mr. Burke) -- as it relates to the
facts of this lawsuit?

          MR. BENJAMIN:  Objection to form.

     Q     (By Mr. Burke) You can answer the
question.  Do you understand my question?

     A     Can you rephrase it?

     Q     You just told me that there's nothing you
don't already know about this lawsuit.  Did I
understand that correctly?

```
1       A       I think that's -- I misrepresented what I
2    was saying when I said that.
3       Q       Well, tell me what you mean to say?
4       A       Well, I'm sure there's things I don't
5    know.  There's nothing I heard yesterday that I
6    didn't already know or assume.  And as far as can I
7    ask all your questions, to the best of my
8    recollection, I will try to answer all your
9    questions.
10      Q       Why did you -- you said -- strike that.
11              You said you decided to sue because you
12   felt like you weren't done right by Ideal Towing.
13   Did I understand that correctly?
14      A       Yes.
15      Q       According to the application you filled
16   out, you worked for other tow companies before you
17   started working for Ideal Towing, correct?
18      A       Incorrect.
19      Q       You've never worked for a tow company?
20      A       Well, I worked light service for a company
21   that did towing.  But prior to Ideal Towing, I never
22   did towing before.
23      Q       Tell me about the light service work that
24   you did at the tow -- a company that did towing.
25      A       I worked for V&S Towing.
```

1       Q     And where were they located?

2       A     They were located in Lithonia, Georgia at

3 the time.

4       Q     And when did you stop working for them?

5       A     2012, approximately June, July,

6 approximately.

7       Q     And how were you paid?

8       A     Supposably, I was paid -- well, I was paid

9 as a 1099 commission.

10      Q     You got a commission based on the number

11 of jobs you did?

12      A     Yes.

13      Q     How long did you work for them?

14      A     I worked for them about three months.

15      Q     And you say supposedly.  What does that

16 mean?

17      A     I mean that's -- that's how I was paid,

18 but I did not know at the time that that wasn't

19 correct, that that was illegal.

20      Q     Are you planning to sue them?

21      A     No.  I believe the statute of limitations

22 on that...

23      Q     What's the statue of limitation?

24      A     I'm not certain.

25      Q     Why do you believe the statue of

```
 1    limitation --

 2              MR. BENJAMIN:  Objection.  Now

 3         you're calling for attorney/client

 4         privileged information.

 5              MR. BURKE:  No, I'm not.

 6         Q    (By Mr. Burke) You can answer the

 7    question.

 8              MR. BENJAMIN:  To the extent you can

 9         answer the question without divulging

10         anything that an attorney told you while

11         you were consulting them for advice, you

12         can answer the question.

13              THE WITNESS:  Honestly, I don't know

14         where I got it from, but certain things

15         that got in my mind, and I knew it was --

16         it's been too long.

17         Q    (By Mr. Burke) Did you ask to be paid

18    commission when you were working for V&S Towing?

19         A    No.

20         Q    They just told you that they were going to

21    pay you on commission and you agreed to that?

22         A    Yes.

23         Q    Why did you leave V&S Towing?

24         A    The owner and manager of the company was

25    very rude and disrespectful.  And he was not giving
```

1  me the shift and calls and everything that he

2  promised when I started working for him.  And -- and

3  he was very, very, very rude and disrespectful.

4       Q    You weren't making any money because you

5  weren't getting the shifts?

6       A    I wasn't getting the calls, specifically.

7       Q    And you would make -- the more shifts you

8  got, you would make more money, correct?

9       A    The better shift and -- which comes with

10  more calls, yes.  There's only two shifts.

11       Q    Is that a night and day?

12       A    Uh-huh.

13            MR. BENJAMIN:  You got to verbal --

14            THE WITNESS:  Yes, sir.  Yes, sir.

15       I'm sorry.

16       Q    (By Mr. Burke) Tell me a little bit about

17  your educational background, sir.

18       A    What would you like to know?

19       Q    You went to high school.  Did you

20  graduate?

21       A    Yes.  I graduated from high school.

22       Q    What year?

23       A    2012.  I'm sorry.  Pardon me.  2002.

24  Excuse me.  I took 10 years off of myself.

25       Q    Where?

          A      Franklin High School in Somerset, New

Jersey.

          Q      Did you go to college?

          A      I went to Delaware State University from

2002 to 2003, and then Middlesex County College from

2003 -- well, just a fall semester for 2003.

          Q      You never graduated from Delaware State,

correct?

          A      No.

          Q      Why did you leave?

          A      College wasn't what I expected.

          Q      And then why did you enroll in Middlesex?

          A      Still trying to do the college thing, but

just less -- at least I was at home and not in the

middle of know where.

          Q      So Delaware, you were there full time, and

Middlesex you were doing part-time school; is that

right?

          A      I was a full-time student, I just didn't

live on campus.

          Q      On both places?

          A      Yes.  Well, I lived on Campus in Delaware.

I did not live on campus in Middlesex.  Middlesex

County College is in New Jersey.

          Q      And you don't have a bachelor's degree,

```
1    correct?

2         A      No.

3         Q      Any other training or education after

4    leaving Middlesex?

5         A      Forklift certification.

6         Q      Where did you get that?

7         A      I got that from a safety coordinator.  I

8    believe that's his title safety coordinator with

9    Holder Construction, and a rigging certification.

10        Q      And when did you get the rigging

11   certification?

12        A      From the safety coordinator with Holder

13   Construction.

14        Q      Is that an actual class that you have to

15   attend?

16        A      Yes.

17        Q      Do you use any of these skills that you

18   learned the holder -- from Holder Construction?

19        A      No.  Not with -- for what?

20        Q      Work, employment.

21        A      Now.  I just recently got those

22   certifications.

23        Q      What year?

24        A      2017.

25        Q      So just this year you got certifications?
```

1      A     Yeah.  And I got a flagging certification

2  in 2016.

3      Q     What is that?

4      A     I'm sorry?

5      Q     What is that?

6      A     Traffic control.

7      Q     Is that where you're on a construction

8  site and you're --

9      A     Yeah.

10     Q     -- controlling the traffic -- let me

11 finish the question first.

12     A     I'm sorry.

13     Q     You were guiding the traffic along the

14 road?

15     A     Yes.

16     Q     And when in 2016 did you get that?

17     A     Second half of 2016.  I can't be sure of

18 the month.

19     Q     And your work experience, tell me the last

20 jobs you've had in the last 10 years?

21     A     The last 10 years?  Two thousand -- going

22 back to 2008, I worked for Great Expressions Dental

23 Group.  Well, at the time, it was Nankin Dental Group

24 and then it was bought out by Great Expressions.

25     Q     Is that in New Jersey?

```
 1        A     No.  That's in Norcross, Georgia.  My
 2   office was in Norcross.
 3        Q     What did you do for them?
 4        A     I did insurance verification.
 5        Q     And were you paid hourly?
 6        A     Yes.
 7        Q     What were you paid per hour?
 8        A     I think I started off there with either 11
 9   or $12 an hour.
10        Q     And you understood that you were going to
11   get 11 and $12, no more, no less, regardless of the
12   number of hours you worked when you worked for this
13   company, correct?
14        A     No.  Because after 40 hours, you got
15   overtime.
16        Q     So you understood that you were going to
17   be entitled to overtime as well?
18        A     Yes.
19        Q     And when did you leave the dental group?
20        A     November two thousand -- Oh, no, no, no.
21   I'm sorry.  September, 2011.
22        Q     Why did you leave?
23        A     I didn't survive the merger.
24        Q     So you were a rift?
25        A     Yeah.  I was --
```

1      Q     You understand what that means?

2      A     I was rift.  That means you fall out.

3      Q     And where did you go after that?

4      A     I went to Auto Rescue.

5      Q     What year was this?

6      A     2011.

7      Q     And Auto Rescue, what did they do?

8      A     Roadside assistance.

9      Q     And what did you do for them?

10     A     Roadside assistance.

11     Q     Tell me what that is.

12     A     Tire changes, lockouts, fuel delivery and

13 jump starts.

14     Q     Were you in a truck, tow truck?

15     A     I was in my personal vehicle.

16     Q     Did you have a title?

17     A     Roadside assistance technician.

18     Q     And how much were you being paid there?

19     A     I was paid strictly commission with

20 bonuses.

21     Q     So you were paid based on a number of jobs

22 you did, correct?

23     A     Yes.

24     Q     And you understood that when you started

25 working for them that that's how you were going to be

1    paid, correct?

2         A    Yes.

3         Q    And that was different from the hourly job

4    that you had at the dental company?

5         A    Yes.

6         Q    How long did you work for Auto and Rescue?

7         A    I worked for Auto Rescue from -- for

8    almost a year.  I believe a little shy of a year.

9         Q    And what did you do -- what was your

10   commission?

11        A    I believe I was getting -- I can't be

12   certain, but I believe I was getting like $10 a call.

13   From certain companies -- because we were getting

14   calls from different companies.  Certain companies,

15   I'll get 10, certain -- one company I'll get 11.  And

16   there's like maybe one company you get like $9 a

17   call.

18        Q    So the companies that were paying the $11

19   per call, the more calls you responded for that

20   company, you would get more money, correct?

21        A    Yes.

22        Q    And of course the opposite would true for

23   the company that was paying the lease amount?

24        A    Yes.

25        Q    What did you do after Auto Rescue?

1    A    After Auto Rescue, for a short time, maybe

2    a week or two, I was at -- actually simultaneously at

3    Auto Rescue and Quick -- QuickPick, QuickPick

4    Roadside Assistance.

5        Q    And what did you do for them?

6        A    Roadside assistance.

7        Q    Same thing that you described that you did

8    for Auto Rescue?

9        A    Yes.

10       Q    Did you use your own personal car as well?

11       A    Yes.

12       Q    And the pay was similar, they got paid per

13   call?

14       A    Yeah, similar.

15       Q    On commission?

16       A    Yes.

17       Q    And you said you worked there while you

18   were working at Auto Rescue, for about a week after

19   you left Auto Rescue?

20       A    Yes.

21       Q    Why did you leave?

22       A    Oh it's because that's when I started to

23   work with V&S.

24       Q    How did you find out about the job at V&S?

25       A    Ran into one of the drivers.

1      Q      And what did he tell you?

2      A      He did the roadside assistance.

3      Q      He told you what?

4      A      That they also did roadside assistance.

5      Q      Did he tell you anything about the

6   company, the compensation plan, anything about --

7      A      No.

8      Q      -- working there?

9      A      No.

10      Q      So he told you about it and then you

11   decided to apply?

12      A      I asked.  And I asked if they did roadside

13   assistance and then -- and I got the number.  And

14   then I just did all the other research myself.

15      Q      I think you told me that was 2012 when you

16   started working for them?

17      A      I believe so.  Yes.

18              THE WITNESS:  Can we take a break

19      for a second?

20              MR. BURKE:  Yeah.  Sure.

21              (Recess was taken.)

22              MR. BURKE:  Back on the record.

23      Q      (By Mr. Burke) I was asking you about M&S

24   [sic] Towing company?

25      A      I'm sorry?

```
1        Q      I was asking you about the towing company,
2   the last job you were telling me about.
3        A      Which one?
4        Q      What was the name of the company?
5        A      Well, we discussed Auto --
6        Q      The last one?
7        A      -- Rescue.
8        Q      The last one.
9             MR. BENJAMIN:  The one you were
10        talking about right before you went --
11             THE WITNESS:  V&S?
12        Q      (By Mr. Burke) V&S.
13        A      Okay.
14        Q      You said you started in 2012.
15        A      Yes.
16        Q      And you were doing roadside assistance?
17        A      Uh-huh.  Yes, sir --
18        Q      Is that a yes?
19        A      Yes.
20        Q      And doing the same thing you described in
21   -- that you were doing for Auto Rescue?
22        A      Yes.
23        Q      And this time you had a truck or were you
24   driving your own vehicle?
25        A      I was driving their vehicle.
```

1     Q     What kind of vehicle was that?

2     A     A -- it was a Montero.  I don't know if

3     that's Nissan or Mitsubishi.  I think it's a

4     Mitsubishi.

5     Q     But it wasn't a tow truck?

6     A     No.  It was light service vehicle.

7     Q     And you were also being paid by

8     commission, correct?

9     A     Yes.

10    Q     And tell me how you were being paid.  Was

11    it a percentage or a flat fee for jobs?

12    A     I do not remember.  I do not recall.

13    Q     How long did you work for them?

14    A     I wasn't with V&S long at all.  I can't

15    recall exactly, but I couldn't have been there for

16    more than a month or two.  Couldn't have been there

17    for more than a couple of months.

18    Q     Why did you leave?

19    A     Because the owner --

20    Q     -- was rude to you?

21    A     And disrespectful.

22    Q     And you didn't get the jobs that you

23    wanted?

24    A     I did not get the shift or the calls that

25    he promised to me.

```
 1        Q     That doesn't refresh your recollection as
 2   to how you got paid, whether it was a percentage or
 3   based on flat fee for the calls?
 4        A     No, I don't recall.  I -- No, I don't
 5   recall.
 6        Q     And what did you do after V&S?
 7        A     I started working at All American Roadside
 8   Assistance.
 9        Q     How did you find out about that job?
10        A     I stopped one of the drivers.
11        Q     How did you do that?
12        A     I mean, I saw him at a gas station, so I
13   walked up to them and started asking them question.
14        Q     Do you remember the name of the driver you
15   spoke to?
16        A     Oh, no.  No.
17        Q     And then after that, you spoke to the
18   drive, what did you do after that?
19        A     Called the number.
20        Q     And?
21        A     Went to the office.
22        Q     Who did you talk to when you called?
23        A     I'm not sure who I spoke to when I called.
24        Q     Was it a male or female?
25        A     I don't recall.
```

```
 1        Q      Did the person tell you to come in and

 2   fill out an application?

 3        A      Either they told me or I just requested

 4   it, you know.

 5        Q      And --

 6        A      I called to get their address.

 7        Q      So that was the only reason you called, to

 8   get the address?

 9        A      To get the address, yes.  Yes.  To get the

10   address so I can come up there and introduce myself

11   in person and...

12        Q      And?

13        A      Introduce myself and see if I can fill out

14   an application, more personal.

15        Q      So you were trying to find a job at All

16   American Tow?

17        A      Yes.

18        Q      And that was because you were partly

19   dissatisfied with the pers -- the company you were

20   working for, correct?

21        A      Yes.

22        Q      And who did you talk to when you got to

23   All American?

24        A      Initially, I can't -- I can't recall.

25        Q      Did you talk to anybody at All American
```

1  Tow that you can recall speaking to when you were

2  looking for a job?

3        A     I went up there a few times.

4        Q     Is that a yes or no?

5        A     Oh.  Rephrase the question, please.

6        Q     You want me to repeat the question?

7        A     Repeat it then.  Sure.

8        Q     I said who did you call and speak to at

9  All American that you do recall speaking to?

10        A     I do recall speaking to Michael James,

11  eventually.  And Tishja James.

12        Q     Tell me a conversation you had with

13  Mr. James.

14        A     I can't be sure of specifics, but pretty

15  much, just, I've been doing roadside assistance for a

16  little while now, I know the game, and then, you

17  know, I can do the job well.

18        Q     So you told them that you had been doing

19  it, that's been your occupation, your job for a

20  while, correct?

21        A     Yes.

22        Q     And you wanted -- your skills that you

23  learned, you wanted to sell those to Mike James.

24              MR. BENJAMIN:  Objection to form.

25        Q     (By Mr. Burke) Do you understand my

1    question?

2        A    Can you rephrase it, please?

3        Q    Do you understand my question?

4        A    No, I don't.

5        Q    Every time a lawyer objects, that's not a

6    hint or a clue for you to say for me to rephrase it,

7    okay?

