

Transcript of **Brian Wynn (Vol.II)**

May 19, 2017

*Jawanza Smith, et al. v. Ideal Towing, LLC , et al.*

Alderson Reporting
1-800-367-3376
info@aldersonreporting.com
http://www.aldersonreporting.com

Alderson Reference Number: 70797

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF GEORGIA

 3                  ATLANTA DIVISION

 4

 5   JAWANZA SMITH, CARLO BURNEY, BRIAN    :

 6   WYNN, CARLTON LEWIS and STANLEY       :

 7   HILL,                                 :

 8          Plaintiffs,   CIVIL ACTION FILE NUMBER:

 9   versus                    1:16-cv-01359-TWT

10   IDEAL TOWING, LLC; MICHAEL JAMES      :

11   and TISHJA JAMES,                     :

12          Defendants.                    :

13

14             DEPOSITION OF BRIAN WYNN

15                  VOLUME II

16                  10:15 a.m.

17                 May 19, 2017

18

19   DeLong Caldwell Bridgers Fitzpatrick & Benjamin

20                3100 Centennial Tower

21                 101 Marietta Street

22                  Atlanta, Georgia

23

24        Susan DeCarlo, RPR, CCR No. B-2125

25
```

1    APPEARANCES:

2

3    On Behalf of the Plaintiff, JAWANZA SMITH, CARLO

4    BURNEY, BRIAN WYNN, CARLTON LEWIS and STANLEY

5    HILL:

6    DELONG CALDWELL BRIDGERS FITZPATRICK & BENJAMIN

7    BY:  Mitchell D. Benjamin

8    3100 Centennial Tower

9    101 Marietta Street, NW

10   Atlanta, GA 30303

11   404.979.3150

12   benjamin@dcbflegal.com

13

14   On Behalf of the Defendants, IDEAL TOWING, LLC;

15   MICHAEL JAMES and TISHJA JAMES:

16   THE BURKE LAW GROUP, LLC

17   BY:  Jordan M. Mahoney

18   199 Peters Street SW

19   Suite A

20   Atlanta, GA 30313

21   404.688.1210

22   jmahoney@burkelawatl.com

23

24   Also Present:  Tishja James

25

1                    INDEX OF EXAMINATIONS

2    WITNESS/EXAMINATION                        PAGE

3    BRIAN WYNN                                 4

4    EXAMINATION

5        BY MR. MAHONEY                         4

6

7

8                     INDEX TO EXHIBITS

9

10   NUMBER          DESCRIPTION                PAGE

11

12   Defendants' Exhibit 3, Form 1099        57

13

14   Defendants' Exhibit 4, Form 1099        59

15

16        (All Exhibits Retained By Counsel.)

17

18

19

20

21

22

23

24

25

1   (Friday, May 19, 2017              10:15 a.m.)

2                    BRIAN WYNN,

3   called as a witness at the instance of the

4   Defendants, being first duly sworn, was examined

5   and deposed as follows:

6                    MR. MAHONEY:  This will be the

7        continued deposition of Brian Wynn.  Can you

8        please state your name for the record?

9                    THE WITNESS:  Brian Wynn.

10                   EXAMINATION

11  BY MR. MAHONEY:

12       Q.       Now, I understand that you already

13  went over the ground rules for depositions the

14  last time you were here, correct?

15       A.       Yes, sir.

16       Q.       Are you on any medications today?

17       A.       No.

18       Q.       When did you learn about this

19  deposition for today specifically?

20       A.       About two days ago.

21       Q.       Okay.  In the last two days did you

22  review any documents?

23       A.       No, I didn't.

24       Q.       Did you speak to anyone other than

25  your attorneys?

1       A.       No.

2       Q.       I am going to ask you a little bit

3    about the family members that live in the Atlanta

4    Metro area.  The reason why I do that is because

5    should this matter proceed to trial we like to be

6    able to keep those family members off the jury.

7    Did you already discuss that in your prior

8    deposition?

9       A.       No.

10      Q.       All right.  Can you please tell me

11   all your family members that live in the Metro

12   Atlanta area, north of Macon preferably?

13      A.       Bruce Wynn II, my brother; his

14   wife, Michelle Wynn; and Liz and James Herbert.

15   And that's it for family.

16      Q.       What is your current residence?

17      A.       1639 Trinity Avenue, Southwest,

18   Atlanta, Georgia.

19      Q.       That is right down the street,

20   isn't it?

21      A.       Uh-huh.

22      Q.       And what was your residence at the

23   time --

24      A.       I'm sorry 169.

25      Q.       169.  What was your residence at

1    the time you worked for Ideal?

2       A.      I moved a couple of times when I

3    worked with Ideal, but 1055 Lancashire Circle,

4    Stone Mountain, Georgia.  And I forgot the

5    address when I stayed with a buddy, but it was in

6    Lithonia.

7       Q.      And can you give me the dates that

8    you lived at 1055 Lancashire Circle?

9       A.      I lived there from approximately

10   the beginning of February 2015 to about February

11   2016.

12      Q.      And prior to that where did you

13   live?

14      A.      I lived in Lithonia.  I forget the

15   address.  I was just staying with a friend.

16      Q.      So you lived in Lithonia?

17      A.      It was off Evans Mill Road.

18      Q.      And you lived on Evans Mill Road

19   prior to moving to Lancashire Circle?

20      A.      Yes.

21      Q.      And what were the dates that you

22   lived at Evans Mill Road?

23      A.      I believe that was from -- I

24   believe it was like -- it was not that long.  I

25   believe that it was the beginning of 2014 until

```
 1   February of 2015.

 2        Q.        Who is your current employer?

 3        A.        I work with Pacesetter Personnel

 4   Service.

 5        Q.        Do you work in an office?

 6        A.        No.

 7        Q.        Are you able to work from home?

 8        A.        No.

 9        Q.        Where is Pacesetter located?

10        A.        Doraville, Georgia.

11        Q.        What do you do there?

12        A.        Construction, forklift driving.

13        Q.        Do you require a special license to

14   operate a forklift?

15        A.        Yes, a certification.

16        Q.        And what is that certification

17   called?

18        A.        Industrial motorized equipment

19   certification, I believe.  Yeah, powered

20   industrial trucks.

21        Q.        And when you complete that

22   certification, do they give you a card?

23        A.        Yes.

24        Q.        When did you complete that

25   certification?
```

Page 8

```
 1     A.        I completed that certification
 2  March 2017.
 3     Q.        My understanding is that you worked
 4  in construction prior to working with Ideal; is
 5  that correct?
 6     A.        No.
 7     Q.        Did you work at any other tow truck
 8  companies prior to working at Ideal?
 9     A.        I worked for a company that did
10  towing, but I did not do towing with any other
11  company.
12     Q.        And what was the name of that
13  company?
14     A.        V&S.  Just all I know is V&S.
15     Q.        Okay.  What was your occupation at
16  the time you worked for Ideal Towing?
17     A.        Tow truck driver.
18     Q.        Did Ideal Towing ever provide you
19  with business cards?
20     A.        No.
21     Q.        Did you ever see business cards for
22  Ideal Towing?
23     A.        For Ideal Towing?
24     Q.        Yes.
25     A.        I'm sorry, allow me to correct
```

```
 1   myself with that last question.  They never

 2   provided me with my own business cards.

 3        Q.      Okay.

 4        A.      But there was a time they handed

 5   out their business cards for us to hand out to

 6   customers.

 7        Q.      Okay.  So they provided you with

 8   business cards, but not your own personalized

 9   ones?

10        A.      No.

11        Q.      Did it have a space on it where you

12   could fill in your name?

13        A.      I don't remember.

14        Q.      Did you have to pay for those

15   business cards?

16        A.      No.

17        Q.      Whose name appeared on the business

18   card?

19        A.      Ideal Towing.

20        Q.      Did their address appear on the

21   business card?

22        A.      I am not certain.

23        Q.      Whose phone number was on the

24   business card?

25        A.      Ideal Towing's phone number.
```

```
 1       Q.        How many business cards did you

 2   receive while you worked for Ideal Towing?

 3       A.        I am not certain.  It was like a

 4   small stack, you know, enough to pass out to my

 5   customers for a few days.

 6       Q.        Do you have any social media

 7   accounts or profiles?

 8       A.        Yes.

 9       Q.        What do you have?

10       A.        Instagram, Facebook and hi5.

11       Q.        Do you put photos on any of those

12   social media profiles?

13       A.        Yeah.

14       Q.        Do any of them have a tow truck in

15   the picture as well?

16       A.        I believe one has a picture inside

17   a tow truck.

18       Q.        Inside a tow truck.  Is that on

19   Facebook?

20       A.        No, I think that that is on hi5.

21       Q.        Okay.  What kind of profile is hi5?

22       A.        It's like a -- it's a social media

23   site, meet people, more like a dating site.