8            MR. BENJAMIN:  No.  It's an

9        objection --

10           MR. BURKE:  If you -- I'm not

11       finished --

12           MR. BENJAMIN:  -- on the record --

13           MR. BURKE:  That's fine --

14           MR. BENJAMIN:  -- when you ask an

15       inappropriate question.  And I'm going to

16       continue to do it, Earl.

17           MR. BURKE:  And I'm not stopping

18       you.  But I'm talking to the witness.  I'm

19       just letting him know that it's not a hint

20       or a clue for you to say repeat it.

21       Q    (By Mr. Burke) If you understand the

22   question, like I said at the very beginning, I expect

23   you to answer the question.  So I'm asking you: Do

24   you understand my question.

25       A    No, I don't understand the question.  It

1   sounds funny to me.

2       Q    Okay.  That's fine.  Fair enough.  That's

3   all you had to say.

4       A    Yeah, I mean, I was -- that's why I looked

5   puzzled when it was initially asked, but it does

6   sound a little funny to me.

7       Q    All right.

8            MR. BENJAMIN:  And don't allow him

9            to put words in your mouth.  If you don't

10           agree with the premise of his question, you

11           don't --

12           MR. BURKE:  Counsel, do you want me

13           to put you under oath, sir?  I can.  I

14           mean, don't testify for him.  You wouldn't

15           do that in a trial.  You could not get up

16           there and say what you're saying at a

17           trial.  This is the same --

18           MR. BENJAMIN:  No.  I --

19           MR. BURKE:  -- behavior as expected

20           of you.  So I'm asking you -- you know, we

21           agreed to waive objections -- to reserve

22           objections, so.

23       Q    (By Mr. Burke) All right.  Let's go back

24   to my question about your conversation with

25   Mr. James.  You said you told him you knew the game,

1  that you had been doing roadside service for sometime

2  now.  And my question was you were trying to convince

3  Mr. James to hire you and telling him that you had

4  some experience doing what his company does, correct?

5       A     Yes.

6       Q     And did Mr. James eventually decide to

7  hire you?

8       A     Yes.  Either Mr. James or Mrs. James.

9       Q     Okay.  When you say "either" -- you don't

10  recall who told you that you were hired?

11       A     No, I don't.

12       Q     As you sit here today, you don't recall?

13       A     No.  Not to be certain.  No.

14       Q     Well, you knew that Mr. James owned that

15  company, correct?

16       A     It was my knowledge of what I understood

17  that Mr. and Mrs. James both owned the company.

18       Q     You didn't know that Mr. James ran the

19  day-to-day operations of the company?

20       A     For the most part, I didn't deal with

21  Mr. James.  For the most part, I dealt with

22  Mrs. James.  So, no, I didn't.  But I thought they

23  were both in charge.

24       Q     Now, you filed a lawsuit in this case,

25  correct?

```
1         A      Excuse me?

2         Q      You filed a lawsuit in this case, correct?

3         A      Yes.

4         Q      Did you read the complaint before it was

5    filed?

6         A      Yes, sir.

7         Q      And you provided the information, some of

8    the information in this lawsuit to your lawyer,

9    correct?

10        A      Yes.

11        Q      This is a copy of your complaint that was

12   filed in the federal case.  I want you to read

13   paragraph 64 for me, please, on the record.

14        A      At all times, material hereto, Defendant

15   Michael James exercise operational control over the

16   work activities of each plaintiff.

17        Q      Is that true?

18        A      Yes.

19        Q      Read 65 for me.

20        A      At all times, material hereto, Defendant

21   Michael James was involved in the day-to-day

22   operations of Ideal Towing, LLC.

23        Q      Is that true?

24        A      Yes.

25        Q      Read number 66 for me.
```

1      A      At all times, materials hereto, Defendant

2    Ideal Towing, LLC vested Defendant Michael James with

3    supervisory authority over each plaintiff.

4      Q      So you knew that Michael James ran the

5    day-to-day operations of Ideal Towing, correct?

6      A      Yes.

7      Q      And I understood you to suggest or say

8    that you dealt with Tishja James as well.  Did I

9    understand that correctly?

10     A      Yes.

11     Q      And you didn't put in a lawsuit that

12   Tishja --

13     A      I'm sorry.  We were just talking about all

14   American Towing.  We weren't talking about Ideal

15   Towing.

16     Q      Well, you understood that Ideal Towing and

17   --

18     A      Well, All American Towing and Ideal Towing

19   was two totally different entities.  They was two

20   totally different...

21     Q      Did you -- who did you sue in this

22   lawsuit?

23     A      We're suing Ideal Towing.

24     Q      Okay.  And --

25     A      But when you were just asking me questions

about who I spoke to and who ran it and who hired me,

that was when I was working for All American.  That

had nothing to do with Ideal.

    Q    So when you were working for All American,

you didn't know who's company it was and who was in

charge?

    A    I believe it was Mike -- Michael James and

Tishja James, co-owner the company.

    Q    But you didn't sue All American Tow,

correct?

    A    No.

    Q    You sued Ideal Towing?

    A    Yes.

    Q    And the paragraphs we just read in the

complaint, that was related to Ideal Towing, correct?

    A    Yes.

    Q    And you understood that Michael James ran

the day-to-day operations of Ideal Towing, correct?

    A    Yes.

    MR. BENJAMIN:  Objection to the

form.

    Q    (By Mr. Burke) And he was your supervisor.

I mean, that's what you put in the lawsuit.  You

understood that?

    A    I understand that.

1       Q      I mean, you understood that when you filed

2    the lawsuit?

3       A      Yes.

4       Q      And how long did you work for All

5    American?

6       A      I worked for All American towing from -- I

7    believe, one and a half -- hold on a second.  From --

8    I believe from November 2012 to about June 2014, I

9    believe.

10       Q      And what did you do for All American Tow?

11       A      Roadside assistance technician.

12       Q      Same thing you told me you did in the

13    other towing companies?

14       A      Yes.

15       Q      Did they provide you with a truck?

16       A      Yes.

17       Q      How were you paid?

18       A      Commission based.

19       Q      So flat fee or percentage?

20       A      Excuse me.  They were supposed to be one

21    in the same.  The flat fee was supposed to be a

22    percentage of the overall cost of the call.

23       Q      Who told you that?

24       A      Either Mr. or Mrs. James.

25       Q      And why did you leave All American Tow?

1      A      Oh, they went under.  They lost our
2 contract.

3      Q      Okay.  Which one is it?  Went under, lost
4 the contract?

5      A      I mean, they lost the contract which means
6 no more business.  Like, there was no more calls
7 coming in like that.

8      Q      What contract?

9      A      AAA.

10     Q      How did you learn that?

11     A      When you lose your job, you find out why.

12     Q      How did you know that?

13     A      Hearsay.

14     Q      Somebody told you because they lost their
15 contract?

16     A      Uh-huh.

17     Q      With AAA?

18     A      Yes.

19     Q      Did you ever go to Mike or Tishja and ask
20 them if that was true?

21     A      I can't be certain if it was verified
22 directly from them.  I'm sure it was because I'm just
23 not just going to, like, not make anymore money and
24 not find out why.  But somewhere, I got verification
25 that they lost their contract with AAA.

1    Q    And what did you do after that in terms of

2  employment?

3    A    I worked at IHOP for a few months.

4    Q    How long did you work at IHOP?

5    A    About two and a half, three months.  Well,

6  I took a few months off, then I worked for IHOP for a

7  few months.

8    Q    What did you do at IHOP?

9    A    I was a server.

10    Q    And why did you leave?

11    A    It wasn't enough money in it.  The

12  restaurant wasn't busy enough.

13    Q    And what did you do after working for

14  IHOP?

15    A    I started working with Ideal Towing.

16    Q    And how did you find out about Ideal

17  Towing?

18    A    I already knew of their existence.

19    Q    How so?

20    A    All American and Ideal shared the same

21  facilities.

22    Q    So tell me how you come to know of Ideal

23  Towing?

24    A    Because we parked our trucks right next to

25  them.  They're owned by the same people.  We see the

1    drivers every day.  We get gas at the same places.

2    We post up at the same places.  We know each other.

3    We wear the same uniforms, almost the same uniforms.

4        Q     When you say "post up," what does that

5    mean?

6        A     That means when you're restricted to your

7    area and you have to wait for a call, then you wait.

8    Post up means to wait.

9        Q     So Ideal Towing and All American, two

10   different companies, but they had offices in the same

11   location?

12       A     Yes.

13       Q     And different trucks?

14       A     Yeah, different trucks, different signage.

15       Q     Ideal Towing was a tow company, correct?

16       A     Yes.

17       Q     And All American was a roadside assistance

18   company?

19       A     Primarily, I believe.  I -- I don't know

20   if towing was in the title and thing, but I know they

21   definitely did majority just roadside assistance.

22       Q     Did you ever see any Ideal Towing -- I'm

23   sorry --

24       A     All American Towing?

25       Q     Yes.

```
1        A      No.

2        Q      So you left, came back.  And what made you

3    decide to try to get a job at Ideal Towing?  You knew

4    about them while you were working at All American?

5        A      Uh-huh.  Yes, sir.  A lot of guys I worked

6    with were working there, had left from the --

7    switched over from roadside assistance to the towing.

8        Q      Why didn't you do that before you went to

9    IHOP?

10       A      Initially, I didn't wants to get into the

11   road -- into the tow truck.

12       Q      What made you decide that you wanted to do

13   that?

14       A      When my former coworkers had done it for a

15   while and decided it was okay.

16       Q      And these coworkers worked for Ideal

17   Towing --

18       A      They worked for All American, and then

19   Ideal Towing.

20       Q      And what time period are we talking about?

21       A      Within the five or six months of me not

22   working at All American and me start to work at

23   Ideal.

24       Q      So five months after you left All

25   American, you started working for Ideal Towing?
```

1          A     Yeah, five to six months.

2          Q     And who did you contact at Ideal to pro --

3     about getting a job?

4          A     I contacted Michael James.

5          Q     Why did you contact Michael James?

6          A     I believe I had his number, his -- his

7     cellular number programmed in my phone.

8          Q     Have you ever seen Michael James' business

9     card?

10         A     Not to -- not to my recollection, no.

11         Q     But you contacted Michael James --

12         A     Uh-huh.

13         Q     -- because you had his cell phone?

14               And what did you tell Michael?

15         A     I need a job.

16         Q     Why did you ask him for a job?

17         A     Because, to my knowledge, he was co-owner

18    of the -- of the Ideal Towing.

19         Q     How did you find that out?  How did you

20    find out that he was co-owner?

21         A     That's what the -- that's how they were --

22    that's how he was portrayed.  That's how he was seen.

23    You know, when the boss walks in, you know who the

24    boss is, you know.  It's the people who refer to him

25    as owner --

1     Q     So you knew --

2     A     -- boss.

3     Q     -- Michael was the owner and the boss?

4     A     Yes.

5     Q     Right.  You said he was co-owner.

6     A     Co-owner.

7     Q     Well, how did you -- why did you feel --

8     feel that he was a co-owner?

9     A     Because we also knew that Tishja was an

10    owner and boss.

11    Q     How did you know that?

12    A     Well, that's -- that's what we -- that's

13    what we were told.

14    Q     Who told you that?

15    A     That's the way -- I can't recall.

16    Q     Tishja never told you that, right?

17    A     To give a specific date -- hold on.  I

18    can't recall the words exactly.

19    Q     Did she ever tell you that she was a

20    co-owner?

21    A     No, she never said it, bust she just --

22    Q     Did Michael ever tell you --

23    A     -- she moved like it.

24    Q     I understand.

25          Did Michael ever tell you that Tishja was

1    a co-owner?

2        A     I can't recall for sure.

3        Q     But you didn't call Tishja and ask her for

4    a job, you called Michael, correct?

5        A     I could have if I had --

6        Q     That's not what I asked you --

7        A     No, I didn't.

8        MR. BENJAMIN:  Objection.  Asked and

9    answered.

10       Q     You didn't call Tishja, correct?

11       A     No.

12       Q     Michael had you fill out an application;

13    do you recall?

14       A     I can't recall, but probably.

15       (Exhibit No. 1 was marked for

16    identification.)

17       Q     (By Mr. Burke) Take a look at Defendant's

18    Exhibit 1, please.  Tell me when you're finished

19    looking at it.

20       A     Okay.

21       Q     Do you recognize this document?

22       A     Yes.

23       Q     What is this?

24       A     Appears to be my application for All

25    American.

1     Q     Is that your signature?

2     A     Yes.

3     Q     Do you recall whether or not you filled

4  out an application for Ideal Towing?

5     A     I don't recall if I filled out an

6  application for Ideal Towing.

7     Q     You could have?

8     A     I don't recall --

9          MR. BENJAMIN:  Objection.  Asked and

10         answered.

11         MR. BURKE:  Counsel, we agreed to

12         reserve objections.

13         MR. BENJAMIN:  You're not accepting

14         the witness's testimony.  You're

15         recalculizing it.  You're asking it again

16         because you want a different answer.

17         THE WITNESS:  I don't recall.

18         MR. BURKE:  Go offer the record,

19         please.

20         (Whereupon, a brief discussion was

21         held off the record.)

22         MR. BURKE:  Okay.  Go back on.

23     Q     (By Mr. Burke) Do you have any reason to

24  dispute that you signed this application on October

25  1st, it looks like, 2012?

1      A     No, I don't.

2      Q     And I understood you to say you don't

3 recall whether or not you signed or did another

4 application for Ideal Towing.  Did I understand that

5 correctly?

6      A     Yeah, I do not recall if I filled out an

7 application for Ideal Towing specifically.

8      Q     Now, if you had filled out an application

9 for Ideal Towing, and you were listing your previous

10 employment based on your testimony, you would have

11 listed, presumably, IHOP on this application,

12 correct?

13     A     Maybe.

14     Q     But you --

15     A     IHOP has nothing to do with any type of

16 roadside assistance.  By that time, I had more

17 roadside assistance experience to fill up the three

18 job placements, previous, you know, employers there.

19 So I would have probably just kept it specific to the

20 industry.

21     Q     You wanted to accentuate your --

22     A     Not accentuate.

23     Q     Let me finish the question.

24     A     I'm sorry.

25     Q     You wanted to accentuate your experience,

1   and that's why you just -- you just said you listed

2   the roadside assistance jobs because you had been

3   doing them longer and this was a job in that

4   industry.  Did I understand that correctly?

5       A    No.  I don't understand what you're

6   saying.  Can you re -- rephr -- yeah, repeat that for

7   me.

8           MR. BURKE:  Can you read back his

9       testimony for me?

10          (Whereupon the record was read

11      back.)

12      Q    (By Mr. Burke) Explain to me why you said

13  that you listed the roadside jobs on this

14  application?

15      A    On this application?

16      Q    Yes, sir.

17      A    Because those are the last two jobs I had

18  previously done on this application for All American.

19      Q    Okay.

20      A    Which I worked at All American two years

21  before I worked for Ideal.

22      Q    You didn't put -- I'm sorry.  Strike that.

23          When you filled this application, V&S, you

24  had already worked for V&S roadside assistance,

25  correct?

```
1          A     Yes.

2          Q     And you didn't list them on here, correct?

3          A     No.  Hold on.  No.

4          Q     And that was a roadside assistance job,

5     right?

6          A     That was a roadside assistance job.

7          Q     But you listed dental company on this

8     application, correct?

9          A     Uh-huh.  Yes, sir.

10          Q     All right.  So my question is, if you

11     filled out an Ideal Towing application, and I

12     understand you said you don't recall whether or not

13     you did, you would have had to the -- or would have

14     included the IHOP job because it's a job you had in

15     between working for All American and trying to work

16     for Ideal, correct?

17          A     I may have.  I'm not certain I would have

18     included IHOP.

19          Q     And why wouldn't you have included IHOP?

20          A     Because IHOP has less -- yeah, I guess,

21     IHOP has less to do with what I have to offer for

22     this particular job.

23          Q     Which job is that?  The job for Ideal?

24          A     I'm looking at an application for All

25     American.  So if I'm going to look at an application
```

1    for All American, I want to talk about All American.