24       Q.        So it's more for like personal

25   communication?
```

Page 11

1      A.      Yeah.

2      Q.      You have never got a customer off

3  of hi5 before?

4      A.      No.

5      Q.      How about Instagram?

6      A.      No.

7      Q.      How about Facebook?

8      A.      No.

9      Q.      Other than business cards and

10  social media, are there any other ways that you

11  advertise yourself professionally?

12      A.      Myself?

13              MR. BENJAMIN:  Object to the form.

14  BY MR. MAHONEY:

15      Q.      Yes.

16      A.      No.

17      Q.      Were people aware that you were a

18  tow truck driver at the time you worked at Ideal

19  Towing?

20      A.      Just anybody that saw me in the

21  uniform or in the tow truck.

22      Q.      Okay.  What was your routine on a

23  workday at Ideal Towing?

24      A.      Arrived there, wait for a truck to

25  be available, inspect the truck, get my tablet,

1    and go to the gas station to fuel up, log in.

2    And we would take the first call -- I mean, take

3    the call that comes in as soon as I log in or

4    wait for a call.

5         Q.       You did not use the same truck

6    every day?

7         A.       No, not every day.

8         Q.       How many different trucks did you

9    use?

10        A.       However many different trucks that

11   they had.  At some point in time I used almost

12   every flatbed.  I never drove the wheel lift.

13        Q.       And you inspected all these trucks?

14        A.       Yes, I did a walk-through.

15        Q.       So you went to the gas station

16   prior to logging in?

17        A.       Usually I would log in first, but

18   it would be somewhere between arriving at, like,

19   getting in the truck and fueling it up.

20        Q.       So you might log in while at the

21   gas station?

22        A.       I might.

23        Q.       What kind of tablet did you have?

24        A.       I believe it was a Samsung.

25        Q.       Did you ever use a DDS while you

Page 13

1  worked at Ideal Towing?

2      A.      A DDS?

3      Q.      Yes.

4      A.      What is that?

5      Q.      Do you know what a DDS is?

6      A.      No.  I am not a dentist.

7      Q.      How are drivers selected by your

8  Samsung tablet?

9      A.      I -- how are they selected?

10     Q.      Yes.

11     A.      I don't know.  That was all done

12  either through AAA or through the dispatch.

13     Q.      Did it have a function to accept

14  calls on it?

15     A.      I am not sure what you mean.

16  Telephone calls or tow calls?

17     Q.      Tow calls.

18     A.      Yes.

19     Q.      Did it have a function to reject

20  calls on it?

21     A.      No, not to my knowledge.

22     Q.      So on the tablet when a call came

23  in, what would the screen prompt you?

24     A.      To accept.

25     Q.      So there is just one button for

 1   accept?

 2       A.        To the best of my knowledge -- the

 3   best of my remembering I believe -- I am not

 4   sure.  I did not reject many calls, so --

 5       Q.        But did you have an option to --

 6   there was a reject button or not?

 7       A.        I don't know.

 8       Q.        Okay.  You said that you did not

 9   reject many calls?

10       A.        No, if I needed to reject a call, I

11   would call the shop.

12       Q.        How long did you use the Samsung

13   tablet?

14       A.        The whole time I was employed at

15   Ideal Towing.

16       Q.        So it was over two years?

17       A.        I was not with Ideal Towing for two

18   years.

19       Q.        It was over a year?

20       A.        Yes.

21       Q.        Were there any rules for what you

22   could do while waiting for the calls?

23       A.        Yes.

24       Q.        What were they?

25       A.        Not to go outside of the territory.

                                                          Page 15

1    To run the calls -- you said while waiting for a

2    call?

3         Q.        Yes.

4         A.        Pretty much not to go outside of

5    the territory and not to do anything in the truck

6    that misrepresents the company.

7         Q.        And what does misrepresent mean?

8         A.        Make the company look bad.

9         Q.        Was that explained to you?

10        A.        Things as they pop up from actions

11   of other drivers, you know, we have meetings and,

12   you know, guys don't do this, don't do that.

13        Q.        Did you have to be sober and ready

14   to accept calls while you were waiting?

15        A.        Yes.

16        Q.        If you were sober and ready to

17   accept a call, could you eat while waiting?

18        A.        Yes.

19        Q.        Could you go to the store and grab

20   a drink while waiting?

21        A.        As long as you could be ready to

22   move on the call within a couple of minutes, you

23   know.

24        Q.        So you could do that as long as you

25   were ready to accept the call?

1       A.       Yeah, whatever you do is limited to

2   how quickly you could get to the truck and move

3   on the call.

4       Q.       Okay.  Could you use a cell phone

5   while you were waiting on a call?

6       A.       Yes, you could.

7       Q.       Could you listen to the radio while

8   you were waiting on a call?

9       A.       Uh-huh.

10      Q.       Could you watch TV?

11      A.       Yes.  Yes to both.

12      Q.       Could you take a nap?

13      A.       Yes.

14      Q.       What was your designated area at

15  the time you were working at Ideal Towing?  And

16  start at the first designated area you had.

17      A.       I believe the territory ran from --

18  like where did it go to?  Far north, just south

19  like Dunwoody, but east of 85 and down towards

20  I-20.  Nothing much past I-20.  South past I-20,

21  all the way east towards all of Lithonia, Stone

22  Mountain and the Decatur area, going around the

23  eastern perimeter of the city, so pretty much

24  west of 85 down to I-20 East as far east as

25  Lithonia.

1      Q.      Did it ever change while you worked

2   at Ideal Towing?

3      A.      Yes, it did.

4      Q.      When?

5      A.      I am not sure when.

6      Q.      What was your new designated area?

7      A.      It was pretty much the same area

8   minus the northern part of the city that we had,

9   so, you know -- except for the north Atlanta,

10  part of that territory.

11     Q.      Do you know why that territory was

12  lost?

13     A.      I believe they lost the contract

14  for it.  I am not -- I can't be certain though.

15  That was, you know, a rumor, talk.

16     Q.      And you don't know when that change

17  occurred?  Do you know what year?

18     A.      No.  I think that it happened in

19  2015.  I can't be certain.

20     Q.      Could you stop at home while you

21  were waiting for a call?

22     A.      You could.  It was kind of frowned

23  upon though.

24     Q.      By who?

25     A.      Management.