2    If we're going to talk about Ideal, then why am I --

3    why are we referencing this at all, because this has

4    nothing to do with Ideal.  So I don't understand what

5    -- like what this is about.  This has nothing to

6    do --

7              All of these jobs, everything that I put

8    on this application has absolutely nothing to do with

9    Ideal Towing.  That came two years later.

10        Q    All right.  Do you understand my question,

11   sir?

12        A    No, I don't.  Like, I don't understand.

13   I'm confused now.

14        Q    All right.  Well --

15        A    Because I'm looking at a All American

16   application and I'm answering questions about Ideal

17   Towing, and what I put on an application that I'm not

18   even sure I -- even exists.

19        Q    And I don't know either, but I'm asking

20   you.  And that's what the purpose of the deposition

21   is, to talk -- for you to tell me what you know.  And

22   you told me --

23        A    Okay.  And that --

24        Q    Let me finish the question.

25             You told me early on in the deposition

1   that you knew everything you needed to know about

2   this case, you didn't need any information from the

3   co-plaintiffs.

4        A    Oh --

5        Q    That's what you told me.

6        A    I was wrong.

7             MR. BENJAMIN:  And I object because

8        it's a thoroughly inappropriate question.

9             THE WITNESS:  I mean, I'm not

10       lawyer.  I was wrong.  I'm sorry.

11       Q    (By Mr. Burke) Well, you don't have to be

12   a lawyer to know the facts.

13       A    Oh, okay.  Well, I messed up on the facts,

14   you know.

15       Q    All right.  Well, let's go back --

16            MR. BENJAMIN:  Don't argue with him.

17       Answer his questions until I tell you not

18       to.

19            THE WITNESS:  Okay.

20       Q    (By Mr. Burke) Let's go back.

21       A    Okay.

22       Q    I understood you to say -- and your lawyer

23   was objecting asked and answered.  And that's why it

24   was important for you to answer my question so I

25   could understand, but you didn't.  You never did.

1          You said you can't recall whether or not

2     you filled out an application for Ideal Towing.

3     That's what you told me.

4          A     Yes.

5          Q     And then I asked you, I said if you had

6     filled out an application for Ideal Towing, wouldn't

7     you have included the IHOP job on that application.

8     And you said no.  And you said the reason why is

9     because IHOP has very little to do with the job I was

10    applying for.  Did I understand that correctly, sir?

11         A     Yes.

12         Q     And the job you were applying for is the

13    job that you had had experience in, roadside

14    assistance, correct?

15         A     Yes.  We're talking about Ideal Towing.

16         Q     Correct.

17         A     Okay.

18         Q     You understand.  And this is the business

19    you had been in most of your working life, correct?

20         A     No.

21               MR. BENJAMIN:  Objection to form.

22         Q     (By Mr. Burke) Well, how many years had

23    you been doing towing or roadside assistance?

24         A     By the time I got to Ideal?

25         Q     Yes, sir.

1      A      About three years.

2      Q      And how many years were you working at the

3   dental place?

4      A      Five years.

5      Q      Look at your application.  All right.

6   According to this application, you say you started

7   working for Auto Rescue 2011.  Do you see that?

8      A      Uh-huh.

9      Q      2012.

10     A      Okay.

11     Q      And then you worked at QuickPick Roadside

12  Assistance from 2012 to the present.  That was

13  October the 11th, 2012.

14     A      Yes, sir.

15     Q      And then you told me you were working for

16  All American for a few years.

17     A      About -- for about a couple of years.

18     Q      Right.

19     A      Roughly.

20     Q      And then by the time you got to Ideal,

21  weren't you working in roadside assistance or the

22  towing business for most of your working life?

23     A      No.  No, sir.  I had been working since I

24  was 16 years old.  At that -- by that time, the

25  majority of the work that I had done had been in food

1    service and probably dental insurance.

2        Q    But you didn't list the food service job

3    on this --

4        A    No, I didn't have -- I didn't have room

5    for that.  But, I mean, you can't fill out -- you

6    know, you can't fill out every job you ever had.

7        Q    I understand that.  But that was

8    irrelevant to the job you were trying to get,

9    correct, food service?

10       A    And -- no, there was no room for it.

11       Q    That's not what I'm asking you.  That had

12   nothing to do with the job you were trying to get,

13   correct?

14       A    No, it didn't.

15       Q    All right.  When you wanted Michael to

16   hire you, and you wanted to show him that you had

17   experience in roadside assistance both with All

18   American and these other companies, correct?

19       A    When I was applying for --

20       Q    A job at Ideal.

21       A    Ideal.  He knew.  He knew my background by

22   then, so I didn't have to let him know anything.

23       Q    So you think it's possible you didn't have

24   to fill out an application?

25       A    Maybe.  I don't recall filling one out.

1     Q     What did Michael tell you that you were

2  going to be doing for Ideal Towing?

3     A     Towing vehicles.

4     Q     And at the time you applied for the job at

5  Ideal Towing, you had never towed vehicles before,

6  right?

7     A     No.

8     Q     Is that the job you were asking for -- to

9  be hired for, towing vehicles?

10     A     Yes.

11     Q     When did you start working for Ideal

12  Towing?

13     A     I started working for Ideal Towing, I

14  believe, November 2014.  I -- I went up there, filled

15  out an application.  They said they were going to

16  hire me, never put me to work for a couple of months.

17  By the time I got in the truck, it was like November

18  2014.

19     Q     So you never started working until that

20  time period?

21     A     Yes, sir.

22     Q     Do you recall signing a contract with

23  Ideal Towing?

24     MR. BENJAMIN:  Objection to form.

25     Q     (By Mr. Burke) Do you understand my

1    question?

2        A    Do I recall signing a contract?

3        Q    Yes, sir.

4        A    Not specifically.

5        Q    Could have?

6        A    Yes, I could have.

7        (Exhibit No. 2 was marked for

8    identification.)

9        Q    (By Mr. Burke) Take a look at Plaintiff's

10    Exhibit -- I'm sorry, Defendant's Exhibit 2, and turn

11    to the last page for me.  Is that your signature?

12        A    Yes.

13        Q    And is that the date that you signed this

14    document?

15        A    That's what the document says.

16        Q    Is that a yes or no, sir?

17        A    I don't remember the date.  It was -- I'm

18    assuming yes because it's on the back of this.

19        Q    That's your handwriting, right?

20        A    Yes, it is.

21        Q    So you would have worked roughly two

22    months in 2014 for Ideal Towing, correct, based on

23    your testimony?

24        A    Yes.  Possibly.  Yes.  Yes, sir.

25        Q    And did you work more than that?

1     A     No.  No.  I'm not sure if I started, you

2     know, on the 10th of October or that's just when I

3     signed the contract.  I know when I was initially

4     hired, I didn't start for quite a while, so.

5          Q     And when you say initially hired, you're

6     talking about for Ideal?

7          A     For Ideal.

8          Q     What were your hours at Ideal when you

9     started?

10         A     I'm sorry.  This is a contract for All

11    American, because it's saying 10/10/2012.  Okay.  So

12    this is an All American contract.  I'm sorry.  This

13    is confusing because you keep talking about Ideal but

14    we keep looking at All American documents, so I'm

15    sorry.

16              What was the last couple of questions,

17    because that changes -- that possibly changes my

18    answers, because I don't know.  This is not Ideal.

19    This is All American contract.  When I signed this,

20    it was with All American.

21         Q     My question -- my last question was what

22    were your hours when you started working for Ideal?

23         A     For Ideal?

24         Q     Yes, sir.

25         A     At first it was 7 p.m. to 7 a.m.

1    Q    How many days a week?

2    A    When I first started, I was doing seven.

3    Q    How many hours a day?

4    A    12, minimum.

5    Q    Did you ask for the 7 p.m. to 7 a.m.

6    shift?

7    A    No.  You usually get started off like that

8    when you're new.

9    Q    Why is that?

10   A    I believe I was told because it's a little

11   bit slower at night.  And when you're knew, you move

12   a little bit slower so you could have time to learn,

13   to get faster, to get better.

14   Q    What about the seven days a week, did you

15   ask to be scheduled seven days a week?

16   A    At that time, yes.  Yes, I did.

17   Q    So you wanted more hours, more work?

18   A    Yes.

19   Q    And how were you supposed to be paid?

20   A    Commission, flat rate.  Flat rate's

21   supposed to be the commission -- you know, I mean,

22   percentage.

23   Q    And you told me about other jobs that

24   you've had with roadside assistance.  And the pay

25   with those jobs all seem to be commission.  Is it

1    fair to say that that's what was normal for the

2    industry?

3              MR. BENJAMIN:  Objection to form.

4              THE WITNESS:  For -- for one thing

5         --

6         Q    (By Mr. Burke) Is that yes or no first,

7    and then you can explain?

8         A    What was the question?

9         Q    Was that normal, the commission, being

10   paid a commission to do roadside jobs?

11        A    It appeared to be.

12        Q    All right.  You can explain if you wanted

13   to say something else.

14        A    It appeared that way to me.

15        Q    And when you and Michael discussed

16   commission, I mean, you weren't surprised that you

17   were going to be paid per job, correct?

18        A    No.

19        Q    You knew that you weren't going to be paid

20   hourly, right?

21        A    Yes.

22        Q    And you knew that you were going to be on

23   call, correct?

24        A    Yes.

25        Q    And you knew you had a territory that you

1　　were responsible for responding to calls in, correct?

2　　　　　A　　　Yes.

3　　　　　Q　　　And you also knew that AAA was the company

4　　that was going to be notifying you via a tablet, that

5　　there was a toll service that was needed?

6　　　　　A　　　Yes.

7　　　　　Q　　　Did your schedule and hours change at any

8　　point while you were working for Ideal Towing?

9　　　　　A　　　Yes.

10　　　　　Q　　　When did it change?

11　　　　　A　　　I'm not sure.  They changed here and

12　　there.  When I started taking days off, the day off

13　　might change.

14　　　　　Q　　　Well, I want you to tell me.  I don't --

15　　　　　A　　　I don't -- I don't recall.

16　　　　　Q　　　You don't recall?

17　　　　　A　　　I know that my schedule had changed.  At

18　　one point in time, I switched to day shift.  Towards

19　　the end of my time there, I changed back to night

20　　shift.  When I did start taking days off, I believe I

21　　had Friday, and then I switched to like some day

22　　during the week or something.  So, they changed.

23　　　　　Q　　　You don't have any records --

24　　　　　A　　　Occasionally.

25　　　　　Q　　　-- of your schedule, what it was from one

1    point to the next?

2        A    No.  Print out.  There was some

3    documentation we turned in, some time -- time cards.

4    Other than that, no, not to my knowledge.

5        Q    Well, you sued my client -- you're suing

6    my client saying that you weren't paid properly.

7    Now, I want to know what records you have to show

8    what schedule you were on, when you worked and how

9    many hours you worked.

10       A    Okay.

11       Q    As you sit here today, you don't have any

12   of that?  You don't know that?

13       A    Not that I can put my hands on.

14       Q    You have it somewhere, this information?

15       A    No.  Not to my recollection.

16       Q    So you don't have it?

17       A    Not to my knowledge.  No, I don't believe

18   so.

19       Q    All right.  So as you sit here today, you

20   don't exactly what your hours were, you don't know

21   what days you worked --

22       A    Hold on.  I know what my hours were --

23            MR. BENJAMIN:  Objection.

24        Mischaracterization.

25            THE WITNESS:  I know what my hours

1        were, you know.  I mean --

2        Q     (By Mr. Burke) You just told me that it

3    changed when you took days off.

4        A     It changed.  Whenever you needed a

5    schedule change or if the company needed you to

6    change your schedule, either -- well, with

7    scheduling, we didn't deal with Michael James at all.

8    With scheduling we either dealt with Tishja James or

9    we dealt with the manager, Kelly.  So we'd go to them

10   for any schedule adjustments.

11       Q     Okay.

12       A     But, I know with my time there, it was a

13   minimum of six days a week, seven to seven, whether

14   it was 7 a.m. to 7 p.m. or 7 p.m. to 7 a.m.  You

15   really don't have to write your schedule down if it's

16   like that.  You get one day off and you're working

17   from one seven to another seven.  There's no need to

18   write that down, to mark that on the calendar.  It's

19   every day you're at work.  It's there.  So, no.

20       Q     So, the schedule that you just

21   described --

22       A     Uh-huh.

23       Q     -- you just told me something different.

24   That it changed -- either changed from 7 p.m. to 7

25   a.m., that was what it was initially.  And then it

might have changed to the morning.

    A    No, no.  I said previously that it initially it was 7 p.m. to 7 a.m.  And then at a later date, it changed from working nights to working during the day.

    Q    All right.  Tell me when it changed --

    A    But on my days off, when I did start taking the day off, whatever my day off was changed also, at some point in time.  Now, when, I can't -- I can't be sure of.

    Q    You don't know when it changed from 7 p.m. --

    A    -- to 7 a.m.?  I work nights -- no, I can't by certain.  I'm not going to speculate.  I can't be certain, but it did do it.

    Q    All right.  Your testimony is that you worked a minimum of six days a week, 12 hours a day. Did I understand that correctly?

    A    Yeah, with an occasional sick day, possibly, you know.  But other than that, yes.

    Q    Do you have any records of sick days that you took?

    A    No.

    Q    Now, when you got the tow truck and went to your territory, your area, you were required to be

1    on call for calls from AAA, correct?

2         A    Yes.

3         Q    And during the time that you were on call,

4    you were free to do whatever you wanted to with your

5    time, correct?

6         A    Within your area, and as long as you can

7    be in the truck in route to the call in, like -- I

8    forget the AAA standard, but like two minutes or

9    something.

10        Q    Is that a yes to my question?

11             MR. BENJAMIN:  That's his answer.

12        No.  You're not going to do that again

13        or -- no.

14        Q    (By Mr. Burke) You need to answer my

15   question, please.

16        A    Okay.

17             MR. BENJAMIN:  That is his answer.

18             THE WITNESS:  What's the question

19        again?

20             MR. BURKE:  Could you read it back

21        for him?

22             (Whereupon the record was read

23        back.)

24             THE WITNESS:  Oh.  That's a no to

25        your question.

1      Q     (By Mr. Burke) That's a no?

2      A     No.

3      Q     Okay.

4      A     Can't do what you wanted.

5      Q     Why not?

6      A     Because you had to be able to be in the

7   truck, in route to the call within like two or three

8   minutes or something.  So, you can't do what you

9   want.  If you want to go, you know, have a game of

10  basketball, go swimming or whatever, you can't do it.

11      Q     All right.  Two minutes is what you said

12  that AAA -- was the requirement that AAA had that you

13  get --

14      A     I believe I said I'm not sure of the

15  required time, but it's something along the lines of

16  two minutes or three minutes, you need to respond to

17  the call and be in route or something.  Something

18  along those lines.

19      Q     Well, what would prevent you from, if you

20  were doing something that you wanted to do,

21  responding to the call in two minutes?

22      A     If you're doing you want to do that you

23  can't pull away from in two or three minutes --

24      Q     You were required to carry the tablet with

25  you, right?

      1          A     Yes.

      2          Q     And the tablet would notify you with a

      3     call, correct?

      4          A     Yes.  It would also track your movements

      5     and everything and let them know, you know, if you're

      6     in route or not within that set amount of time.

      7          Q     So when you say track your movements, it

      8     was a --

      9          A     GPS.

     10          Q     -- GPS on it so they'd know exactly where

     11     you were?

     12          A     Yes, sir.

     13          Q     Did anybody at Ideal Towing tell you that

     14     you were required to stay stationary while you're

     15     waiting for calls?

     16          A     Stay within the -- in the range, the tow

     17     zone.