```
 1      Q.        Okay.  How would they know that you
 2   stopped at home?
 3      A.        They have you on GPS so they could
 4   see you if they are watching.
 5      Q.        And were there ever any locations
 6   where tow truck drivers would meet up together
 7   during the day?
 8      A.        At a gas station where we fuel up.
 9      Q.        Anywhere else?
10      A.        I did not meet too much with
11   drivers.  Some drivers may have had, you know,
12   friendships and different spots that they met.  I
13   am not certain.
14      Q.        Were there any driver's houses
15   where other drivers would meet up with the tow
16   trucks?
17      A.        I would not know because I did not
18   meet up at anybody's house.
19      Q.        If you did not get a call for,
20   let's say, two hours, could you eat dinner?
21      A.        Well, it was like the answer to the
22   last question and a few questions before.  You
23   could eat as long as you could move on a call.
24   You never know when the call is coming, so it's
25   not like you can go order a meal and sit down at
```

1    a restaurant, you know, you got to be ready for

2    the next call.

3         Q.        Did you ever eat at home while you

4    were waiting on a call?

5         A.        I am sure I have.

6         Q.        Did you ever sleep at home while

7    you were waiting for a call?

8         A.        Probably.

9         Q.        Were you ever allowed to keep the

10   truck overnight?

11        A.        Was I?  I was a few times, yeah.

12        Q.        Were you ever able to run an errand

13   while you were waiting on a call?

14        A.        You could do whatever as long as

15   you are ready to move on the call within two

16   minutes.

17        Q.        Can you give me an example of an

18   errand that you were able to run while you were

19   waiting on the call?

20        A.        Pick up a prescription, drop a

21   movie off at Netflix -- not Netflix, Redbox.

22        Q.        How many tows were you required to

23   perform in a day?

24        A.        As many that hit your box.

25        Q.        Was there a quota that if you fell

1     under it you would be disciplined?

2          A.        No.  There was -- no, there was no

3     quota.

4          Q.        What is the least amount of tow

5     jobs that you have done in a day --

6          A.        Oh --

7          Q.        -- while on duty?

8          A.        On a day?  I don't think I had any

9     that were zero, but one.  I definitely had a few

10    one days.

11         Q.        And at some duration in your

12    employment with Ideal Towing you were paid a set

13    amount of dollars per call; is that correct?

14         A.        That's -- that's what I was told.

15    Now, the set amount of dollars was supposed to be

16    a percentage, from my understanding, it was

17    supposed to be a percentage of what the company

18    was getting paid for AAA to run the call.  I am

19    not sure of that.

20         Q.        So I understand that there is

21    commission-based pay but there was also a time

22    where you were paid a flat fee plus a certain

23    dollar amount for the calls that you received; is

24    that correct?

25         A.        Yeah, there was a time like that.

1    Right.

2         Q.        Okay.  During that time period

3    where you were receiving a set dollar amount for

4    calls, do you know on average how many calls you

5    received per day?

6         A.        At -- at the time that happened, I

7    believe I was working night shift and I probably

8    would average maybe five to six a night.

9         Q.        Did you prefer night shift?

10        A.        It depends on what I had going on

11   at the time.

12        Q.        At that time did you prefer night

13   shift or would you have preferred to work day

14   shift?

15        A.        At that time, because that is when

16   I started, I was just -- I just wanted to work,

17   so it did not matter.

18        Q.        What does loading a vehicle on to

19   the truck entail?

20        A.        Well, after you position your truck

21   either in front or behind the vehicle, you lower

22   your bed, release tension on the cable, release

23   the hook on the cable so that you could pull the

24   cable out.  You would hook the cable up to the

25   proper hook points on the vehicle, put the

1    vehicle in neutral and reengage the lock on the

2    cable and winch it on to the bed, put the vehicle

3    in park, strap down the tires, put your bed up

4    and you are ready to roll.

5         Q.       Is there anything that could make

6    this process take longer?

7         A.       Oh, yeah, any number of things.

8         Q.       What was the average amount of time

9    it took to do this process?

10        A.       It depends on the circumstances,

11   the scenario.  But I mean, a driver could do it

12   anywhere between, you know, seven, eight minutes,

13   you know, five to seven minutes or it could take

14   as long as -- I have seen them take as long as an

15   hour sometimes depending on the situation.

16        Q.       So what kind of situation could

17   lead it to taking an hour?

18        A.       Inclement weather, terrain,

19   condition of the vehicle, condition of the

20   equipment on the truck.  If the member is there,

21   the customer is there.

22        Q.       What does the customer being there,

23   how does that affect it?

24        A.       Usually you have to -- the customer

25   has to be present usually and/or you may need

1  them to have access to the keys to get access to

2  inside the vehicle in to the ignition and to

3  verify their AAA membership.

4      Q.      What about a luxury car, one that

5  is low to the ground, does that take longer to

6  tow?

7      A.      There is extra steps involved with

8  that.

9      Q.      Can you tell me what the extra

10  steps are?

11      A.      You have to put boards down where

12  the tires would go on to the bed kind of like a

13  ramp onto the bed because the vehicle sits so low

14  as it approaches the ramp -- as it approaches the

15  bed at that angle it may scratch the front and

16  the back of the vehicle, the front bottom bumper

17  or the back bumper so you put the boards down to

18  kind of give it extra incline so it does not

19  touch.

20      Q.      How did you learn this process?

21      A.      Other drivers I worked with that

22  trained me.

23      Q.      Can you name one of the drivers?

24      A.      Ernest -- I forget Ernest's last

25  name -- and -- Ernest.

Page 24

1      Q.        Do you know what year you learned

2  that?

3      A.        2014, I believe.

4      Q.        If damage was done to the car like

5  you described, who would be responsible for that?

6      A.        The driver.

7      Q.        Were there instances of when you

8  could help a customer without towing their car?

9      A.        Yes.

10     Q.        If they were locked out?

11     A.        If you had the equipment.

12     Q.        Okay.  Did you have the equipment

13  while you worked at Ideal?

14     A.        I did at one point.

15     Q.        Okay.  When did you have the

16  lockout kit equipment?

17     A.        The first few months of my

18  employment at Ideal.

19     Q.        Who provided that tool to you?

20     A.        I already had it.

21     Q.        What happened to it?

22     A.        It was stolen out of the truck I

23  used the night before, probably by another

24  driver.

25     Q.        What did you do after it was

```
 1   stolen?  Did you ever get a new one?

 2        A.        No.

 3        Q.        How about a jump box, did you have

 4   one of those?

 5        A.        Yes.

 6        Q.        For the entire duration?

 7        A.        I did, but it was not very good.

 8        Q.        Okay.  And who provided that?

 9        A.        I did.

10        Q.        Did you buy a new one or did you

11   already have it?

12        A.        I already had it.

13        Q.        How about wrenches?

14        A.        I did not have a wrench, but they

15   were usually on the truck.

16        Q.        Drills?

17        A.        No.

18        Q.        Flashlight?

19        A.        Yes.

20        Q.        And whose flashlight was it that

21   you used?

22        A.        It was my flashlight.

23        Q.        Did you buy a new one or did you

24   already have it?

25        A.        I bought several flashlights.
```

Page 26

```
 1      Q.        Why did you need so many?

 2      A.        Because they would fall and break.

 3      Q.        When you first started working at

 4   Ideal did you already have a flashlight?

 5      A.        Yes.

 6      Q.        And then you would buy new ones

 7   when they broke?

 8      A.        Yes.

 9      Q.        Were there any other tools that you

10   owned that you used while you worked at Ideal?

11      A.        No.  Gloves, pens and stuff.

12      Q.        And these were things that you

13   already owned prior to working there?

14      A.        Yes.

15      Q.        So working at Ideal Towing you

16   helped some customers that were locked out

17   without towing their car?

18      A.        Yes.

19      Q.        Did you help them change their

20   tires?

21      A.        Yes, I have done that too.

22      Q.        Did you help them if they needed a

23   jump?

24      A.        Yes.

25      Q.        How did the customer pay in those
```

 1   instances?

 2       A.       It would count as a AAA call.

 3       Q.       Was there any time while you worked

 4   at Ideal where you were no longer able to do

 5   these light service jobs?

 6       A.       I mean, if I did not have the

 7   equipment on me.

 8       Q.       Okay.  And when did you learn how

 9   to perform those light service skills?

10       A.       The previous jobs.

11       Q.       What do you do with the vehicle

12   once it was loaded on to the truck?

13       A.       I would put the destination, the

14   tow destination in the GPS and take it.

15       Q.       Were you able to leave the

16   designated area?

17       A.       To deliver a vehicle?

18       Q.       Yes.

19       A.       Yeah.

20       Q.       Where is the farthest you had to

21   take a vehicle to deliver it?

22       A.       The farthest?

23       Q.       Yes.

24       A.       Probably Tuskeegee, Alabama.

25       Q.       And did the customer ride with you

1    when you went there?

2         A.        No.

3         Q.        Was there ever a time when a

4    customer rode with you out of state?

5         A.        No.  I only went out of state a

6    couple of times.  I believe so, yes.

7         Q.        What other states did you drive to?

8         A.        South Carolina.

9         Q.        Any others?

10        A.        Alabama, South Carolina, that's it.

11        Q.        What did you do after you dropped

12   the vehicle off?

13        A.        If I needed to collect any payment

14   from the customer, I would collect payment from

15   the customer, wished them well and headed back to

16   the designated area.

17        Q.        Could you receive calls while you

18   were out of the designated area?

19        A.        Yes, it has happened, could happen.

20        Q.        And would the calls be for

21   somewhere near the truck or would it be in the

22   designated area?

23        A.        The incoming calls would be in the

24   designated area, so that was the pickup area,

25   that is why we needed to stay in that area

1   because that is where the majority of our calls

2   would come from in that area.

3       Q.      So you would sometimes receive a

4   call while out of the designated area to do a job

5   inside the designated area?

6       A.      Pick up inside the designated area,

7   yes.

8       Q.      To your understanding, why would

9   that occur?

10      A.      Other drivers may still be on a

11  call, they may have just picked up a car and had

12  to travel 15 miles to drop it off and then get

13  back.  I may have just dropped off a call, be on

14  my way back to the designated area, pretty much

15  based on availability and how quickly a driver

16  can get to a customer.

17      Q.      So would the proximity to the job

18  play a factor?

19      A.      I would assume.  But I -- you know,

20  I would think so, yes.  I would think so.  I am

21  not certain.  I would just venture.

22      Q.      Right.  And I think that you talked

23  about this at your prior deposition, but neither

24  your attorney or me want you to speculate as to

25  things, but if you believe -- and if you have

1   reasons to believe something is factually true,

2   such as proximity determined whether or not you

3   received a call, then you can answer as to that.

4   But I definitely do not want you to speculate.

5        A.        Yeah, I do not want to speculate.

6   It would make sense for that to happen, but I

7   would not know.

8        Q.        To your knowledge who was sending

9   you the calls?

10       A.        AAA had a system -- I believe -- to

11  my knowledge there was a AAA -- it was that AAA

12  would send the call to the nearest available

13  driver and we also had a dispatcher at the shop

14  who could then more or less cherry-pick the calls

15  to which driver was best suited for it or

16  whatever other knowledge they had about the

17  situation that would make them take the call and

18  pick the driver.

19       Q.        Were there times when you would

20  receive a call and then the dispatcher from the

21  shop would try and change it?

22       A.        Yes, that has happened.

23       Q.        Did you dislike those types of

24  situations?

25       A.        Sometimes.

Page 31

1      Q.      And why is that?

2      A.      Because we got paid per call, so

3   sometimes it felt like taking money out of my

4   pocket and sometimes they had a good reason, a

5   good explanation.

6      Q.      Is the reason why you did not

7   reject calls because you wanted to make more

8   money so you accepted more calls?

9      A.      Yes.

10     Q.      So you testified that you served

11  AAA customers?

12     A.      Yes.

13     Q.      Were there other types of customers

14  that you served while working at Ideal Towing?

15     A.      Yes, we had -- Ideal had a contract

16  at one point with a company by the name of Jerald

17  and, you know, every once in a while there would

18  be a private call, somebody just call directly to

19  the company.

20     Q.      Did you personally ever receive a

21  private call?

22     A.      I have had some dispatched to me

23  from the office.

24     Q.      Did you ever call the office and

25  tell them that you had a private call that you

1    wanted to do?

2        A.      No, I did not solicit calls.

3        Q.      Did anyone ever hail you down on

4    the road?

5        A.      Oh, a lot of people tried to hail

6    me down.

7        Q.      And what did you do in that

8    situation?

9        A.      I would stop.  I would talk to

10   them, you know, tell them the prices and see if

11   they wanted to go through with it or not.

12       Q.      And that would put more money in

13   your pocket if they did decide to go through with

14   it, right?

15       A.      Yeah, I believe -- I believe you

16   got a bigger percentage for a private call.

17       Q.      What was that percentage?

18       A.      I believe that it was still 30

19   percent, but the cost to the customer was higher

20   because they weren't in the AAA network.

21       Q.      So would you agree with me that

22   handing out the business cards could result in

23   you getting paid more because those individuals

24   would then call and you would get a higher

25   percentage because they would not have a AAA

1    discount?

2              MR. BENJAMIN:  Object to the form.

3              THE WITNESS:  It could.

4    BY MR. MAHONEY:

5        Q.      What incentive did you have to hand

6    out the business cards?

7        A.      Make my boss happy.

8        Q.      And how would the boss become happy

9    if you handed out a business card?

10       A.      Promoting their business.

11       Q.      How would they know you promoted

12   it?

13       A.      Just seeing the results.

14       Q.      Can you explain what the result

15   would be that would make the boss happy?

16       A.      Well, if you promote the business

17   more, you get more business and I would assume

18   that would make them happy.

19       Q.      But they would not know that you

20   were the one that promoted it, would they?

21       A.      No.

22       Q.      Were you paid more to hand out the

23   business cards?

24       A.      No.

25       Q.      And now your name would not appear

Page 34