     18          Q     The area?

     19          A     Yes.

     20          Q     That's the only requirement they have,

     21     correct?

     22          A     No.  It's not the only requirement.  You

     23     got to be in the zone and ready to move on the call

     24     in a few minutes.  So --

     25          Q     But nobody told you you couldn't take care

```
1    of your personal affairs, you couldn't go home if you

2    needed to --

3         A    You're limited to do --

4         Q    Answer that question.  Nobody's --

5         A    Yes.

6         Q    -- told you that --

7         A    No.

8         Q    Right?

9         A    No.  Can I make an explanation now?

10             MR. BENJAMIN:  Yes, you can.

11             THE WITNESS:  You can -- you are

12        limited to do whatever, as long as you can

13        move within two to three minutes.  So that

14        limits whatever you can do.

15        Q    (By Mr. Burke) All right.  I under --

16        A    You may have enough time to take a number

17   one, but you don't have enough time to take a number

18   two if you get the call.  You got to move.

19        Q    All right.  And you don't know what --

20        A    So that's not everything.  That's not do

21   whatever you want to do.

22        Q    I understand.  I understand.  And that is

23   written somewhere that you were shown, that you have

24   to be able to move within two minutes?

25        A    There were meetings, there were AAA --
```

1      Q      Is that written anywhere?

2      A      Possibly.  I'm not certain.

3      Q      Where are you getting it from?  It's your

4  testimony.  You're telling me this --

5      A      Oh.  We had weekly meetings.  We had

6  meetings.

7      Q      Well, where are you getting it from?  Who

8  told you?

9      A      This came from management, this came from

10  Tishja James, Mike James, and George, I believe his

11  name Goodhart, Gerhardt something.  The AAA

12  representative or liaison to Ideal Towing for AAA.

13      Q      Somebody from AAA came and told you that

14  you need to be able to move within two minutes?

15      A      Yes.  We were under constant, constant --

16  you know, letting us know constantly of our response

17  times and everything.  That was a big thing.

18      Q      There were times that you didn't respond

19  to a AAA call, correct?

20      A      Probably.

21      Q      A number of times?

22      A      Sure.

23      Q      And that's because you were doing

24  something else, correct?

25      A      Possibly, or there were malfunctions with

1    the tablet system.  Could be any number of things,

2    any number of things.  I can't -- you know, do you

3    have a specific occasion?

4         Q    When you say the tablet was malfunctioned,

5    how often did that happen?

6         A    Oh.  Happened pretty regularly.

7         Q    Did you notify anybody at Ideal Towing

8    that the tablet was not working properly?

9         A    Yeah.  Whenever there was a problem with

10   the tablet, I would let somebody know.

11        Q    And they'd fix it, correct?

12        A    Yeah, you know, as best they could or

13   they'll radio you calls, or they'll cell phone and

14   send you call.

15        Q    Have you ever been sent out in a

16   particular area and any shift with a tablet that

17   didn't work?

18        A    Yes.

19        Q    That they knew about at Ideal Towing?

20        A    Yes.

21        Q    Tell me about that.  What day did that

22   happen?

23        A    Oh, I can't recall a specific day.  I do

24   recall being out with the tablet, and the system, the

25   network not working.  That would happen occasionally.

1      There would be occasions of --

2          Q      Let me make sure you understand my

3      question.

4          A      Okay.

5          Q      My question is: You picked up the truck

6      and got in the truck and you got the tablet, and you

7      knew the tablet wasn't working.  You told somebody at

8      Ideal it wasn't working, but you were sent out with

9      the tablet not working anyway.  I'm asking for

10     examples of when that happened.

11         A      Yes, that happened.  Specific dates, I do

12     not know.

13         Q      All right.  So, the tablet could be

14     malfunctioning, you still get a request to tow

15     somebody?

16         A      Yes.

17         Q      And you're saying that you've gone out

18     with the tablet not working, told them that it wasn't

19     working, and wasn't able to respond to a particular

20     call because the tablet wasn't working.  Is that your

21     testimony?

22         A      That -- that is -- yes.  There have been

23     times when they would call it in to you on your cell

24     phone or text you the information.

25         Q      And you don't recall the times that that

1  happened?

2      A     No.  Not specifically.

3      Q     But other than a malfunction that you just

4  told me about, there are times when you did not

5  respond to calls for whatever reason?

6      A     Possibly.

7      Q     Did you or did you not?

8           MR. BENJAMIN:  Object to the form.

9           THE WITNESS:  It's possible.  Like,

10      you want specific dates?

11      Q    (By Mr. Burke) No.  That's not what I

12  asked you.

13      A     It's possible.

14      Q     Again, you told me you remember all the

15  facts, sir.  I'm asking you --

16      A     Okay.  And I also told you that I was

17  wrong about that.

18           MR. BENJAMIN:  And I also object to

19      the inappropriate question.

20           THE WITNESS:  So, you know, what I'm

21      saying, like, I was wrong, but...

22      Q    (By Mr. Burke) So you lied.

23           MR. BENJAMIN:  Objection.  You know

24      what, I'm terminating this deposition and

25      I'm making a motion for protective order.

1          We're done.

2                  I want a copy of this transcript.

3                  MR. BURKE:  That's fine.  And I want

4          to put something on the record.

5                  Counsel has terminated the record,

6          or terminated the deposition.  For the

7          record, we're going to ask the court to

8          compel this witness be forced to continue

9          his deposition.  I'm entitled to, I

10         believe, under the rules, seven hours.

11         This deposition started at two thirty --

12         2:35, I believe, 2:40.  So, I reserve my

13         right to continue this deposition.

14                 MR. BENJAMIN:  We do not have a

15         problem with the deposition continuing once

16         Mr. --

17                 MR. BURKE:  Well, you said you're

18         terminating it.

19                 MR. BENJAMIN:  I am -- once

20         Mr. Burke is going to behave appropriately,

21         let the witness actually answer the

22         questions the way the witness believes is

23         appropriate to answer them under oath, not

24         to deliberately mischaracterize his

25         testimony as he has done multiple times

1    during this deposition.  So when we get an

2    appropriate instruction from the judge, we

3    will voluntarily bring Mr. Wynn back for

4    any appropriately conducted remainder of

5    the deposition.

6          MR. BURKE:  I'm just going to -- I'm

7    going to see the judge for --

8          MR. BENJAMIN:  You do it.  You do

9    it.  I am as well.

10         MR. BURKE:  Well, I'm not the one

11    terminating the deposition.  You're the one

12    terminating the deposition --

13         MR. BENJAMIN:  That's correct.

14         MR. BURKE:  -- and walking out.  And

15    I don't think you can do that under the

16    rules, but...

17         MR. BENJAMIN:  Well, let me ask you

18    this on the record: Are you going to behave

19    yourself and conduct this deposition in an

20    appropriate way as the others have been

21    conducted, or --

22         MR. BURKE:  Counsel --

23         MR. BENJAMIN:  -- are you going to

24    continue to do this?

25         MR. BURKE:  Counsel, I've never been

```
1          doing this for awhile.  I've never been

2          accused of complete -- conducting a

3          deposition inappropriately.  If I had him

4          on the stand, I'm entitled to thorough and

5          consistent cross-examination of this

6          witness.  That's precisely what I'm trying

7          to understand and do today.

8               MR. BENJAMIN:  And I'm going to put

9          my objections --

10              MR. BURKE:  That's fine.

11              MR. BENJAMIN:  -- and sustain them.

12              MR. BURKE:  Your objections are on

13         the record.

14              MR. BENJAMIN:  They are.

15              (Whereupon proceedings concluded at

16         4:10 p.m.)

17              (It was stipulated and agreed by and

18         between counsel for the respective parties

19         and the witness that the signature of the

20         witness to the deposition be reserved.)

21

22

23

24

25
```

1                    DISCLOSURE

2

3          Pursuant to Article 10.B of the Rules
     and Regulations of the Board of Court
     Reporting of the Judicial Council of
4    Georgia which states: "Each court reporter
     shall tender a disclosure form at the time
5    of the taking of the deposition stating the
     arrangements made for the reporting
6    services of the certified court reporter,
     by the certified court reporter, the court
7    reporter's employer or the referral source
     for the deposition, with any party to the
8    litigation, counsel to the parties, or
     other entity.  Such form shall be attached
9    to the deposition transcript," I make the
     following disclosure:

10

     I am a Georgia Certified Court Reporter.  I
11   am here as a representative of L. George
     Court Reporting.  L. George Court Reporting
12   was contacted to provide court reporting
     services for the deposition.  L. George
13   Court Reporting will not be taking
     this deposition under any contract that is
14   prohibited by O.C.G.A. 9-11-28(c).

15   L. George Court Reporting contract/agreement
     to provide reporting services with any party
16   to the case, any counsel in the case, or any
     reporter or reporting agency from whom a
17   referral might have been made to cover this
     deposition.

18

     L. George Court Reporting will charge its
19   usual and customary rates to all parties in
     the case, and a financial discount will not
20   be given to any party to this litigation.

21

                        _____
22                      Lamarra George, CCR-2582
                        May 4, 2017

23

24

25

1                  C E R T I F I C A T E

2

3    STATE OF GEORGIA:

4    COUNTY OF FULTON:

5

6              I hereby certify that the foregoing

7         transcript was taken down, as stated in the

8         caption, and the questions and answers

9         thereto were reduced to typewriting under

10        my direction; that the foregoing pages 1

11        through 84 represent a true, complete, and

12        correct transcript of the evidence given

13        upon said hearing, and I further certify

14        that I am not of kin or counsel to the

15        parties in the case; am not in the regular

16        employ of counsel for any of said parties;

17        nor am I in any way interested in the

18        result of said case.

19             This, the 7th day of July 2017.

20

21

22        _____
          Lamarra George, CCR-2582
23        My commission expires on
          the 1st of April 2017.
24

25

DEPOSITION OF BRIAN WYNN/LG

        I do hereby certify that I have read all
questions propounded to me and all answers given
by me on the 4th day of May 2017, taken before
Lamarra George, and that:

_____ 1)  There are no changes noted.
_____ 2)  The following changes are noted:

        Pursuant to Rule 30(e) of the Federal Rules of
Civil Procedure and/or the Official Code of Georgia
Annotated 9-11-30(e), both of which read in part:
Any changes in form or substance which you desire to
make shall be entered upon the deposition...with a
statement of the reasons given...for making them.
Accordingly, to assist you in effecting corrections,
please use the form below:


Page No. _____ Line No. _____ should read:_____
_____
_____

Page No. _____ Line No. _____ should read: _____
_____
_____

Page No. _____ Line No. _____ should read: _____
_____
_____

Page No. _____ Line No. _____ should read: _____
_____
_____

Page No. _____ Line No. _____ should read:_____
_____
_____

Page No. _____ Line No. _____ should read: _____
_____
_____

Page No. _____ Line No. _____ should read:_____
_____
_____

DEPOSITION OF BRIAN WYNN/LG

Page No. _____ Line No. _____ should read:_____
_____

Page No. _____ Line No. _____ should read:_____
_____

Page No. _____ Line No. _____ should read:_____
_____

Page No. _____ Line No. _____ should read:_____
_____

Page No. _____ Line No. _____ should read:_____
_____

Page No. _____ Line No. _____ should read:_____
_____

If supplemental or additional pages are necessary,
please furnish same in typewriting annexed to this
deposition.


_____
BRIAN WYNN

Sworn to and subscribed before me,
this the _____ day of _____, 20____.

_____
Notary Public
My commission expires: _____

## $

**$10** [1] - 33:12
**$11** [1] - 33:18
**$12** [2] - 31:9, 31:11

## 1

**1** [6] - 4:3, 4:24, 54:15, 54:18, 85:10, 86:4
**10** [4] - 27:24, 30:20, 30:21, 33:15
**10.B** [1] - 84:2
**10/10/2012** [1] - 66:11
**101** [2] - 1:18, 2:6
**1099** [1] - 25:9
**10th** [1] - 66:2
**11** [3] - 31:8, 31:11, 33:15
**11th** [1] - 62:13
**12** [3] - 20:2, 67:4, 72:17
**16** [1] - 62:24
**199** [1] - 2:11
**1:16-cv-01359-TWT** [1] - 1:8
**1st** [2] - 55:25, 85:23

## 2

**2** [5] - 4:5, 4:24, 65:7, 65:10, 86:5
**20** [1] - 87:18
**2002** [2] - 27:23, 28:5
**2003** [3] - 28:5, 28:6
**2007** [1] - 8:17
**2008** [1] - 30:22
**2011** [4] - 7:14, 31:21, 32:6, 62:7
**2012** [9] - 25:5, 27:23, 35:15, 36:14, 47:8, 55:25, 62:9, 62:12, 62:13
**2014** [4] - 47:8, 64:14, 64:18, 65:22
**2015** [2] - 13:2
**2016** [5] - 13:3, 20:15, 30:2, 30:16, 30:17
**2017** [6] - 1:16, 29:24, 84:22, 85:19, 85:23, 86:3
**2104** [1] - 9:18
**2:35** [1] - 81:12
**2:40** [2] - 1:17, 81:12