```
 1    on the business card that you handed out to them,
 2    would it?
 3         A.         My name wouldn't.
 4         Q.         Could a private individual request
 5    a tire changed?
 6         A.         Yes, they could.
 7         Q.         Jump start?
 8         A.         Yes.
 9         Q.         Lock-out assistance?
10         A.         Yes.
11         Q.         Did you ever do those things?
12         A.         For a private individual?
13         Q.         Yes.
14         A.         Not dispatched -- not that was not
15    dispatched from the office.
16         Q.         Why wasn't it dispatched from the
17    office?
18         A.         No, I have not done one of those
19    services for somebody who was not dispatched from
20    the office.
21         Q.         Thanks for clarifying that.
22         A.         Uh-huh.
23         Q.         So every private individual that
24    hailed you down while you were driving actually
25    needed their car towed?
```

    1      A.        Not necessarily.  Many needed a
    2  tire change.  They may have locked their keys in
    3  the car, jump-start.
    4      Q.        So what did you do in that
    5  situation?
    6      A.        I would tell them the price.
    7      Q.        Did any of them ever request a
    8  light service job?
    9      A.        No.  No.  I mean, they -- they --
   10  the -- I tell them the price and a lot of times
   11  they figured that they could get it cheaper or
   12  wait for somebody else to come and help them.
   13      Q.        What were the prices?
   14      A.        To be honest with you, I forget.
   15      Q.        Okay.  When a customer's car has
   16  issues, what is your understanding of the process
   17  they go through?  What do they call, the company,
   18  AAA?
   19      A.        From my understanding, if they are
   20  a AAA member, they would call AAA.
   21      Q.        And then what happens?
   22      A.        To my understanding, the call would
   23  go to AAA, AAA would ask them their information
   24  where they are at, designate it to wherever
   25  the -- send the call to wherever the designated

1    AAA provider is in that area.  If it were Ideal

2    Towing, their system would choose the nearest

3    available driver to service that client.

4        Q.        And you mean Ideal's towing system

5    or their system?

6        A.        I believe the AAA system.  With

7    Ideal's dispatcher, you know, having the -- I

8    guess the final say in which driver takes the

9    call.

10       Q.        So Ideal's dispatcher can

11   intervene?

12       A.        Yes.

13       Q.        Did Michael James handle the

14   day-to-day operations at Ideal Towing?

15       A.        From where I sat it seemed no.

16       Q.        Okay.  Did Tishja James handle

17   clerical matters at Ideal Towing?

18       A.        From where I sat, yes.  From where

19   I sat, Michael James was definitely involved, a

20   part, had a say --

21       Q.        Okay.

22       A.        -- but it looked to me as though

23   Tishja ran more of the hands-on everyday

24   decision-making on that.

25       Q.        What kind of decisions had to be

Page 37

1    made?

2        A.       Payroll decisions, disciplinary

3    decisions, you know, that's from my experience.

4        Q.       From where you sat?

5        A.       From where I sat in my dealings,

6    but it's -- it seemed and appeared to me like

7    everything, like -- like, you know, the boss.

8        Q.       Okay.  So payroll decision and

9    discipline decisions?

10       A.       In my dealings, not just that.  If

11   there was damages and it had to come out of a

12   driver's check, Tishja would be the one to, you

13   know, set the price, how it was going to come out

14   of the check, in what increments, scheduling.  A

15   lot of times if a driver had a problem with

16   another driver or some other staff member, you

17   know, the mediator, that the --

18       Q.       So she mediated issues between the

19   drivers?

20       A.       Yeah, between drivers and staff,

21   you know, like the decider.

22       Q.       As you sit here today, do you know

23   whether or not Michael James had to approve her

24   decisions?

25       A.       I did not know.  You know, it

                                                    Page 38

1    definitely seemed like a partnership, so it would

2    appear that -- you know, I can't be certain.  I

3    did not sit in on their meetings, but it would

4    seem like there would have to be some type of

5    agreement or consensus or something.

6         Q.      And from where you sat, you seen --

7    it seemed that he was involved and he had a

8    partner?

9         A.      Oh, definitely.  It appeared to be

10   a partnership.

11        Q.      If Michael James said that he had

12   to approve all payroll decisions, would you have

13   any way to dispute that?

14        A.      Would I have any way to dispute it?

15        Q.      Yes.

16        A.      If he said it now or then?

17        Q.      If he said it now.

18        A.      The only thing I would say is that

19   I never dealt with him for payroll.  I only dealt

20   with Tishja for payroll.

21        Q.      Okay.  And that's it?  Anything

22   else?

23        A.      I only dealt with Tishja for

24   payroll.  I never dealt with him for payroll.

25        Q.      If Michael James said that all

1    discipline decisions had to be approved by him,

2    would you have any way to dispute that?

3         A.       The only dispute I would have is

4    that whenever -- as far as my dealings with Ideal

5    Towing and any disciplinary actions -- well, not

6    any disciplinary actions, but the majority would

7    be, you know, Tishja made the -- would decide

8    whatever action would be taken and I did not see

9    her, you know, consult, you know -- she would

10   make the decision and the decision would be done.

11        Q.       And if Michael James said he had to

12   approve all those decisions, would you have any

13   way to dispute that?

14        A.       No, I don't have any way to dispute

15   it.

16        Q.       My understanding is that you worked

17   some hourly jobs prior to working at Ideal

18   Towing; is that correct?

19        A.       Yes.

20        Q.       Why did you switch from an hourly

21   position to a commission-based position?

22        A.       When I first entered into

23   commission-based work I was laid off of a job

24   that was hourly and I fell into commission-based

25   work.  After a few commission-based jobs, when I

Page 40

1    got to IHOP, even that was mostly a

2    commission-based job and I was working mostly off

3    of tips and I was only getting $2.83 an hour, so,

4    you know, it was all very similar in a sense that

5    you never know what you were going to make.

6         Q.      Okay.  You testified that there are

7    different ways that damages that were done to

8    vehicles could be paid for by the driver?

9         A.      Yeah, they do their -- yes, I did.

10        Q.      So you did not have to pay the

11   damages all up front?

12        A.      Not my experience.  I can't say the

13   same for any other driver though.

14        Q.      So in other words, you were

15   responsible for the damages but the company would

16   allow you to pay it over time out of your checks?

17        A.      Yes.

18        Q.      Isn't it true that you got to

19   choose what schedule that you wanted to work when

20   you began working for Ideal Towing?

21        A.      No.

22        Q.      You did not let them know what

23   hours you could work?

24        A.      You might be able to tell them just

25   like with any other job, you know, when you are

                                                        Page 41

1    available and if your availability does not suit

2    the company, you know, it is what it is.  That is

3    with anything, but all new drivers start off on

4    night shift.

5        Q.        And at some point while you worked

6    at Ideal did your shift change?

7        A.        Yes.

8        Q.        When did that change?

9        A.        I believe it happened a few months

10   after I started.

11       Q.        And why did that change happen?

12       A.        I requested day shift and I waited

13   for an opening.  I believe either somebody had

14   quit or was let go and a position opened up for

15   day shift.

16       Q.        Why did you request day shift?

17       A.        I was just ready for day shift.

18       Q.        When did you request day shift?

19       A.        I believe that it was a few months

20   after I was working.  I was working there for a

21   little bit.

22       Q.        Did you ever have an issue with

23   another driver?

24                 MR. BENJAMIN:  Objection to form.

25                 THE WITNESS:  I mean, nothing

```
 1      major, nothing serious.