## 3

**30(e** [1] - 86:6
**303013** [1] - 2:12
**30303** [1] - 2:6
**3100** [2] - 1:19, 2:5

## 4

**4** [2] - 1:16, 84:22
**40** [1] - 31:14
**404-688-1210** [1] - 2:13
**4:10** [1] - 83:16
**4th** [1] - 86:3

## 5

**54** [1] - 4:3
**5th** [1] - 15:19

## 6

**6** [1] - 3:3
**64** [1] - 44:13
**65** [2] - 4:5, 44:19
**66** [1] - 44:25

## 7

**7** [15] - 4:5, 66:25, 67:5, 71:14, 71:24, 72:3, 72:11, 72:13
**770-859-0754** [1] - 2:7
**7th** [1] - 85:19

## 8

**8** [1] - 8:17
**84** [1] - 85:11

## 9

**9** [1] - 33:16
**9-11-28(c)** [1] - 84:14
**9-11-30(e** [1] - 86:7

## A

**a.m** [7] - 66:25, 67:5, 71:14, 71:25, 72:3, 72:13
**AAA** [13] - 48:9, 48:17, 48:25, 69:3, 73:1, 73:8, 74:12, 76:25, 77:11, 77:12, 77:13, 77:19
**abiding** [1] - 6:18
**able** [5] - 23:5, 74:6, 76:24, 77:14, 79:19
**absolutely** [1] - 59:8
**accentuate** [3] - 56:21, 56:22, 56:25
**accepting** [1] - 55:13
**according** [2] - 24:15, 62:6
**Accordingly** [1] - 86:9
**accused** [1] - 83:2
**ACTIO** [1] - 1:7
**activities** [1] - 44:16
**actual** [1] - 29:14
**add** [1] - 21:2
**additional** [1] - 87:14
**address** [5] - 11:9, 39:6, 39:8, 39:9, 39:10
**addresses** [1] - 11:16
**adjustments** [1] - 71:10
**advice** [1] - 26:11
**advising** [1] - 17:5
**affairs** [1] - 76:1
**agency** [1] - 84:16
**ago** [2] - 19:15
**agree** [1] - 42:10
**agreed** [4] - 26:21, 42:21, 55:11, 83:17
**Agreement** [1] - 4:6
**allow** [3] - 5:9, 5:12, 42:8
**almost** [2] - 33:8, 50:3
**American** [39] - 4:3, 4:5, 38:7, 39:16, 39:23, 39:25, 40:9, 45:14, 45:18, 46:2, 46:4, 46:9, 47:5, 47:6, 47:10, 47:25, 49:20, 50:9, 50:17, 50:24, 51:4, 51:18, 51:22, 51:25, 54:25, 57:18, 57:20, 58:15, 58:25, 59:1, 59:15, 62:16, 63:18, 66:11, 66:12, 66:14, 66:19, 66:20
**amount** [2] - 33:23, 75:6
**and..** [1] - 39:11
**annexed** [1] - 87:14
**Annotated** [1] - 86:7
**answer** [23] - 5:10, 5:12, 5:16, 6:6, 16:22, 17:5, 17:9, 23:5, 23:13, 23:20, 24:8, 26:6, 26:9, 26:12, 41:23, 55:16, 60:17, 60:24, 73:11, 73:14, 73:17, 81:21, 81:23
**Answer** [1] - 76:4
**answered** [5] - 5:18, 13:16, 54:9, 55:10, 60:23
**answering** [1] - 59:16
**answers** [4] - 13:20, 66:18, 85:8, 86:2
**anyway** [1] - 79:9
**APPEARANCES** [1] - 2:1
**appeared** [2] - 68:11, 68:14
**application** [31] - 4:3, 24:15, 39:2, 39:14, 54:12, 54:24, 55:4, 55:6, 55:24, 56:4, 56:7, 56:8, 56:11, 57:14, 57:15, 57:18, 57:23, 58:8, 58:11, 58:24, 58:25, 59:8, 59:16, 59:17, 61:2, 61:6, 61:7, 62:5, 62:6, 63:24, 64:15
**applied** [1] - 64:4
**apply** [1] - 35:11
**applying** [3] - 61:10, 61:12, 63:19
**appropriate** [3] - 81:23, 82:2, 82:20
**appropriately** [2] - 81:20, 82:4
**appropriateness** [1] - 17:4
**April** [2] - 20:15, 85:23
**area** [5] - 50:7, 72:25, 73:6, 75:18, 78:16
**argue** [1] - 60:16
**arrangements** [1] - 84:5
**arrest** [1] - 11:5
**arrested** [10] - 8:13, 8:18, 8:21, 8:22, 9:1, 9:9, 10:2, 10:20, 11:2, 11:11
**arrests** [1] - 8:16
**Article** [1] - 84:2
**assist** [1] - 86:9
**assistance** [24] - 32:8, 32:10, 32:17, 34:6, 35:2, 35:4, 35:13, 36:16, 40:15, 47:11, 50:17, 50:21, 51:7, 56:16, 56:17, 57:2, 57:24, 58:4, 58:6, 61:14, 61:23, 62:21, 63:17, 67:24
**Assistance** [3] - 34:4, 38:8, 62:12
**assume** [2] - 5:17, 24:6
**assuming** [1] - 65:18
**ATLANTA** [1] - 1:2
**Atlanta** [3] - 1:19, 2:6, 2:12
**attached** [2] - 4:24, 84:8
**attend** [1] - 29:15
**attorney** [2] - 15:5, 26:10
**attorney/client** [1] - 26:3
**attorneys** [1] - 18:8
**authority** [1] - 45:3
**Auto** [13] - 32:4, 32:7, 33:6, 33:7, 33:25, 34:1, 34:3, 34:8, 34:18, 34:19, 36:5, 36:21, 62:7
**awhile** [1] - 83:1

## B

**bachelor's** [1] - 28:25
**background** [2] - 27:17, 63:21
**Barbara** [1] - 15:17
**based** [6] - 25:10, 32:21, 38:3, 47:18, 56:10, 65:22
**basic** [1] - 14:2
**basketball** [1] - 74:10
**beginning** [3] - 13:3, 41:22
**behalf** [2] - 2:2, 2:8
**behave** [2] - 81:20, 82:18
**behavior** [1] - 42:19
**believes** [1] - 81:22
**below** [1] - 86:9
**BENJAMIN** [52] - 2:4, 6:17, 6:23, 8:1, 12:11, 14:4, 14:8, 14:25, 16:20, 17:10, 17:14, 18:1, 18:6, 21:15, 23:8, 23:15, 23:19, 26:2, 26:8, 27:13, 36:9, 40:24, 41:8, 41:12, 41:14, 42:8, 42:18, 46:20, 54:8, 55:9, 55:13, 60:7, 60:16, 61:21, 64:24, 68:3, 70:23, 73:11, 73:17, 76:10, 80:8,

80:18, 80:23, 81:14, 81:19, 82:8, 82:13, 82:17, 82:23, 83:8, 83:11, 83:14
**Benjamin** [1] - 2:5
**benjamin@ dcbflegal.com** [1] - 2:7
**best** [3] - 23:7, 24:7, 78:12
**better** [2] - 27:9, 67:13
**between** [2] - 58:15, 83:18
**big** [1] - 77:17
**bit** [3] - 27:16, 67:11, 67:12
**Board** [1] - 84:3
**bonuses** [1] - 32:20
**boring** [2] - 22:24, 23:1
**boss** [5] - 52:23, 52:24, 53:2, 53:3, 53:10
**bought** [1] - 30:24
**break** [5] - 6:3, 6:4, 6:6, 17:11, 35:18
**BRIAN** [6] - 1:4, 1:15, 2:3, 86:1, 87:1, 87:17
**Brian** [1] - 4:6
**Bridgers** [1] - 2:5
**brief** [3] - 16:25, 17:16, 55:20
**bring** [1] - 82:3
**Bruce** [1] - 15:17
**Bryan** [1] - 4:3
**burke** [2] - 12:14, 81:20
**Burke** [37] - 2:11, 3:3, 5:2, 8:5, 14:9, 15:4, 17:19, 18:4, 18:11, 21:18, 23:12, 23:17, 23:20, 26:6, 26:17, 27:16, 35:23, 36:12, 40:25, 41:21, 42:23, 46:22, 54:17, 55:23, 57:12, 60:11, 60:20, 61:22, 64:25, 65:9, 68:6, 71:2, 73:14, 74:1, 76:15, 80:11, 80:22
**BURKE** [35] - 5:1, 5:21, 6:9, 6:12, 6:14, 6:19, 6:25, 15:3, 16:23, 17:2, 17:13, 17:18, 23:10, 26:5, 35:20, 35:22, 41:10, 41:13, 41:17, 42:12, 42:19, 55:11, 55:18, 55:22, 57:8, 73:20,

81:3, 81:17, 82:6, 82:10, 82:14, 82:22, 82:25, 83:10, 83:12
**burney** [1] - 18:22
**BURNEY** [2] - 1:4, 2:3
**Burney** [3] - 16:17, 19:5, 20:2
**Burney's** [1] - 20:6
**business** [4] - 48:6, 52:8, 61:18, 62:22
**bust** [1] - 53:21
**busy** [1] - 49:12
**but..** [2] - 80:21, 82:16
**BY** [1] - 6:25

# C

**Caldwell** [1] - 2:5
**calendar** [1] - 71:18
**campus** [3] - 28:20, 28:23
**Campus** [1] - 28:22
**caption** [1] - 85:8
**car** [1] - 34:10
**card** [1] - 52:9
**cards** [1] - 70:3
**care** [1] - 75:25
**CARLO** [2] - 1:4, 2:3
**Carlon** [1] - 16:16
**CARLON** [2] - 1:5, 2:3
**carry** [1] - 74:24
**case** [11] - 13:6, 23:3, 43:24, 44:2, 44:12, 60:2, 84:16, 84:19, 85:15, 85:18
**CCR-2582** [3] - 1:21, 84:22, 85:22
**cell** [3] - 52:13, 78:13, 79:23
**cellular** [1] - 52:7
**Centennial** [2] - 1:19, 2:5
**certain** [22] - 7:15, 8:12, 8:17, 8:21, 9:10, 9:11, 9:21, 11:17, 12:2, 13:4, 25:24, 26:14, 33:12, 33:13, 33:14, 33:15, 43:13, 48:21, 58:17, 72:14, 72:15, 77:2
**certification** [4] - 29:5, 29:9, 29:11, 30:1
**certifications** [2] - 29:22, 29:25
**certified** [2] - 84:6, 84:6

**Certified** [1] - 84:10
**certify** [3] - 85:6, 85:13, 86:2
**chair** [1] - 21:16
**change** [3] - 69:7, 69:10, 69:13, 71:5, 71:6
**changed** [13] - 69:11, 69:17, 69:19, 69:22, 71:3, 71:4, 71:24, 72:1, 72:4, 72:6, 72:8, 72:11
**changes** [6] - 32:12, 66:17, 86:4, 86:5, 86:7
**charge** [3] - 43:23, 46:6, 84:18
**CIVIL** [1] - 1:7
**Civil** [1] - 86:6
**class** [1] - 29:14
**Clayton** [1] - 8:22
**clear** [2] - 5:6, 23:12
**client** [4] - 16:21, 17:5, 70:5, 70:6
**clue** [2] - 41:6, 41:20
**co** [13] - 16:9, 17:12, 21:24, 22:4, 46:8, 52:17, 52:20, 53:5, 53:6, 53:8, 53:20, 54:1, 60:3
**co-counsel** [1] - 17:12
**co-owner** [8] - 46:8, 52:17, 52:20, 53:5, 53:6, 53:8, 53:20, 54:1
**co-plaintiffs** [4] - 16:9, 21:24, 22:4, 60:3
**Code** [1] - 86:6
**college** [3] - 28:3, 28:11, 28:13
**College** [2] - 28:5, 28:24
**coming** [1] - 48:7
**Commission** [1] - 67:20
**commission** [16] - 25:9, 25:10, 26:18, 26:21, 32:19, 33:10, 34:15, 37:8, 47:18, 67:21, 67:25, 68:9, 68:10, 68:16, 85:23, 87:20
**companies** [8] - 24:16, 33:13, 33:14, 33:18, 47:13, 50:10, 63:18
**company** [26] - 24:19, 24:20, 24:24, 26:24, 31:13, 33:4,

33:15, 33:16, 33:20, 33:23, 35:6, 35:24, 36:1, 36:4, 39:19, 43:4, 43:15, 43:17, 43:19, 46:5, 46:8, 50:15, 50:18, 58:7, 69:3, 71:5
**compel** [1] - 81:8
**compensation** [1] - 35:6
**complaint** [3] - 44:4, 44:11, 46:15
**complete** [2] - 83:2, 85:11
**completely** [1] - 21:3
**concluded** [1] - 83:15
**conduct** [1] - 82:19
**conducted** [2] - 82:4, 82:21
**conducting** [1] - 83:2
**conferred** [1] - 14:1
**confused** [1] - 59:13
**confusing** [1] - 66:13
**consistent** [1] - 83:5
**constant** [2] - 77:15
**constantly** [1] - 77:16
**Construction** [3] - 29:9, 29:13, 29:18
**construction** [1] - 30:7
**consulting** [1] - 26:11
**contact** [3] - 20:1, 52:2, 52:5
**contacted** [5] - 18:22, 52:4, 52:11, 84:12
**continue** [4] - 41:16, 81:8, 81:13, 82:24
**continuing** [1] - 81:15
**contract** [13] - 48:2, 48:4, 48:5, 48:8, 48:15, 48:25, 64:22, 65:2, 66:3, 66:10, 66:12, 66:19, 84:13
**contract/ agreement** [1] - 84:15
**Contractor** [1] - 4:6
**control** [2] - 30:6, 44:15
**controlling** [1] - 30:10
**conversation** [3] - 18:24, 40:12, 42:24
**conversations** [3] - 17:20, 18:4, 21:23
**convince** [1] - 43:2

**coordinator** [3] - 29:7, 29:8, 29:12
**Copy** [2] - 4:3, 4:5
**copy** [2] - 44:11, 81:2
**correct** [54] - 8:14, 10:5, 11:7, 12:6, 21:21, 21:25, 24:17, 25:19, 27:8, 28:8, 29:1, 31:13, 32:22, 33:1, 33:20, 37:8, 39:20, 40:20, 43:4, 43:15, 43:25, 44:2, 44:9, 45:5, 46:10, 46:15, 46:18, 50:15, 54:4, 54:10, 56:12, 57:25, 58:2, 58:8, 58:16, 61:14, 61:16, 61:19, 63:9, 63:13, 63:18, 65:22, 68:17, 68:23, 69:1, 73:1, 73:5, 75:3, 75:21, 77:19, 77:24, 78:11, 82:13, 85:12
**corrections** [1] - 86:9
**correctly** [7] - 23:25, 24:13, 45:9, 56:5, 57:4, 61:10, 72:18
**cost** [1] - 47:22
**Council** [1] - 84:3
**counsel** [14] - 14:1, 17:5, 17:12, 18:12, 18:15, 42:12, 55:11, 81:5, 82:25, 83:18, 84:8, 84:16, 85:14, 85:16
**Counsel** [2] - 17:8, 82:22
**COUNSEL** [1] - 2:1
**County** [6] - 7:12, 8:8, 8:18, 8:23, 28:5, 28:24
**COUNTY** [1] - 85:4
**couple** [7] - 8:13, 12:1, 17:23, 37:17, 62:17, 64:16, 66:16
**course** [1] - 33:22
**Court** [7] - 84:3, 84:10, 84:11, 84:13, 84:15, 84:18
**COURT** [1] - 1:1
**court** [10] - 5:23, 7:6, 7:18, 11:18, 81:7, 84:4, 84:6, 84:6, 84:12
**courtesy** [1] - 5:11
**cover** [1] - 84:17
**coworkers** [2] - 51:14, 51:16
**creditor** [2] - 7:11,

8:7
**cross** [1] - 83:5
**cross-examination** [1] - 83:5
**customary** [1] - 84:19

# D

**date** [5] - 11:18, 53:17, 65:13, 65:17, 72:4
**dates** [3] - 14:21, 79:11, 80:10
**day-to-day** [4] - 43:19, 44:21, 45:5, 46:18
**days** [12] - 19:15, 67:1, 67:14, 67:15, 69:12, 69:20, 70:21, 71:3, 71:13, 72:7, 72:17, 72:21
**deal** [2] - 43:20, 71:7
**dealt** [4] - 43:21, 45:8, 71:8, 71:9
**Decatur** [4] - 10:3, 10:17, 10:19, 10:21
**decide** [4] - 20:9, 43:6, 51:3, 51:12
**decided** [4] - 20:13, 24:11, 35:11, 51:15
**Defendant** [5] - 2:8, 44:14, 44:20, 45:1, 45:2
**Defendant's** [2] - 54:17, 65:10
**Defendants** [1] - 1:10
**defendants** [1] - 5:2
**definitely** [1] - 50:21
**degree** [1] - 28:25
**DeKalb** [2] - 7:12, 8:7
**Delaware** [4] - 28:4, 28:7, 28:16, 28:22
**deliberately** [1] - 81:24
**delivery** [1] - 32:12
**Delong** [1] - 2:5
**Dental** [3] - 30:22, 30:23
**dental** [5] - 31:19, 33:4, 58:7, 62:3, 63:1
**dep** [1] - 13:17
**depo** [1] - 13:12
**deposition** [60] - 6:10, 6:15, 7:2, 7:4, 13:6, 13:10, 13:15, 13:18, 14:2, 14:3, 14:19, 15:6, 15:9, 15:11, 15:19, 16:7,

16:10, 18:10, 18:12, 18:16, 18:21, 18:23, 18:24, 18:25, 19:2, 19:6, 19:10, 19:14, 19:18, 21:20, 21:25, 22:3, 22:7, 22:13, 22:15, 22:16, 22:17, 22:23, 59:20, 59:25, 80:24, 81:6, 81:9, 81:11, 81:13, 81:15, 82:1, 82:5, 82:11, 82:12, 82:19, 83:3, 83:20, 84:5, 84:7, 84:9, 84:12, 84:13, 84:17, 87:15
**DEPOSITION** [3] - 1:14, 86:1, 87:1
**deposition...with** [1] - 86:8
**described** [3] - 34:7, 36:20, 71:21
**Description** [1] - 4:2
**desire** [1] - 86:7
**different** [9] - 33:3, 33:14, 45:19, 50:10, 50:13, 50:14, 55:16, 71:23
**different..** [1] - 45:20
**direction** [1] - 85:10
**directly** [1] - 48:22
**DISCLOSURE** [1] - 84:1
**disclosure** [2] - 84:4, 84:9
**discount** [1] - 84:19
**discovery** [2] - 13:16, 13:21
**discrepancy** [2] - 11:15
**discuss** [6] - 14:8, 17:11, 18:9, 18:11, 18:24, 19:10
**discussed** [6] - 14:5, 14:19, 20:3, 20:4, 36:5, 68:15
**discussion** [4] - 16:25, 17:3, 17:16, 55:20
**discussions** [4] - 14:24, 15:1, 17:6, 19:25
**dispute** [1] - 55:24
**disrespectful** [3] - 26:25, 27:3, 37:21
**dissatisfied** [1] - 39:19
**DISTRICT** [2] - 1:1, 1:1
**DIVISION** [1] - 1:2
**divulging** [1] - 26:9
**document** [3] -