 2   BY MR. MAHONEY:

 3      Q.      Anything that required mediation?

 4      A.      With another driver?

 5      Q.      Yes.

 6      A.      I don't think so.  Not with another

 7   driver.

 8      Q.      How about with staff?

 9      A.      Oh, yeah, the manager, Kelly.

10      Q.      Were there any other managers you

11   had an issue with?

12      A.      Nothing that required mediation.

13      Q.      And when you had an issue with

14   Kelly, Tishja mediated it?

15      A.      I believe so.  To be honest, I am

16   not quite sure how that was resolved, you know.

17   Personality clashes.  But everybody is adults, so

18   you do what you got to do.

19      Q.      So as you sit here today, you don't

20   know if Tishja helped you resolve that issue?

21      A.      I can't be certain.

22      Q.      What issues are you aware of that

23   Tishja mediated --

24      A.      As far --

25      Q.      -- between driver and driver?
```

Page 43

```
 1      A.         Well, I did not have any issues
 2   with any other driver --
 3      Q.         How about between --
 4      A.         -- that needed mediation.
 5      Q.         Okay.  How about between driver and
 6   staff?
 7      A.         Like, I could only speak for
 8   myself.
 9      Q.         And which ones that you can speak
10   towards did Tishja mediate?
11      A.         For me?
12      Q.         At all.
13      A.         Like, you know, when the manager
14   wrote me up for something, like, I don't remember
15   what it was.  I know that I was written up for
16   something and it was completely ridiculous to me
17   and I took it to Tishja and, you know, she made
18   me feel much better about the situation, you
19   know.  I felt it to be over on my end.
20      Q.         Did she discipline the manager, to
21   your knowledge?
22      A.         To my knowledge, no, but I don't
23   believe the write-up stood after the meeting with
24   her and I.
25      Q.         So when you get a write-up, what
```

Page 44

1    does the write-up entail discipline-wise?  Does

2    it just stay on your record?

3         A.        I suppose.  I don't know.  You

4    know, you get a write-up you did something wrong

5    or somebody is accusing you of -- the manager is

6    accusing you of doing something wrong.  Where it

7    goes from there, I never really paid attention to

8    the system if it was, you know, first one verbal,

9    second one written, third one, you know, it was

10   just -- the write-up itself was ludicrous to me.

11   I forget what it was for, but it just seemed

12   ridiculous, so I did not even pay any attention

13   to what it meant.  It just was completely

14   ridiculous to me.

15        Q.        Okay.  I understand.  Do you know

16   if that write-up was taken out of your record?

17        A.        I believe -- I felt like it was

18   after meeting with Tishja, you know, like she

19   made me feel better about the situation, so --

20   but then again, at the time it did not really --

21   like, to me, I was still working, so it did not

22   matter if it stood or didn't.

23        Q.        Were there any other conflicts that

24   you know that Tishja mediated?

25        A.        Between, like, staff -- myself and

Page 45

1   staff or anything, or just any issues?

2       Q.      Any dispute between a driver and a

3   driver or a driver and staff.

4       A.      I am sure she did.  There were

5   plenty of arguments between drivers and

6   management or in some cases maybe driver and

7   driver.  But me minding my own business, I did

8   not, you know, follow up to see what happened or

9   whatever, so -- as a matter of fact.  I know

10  there were other incidents but for me to be able

11  to speak on it, the details of any kind, I can't.

12      Q.      Like, do you know the drivers that

13  were involved?

14      A.      You know, every -- about 85 to 90

15  percent of the drivers at one point or another

16  had some type of argument, cursing or screaming

17  match, with the manager, so, you know.

18      Q.      And you don't know if the managers

19  were disciplined for -- as a result of these

20  mediations that you say occurred?

21      A.      I mean, I can't speak for certain.

22  I doubt that he was, like, disciplined, do you

23  know what I mean?  But, you know, I mean, people

24  did not like him, you know, and he did not seem

25  to like anybody so there was conflict.

Page 46

```
 1      Q.       Okay.
 2      A.       And when there was conflict you go
 3  to Tishja, you know, and she had a way of making
 4  everybody feel better.
 5      Q.       Okay.  What were your off days at
 6  Ideal at every time period?
 7      A.       When I first started the first
 8  couple of months I did not take an off day at
 9  all.  Then I believe my off day was --
10      Q.       That is when you were working night
11  shift?
12      A.       That is when I was working night
13  shift.  I did not take an off day.  My first
14  couple of months, maybe a day here and there, but
15  nothing, you know, like, official.  And that was
16  by my choice, but eventually I did start taking
17  an off day.  I know at one point my off day was
18  on Friday and I believe it switched from there
19  but I can't be certain.  I know the only off day
20  I really ever wanted was Sunday and I never got
21  it, so I know at one point it was Friday.
22      Q.       Were you ever disciplined for
23  taking your off days by choice?
24      A.       By not showing up to work or
25  something?  I do not understand what you mean.
```

1      Q.        You said that you had a day here or

2    there in the first couple of months where you

3    took the day off by choice.  Did you testify to

4    that or not?

5      A.        I am saying -- what I said was my

6    first couple of months I did take an off day, a

7    scheduled off day.  There were a day here and

8    there where I may have had off in those first

9    couple of months and I worked all seven days of

10   the week by choice those first two months.  So I

11   mean --

12     Q.        Like, I am sorry for interrupting

13   you, but my question was:  Were you disciplined

14   when you took those off days by choice?

15     A.        No, because I had communication

16   with them and I know that they understood how

17   much I had been working.

18     Q.        Did you ever have sick days?

19     A.        Through my course of time of

20   employment with Ideal, I am sure I have had a day

21   or two.  I ain't sick that often though.

22     Q.        How about holidays?

23     A.        No.

24     Q.        So you worked Christmas?

25     A.        Yes.  I -- did I work -- I worked

Page 48

1    Thanksgiving too.  I think 2000.

2              MR. BENJAMIN:  Don't think out loud

3        it makes for a messy transcript.

4              THE WITNESS:  I'm sorry.  I did not

5        think about that.  I am -- yeah, I worked

6        most holidays.

7    BY MR. MAHONEY:

8        Q.      Most holidays or all holidays?

9        A.      Most.

10       Q.      Which holidays did you not work?

11       A.      I believe I did not work a

12   Thanksgiving.

13       Q.      How many sick days did you take in

14   total?

15       A.      I don't know.  It could not have

16   been more than three.

17       Q.      How many off days did you take

18   total?

19       A.      Oh, I don't know.  Oh, I don't

20   know.  I cannot be sure of that.  I know not

21   many.

22       Q.      How did you keep track of the tows

23   that you performed?

24       A.      We had a yellow sheet that we would

25   record our calls on, the date, location, call

1    number, tow destination and we would record them

2    daily on the sheet.

3        Q.        Did you also have sign-in sheets

4    that you used when you came to work?

5        A.        Later on they had a punch clock

6    time card.

7        Q.        You say later on.  Do you know what

8    year?

9        A.        It either started late 2015 or very

10   early 2016.  I am not certain.

11       Q.        So to your knowledge there were no

12   time sheets?

13       A.        Like sign-in?

14       Q.        Yes.

15       A.        No, not to my knowledge.

16       Q.        Now, I asked you something about

17   this earlier, but I want to be a little bit more

18   specific.  What was the average number of calls

19   that you did in 2015 specifically?

20       A.        For the whole year?

21       Q.        Yes.

22       A.        I can't even -- I would say I

23   probably -- I can't say for the whole year.

24       Q.        Okay.  While you were working day

25   shift?

Page 50

1      A.        I worked day shift for part of

2   2015, which means that I would have to do more

3   calls during the day shift than at the time that

4   I worked at night shift, but I would average --

5   what I would like to do for myself every day

6   would be ten calls a day.  If I did ten calls a

7   day, I would be good.  So I wanted to average 60

8   to 70 calls a week, which I would either do or

9   fall short by five to ten, you know, so...

10     Q.        So you have a range?

11     A.        I don't know the math for that,

12   but, you know --

13     Q.        So you are saying if you want to do

14   60 and you fell short by ten, that means that it

15   would be 50 on the low end?

16     A.        Yeah, but then there may be weeks

17   where I might do 65, 70, you know, so...

18     Q.        So you can't give an average -- can

19   you give a range?

20               MR. BENJAMIN:  I think that he just

21        did.

22               THE WITNESS:  Yes, that is the best

23        that I could -- I wanted my check to look a

24        certain way every week, and each week I kind

25        of knew what I had to do to get it or what I

1      would like to do to get it, you know.

2   BY MR. MAHONEY:

3      Q.      From June 2015 until January 2016

4   what was the least amount of tows you performed

5   in a day?

6      A.      The least amount?  Like, one.  I

7   don't think that I had any zero days.  I might

8   have, but for me it would be one.

9      Q.      And what would you do on those days

10  while waiting?

11     A.      Most of the time I waited for a

12  call I would be in my truck on my phone just, you

13  know, posted up somewhere convenient to the

14  highways or the areas in our territory that I

15  thought would be the best, you know, but -- so

16  mostly just sit and wait in the truck.

17     Q.      Did you ever wait at your house?

18     A.      Yeah, there were times I waited at

19  my house.

20     Q.      Did you pay for your own uniform

21  while you worked at Ideal Towing?

22     A.      It was like a rental.  Rental fee,

23  cleaning fee.

24     Q.      Do you have any skills as a

25  mechanic whatsoever?

                                                    Page 52

 1      A.      No.

 2      Q.      Have you ever performed light

 3 service for friends not through Ideal Towing?

 4      A.      Not through Ideal Towing?

 5      Q.      Yes.

 6      A.      In my own personal vehicle I used

 7 to do light service out of my own personal

 8 vehicle, so, yes.

 9      Q.      Okay.  What years did you do that?

10      A.      2011 through -- 2011 through '13, I

11 believe.

12      Q.      What was your personal vehicle?

13      A.      It was a Mazda Tribute.

14      Q.      Have you ever privately performed

15 towing services for friends outside of Ideal

16 Towing?

17      A.      No.

18      Q.      Did you ever charge for the light

19 service that you performed out of your personal

20 vehicle?

21      A.      Oh, yeah.

22      Q.      How much?

23      A.      I mean, it depends on the person

24 and the situation and the job.

25      Q.      What is the most amount you ever

1    charged somebody?

2        A.        Like $100.

3        Q.        What is the least amount you ever

4    charged?

5        A.        Like five bucks and a cigarette or

6    something, like, you know, when they are down on

7    their luck.

8        Q.        And do you know what the average

9    cost would be?

10       A.        I believe the average cost would be

11   anywhere between $50 to $75.

12       Q.        How did people know that you could

13   perform light service?

14       A.        I had a sticker on the side of my

15   vehicle that said roadside assistance and I had a

16   big bright yellow vest.

17       Q.        Where did you get those things?

18       A.        From Auto Rescue, a company I

19   worked for.  Actually I was a contractor driver

20   with them?

21       Q.        During those same years?

22       A.        Part of it.

23       Q.        Okay.  Do you still own that

24   sticker and vest?

25       A.        No.

Page 54