54:21, 65:14, 65:15
**documentation** [1] - 70:3
**documents** [3] - 13:19, 14:12, 66:14
**done** [9] - 18:16, 20:11, 20:24, 24:12, 51:14, 57:18, 62:25, 81:1, 81:25
**down** [4] - 5:23, 71:15, 71:18, 85:7
**drive** [3] - 10:5, 10:8, 38:18
**driver** [1] - 38:14
**drivers** [3] - 34:25, 38:10, 50:1
**driving** [9] - 9:24, 10:20, 11:1, 11:23, 12:6, 12:10, 12:18, 36:24, 36:25
**drove** [1] - 10:10
**during** [6] - 9:13, 9:22, 69:22, 72:5, 73:3, 82:1

# E

**Earl** [3] - 5:2, 6:17, 41:16
**early** [2] - 13:11, 59:25
**eburke@ burkelawatl.com** [1] - 2:13
**education** [1] - 29:3
**educational** [1] - 27:17
**effecting** [1] - 86:9
**either** [9] - 31:8, 39:3, 43:8, 43:9, 47:24, 59:19, 71:6, 71:8, 71:24
**employ** [1] - 85:16
**employer** [1] - 84:7
**employers** [1] - 56:18
**employment** [4] - 4:3, 29:20, 49:2, 56:10
**end** [2] - 13:2, 69:19
**enroll** [1] - 28:12
**entered** [1] - 86:8
**entities** [1] - 45:19
**entitled** [3] - 31:17, 81:9, 83:4
**entity** [1] - 84:8
**ESQ** [2] - 2:4, 2:10
**eventually** [2] - 40:11, 43:6
**evidence** [1] - 85:12

**exactly** [4] - 37:15, 53:18, 70:20, 75:10
**Examination** [2] - 3:2, 3:3
**EXAMINATION** [1] - 6:24
**examination** [1] - 83:5
**EXAMINATIONS** [1] - 3:1
**examples** [1] - 79:10
**except** [1] - 6:21
**excuse** [4] - 6:11, 27:24, 44:1, 47:20
**exercise** [1] - 54:5
**Exhibit** [6] - 4:2, 54:15, 54:18, 65:7, 65:10
**EXHIBITS** [1] - 4:1
**Exhibits** [1] - 4:24
**existence** [1] - 49:18
**exists** [1] - 59:18
**expect** [2] - 6:5, 41:22
**expected** [2] - 28:11, 42:19
**experience** [6] - 30:19, 43:4, 56:17, 56:25, 61:13, 63:17
**expires** [2] - 85:23, 87:20
**explain** [2] - 68:7, 68:12
**Explain** [1] - 57:12
**explanation** [1] - 76:9
**Expressions** [2] - 30:22, 30:24
**extend** [1] - 5:11
**extent** [1] - 26:8
**extremely** [1] - 23:1

# F

**facilities** [1] - 49:21
**fact** [5] - 15:10, 16:12, 16:14, 20:4, 21:24
**facts** [5] - 23:3, 23:18, 60:12, 60:13, 80:15
**failure** [1] - 8:25
**fair** [3] - 5:19, 5:20, 68:1
**Fair** [3] - 6:7, 6:8, 42:2
**fall** [2] - 28:6, 32:2
**family** [1] - 15:15
**far** [1] - 24:6
**faster** [1] - 67:13

**Federal** [1] - 86:6
**federal** [1] - 44:12
**fee** [4] - 37:11, 38:3, 47:19, 47:21
**felt** [3] - 20:11, 20:23, 24:12
**female** [1] - 38:24
**few** [8] - 9:11, 19:15, 40:3, 49:3, 49:6, 49:7, 62:16, 75:24
**FILE** [1] - 1:7
**file** [2] - 20:6, 20:9
**filed** [5] - 43:24, 44:2, 44:5, 44:12, 47:1
**fill** [7] - 39:2, 39:13, 54:12, 56:17, 63:5, 63:6, 63:24
**filled** [10] - 24:15, 55:3, 55:5, 56:6, 56:8, 57:23, 58:11, 61:2, 61:6, 64:14
**filling** [1] - 63:25
**financial** [1] - 84:19
**fine** [5] - 6:19, 41:13, 42:2, 81:3, 83:10
**finish** [5] - 5:10, 5:12, 30:11, 56:23, 59:24
**finished** [2] - 41:11, 54:18
**firm** [1] - 17:15
**first** [9] - 6:21, 7:3, 8:18, 11:5, 11:21, 30:11, 66:25, 67:2, 68:6
**Fitzpatrick** [1] - 2:5
**five** [4] - 51:21, 51:24, 52:1, 62:4
**fix** [2] - 15:2, 78:11
**flagging** [1] - 30:1
**flat** [6] - 37:11, 38:3, 47:19, 47:21, 67:20
**following** [2] - 84:9, 86:5
**food** [3] - 62:25, 63:2, 63:9
**FOR** [1] - 1:1
**forced** [1] - 81:8
**foregoing** [2] - 85:6, 85:10
**forget** [1] - 73:8
**forklift** [1] - 29:5
**form** [14] - 6:21, 23:8, 23:15, 23:19, 40:24, 46:21, 61:21, 64:24, 68:3, 80:8, 84:4, 84:8, 86:7, 86:9
**former** [1] - 51:14
**forward** [1] - 5:8
**frame** [1] - 12:21

Franklin [1] - 28:1
free [1] - 73:4
Friday [1] - 69:21
fuel [1] - 32:12
full [2] - 28:16, 28:19
full-time [1] - 28:19
FULTON [1] - 85:4
funny [2] - 42:1, 42:6
furnish [1] - 87:14

**G**

game [3] - 40:16, 42:25, 74:9
gas [2] - 38:12, 50:1
George [10] - 1:21, 77:10, 84:11, 84:11, 84:12, 84:15, 84:18, 84:22, 85:22, 86:3
GEORGIA [2] - 1:1, 85:3
Georgia [8] - 1:19, 2:6, 2:12, 25:2, 31:1, 84:4, 84:10, 86:6
Gerhardt [1] - 77:11
gestures [1] - 5:25
given [8] - 6:10, 6:14, 7:1, 7:4, 13:16, 84:20, 85:12, 86:2
given...for [1] - 86:8
glad [2] - 5:15, 6:4
Goodhart [1] - 77:11
GPS [2] - 75:9, 75:10
graduate [1] - 27:20
graduated [2] - 27:21, 28:7
Great [2] - 30:22, 30:24
ground [2] - 5:7, 17:15
Group [3] - 2:11, 30:23
group [1] - 31:19
guess [4] - 16:9, 21:13, 21:15, 58:20
guiding [1] - 30:13
guys [1] - 51:5
Gwinnett [1] - 8:18

**H**

half [3] - 30:17, 47:7, 49:5
hand [1] - 12:4
hands [1] - 70:13
handwriting [1] - 65:19
Hapeville [6] - 9:1, 9:6, 9:9, 9:10, 10:11, 10:22

hard [1] - 6:1
head [1] - 5:24
heard [2] - 22:9, 22:10, 24:5
hearing [1] - 85:13
hearsay [1] - 48:13
held [1] - 17:1, 17:17, 55:21
hereby [2] - 85:6, 86:2
hereto [3] - 44:14, 44:20, 45:1
high [2] - 27:19, 27:21
High [1] - 28:1
HILL [2] - 1:5, 2:3
hint [2] - 41:6, 41:19
hire [4] - 43:3, 43:7, 63:16, 64:16
hired [5] - 43:10, 46:1, 64:9, 66:4, 66:5
hold [5] - 9:4, 47:7, 53:17, 58:3
Hold [1] - 70:22
Holder [2] - 29:9, 29:12, 29:18
holder [2] - 29:18
home [2] - 28:14, 76:1
honestly [1] - 26:13
hour [2] - 31:7, 31:9
hourly [2] - 31:5, 33:3, 68:20
hours [14] - 21:1, 31:12, 31:14, 66:8, 66:22, 67:3, 67:17, 69:7, 70:9, 70:20, 70:22, 70:25, 72:17, 81:10
hum [1] - 6:1

**I**

idea [3] - 20:6, 20:7, 20:8
ideal [1] - 63:21
IDEAL [2] - 1:8, 2:9
Ideal [82] - 4:5, 9:13, 9:16, 9:17, 9:23, 10:15, 10:21, 10:24, 11:2, 11:19, 12:12, 12:15, 20:7, 20:10, 20:12, 20:24, 24:12, 24:17, 24:21, 44:22, 45:2, 45:5, 45:14, 45:16, 45:18, 45:23, 46:3, 46:12, 46:15, 46:18, 49:15, 49:16, 49:20, 49:22, 50:9, 50:15, 50:22, 51:3, 51:16, 51:19, 51:23,

51:25, 52:2, 52:18, 55:4, 55:6, 56:4, 56:7, 56:9, 57:21, 58:11, 58:16, 58:23, 59:2, 59:4, 59:9, 59:16, 61:2, 61:6, 61:15, 61:24, 62:20, 63:20, 64:2, 64:5, 64:11, 64:13, 64:23, 65:22, 66:6, 66:7, 66:8, 66:13, 66:18, 66:22, 66:23, 69:8, 75:13, 77:12, 78:7, 78:19, 79:8
identification [2] - 54:16, 65:8
IHOP [15] - 49:3, 49:4, 49:6, 49:8, 49:14, 51:9, 56:11, 56:15, 58:14, 58:18, 58:19, 58:20, 58:21, 61:7, 61:9
illegal [1] - 25:19
immediately [1] - 11:24
important [1] - 60:24
IN [1] - 1:1
inappropriate [3] - 41:15, 60:8, 80:19
inappropriately [1] - 83:3
included [5] - 14:13, 58:14, 58:18, 58:19, 61:7
incorrect [1] - 24:18
Independent [1] - 4:6
INDEX [2] - 3:1, 4:1
industry [1] - 56:20, 57:4, 68:2
information [7] - 22:19, 26:4, 44:7, 44:8, 60:2, 70:14, 79:24
informed [2] - 13:7, 13:9
instructing [2] - 16:21, 17:9
instruction [1] - 82:2
insurance [2] - 31:4, 63:1
interested [1] - 85:17
interrogatories [1] - 21:21
interrogatory [5] - 13:22, 14:10, 14:14, 14:15
introduce [2] - 39:10, 39:13
involved [1] - 44:21
irrelevant [1] - 63:8

**J**

JAMES [4] - 1:9, 1:9, 2:9, 2:9
James [31] - 2:18, 40:10, 40:11, 40:13, 40:23, 42:25, 43:3, 43:6, 43:8, 43:14, 43:17, 43:18, 43:21, 43:22, 44:15, 44:21, 45:2, 45:4, 45:8, 46:7, 46:8, 46:17, 47:24, 52:4, 52:5, 52:11, 71:7, 71:8, 77:10
James¹ [1] - 52:8
January [2] - 13:10, 13:11
Jawanza [2] - 19:1, 19:3
JAWANZA [2] - 1:4, 2:3
jawanza [1] - 20:19
Jersey [3] - 28:2, 28:24, 30:25
job [35] - 33:3, 34:24, 36:2, 38:9, 39:15, 40:2, 40:17, 40:19, 48:11, 51:3, 52:3, 52:15, 52:16, 54:4, 56:18, 57:3, 58:4, 58:6, 58:14, 58:22, 58:23, 61:7, 61:9, 61:12, 61:13, 63:2, 63:6, 63:8, 63:12, 63:20, 64:4, 64:8, 68:17
jobs [12] - 25:11, 30:20, 32:21, 37:11, 37:22, 57:2, 57:13, 57:17, 59:7, 67:23, 67:25, 68:10
join [1] - 20:13
Jordan [1] - 14:23
JORDAN [1] - 2:10
jordan.mahoney@ burkelawatl.com [1] - 2:14
judge [2] - 82:2, 82:7
judgment [1] - 7:17
Judicial [1] - 84:3
July [2] - 25:5, 85:19
jump [1] - 32:13
June [2] - 25:5, 47:8
jurisdiction [1] - 10:19

**K**

keep [2] - 66:13, 66:14

Kelly [1] - 71:9
kept [1] - 56:19
kin [1] - 85:14
kind [1] - 37:1
knowledge [6] - 8:11, 14:3, 43:16, 52:17, 70:4, 70:17

**L**

Lamarra [4] - 1:21, 84:22, 85:22, 86:3
last [14] - 9:11, 9:18, 9:19, 14:20, 30:19, 30:20, 30:21, 36:2, 36:6, 36:8, 57:17, 65:11, 66:16, 66:21
Law [1] - 2:11
lawsuit [26] - 5:3, 7:8, 7:11, 7:16, 7:21, 8:6, 8:9, 16:3, 17:7, 17:21, 18:20, 19:21, 19:22, 20:3, 20:7, 20:13, 20:17, 23:18, 23:24, 43:24, 44:2, 44:8, 45:11, 45:22, 46:23, 47:2
lawyer [6] - 7:23, 41:5, 44:8, 60:10, 60:12, 60:22
learn [5] - 22:17, 22:22, 23:3, 48:10, 67:12
learned [2] - 29:18, 40:23
lease [1] - 33:23
least [1] - 28:14
leave [8] - 26:23, 28:10, 31:19, 31:22, 34:21, 37:18, 47:25, 49:10
leaving [1] - 29:4
left [5] - 18:17, 34:19, 51:2, 51:6, 51:24
less [4] - 28:14, 31:11, 58:20, 58:21
letting [2] - 41:19, 77:16
LEWIS [2] - 1:5, 2:3
liaison [1] - 77:12
license [18] - 8:20, 9:2, 9:6, 9:9, 9:12, 9:22, 10:4, 10:8, 10:9, 10:11, 10:18, 11:3, 11:6, 11:12, 11:20, 12:9, 12:22
lied [1] - 80:22
life [3] - 18:17, 61:19, 62:22
light [3] - 24:20,

24:23, 37:6
**Lilburn** [7] - 9:2, 9:7, 9:8, 10:2, 10:11, 10:17, 10:21
**limitation** [2] - 25:23, 26:1
**limitations** [1] - 25:21
**limited** - 76:3, 76:12
**limits** - 76:14
**Line** - 86:11, 86:13, 86:15, 86:17, 86:19, 86:21, 86:23, 87:2, 87:4, 87:6, 87:8, 87:10, 87:12
**lines** [2] - 74:15, 74:18
**list** [2] - 58:2, 63:2
**listed** [4] - 56:11, 57:1, 57:13, 58:7
**listing** [1] - 56:9
**Lithonia** [1] - 25:2
**litigation** [2] - 84:8, 84:20
**live** [3] - 15:25, 28:20, 28:23
**lived** - 28:22
**LLC** [6] - 1:8, 2:9, 2:11, 4:5, 44:22, 45:2
**located** [2] - 25:1, 25:2
**location** [1] - 50:11
**lockouts** [1] - 32:12
**look** - 13:18, 14:15, 54:17, 58:25, 62:5, 65:9
**looked** [3] - 14:9, 21:19, 42:4
**looking** [5] - 40:2, 54:19, 58:24, 59:15, 66:14
**looks** [1] - 55:25
**lose** [1] - 48:11
**lost** [5] - 48:1, 48:3, 48:5, 48:14, 48:25