```
 1      Q.        When did you lose it?
 2      A.        A couple of years, a few years ago,
 3 I stopped using it and lost track of it.  Well, I
 4 used the vest until I had to get a new one until
 5 it wore out.  But the stickers, I don't know.
 6      Q.        Do you know what year you lost the
 7 sticker?
 8      A.        Actually you know what, I turned
 9 them back in when I stopped working for Auto
10 Rescue.
11      Q.        Do you know what year that was?
12      A.        Late 2012.
13      Q.        The sticker and the vest you turned
14 in?
15      A.        No, just the sticker.  I kept the
16 vest.  The vest was just a basic safety vest
17 that -- it did not have a local insignia on it.
18      Q.        So between late '12 and 2013 when
19 you performed light service out of your personal
20 vehicle, how did people know that you could do
21 light service?
22      A.        The calls were sent to me through a
23 dispatching app that I downloaded on my phone
24 from the company, Auto Rescue, and they would
25 send me calls.  Now, for any jobs that I did on
```

1    my own without Auto Rescue, the people could just

2    see because I had a big signs on my truck that

3    said roadside assistance.

4        Q.        And I am saying after you turned in

5    the sticker.

6        A.        Oh, I mean, then I -- oh, I worked

7    for a different company for a little bit called

8    Quick Pick and they had signs and stickers on --

9    maybe not stickers that you put on the side of

10   your vehicle to let them know that you do

11   roadside services.

12       Q.        And my question is:  Did you ever

13   privately perform these services and did not pay

14   a company like Quick Pick or Auto Rescue?

15       A.        Well, with Auto Rescue and Quick

16   Pick I was an actual independent contractor, so I

17   used all of my own vehicles, like my own vehicle,

18   my own tools, my own time, you know.  I worked

19   like an Uber almost in the sense that, yeah, I am

20   going to take lunch.  I am not available.  Like I

21   am going home, going to a movie or whatever.  And

22   I used all my own vehicles or whatever and I was

23   only required to pay them from the calls that

24   they dispatched to me and actually they got the

25   money before I did so they would pay me my

Page 56

1   percentage.  Any other call that I did while I

2   was out that was personal was mine to keep.  They

3   had no say in that.

4        Q.        So when you started working at

5   Ideal Towing you had significant experience as an

6   independent contractor?

7             MR. BENJAMIN:  Object to the form.

8             THE WITNESS:  What I thought in my

9        understanding.  See, prior to me working

10        with Auto Rescue I had never been an

11        independent contractor before so I did not

12        know what an independent contractor meant,

13        you know, I was just -- this guy said, you

14        know, that he was going to let me work and

15        earn, so --

16   BY MR. MAHONEY:

17        Q.        Now, I understand that you might

18   have discussed this a little bit in your first

19   deposition, but how long did you work for Auto

20   Rescue?

21        A.        I worked for Auto Rescue from

22   September 2011 to just approximately November

23   2012.  And at one point I was working for Auto

24   Rescue and Quick Pick both.

25        Q.        And what years did you work at

Page 57

1    Quick Pick?

2        A.        Just for -- I was only there for a

3    couple of months and that was 2012.

4                  (Defendants' Exhibit 3, Form 1099,

5          was marked for identification.)

6    BY MR. MAHONEY:

7        Q.        I have here what is marked as

8    Defendants' Exhibit Number 3.

9        A.        Before we get into that I need to

10   take a break.

11                 MR. BENJAMIN:  Sure, is that fine

12         with you?

13                 MR. MAHONEY:  Yes, that is fine.

14                 (Recess.)

15   BY MR. MAHONEY:

16       Q.        I would like to hand you what has

17   been marked as Defendants' Exhibit 3.

18   (Tendered.)

19                 Take a look at that for a moment.

20       A.        Okay.

21       Q.        Do you recognize that?

22       A.        Yes.

23       Q.        What is it?

24       A.        It appears to be a 1099 form.

25       Q.        Did you receive one of these from

Page 58

1    Ideal Towing?

2        A.      Yes.

3        Q.      When did you receive it?

4        A.      2015.

5        Q.      Can you take a look at box number

6    7, non-employee compensation.

7        A.      Uh-huh.

8        Q.      Do you dispute that the dollar

9    amount there is what you received from Ideal

10   Towing in 2014?

11       A.      No, I don't dispute that.  That was

12   what I received, right?

13       Q.      Correct.

14       A.      No, I don't dispute that.

15       Q.      Okay.  Have you ever had a tax

16   identification number?

17       A.      A tax ID?  Is that different from

18   EIN?

19       Q.      Not necessarily.  Have you ever had

20   an EIN?

21       A.      I did, but I never used it.

22       Q.      When did you have one?

23       A.      I think that I set that up in

24   2000 -- I think that it was 2007, 2008.  I am not

25   certain.

1      Q.       And what did you set it up for?

2      A.       I was going to start a t-shirt

3   company.

4      Q.       Did you consider yourself an

5   entrepreneur?

6      A.       No, because I had not made any

7   money as an entrepreneur.

8      Q.       How about when you were working at

9   Quick Pick?

10      A.       Well, Quick Pick and Auto Rescue, I

11   guess, technically I could be considered an

12   entrepreneur even though my business was reliant

13   on them, so I did not -- you know, even that I

14   had all my own experiences and equipment and

15   stuff I did not feel like an entrepreneur,

16   although technically at that time I was.

17               (Defendants' Exhibit 4, Form 1099,

18       was marked for identification.)

19   BY MR. MAHONEY:

20      Q.       Okay.  I have here what is marked

21   as Defendants' Exhibit 4.  (Tendered.)

22               And take a moment to look at that.

23      A.       I have not gotten it.  Where is it?

24      Q.       (Tendered.)

25      A.       Okay.

1       Q.          Do you recognize that document?

2       A.          This looks familiar.

3       Q.          What is it?

4       A.          It looks like a 1099 form.

5       Q.          Did you receive this document from

6    Ideal Towing?

7       A.          I may have.  I think when this came

8    I had moved, so I did not receive it in the mail,

9    but it appears to be a 1099 form.

10      Q.          Do you know when you would have

11   received it?

12      A.          I am guessing early 2016.

13      Q.          Can you look at the box number 7?

14      A.          Yeah.

15      Q.          Can you tell me if the dollar

16   amount there is the correct amount of monies you

17   received from Ideal Towing in 2015?

18      A.          I can't be certain, but it seems as

19   though it could be like about that.

20      Q.          Okay.  Do you have any reason to

21   dispute that that is the amount that you actually

22   received in 2015?

23      A.          Do I have any reason to dispute it?

24      Q.          Yeah, to dispute that that is the

25   actual dollar amount that you received in 2015.

1     A.        Yeah, I think that I have reason to

2  dispute it.

3     Q.        Okay.  Did you receive more or less

4  than that amount?

5     A.        To be honest with you, I am not

6  certain.  I saved a great deal of my check stubs

7  from that year, but not all of them and with

8  the -- just the way certain things were being

9  conducted, like, it could be what I received or

10 it could not be.  I can't -- you know, I can't be

11 certain.

12    Q.        Okay.  Do you believe that you

13 received more than that?

14    A.        I may have.  I may have or I may

15 have received less.  Just going off of what is on

16 the paper requires like a trust that I have to

17 trust that that information put on there is

18 accurate.  And right now I can't say that I have

19 that trust.  It could be, but also it could not

20 be for me.  Do you know what I am saying?

21    Q.        Yes.

22    A.        I can't be certain.

23    Q.        I understand that.  So my question

24 is:  What do you base your dispute on other than

25 just lack of trust?  Do you have any factual

Page 62