## M

**M&S** [1] - 35:23
**MAHONEY** [1] - 2:10
**majority** [3] - 21:4, 50:21, 62:25
**male** [1] - 38:24
**malfunction** [1] - 80:3
**malfunctioned** [1] - 78:4
**malfunctioning** [1] - 79:14

**malfunctions** [1] - 77:25
**management** [1] - 77:9
**manager** [2] - 26:24, 71:9
**march** [1] - 20:15
**March** [1] - 9:20
**Marietta** [2] - 1:18, 2:6
**mark** [1] - 71:18
**marked** [2] - 54:15, 65:7
**material** [2] - 44:14, 44:20
**materials** [1] - 45:1
**mean** [1] - 16:9, 20:24, 24:3, 25:16, 25:17, 38:12, 42:4, 42:14, 46:23, 47:1, 48:5, 50:5, 60:9, 63:5, 67:21, 68:16, 71:1
**means** [1] - 32:1, 32:2, 48:5, 50:6, 50:8
**meetings** [3] - 76:25, 77:5, 77:6
**members** [1] - 15:15
**merger** [1] - 31:23
**messed** [2] - 21:3, 60:13
**Michael** [21] - 40:10, 44:15, 44:21, 45:2, 45:4, 46:7, 46:17, 52:4, 52:5, 52:8, 52:11, 52:14, 53:3, 53:22, 53:25, 54:4, 54:12, 63:15, 64:1, 68:15, 71:7
**MICHAEL** [2] - 1:9, 2:9
**middle** [1] - 28:15
**Middlesex** [5] - 28:5, 28:12, 28:17, 28:23, 29:4
**middlesex** [1] - 28:23
**might** [3] - 69:13, 72:1, 84:17
**Mike** [4] - 40:23, 46:7, 48:19, 77:10
**mind** [2] - 21:11, 26:15
**minimum** [1] - 67:4, 71:13, 72:17
**minute** [1] - 17:11
**minutes** [11] - 73:8, 74:8, 74:11, 74:16, 74:21, 74:23, 75:24, 76:13, 76:24, 77:14
**Mischaracterization** [1] - 70:24

**mischaracterize** [1] - 81:24
**misrepresented** [1] - 24:1
**missed** [1] - 11:18
**MITCHELL** [1] - 2:4
**Mitsubishi** [2] - 37:3, 37:4
**money** [5] - 27:4, 27:8, 33:20, 48:23, 49:11
**Montero** [1] - 37:2
**month** [2] - 30:18, 37:16
**months** [12] - 20:2, 25:14, 37:17, 49:3, 49:5, 49:6, 49:7, 51:21, 51:24, 52:1, 64:16, 65:22
**morning** [1] - 72:1
**most** [4] - 43:20, 43:21, 61:19, 62:22
**motion** [1] - 80:25
**mouth** [1] - 42:9
**move** [6] - 67:11, 75:23, 76:13, 76:18, 76:24, 77:14
**moved** [2] - 11:16, 53:23
**movements** [2] - 75:4, 75:7
**MR** [86] - 5:1, 5:21, 6:9, 6:12, 6:14, 6:17, 6:19, 6:23, 6:25, 8:1, 12:11, 14:4, 14:8, 14:25, 15:3, 16:20, 16:23, 17:2, 17:10, 17:13, 17:14, 17:18, 18:1, 18:6, 21:15, 23:8, 23:10, 23:15, 23:19, 26:2, 26:5, 26:8, 27:13, 35:20, 35:22, 36:9, 40:24, 41:8, 41:10, 41:12, 41:13, 41:14, 41:17, 42:8, 42:12, 42:18, 42:19, 46:20, 54:8, 55:9, 55:11, 55:13, 55:18, 55:22, 57:8, 60:7, 60:16, 61:21, 64:24, 68:3, 70:23, 73:11, 73:17, 73:20, 76:10, 80:8, 80:18, 80:23, 81:3, 81:14, 81:17, 81:19, 82:6, 82:8, 82:10, 82:13, 82:14, 82:17, 82:22, 82:23, 82:25, 83:8, 83:10, 83:11, 83:12, 83:14
**multiple** [1] - 81:25

## N

**N.W** [1] - 2:6
**name** [4] - 5:1, 36:4, 38:14, 77:11
**names** [1] - 17:23
**Nankin** [1] - 30:23
**necessary** [1] - 87:14
**need** [7] - 19:8, 52:15, 60:2, 71:17, 73:14, 74:16, 77:14
**needed** [5] - 60:1, 69:5, 71:4, 71:5, 76:2
**nervous** [2] - 21:9, 21:13
**network** [1] - 78:25
**never** [14] - 7:4, 13:10, 22:14, 24:19, 24:21, 28:7, 53:16, 60:25, 64:5, 64:16, 64:19, 82:25, 83:1
**New** [3] - 28:1, 28:24, 30:25
**new** [1] - 67:8
**next** [4] - 49:24, 70:1
**night** [3] - 27:11, 67:11, 69:19
**nights** [2] - 72:4, 72:13
**Nissan** [1] - 37:3
**NO** [1] - 1:8
**nobody** [1] - 75:25
**nobody's** [1] - 76:4
**noise** [1] - 21:14
**Norcross** [2] - 31:1, 31:2
**normal** [2] - 68:1, 68:9
**NORTHERN** [1] - 1:1
**Notary** [1] - 87:20
**noted** [2] - 86:4, 86:5
**nothing** [12] - 15:21, 18:14, 23:4, 23:11, 23:23, 24:5, 46:3, 56:15, 59:4, 59:5, 59:8, 63:12
**notice** [1] - 14:22
**notify** [4] - 11:19, 12:14, 75:2, 78:7
**notifying** [1] - 69:4
**November** [5] - 9:17, 31:20, 47:8, 64:14, 64:17
**number** [12] - 25:10, 31:12, 32:21, 35:13, 38:19, 44:25, 52:6, 52:7, 76:16, 76:17, 77:21, 78:1, 78:2

**NW** [1] - 2:11

## O

**O.C.G.A** [1] - 84:14
**oath** [2] - 42:13, 81:23
**object** [2] - 60:7, 80:18
**Object** [1] - 80:8
**objecting** [1] - 60:23
**Objection** [1] - 70:23
**objection** [14] - 16:20, 23:8, 23:15, 23:19, 26:2, 40:24, 41:9, 46:20, 54:8, 55:9, 61:21, 64:24, 68:3, 80:23
**objections** [6] - 6:20, 42:21, 42:22, 55:12, 83:9, 83:12
**objects** [1] - 41:5
**occasion** [1] - 78:3
**occasional** [1] - 72:19
**occasionally** [2] - 69:24, 78:25
**occasions** [1] - 79:1
**occupation** [1] - 40:19
**October** [3] - 55:24, 62:13, 66:2
**OF** [7] - 1:1, 1:14, 2:1, 85:3, 85:4, 86:1, 87:1
**offer** [2] - 55:18, 58:21
**office** [5] - 14:11, 18:21, 19:19, 31:2, 38:21
**offices** [1] - 50:10
**Official** [1] - 86:6
**often** [1] - 78:5
**old** [1] - 62:24
**once** [2] - 81:15, 81:19
**one** [26] - 8:9, 8:10, 15:10, 16:13, 22:3, 23:16, 33:15, 33:16, 34:25, 36:3, 36:6, 36:8, 36:9, 38:10, 47:7, 47:20, 48:3, 63:25, 68:4, 69:18, 69:25, 71:16, 71:17, 76:17, 82:10, 82:11
**ones** [1] - 16:16
**operational** [1] - 44:15
**operations** [4] - 43:19, 44:22, 45:5, 46:18

**opposed** [1] - 14:16
**opposite** [1] - 33:22
**order** [1] - 80:25
**original** [1] - 4:25
**outside** [2] - 18:21, 19:18
**overall** [1] - 47:22
**overtime** [2] - 31:15, 31:17
**own** [3] - 14:10, 34:10, 36:24
**owned** [3] - 43:14, 43:17, 49:25
**owner** [13] - 26:24, 37:19, 46:8, 52:17, 52:20, 52:25, 53:3, 53:5, 53:6, 53:8, 53:10, 53:20, 54:1

**P**

**p.m** [9] - 1:17, 66:25, 67:5, 71:14, 71:24, 72:3, 72:11, 83:16
**page** [1] - 65:11
**Page** [15] - 3:2, 4:2, 86:11, 86:13, 86:15, 86:17, 86:19, 86:21, 86:23, 87:2, 87:4, 87:6, 87:8, 87:10, 87:12
**pages** [2] - 85:10, 87:14
**paid** [21] - 25:7, 25:8, 25:17, 26:17, 31:5, 31:7, 32:18, 32:19, 32:21, 33:1, 34:12, 37:7, 37:10, 38:2, 47:17, 67:19, 68:10, 68:17, 68:19, 70:6
**paragraph** [1] - 44:13
**paragraphs** [1] - 46:14
**pardon** [1] - 27:23
**parents** [1] - 15:24
**parked** [1] - 49:24
**part** [5] - 16:2, 28:17, 43:20, 43:21, 86:7
**part-time** [1] - 28:17
**particular** [3] - 58:22, 78:16, 79:19
**parties** [6] - 17:7, 83:18, 84:8, 84:19, 85:15, 85:16
**partly** [1] - 39:18
**party** [7] - 7:8, 7:20, 8:6, 8:8, 84:7, 84:15, 84:20
**past** [1] - 20:2
**pay** [5] - 8:25, 21:1,

26:21, 34:12, 67:24
**paying** [2] - 33:18, 33:23
**people** [3] - 22:20, 49:25, 52:24
**per** [4] - 31:7, 33:19, 34:12, 68:17
**percentage** [5] - 37:11, 38:2, 47:19, 47:22, 67:22
**period** [5] - 11:25, 12:3, 22:6, 51:20, 64:20
**pers** [1] - 39:19
**person** [4] - 20:1, 22:9, 39:1, 39:11
**personal** [4] - 32:15, 34:10, 39:14, 76:1
**Peters** [1] - 2:11
**phone** [4] - 52:7, 52:13, 78:13, 79:24
**picked** [1] - 79:5
**place** [3] - 13:10, 15:10, 62:3
**placements** [1] - 56:18
**places** [3] - 28:21, 50:1, 50:2
**Plaintiff** [1] - 2:2
**plaintiff** [2] - 44:16, 45:3
**Plaintiff's** [1] - 65:9
**plaintiffs** [11] - 1:6, 16:9, 17:20, 17:21, 18:5, 18:7, 18:20, 19:22, 21:24, 22:4, 60:3
**plan** [1] - 35:6
**planning** [1] - 25:20
**point** [5] - 11:6, 69:8, 69:18, 70:1, 72:9
**portrayed** [1] - 52:22
**position** [1] - 17:8
**possible** [3] - 63:23, 80:9, 80:13
**possibly** [6] - 65:24, 66:17, 72:20, 77:2, 77:25, 80:6
**post** [3] - 50:2, 50:4, 50:8
**precisely** [1] - 83:6
**premise** [1] - 42:10
**preparation** [2] - 13:14, 13:17, 21:20
**prepared** [1] - 23:13
**present** [1] - 62:12
**Present** [1] - 2:17
**presumably** [1] - 56:11
**pretty** [2] - 40:14, 78:6

**prevent** [1] - 74:19
**previous** [2] - 56:9, 56:18
**previously** [2] - 57:18, 72:2
**primarily** [1] - 50:19
**print** [1] - 70:2
**privileged** [1] - 26:4
**pro** [1] - 52:2
**problem** [2] - 78:9, 81:15
**Procedure** [1] - 86:6
**proceedings** [1] - 83:15
**programmed** [1] - 52:7
**prohibited** [1] - 84:14
**promised** [2] - 27:2, 37:25
**properly** [2] - 70:6, 78:8
**propounded** [1] - 86:2
**protective** [1] - 80:25
**provide** [3] - 47:15, 84:12, 84:15
**provided** [1] - 44:7
**Public** [1] - 87:20
**pull** [1] - 74:23
**purpose** [1] - 59:20
**Pursuant** [2] - 84:2, 86:6
**put** [11] - 42:9, 42:13, 45:11, 46:23, 57:22, 59:7, 59:17, 64:16, 70:13, 81:4, 83:8
**puzzled** [1] - 42:5

**Q**

**questions** [22] - 5:4, 5:5, 5:10, 7:23, 13:16, 13:21, 14:11, 14:18, 16:19, 22:10, 23:6, 23:9, 23:13, 24:7, 24:9, 45:25, 59:16, 60:17, 66:16, 81:22, 85:8, 86:2
**Quick** [1] - 34:3
**QuickPick** [3] - 34:3, 62:11
**quite** [1] - 66:4

**R**

**radio** [1] - 78:13
**ran** [1] - 34:25, 43:18, 45:4, 46:1, 46:17

**range** [1] - 75:16
**rate** [1] - 67:20
**rate's** [1] - 67:20
**rates** [1] - 84:19
**re** [1] - 57:6
**reached** [1] - 20:21
**read** [24] - 44:4, 44:12, 44:19, 44:25, 46:14, 57:8, 57:10, 73:20, 73:22, 86:2, 86:7, 86:11, 86:13, 86:15, 86:17, 86:19, 86:21, 86:23, 87:2, 87:4, 87:6, 87:8, 87:10, 87:12
**ready** [1] - 75:23
**really** [5] - 13:4, 16:10, 21:5, 21:8, 71:15
**reason** [2] - 22:16, 39:7, 55:23, 61:8, 80:5
**reasons** [1] - 86:8
**recalculizing** [1] - 55:15
**recently** [1] - 29:21
**Recess** [1] - 35:21
**recognize** [1] - 54:21
**recollection** [6] - 19:20, 23:7, 24:8, 38:1, 52:10, 70:15
**record** [19] - 5:6, 6:1, 16:24, 17:1, 17:4, 17:17, 17:18, 35:22, 41:12, 44:13, 55:18, 55:21, 57:10, 73:22, 81:4, 81:5, 81:7, 82:18, 83:13
**records** [4] - 12:3, 69:23, 70:7, 72:21
**reduced** [1] - 85:9
**refer** [1] - 52:24
**referencing** [1] - 59:3
**referral** [2] - 84:7, 84:17
**refresh** [1] - 38:1
**regarding** [2] - 17:4, 18:16
**regardless** [1] - 31:11
**regards** [1] - 16:7
**regular** [1] - 85:15
**regularly** [1] - 78:6
**Regulations** [1] - 84:3
**related** [3] - 14:18, 17:6, 46:15
**relates** [1] - 23:17
**remainder** [1] - 82:4
**remember** [4] -

37:12, 38:14, 65:17, 80:14
**repeat** [5] - 5:15, 40:6, 40:7, 41:20, 57:6
**rephr** [1] - 57:6
**rephrase** [5] - 5:15, 23:22, 40:5, 41:2, 41:6
**Reporter** [1] - 84:10
**reporter** [5] - 5:23, 84:4, 84:6, 84:6, 84:16
**reporter's** [1] - 84:7
**Reporting** [6] - 84:3, 84:11, 84:13, 84:15, 84:18
**reporting** [4] - 84:5, 84:12, 84:15, 84:16
**represent** [2] - 5:2, 85:11
**representative** [2] - 77:12, 84:11
**request** [1] - 79:14
**requested** [1] - 39:3
**required** [5] - 5:22, 72:25, 74:15, 74:24, 75:14
**requirement** [3] - 74:12, 75:20, 75:22
**Rescue** [7] - 32:4, 32:7, 33:6, 33:7, 33:25, 34:1, 34:3, 34:8, 34:18, 34:19, 36:7, 36:21, 62:7
**research** [1] - 35:14
**reserve** [4] - 6:20, 42:21, 55:12, 81:12
**reserved** [1] - 83:20
**respect** [1] - 14:2
**respective** [1] - 83:18
**respond** [4] - 74:16, 77:18, 79:19, 80:5
**responded** [1] - 33:19
**responding** [2] - 69:1, 74:21
**response** [2] - 6:2, 77:16
**responses** [8] - 5:22, 13:21, 13:23, 14:10, 14:14, 14:16, 14:22, 21:21
**responsible** [1] - 69:1
**restaurant** [1] - 49:12
**restricted** [1] - 50:6
**result** [1] - 85:18
**rift** [2] - 31:24, 32:2