```
 1    basis for believing that you received --
 2         A.        No, I don't.
 3         Q.        -- more or less?  Okay.  What type
 4    of vehicles did you tow out of state?
 5         A.        I know one was a -- just regular
 6    passenger vehicle.  I mean, you know, just
 7    regular -- just regular passenger vehicle.
 8         Q.        Was it a car, truck, van, do you
 9    know?
10         A.        One was a car and the other one, I
11    believe, was an SUV.
12         Q.        How were you paid for those jobs?
13         A.        The standard way that we were paid
14    at the time.
15         Q.        And what would that be?
16         A.        Well, you know, we got paid
17    different ways, they switched it up a couple of
18    times.  I know one for certain I got a 30 percent
19    of the total thing and I think that we were going
20    off of mileage at the time, so I forget the
21    formula for it.  We got paid, you know, a certain
22    amount after five miles and then --
23         Q.        Did this apply to one of your
24    out-of-state jobs?
25         A.        Yes.
```

                                                    Page 63

```
 1      Q.        So you got paid by the mile?
 2      A.        Yeah, at that time.  One time I
 3   know for certain and the other time I am not
 4   certain how I got paid.
 5      Q.        Was this in 2015?
 6      A.        Yes, it had to be.
 7      Q.        Do you know what month?
 8      A.        No, I don't.
 9      Q.        Were you tipped for any of the tow
10   jobs you performed?
11      A.        Yes, sir.
12      Q.        How often?
13      A.        I would say about a third of the
14   time.
15      Q.        What is the largest tip you ever
16   received?
17      A.        Oh, man, I received a -- I received
18   over $100 from a customer once.
19      Q.        And what would you say is the
20   average amount that you were tipped?
21      A.        You know, $5 or $10, average about
22   $10, yeah.
23      Q.        And did you ever disclose the
24   amount that you were tipped to Ideal Towing?
25      A.        No.
```

Page 64

1     Q.        And did you ever keep track of how
2 much in tips you got?
3     A.        Not really.
4     Q.        For instance, could you give an
5 estimate of how many tips -- how much in tips you
6 received in 2015?
7     A.        No, not for the whole year.
8     Q.        Could you do it for any time
9 period?
10    A.        I would say in a week I might have
11 made -- I would make about -- in a week's time I
12 would say anywhere between maybe 50 to a little
13 over $100 a week in tips.
14    Q.        And you testified that you --
15 didn't you testify that you performed about 60
16 tows per week?
17    A.        Yes, that is what I was aiming for
18 on a weekly -- it may fall short or sometimes it
19 may run over.
20    Q.        Okay.  Did you ever deliver any
21 products from Ideal Towing out of state?
22    A.        I don't know what you mean.
23    Q.        So you delivered tow vehicles out
24 of state, correct?
25    A.        Uh-huh.

Page 65

```
 1      Q.      Did you ever deliver anything that
 2  was Ideal Towing property out of state?
 3      A.      No, not me.
 4      Q.      Were you allowed to sell anything
 5  while you worked at Ideal Towing?
 6      A.      In the truck?
 7      Q.      Yes.
 8      A.      I mean, I don't know of any
 9  specific rule, but I did not.
10      Q.      Did Ideal Towing ever ask you to
11  sell anything out of the truck?
12      A.      Ideal Towing, no.
13      Q.      Okay.  Did you ever keep any drugs
14  on you while you were in the truck?
15      A.      I had some marijuana on me once.
16      Q.      One time?
17      A.      Yes, sir.
18      Q.      For the entire shift?
19      A.      No, not for the entire shift.
20  Well, for the shift I worked, yes.
21      Q.      Never had cocaine on you?
22      A.      No.
23              MR. BENJAMIN:  And I am going to
24      instruct him not to answer any more
25      questions about any kind of drugs because I
```

                                           Page 66

```
 1      see no relevance to it whatsoever.  If you
 2      can tell me why it's reasonable to go into
 3      that, we will possibly reevaluate that.
 4      This case is about an independent contractor
 5      versus an employee.
 6              MR. MAHONEY:  I understand that you
 7      guys probably discussed some things at the
 8      last deposition and I would like to go over
 9      them again just to be clear.  So first did
10      you have an opportunity to speak about -- to
11      your employee about read and signing?
12              MR. BENJAMIN:  Well, we have not
13      ordered the transcript.  I would say that
14      for the moment we will reserve signature.
15              MR. MAHONEY:  Okay.  And do we
16      agree to reserve all objections except as to
17      form and responsiveness of the witness until
18      first use?
19              MR. BENJAMIN:  Well, yes, what the
20      rules generally say -- I have objected when
21      I thought was necessary today.
22              MR. MAHONEY:  I understand.  All
23      right.  So can we agree that, you know, if
24      Defendants which I am sure you know is very
25      unlikely -- if Defendant wanted to use that
```

 1      information that he testified about at

 2      trial.  You could object then.

 3              MR. BENJAMIN:  Well, certainly we

 4      would object then and any other use of it?

 5              MR. MAHONEY:  I understand that.

 6      So do you still plan on instructing him not

 7      to answer the question?

 8              MR. BENJAMIN:  Yes, I think that

 9      it's beyond the scope of Rule 26.  It's not

10      even remotely close.

11              MR. MAHONEY:  Okay.  I don't

12      believe that the witness has the ability to

13      not answer a question at a deposition in

14      this form based on a regular objection as to

15      relevance.  And on that basis, I am going to

16      instruct him to answer.

17              MR. BENJAMIN:  Okay.  I am going to

18      instruct him not to, but I -- explain to me

19      why this is an appropriate topic because it

20      is not correct that in any deposition any

21      topic of any crime is fair game and it's

22      not.

23              MR. MAHONEY:  So the discussion you

24      want to have right now will needlessly make

25      this deposition very long.  It's not the

Page 68

```
 1      appropriate time or place to have this
 2      discussion.  Your objection is noted for the
 3      record and you can always raise it whenever
 4      the information is sought to be used but I
 5      don't think it's appropriate to instruct the
 6      witness not to answer a question based on a
 7      general objection as to relevance.
 8              MR. BENJAMIN:  I think that that is
 9      not correct.  And I am instructing him not
10      to answer because, look, I can reevaluate my
11      position if you explain any way, shape or
12      form in an FSLA case why the questions you
13      are asking about drug use have any bearing.
14              MR. MAHONEY:  That explanation is
15      not necessary.  The only explanation that is
16      necessary is that he does not have the
17      ability to refuse to answer questions.
18              MR. BENJAMIN:  Yes, he does.
19              MR. MAHONEY:  Based on a general
20      objection?
21              MR. BENJAMIN:  He does not -- it's
22      not a general objection.  You cannot ask
23      him these questions.
24              MR. MAHONEY:  The rules for this
25      deposition are the same that they would be
```

1     at trial.

2              MR. BENJAMIN:  Correct.

3              MR. MAHONEY:  Do you contend that

4     you would be able to instruct the witness

5     not to answer when he is on the stand or

6     would you object to the judge.

7              MR. BENJAMIN:  I would object to

8     the judge and get a ruling that it is unduly

9     prejudicial and has no relevance whatsoever.

10             MR. MAHONEY:  I understand that.

11    Now, on the basis that the judge is not here

12    right now to grant your objection, I think

13    that the best thing to do is to allow the

14    witness to answer the question and then you

15    can remove it later based on an objection

16    that is ruled upon by a judge.

17             MR. BENJAMIN:  I disagree.  And I

18    am instructing him not to answer any

19    questions about drug use.  And what I would

20    suggest is that you continue the deposition

21    on any other topics and then we can take

22    this up with the judge at the end of the

23    deposition or after the deposition.

24             MR. MAHONEY:  I understand that.  I

25    am trying to avoid having to reconvene this

Page 70

1       deposition the third time.  Today is the

2       last day of discovery.  I want to avoid

3       discovery having to be reextended, and I

4       suggest that you allow the witness to answer

5       and then you can object to it when it's

6       intended to be used.

7              MR. BENJAMIN:  Well, still, explain

8       to me how it's appropriate at all and I may

9       reconsider because, to me, it looks like

10      it's simply harassment.  It's an attempt to

11      abuse him.  It's an attempt to get him to

12      admit to committing crimes.  None of those

13      things have any bearing on this case.  None,

14      not remotely.

15             MR. MAHONEY:  So are you objecting

16      based on him being subject to criminal

17      prosecution?

18             MR. BENJAMIN:  It's always a

19      possibility.  I don't know the answers to

20      these questions but what I am saying is

21      there is a scope of Rule 26 and you are not

22      remotely in it anymore and I am instructing

23      on that.  If you want to call the judge, we

24      can do that and we will get a ruling and we

25      will obey what the judge says.

Page 71