**rigging** [2] - 29:9, 29:10
**road** [2] - 30:14, 51:11
**Roadside** [5] - 4:4, 4:5, 34:4, 38:7, 62:11
**roadside** [27] - 32:8, 32:10, 32:17, 34:6, 35:2, 35:4, 35:12, 36:16, 40:15, 43:1, 47:11, 50:17, 50:21, 51:7, 56:16, 56:17, 57:2, 57:13, 57:24, 58:4, 58:6, 61:13, 61:23, 62:21, 63:17, 67:24, 68:10
**rocking** [2] - 21:11
**room** [2] - 63:4, 63:10
**roughly** [2] - 62:19, 65:21
**route** [4] - 73:7, 74:7, 74:17, 75:6
**rude** [3] - 26:25, 27:3, 37:20
**Rule** [1] - 86:6
**Rules** [2] - 84:2, 86:6
**rules** [3] - 5:7, 81:10, 82:16

**S**

**safety** [3] - 29:7, 29:8, 29:12
**sat** [5] - 19:7, 19:11, 22:3, 22:13, 22:16
**saw** [2] - 16:16, 38:12
**schedule** [9] - 69:7, 69:17, 69:25, 70:8, 71:5, 71:6, 71:10, 71:15, 71:20
**scheduled** [1] - 67:15
**scheduling** [2] - 71:7, 71:8
**school** [3] - 27:19, 27:21, 28:17
**School** [1] - 28:1
**second** [6] - 11:14, 12:5, 12:9, 30:17, 35:19, 47:7
**see** [6] - 14:2, 39:13, 49:25, 50:22, 62:7, 82:7
**seem** [1] - 67:25
**sell** [1] - 40:23
**semester** [1] - 28:6
**send** [1] - 78:14
**sent** [3] - 11:17, 78:15, 79:8

**September** [1] - 31:21
**server** [1] - 49:9
**service** [8] - 24:20, 24:23, 37:6, 43:1, 63:1, 63:2, 63:9, 69:5
**Services** [2] - 4:4, 4:6
**services** [3] - 84:6, 84:12, 84:15
**set** [2] - 5:7, 75:6
**seven** [8] - 67:2, 67:14, 67:15, 71:13, 71:17, 81:10
**several** [1] - 11:16
**shaking** [1] - 5:25
**shall** [3] - 84:4, 84:8, 86:8
**shared** [1] - 49:20
**shift** [7] - 27:1, 27:9, 37:24, 67:6, 69:18, 69:20, 78:16
**shifts** [2] - 27:5, 27:7, 27:10
**short** [1] - 34:1
**show** [2] - 63:16, 70:7
**shown** [1] - 76:23
**shy** [1] - 33:8
**sic** [1] - 35:24
**sick** [2] - 72:19, 72:21
**signage** [1] - 50:14
**signature** [3] - 55:1, 65:11, 83:19
**signed** [5] - 55:24, 56:3, 65:13, 66:3, 66:19
**signing** [2] - 64:22, 65:2
**similar** [2] - 34:12, 34:14
**simultaneously** [1] - 34:2
**sit** [5] - 12:23, 22:6, 43:12, 70:11, 70:19
**site** [1] - 30:8
**sitting** [1] - 22:22
**six** [4] - 51:21, 52:1, 71:13, 72:17
**skills** [2] - 29:17, 40:22
**sleep** [1] - 23:2
**slower** [2] - 67:11, 67:12
**smith** [2] - 19:1, 20:18
**SMITH** [2] - 1:4, 2:3
**Smith** [2] - 19:2, 19:3
**Somerset** [1] - 28:1
**sometime** [1] - 43:1

**somewhere** [3] - 48:24, 70:14, 76:23
**sorry** [21] - 9:5, 10:14, 12:7, 18:3, 19:9, 21:6, 27:15, 27:23, 30:4, 30:12, 31:21, 35:25, 45:13, 50:23, 56:24, 57:22, 60:10, 65:10, 66:10, 66:12, 66:15
**sort** [1] - 5:6
**sound** [1] - 42:6
**sounds** [1] - 42:1
**source** [1] - 84:7
**speaking** [3] - 40:1, 40:9, 40:10
**specific** [6] - 53:17, 56:19, 78:3, 78:23, 79:11, 80:10
**specifically** [4] - 27:6, 56:7, 65:4, 80:2
**specifics** [1] - 40:14
**speculate** [1] - 72:14
**spoken** [3] - 18:20, 19:17, 19:21
**squeaky** [1] - 21:16
**stand** [1] - 83:4
**standard** [1] - 73:8
**STANLEY** [2] - 1:5, 2:3
**start** [5] - 51:22, 64:11, 66:4, 69:20, 72:7
**started** [22] - 5:5, 24:17, 27:2, 31:8, 32:24, 34:22, 35:16, 36:14, 38:7, 38:13, 49:15, 51:25, 62:6, 64:13, 64:19, 66:1, 66:9, 66:22, 67:2, 67:7, 69:12, 81:11
**starts** [1] - 32:13
**State** [2] - 28:4, 28:7
**STATE** [1] - 85:3
**statement** [1] - 86:8
**STATES** [1] - 1:1
**states** [1] - 84:4
**stating** [1] - 84:5
**station** [1] - 38:12
**stationary** [1] - 75:14
**statue** [2] - 25:23, 25:25
**status** [1] - 20:5
**statute** [1] - 25:21
**stay** [2] - 75:14, 75:16
**still** [4] - 15:2, 17:8, 28:13, 79:14
**stipulated** [1] - 83:17
**stipulations** [1] - 6:18

**stop** [3] - 11:23, 21:11, 25:4
**stopped** [2] - 12:18, 38:10
**stopping** [1] - 41:17
**Street** [3] - 1:18, 2:6, 2:11
**strictly** [1] - 32:19
**strike** [2] - 24:10, 57:22
**student** [1] - 28:19
**subscribed** [1] - 87:18
**subsequently** [1] - 11:11
**substance** [1] - 86:7
**sue** [3] - 21:5, 21:8, 24:11, 25:20, 45:21, 46:9
**sued** [3] - 8:7, 46:12, 70:5
**suggest** [1] - 45:7
**suing** [2] - 45:23, 70:5
**suit** [1] - 20:9
**Suite** [1] - 2:12
**supervisor** [1] - 46:22
**supervisory** [1] - 45:3
**supplemental** [1] - 87:14
**supposably** [1] - 25:8
**supposed** [7] - 10:5, 10:7, 13:9, 47:20, 47:21, 67:19, 67:21
**supposedly** [1] - 25:15
**surprised** [1] - 68:16
**survive** [1] - 31:23
**suspended** [17] - 8:20, 9:2, 9:6, 9:9, 9:12, 9:23, 10:4, 10:8, 10:9, 10:11, 10:18, 11:3, 11:7, 11:20, 12:5, 12:10
**suspension** [2] - 11:9, 11:12
**sustain** [1] - 83:11
**swimming** [1] - 74:10
**switched** [3] - 51:7, 69:18, 69:21
**Sworn** [1] - 87:18
**system** [2] - 78:1, 78:24

**T**

**tablet** [15] - 69:4, 74:24, 75:2, 78:1, 78:4, 78:8, 78:10, 78:16, 78:24, 79:6, 79:7, 79:9, 79:13, 79:18, 79:20
**taxes** [1] - 21:2
**technician** [2] - 32:17, 47:11
**tender** [1] - 84:4
**terminated** [2] - 81:5, 81:6
**terminating** [4] - 80:24, 81:18, 82:11, 82:12
**terms** [1] - 49:1
**territory** [2] - 68:25, 72:25
**testified** [1] - 7:6
**testify** [1] - 42:14
**testifying** [2] - 22:10, 22:20
**testimony** [11] - 18:19, 19:17, 21:19, 55:14, 56:10, 57:9, 65:23, 72:16, 77:4, 79:21, 81:25
**text** [1] - 79:24
**that..** [1] - 35:22
**THE** [27] - 1:1, 1:1, 5:20, 6:8, 6:11, 6:13, 6:16, 8:3, 12:13, 14:7, 18:3, 18:9, 21:17, 26:13, 27:14, 35:18, 36:11, 55:17, 60:9, 60:19, 68:4, 70:25, 73:18, 73:24, 76:11, 80:9, 80:20
**thereto** [1] - 85:9
**thirty** [1] - 81:11
**thorough** [1] - 83:4
**thoroughly** [1] - 60:8
**thousand** [2] - 30:21, 31:20
**three** [8] - 25:14, 49:5, 56:17, 62:1, 74:7, 74:16, 74:23, 76:13
**ticket** [1] - 9:1
**tire** [1] - 32:12
**Tishja** [13] - 2:18, 40:11, 45:8, 45:12, 46:8, 48:19, 53:9, 53:16, 53:25, 54:3, 54:10, 71:8, 77:10
**TISHJA** [2] - 1:9, 2:9
**title** [3] - 29:8, 32:16, 50:20

**TO** [2] - 3:1, 4:1
**today** [14] - 5:4, 8:10, 12:23, 13:15, 13:18, 15:6, 15:9, 18:21, 23:6, 23:13, 43:12, 70:11, 70:19, 83:7
**toll** [1] - 69:5
**took** [5] - 13:10, 27:24, 49:6, 71:3, 72:22
**totally** [2] - 45:19, 45:20
**tow** [14] - 9:24, 11:2, 12:6, 12:10, 24:16, 24:19, 24:24, 32:14, 37:5, 50:15, 51:11, 72:24, 75:16, 79:14
**Tow** [5] - 39:16, 40:1, 46:9, 47:10, 47:25
**towards** [1] - 69:18
**towed** [2] - 11:20, 64:5
**Tower** [2] - 1:19, 2:5
**towing** [12] - 24:21, 24:22, 24:24, 36:1, 47:6, 47:13, 50:20, 51:7, 61:23, 62:22, 64:3, 64:9
**Towing** [69] - 4:4, 4:5, 4:5, 9:14, 9:16, 9:17, 9:23, 10:15, 10:21, 10:24, 11:2, 11:19, 20:7, 20:10, 20:12, 20:24, 24:12, 24:17, 24:21, 24:25, 26:18, 26:23, 35:24, 44:22, 45:2, 45:5, 45:14, 45:15, 45:16, 45:18, 45:23, 46:12, 46:15, 46:18, 49:15, 49:17, 49:23, 50:9, 50:15, 50:22, 50:24, 51:3, 51:17, 51:19, 51:25, 52:18, 55:4, 55:6, 56:4, 56:7, 56:9, 58:11, 59:9, 59:17, 61:2, 61:6, 61:15, 64:2, 64:5, 64:12, 64:13, 64:23, 65:22, 69:8, 75:13, 77:12, 78:7, 78:19
**TOWING** [2] - 1:8, 2:9
**track** [2] - 75:4, 75:7
**traffic** [3] - 30:6, 30:10, 30:13
**training** [1] - 29:3
**transcript** [5] - 4:25, 81:2, 84:9, 85:7, 85:12
**trial** [2] - 42:15, 42:17

**truck** [17] - 9:24, 11:2, 12:6, 12:10, 32:14, 36:23, 37:5, 47:15, 51:11, 64:17, 72:24, 73:7, 74:7, 79:5, 79:6
**trucks** [3] - 49:24, 50:13, 50:14
**true** [5] - 33:22, 44:17, 44:23, 48:20, 85:11
**truthfully** [1] - 5:19
**try** [2] - 24:8, 51:3
**trying** [7] - 28:13, 39:15, 43:2, 58:15, 63:8, 63:12, 83:6
**turn** [1] - 65:10
**turned** [1] - 70:3
**two** [26] - 12:25, 17:11, 27:10, 30:21, 31:20, 34:2, 37:16, 45:19, 49:5, 50:9, 57:17, 57:20, 59:9, 65:21, 73:8, 74:7, 74:11, 74:16, 74:21, 74:23, 76:13, 76:18, 76:24, 77:14, 81:11
**two-minute** [1] - 17:11
**type** [1] - 56:15
**typewriting** [2] - 85:9, 87:14

## U

**um-hum** [1] - 6:1
**under** [10] - 42:13, 48:1, 48:3, 76:15, 77:15, 81:10, 81:23, 82:15, 84:13, 85:9
**understood** [12] - 5:17, 31:10, 31:16, 32:24, 43:16, 45:7, 45:16, 46:17, 46:24, 47:1, 56:2, 60:22
**uniforms** [2] - 50:3
**UNITED** [1] - 1:1
**University** [1] - 28:4
**up** [13] - 21:2, 21:3, 38:13, 39:10, 40:3, 42:15, 50:2, 50:4, 50:8, 56:17, 60:13, 64:14, 79:5
**usual** [1] - 84:19

## V

**V&S** [11] - 24:25, 26:18, 26:23, 34:23, 34:24, 36:11, 36:12,

37:14, 38:6, 57:23, 57:24
**vehicle** [5] - 32:15, 36:24, 36:25, 37:1, 37:6
**vehicles** [3] - 64:3, 64:5, 64:9
**verbal** [3] - 5:22, 6:2, 27:13
**verification** [2] - 31:4, 48:24
**verified** [2] - 14:23, 48:21
**versus** [1] - 21:1
**vested** [1] - 45:2
**via** [1] - 69:4
**voluntarily** [1] - 82:3
**vs** [1] - 1:7

## W

**wait** [3] - 50:7, 50:8
**waiting** [1] - 75:15
**waive** [1] - 42:21
**walked** [1] - 38:13
**walking** [1] - 82:14
**walks** [1] - 52:23
**wants** [1] - 51:10
**warrant** [1] - 8:25
**wear** [1] - 50:3
**week** [10] - 12:1, 12:25, 34:2, 34:18, 67:1, 67:14, 67:15, 69:22, 71:13, 72:17
**weekly** [1] - 77:5
**weeks** [1] - 12:2
**whatever's** [1] - 14:13
**whole** [1] - 22:7
**WITNESS** [25] - 5:20, 6:8, 6:11, 6:13, 6:16, 8:3, 12:13, 14:7, 18:3, 18:9, 21:17, 26:13, 27:14, 35:18, 36:11, 55:17, 60:9, 60:19, 68:4, 70:25, 73:18, 73:24, 76:11, 80:9, 80:20
**witness** [7] - 41:18, 81:8, 81:21, 81:22, 83:6, 83:19, 83:20
**witness's** [1] - 55:14
**words** [2] - 42:9, 53:18
**write** [2] - 71:15, 71:18
**written** [2] - 76:23, 77:1
**Wynn** [5] - 4:6, 5:1, 15:17, 82:3

**WYNN** [4] - 1:4, 1:15, 2:3, 87:17
**Wynn's** [1] - 4:3
**WYNN/LG** [2] - 86:1, 87:1

## Y

**year** [14] - 7:15, 8:21, 9:18, 9:19, 13:1, 13:11, 14:20, 19:4, 27:22, 29:23, 29:25, 32:5, 33:8
**years** [13] - 9:11, 27:24, 30:20, 30:21, 57:20, 59:9, 61:22, 62:1, 62:2, 62:4, 62:16, 62:17, 62:24
**yesterday** [3] - 19:16, 22:3, 24:5
**yourself** [1] - 82:19

## Z

**zone** [2] - 75:17, 75:23