```
 1              MR. MAHONEY:  I think that we
 2      should do that.
 3              MR. BENJAMIN:  My instruction now
 4      is that this is inappropriate and I am not
 5      allowing him to answer any questions about
 6      drug use especially when you have not even
 7      been able to tell me why this is reasonable.
 8              MR. MAHONEY:  I think it's relevant
 9      to what other activities he could perform
10      while being an independent contractor.  It's
11      that simple.
12              MR. BENJAMIN:  Okay.  Do you want
13      to continue and we will call the judge at
14      the end of the -- when you are done with
15      others or do you want to stop now and call?
16              MR. MAHONEY:  I say that we should
17      stop now and call it.
18              MR. BENJAMIN:  All right.  Let's
19      take a break for a moment.
20              (Recess.)
21              MR. MAHONEY:  Do you want to
22      restate your objection for the record based
23      on the last question?
24              MR. BENJAMIN:  I am instructing my
25      client not to answer on numerous grounds.
```

Page 72

```
 1      One is he is asserting his Fifth Amendment
 2      right against self-incrimination.  And two
 3      is that I think that it is beyond the scope
 4      that is permitted by Rule 26.  I think that
 5      it is asked to harass and oppress and not
 6      for any legitimate discovery purpose and on
 7      all of those bases I am instructing my
 8      client not to answer that question.
 9  BY MR. MAHONEY:
10      Q.      And can you respond?
11      A.      No.
12              MR. BENJAMIN:  We -- my client is
13      accepting my advice not to answer that
14      question on the grounds that -- as just
15      stated.
16              MR. MAHONEY:  I would like him to
17      assert that he is raising his Fifth
18      Amendment privilege.
19              MR. BENJAMIN:  Is that correct?
20              THE WITNESS:  Yes, I am raising my
21      Fifth Amendment on that question.
22  BY MR. MAHONEY:
23      Q.      Were you ever disciplined for
24  having marijuana in the truck by Ideal Towing?
25              MR. BENJAMIN:  You can answer.
```

Page 73

1           THE WITNESS:  Yeah, I was talked to
2      about it.
3  BY MR. MAHONEY:
4      Q.      How did Ideal find out that you had
5  marijuana in the truck?
6      A.      I had a bag in the -- like a locked
7  compartment of the truck and it was in there.  I
8  forgot I had it, but I left it in the truck.  And
9  somebody went in the truck and I guess that they
10  were trying to see whose bag it was and that is
11  when they found it.
12      Q.      Did you ever smoke while you were
13  in the truck?
14      A.      No, I did not smoke weed in the
15  truck.
16      Q.      Did you ever smoke weed outside of
17  the truck during your shift?
18           MR. BENJAMIN:  I am going to object
19      and, again, assert Fifth Amendment right
20      against incrimination and because it's
21      wholly irrelevant and these questions are
22      asked for harassment purposes because they
23      have no legitimate discovery purpose.  So I
24      am instructing him not to answer.
25           THE WITNESS:  I plead my Fifth

Page 74

1      Amendment right.

2   BY MR. MAHONEY:

3      Q.      Did you ever go to work high?

4              MR. BENJAMIN:  You can answer the

5      question.

6              THE WITNESS:  No.

7   BY MR. MAHONEY:

8      Q.      Did you ever leave work high?

9      A.      No.

10     Q.      What purpose did you have the

11  marijuana in the truck?

12             MR. BENJAMIN:  I am going to also

13     instruct him not to answer.  Same basis.

14             THE WITNESS:  Yeah, I plead the

15     Fifth.

16             MR. MAHONEY:  Okay.  No further

17     questions.

18             MR. BENJAMIN:  At present we are

19     not going to order, but I may have a

20     question.

21             I have no questions.  We will read

22     and sign.

23             MR. MAHONEY:  Okay.  And at the

24     moment I don't know either.  I have your

25     information and I will have the office call

Page 75

1       you.

2               (Deposition adjourned at 12:20 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 76

1   Notice Date: 6/15/17

2   Deposition Date: 5/19/17

3   Deponent: Brian Wynn (Vol. II)

4   Case Name: Jawanza Smith, et al.

5   v. Ideal Towing, LLC , et al.

6   Page: Line        Now Reads              Should Read

7   _____  _____    _____

8   _____  _____    _____

9   _____  _____    _____

10  _____  _____    _____

11  _____  _____    _____

12  _____  _____    _____

13  _____  _____    _____

14  _____  _____    _____

15  _____  _____    _____

16  _____  _____    _____

17  _____  _____    _____

18  _____  _____    _____

19  _____  _____    _____

20  _____  _____    _____

21  _____  _____    _____

22  _____  _____    _____

23  _____  _____    _____

24  _____  _____    _____

25  _____  _____    _____

                                                            Page 77

1                    CERTIFICATE OF DEPONENT

2

3      I hereby certify that I have read and examined the

4      foregoing transcript, and the same is a true and

5      accurate record of the testimony given by me.

6      Any additions or corrections that I feel are

7      necessary, I will attach on a separate sheet of

8      paper to the original transcript.

9

10                          _____

11                             Signature of Deponent

12

13     I hereby certify that the individual representing

14     himself/herself to be the above-named individual,

15     appeared before me this _____ day of _____,

16     2017, and executed the above certificate in my

17     presence.

18

19                          _____

20                             NOTARY PUBLIC IN AND FOR

21

22                          _____

23                                County Name

24

25     MY COMMISSION EXPIRES:

JAWANZA SMITH, et al. vs IDEAL TOWING, LLC, et al.
BRIAN WYNN, VOLUME II on 05/19/2017

DEPOSITION
OFDEPOSITION
OF Page 78

1                       DISCLOSURE

2    Pursuant to Article 10.B of the Rules and

3    Regulations of the Board of Court Reporting of

4    the Judicial Council of Georgia which states:

5    Each court reporter shall tender a disclosure

6    form at the time of the taking of the deposition

7    stating the arrangements made for the reporting

8    services of the certified court reporter, by the

9    certified court reporter, the court reporter's

10   employer or the referral source for the

11   deposition, with any party to the litigation,

12   counsel to the parties, or other entity.  Such

13   form shall be attached to the deposition

14   transcript, I make the following disclosure:  I

15   am a Georgia Certified Court Reporter.  I am here

16   as a representative of Discovery Litigation

17   Services, LLC.

18          Discovery Litigation Services, LLC was

19   contacted to provide court reporting services for

20   the deposition.  Discovery Litigation Services,

21   LLC will not be taking this deposition under any

22   contract that is prohibited by O.C.G.A.

23   9-11-28(c).  Discovery Litigation Services, LLC

24   has no contract/agreement to provide reporting

25   services with any party to the case, any counsel

JAWANZA SMITH, et al. vs IDEAL TOWING, LLC, et al.
BRIAN WYNN, VOLUME II on 05/19/2017

DEPOSITION
OFDEPOSITION
OF Page 79

1   in the case, or any reporter or reporting agency

2   from whom a referral might have been made to

3   cover this deposition.  Discovery Litigation

4   Services, LLC will charge its usual and customary

5   rates to all parties in the case, and a financial

6   discount will not be given to any party to this

7   litigation.

8

9

10

11          *M. Susan DeCarlo*

12          M. Susan DeCarlo, Notary Public

13          and Registered Professional Reporter

14          Commission Expires 10-22-2020

15          Georgia Certificate Number 2125

16

17

18

19

20

21

22

23

24

25

JAWANZA SMITH, et al. vs IDEAL TOWING, LLC, et al.
BRIAN WYNN, VOLUME II on 05/19/2017

DEPOSITION
OFDEPOSITION
OF Page 80

1    STATE OF GEORGIA:

2    COUNTY OF FULTON:

3         I hereby certify that the foregoing

4    transcript was reported, as stated in the

5    caption, and the questions and answers thereto

6    were reduced to typewriting under my direction;

7    that the foregoing pages represent a true,

8    complete, and correct transcript of the evidence

9    given upon said hearing, and I further certify

10   that I am not of kin or counsel to the parties in

11   the case; am not in the employ of counsel for any

12   of said parties; nor am I in any way interested

13   in the result of said case.

14

15

16

17        *M. Susan DeCarlo*

18        M. Susan DeCarlo, Notary Public

19        and Registered Professional Reporter

20        Commission Expires 10-22-2020

21        Georgia Certificate Number 2125

22

23

24

25