<pre>
 1              IN THE UNITED STATES DISTRICT COURT

 2                 NORTHERN DISTRICT OF GEORGIA

 3                      ATLANTA DIVISION

 4   JAWANZA SMITH, CARLON BURNEY,

 5   BRIAN WYNN, CARLON LEWIS,

 6   And STANLEY HILL,

 7          Plaintiffs,

 8   VS.                      CIVIL ACTION

 9                            FILE NO:  1:16-CV-0139-TWT

10   IDEAL TOWING, LLC,

11   MICHAEL JAMES and TISHJA

12   JAMES,

13          Defendants.

14   _____/

15

16              The deposition of STANLEY MARK HILL, JR.,

17   taken pursuant to agreement of counsel; all formalities

18   waived, excluding the reading and signing of the

19   deposition before Tamika Burnette, Certified Court

20   Reporter, in and for the State of Georgia, commencing at

21   2:27 p.m., on May 3, 2017, at 3100 Centennial Tower, 101

22   Marietta, Atlanta, Georgia.

23

24

25
</pre>

```
 1                    APPEARANCES

 2    ON BEHALF OF THE PLAINTIFF:

 3    DELONG, CALDWELL, BRIDGERS, FITZPATRICK & BENJAMIN, LLC

 4    MR. MICHAEL A. CALDWELL, ESQUIRE

 5    3100 Centennial Tower

 6    101 Marietta Street

 7    Atlanta, Georgia  30303

 8    (888) 680-0416

 9    Michael@dcbflegal.com

10

11    ON BEHALF OF THE DEFENDANT:

12    THE BURKE LAW GROUP, LLC

13    MR. JORDAN M. MAHONEY, ESQUIRE

14    199 Peters Street, Southwest

15    Suite A

16    Atlanta, Georgia  30313

17    Eburke@burkelawatl.com

18    (404) 688-1210

19

20

21

22

23

24

25
```

```
 1                    INDEX PAGE

 2    WITNESS:           EXAMINATION:              PAGE:

 3    STANLEY MARK HILL, JR.

 4                       MR. MAHONEY                 4

 5                       MR. CALDWELL                77

 6

 7

 8    EXHIBIT:           DESCRIPTION:              PAGE:

 9    EXHIBIT NO. 1      APPLICATION               64

10    EXHIBIT NO. 2      WORK CONTRACT             69

11    EXHIBIT NO. 3      TRIPLE A CALL SHEET       71

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  P R O C E E D I N G S

 2                  *     *     *

 3                  (Witness sworn.)

 4                  STANLEY MARK HILL, JR.,

 5            After having been first duly sworn to tell

 6            The whole truth in this matter, was examined

 7            and testified as follows:

 8                      EXAMINATION

 9   Q.    (By Mr. Mahoney)  Can you please state your full

10   name for the record?

11   A.    Stanley Mark Hills, Jr.

12   Q.    Okay.  Have you ever been in a deposition

13   before?

14   A.    No.

15   Q.    Have you ever testified as a witness?

16   A.    No.

17   Q.    I'd like to give you a few ground rules that

18   will help us make sure this process goes smoothly?

19   A.    Can you speak up a little bit for me?

20   Q.    You can't hear me?  Sorry.  All right.

21            MR. CALDWELL:  You speak very softly, and I

22   was straining a little.

23            MR. MAHONEY:  You were straining as well?

24            MR. CALDWELL:  The witness is worse than you

25   are because his voice was so low.
```

MR. MAHONEY:  It's just conversational, I

guess.

         MR. CALDWELL:  You obviously came from a

smaller family.

         MR. MAHONEY:  No, I came from a large family.

         MR. CALDWELL:  I was in the middle of seven

and so I just learned to talk loud.

         MR. MAHONEY:  I have four siblings, so...

         MR. CALDWELL:  Okay.

Q.    (By Mr. Mahoney)  All right.  So I want to go

over some ground rules.  The court reporter is taking

down everything we say.  So not only do we need to speak

up, but we also need to make sure we don't talk over

each other.  So I ask that you let me finish my whole

question before you begin answering.  And likewise, I'll

let you finish your answer before I begin my next

question.

         It's important that you verbalize all of your

answers rather than shaking your head or nodding your

head.  While it's common to do that in a conversation,

it's very hard for the court reporter to take that down.

So please verbalize with a yes or a no answer.  If you

need a break at any time, just let me know, I'll be

happy to let you have one.

         MR. MAHONEY:  Michael, do we agree to reserve

1   all objections except for form and responsiveness of the

2   witness until first use?

3            MR. CALDWELL:  We do.

4            MR. MAHONEY:  And did you have an opportunity

5   to speak your client about signature?

6            MR. CALDWELL:  We'll read and sign.

7            MR. MAHONEY:  Thanks.

8            MR. CALDWELL:  Did you ever meet anybody who

9   didn't read and sign?

10            MR. MAHONEY:  Not lately.  And I've only been

11   practicing lately, so.

12   Q.     (By Mr. Mahoney)  When did you learn of this

13   deposition?

14   A.     Maybe about January.

15   Q.     And how did you find out about it?

16   A.     Through my legal counsel.

17   Q.     Now I don't want to get into any specific

18   conversations you had with your counsel, but did you

19   speak with anyone about this deposition other than them?

20   A.     No.

21   Q.     Did you review any documents in preparation for

22   today?

23   A.     Excuse me?

24   Q.     Did you review any documents in preparation for

25   today?

```
 1    A.      No.

 2    Q.      How did you meet Michael James?

 3    A.      The first time I met Michael James is at Black

 4    Barter Truck Equipment.  I was working for another

 5    station at the time.

 6    Q.      And who were you working for at the time?

 7    A.      D&S Towing.

 8    Q.      And how did you come to get a job working for

 9    Michael James?

10    A.      I applied for it.

11    Q.      What made you apply?

12    A.      Because I needed a job.

13    Q.      Were you currently unemployed?

14    A.      I don't remember.

15    Q.      How did you learn that Michael James was the

16    owner of Ideal Towing?

17    A.      How did I learn that he was the owner?

18    Q.      Yes.

19    A.      I mean, he employed me.

20    Q.      Did he ever tell you that he was the owner?

21    A.      Yes.

22    Q.      Did he have the power to fire you?

23    A.      Yes.

24    Q.      Did he have control of your pay?

25    A.      Yes.
```

```
1    Q.      Did he control the day-to-day operations of the
2    company?
3    A.      Yes.
4    Q.      Have you ever been arrested before?
5    A.      Yes.
6    Q.      When?
7    A.      1992.
8    Q.      For what?
9    A.      Armed robbery.
10   Q.      Where?
11   A.      Dekalb County, Georgia.
12   Q.      Were you convicted?
13   A.      Yes.
14   Q.      What did your sentence consist of?
15   A.      Five years of incarceration.
16   Q.      Any other arrests?
17   A.      Yes.
18   Q.      When?
19   A.      Maybe a marijuana charge in '99 or 2000 maybe.
20   Q.      For doing what with marijuana?
21   A.      For using it.
22   Q.      Any others?
23   A.      No.
24   Q.      Not even traffic?
25   A.      Huh?
```

```
1    Q.      Not even traffic citations?

2    A.      Other than the one I caught while working for

3    Michael James.

4    Q.      What year was that?

5    A.      I don't recall the year.

6    Q.      And what was the violation?

7    A.      Improper decal on a tow truck, no MC number.  MC

8    stands for motor carrier.

9    Q.      You never had any arrests related to cocaine?

10   A.      Yes, but that was dismissed.

11   Q.      What year was it?

12   A.      Maybe '98, '99.

13   Q.      Was that for possession of cocaine or

14   distribution of cocaine?

15   A.      Possession.

16          MR. CALDWELL:  Can I have one second -- no, go

17   on.  I didn't know there was -- I mean, there is a call

18   I need to take this afternoon.

19          MR. MAHONEY:  When?  It's come up?

20          MR. CALDWELL:  Yes.  I asked them to send me a

21   text message before he call.

22          MR. MAHONEY:  That's fine.

23   Q.      (By Mr. Mahoney)  Where do you currently live?

24   A.      In Lithia Springs, Georgia.

25   Q.      Do you have any family that lives in the Atlanta
```

```
 1   area?

 2   A.      Yes.

 3   Q.      Where?

 4   A.      All over.

 5   Q.      Can you name them, please?

 6   A.      Dekalb.

 7   Q.      Any other counties?

 8   A.      Fulton.

 9   Q.      How about Cobb?

10   A.      No.

11   Q.      Any other counties you can think of in the

12   Atlanta metro area?

13   A.      No.

14   Q.      Part of why I'm asking you these questions is,

15   if there is a trial in this case, we'll need to make

16   sure that none of your family members end up on the

17   jury.  So I'm going to ask you the names of your family

18   members that live in the area you've described.

19           Do you have anyone in your immediate family

20   that lives in the Atlanta metro area?

21   A.      Excuse me?

22   Q.      Do you have anyone in your immediate family that

23   lives in the Atlanta metro area; brothers, sisters,

24   mother, father?

25   A.      My sister.
```

```
1    Q.      What her name?

2    A.      Shaniesha.

3    Q.      Can you spell?

4    A.      S-H-A-N-I-E-S-H-A.

5    Q.      What other family members, by name, live in the

6    Atlanta metro area?

7    A.      My grandmother.

8    Q.      Name?

9    A.      Janey Hill.

10   Q.      Anyone else?

11   A.      No.  That's it.

12   Q.      Have you ever been a party to a lawsuit?

13   A.      Party to a lawsuit?  No.

14   Q.      Other than the criminal matters that we've

15   discussed, have you ever been a plaintiff --

16   A.      No.

17   Q.      -- or sued someone?

18   A.      No.

19   Q.      Have you ever been sued by someone?

20   A.      No.

21   Q.      Tell me all of the educational degrees you've

22   received in your life.

23   A.      A GED.

24   Q.      When did you receive it?

25   A.      In '98 -- excuse me '93.
```

```
1    Q.    Any others?

2    A.    I got a culinary arts degree.

3    Q.    Where did you get your GED from?

4    A.    In prison.

5    Q.    Where did you get your culinary arts degree?

6    A.    In prison.

7    Q.    What year did you get your culinary arts degree?

8    A.    In '96.

9    Q.    Do you have any other professional or vocational

10   training?

11   A.    No.

12   Q.    Did you go to high school?

13   A.    Yes.

14   Q.    Where?

15   A.    Atlanta, Georgia.

16   Q.    What was the name of the high school?

17   A.    McNair Senior High School.

18   Q.    What years did you attend?

19   A.    '89, '88 -- '89, up until '92.

20   Q.    And you didn't graduate?

21   A.    No, I didn't.

22   Q.    Was that due to legal troubles or did you leave

23   for another reason?

24   A.    Yes.

25   Q.    Why did you leave?
```

```
 1   A.      Legal troubles.
 2   Q.      Did you attend any other schools other than what
 3   we've listed here?
 4   A.      No.
 5   Q.      What was your first job after high school, not
 6   including anything you did in prison?
 7   A.      My first job after high school?
 8   Q.      Yes.
 9   A.      I don't remember.
10   Q.      What's the first job you do remember?
11   A.      Triple A contract.
12   Q.      What was the name of that?
13   A.      DJV Towing.
14   Q.      You don't remember any employment you had prior
15   to DJV?
16   A.      No.
17   Q.      And what year did you start work at DJV?
18   A.      2005, maybe.
19   Q.      What did you do between 1997 and 2005?
20   A.      What did I do?  Meaning?
21   Q.      What did you do?  Were you employed?
22   A.      No, I wasn't.
23   Q.      Were you unemployed for that duration?
24   A.      Yes.
25   Q.      When did you leave DJV Towing?
```

| | | |
|---|---|---|
| 1 | A. | 2007, maybe. |
| 2 | Q. | Did you work any jobs while you were in prison? |
| 3 | A. | Prison detail. |
| 4 | Q. | What year did you begin that? |
| 5 | A. | In 1993. |
| 6 | Q. | And what did that consist of? |
| 7 | A. | Whatever they told you to do. |
| 8 | Q. | Various things? |
| 9 | A. | Yes. |
| 10 | Q. | And were you paid? |
| 11 | A. | No. |
| 12 | Q. | Did you earn anything, any credits? |
| 13 | A. | No. |
| 14 | Q. | Anything after that, before DJV? |
| 15 | A. | No. |
| 16 | Q. | Was DJV hourly? |
| 17 | A. | No.  It was on a percentage.  I was a |
| 18 | | contractor.  It was a percentage. |
| 19 | Q. | And what was your percentage? |
| 20 | A. | Twenty-two percent. |
| 21 | Q. | And you got 22 percent of what? |
| 22 | A. | Twenty-two percent of what my truck grossed in |
| 23 | | the pay period. |
| 24 | Q. | Why did you leave DJV Towing? |
| 25 | A. | For better pay. |

```
 1   Q.      Where did you work after DJV?

 2   A.      D&S Towing, maybe.  Yes, D&S Towing.

 3   Q.      When did you start there?

 4   A.      Maybe the end of 2007, maybe.

 5   Q.      And how long did you work there?

 6   A.      I'm not sure.

 7   Q.      Were they also a Triple A contractor?

 8   A.      Yes.

 9   Q.      Were you hourly?

10   A.      No.

11   Q.      How were you paid?

12   A.      Percentage-wise.

13   Q.      Were you a contractor?

14   A.      Yes.

15   Q.      What was your percentage?

16   A.      Thirty.

17   Q.      And you got 30 percent of what?

18   A.      What my truck grossed in a pay period.

19   Q.      Why did you leave D&S Towing?

20   A.      I was laid off.

21   Q.      Did they tell you why you were being laid off?

22   A.      Why?  Because they couldn't afford to cover me

23   on the insurance?

24   Q.      And why was that?

25   A.      Because I had an accident.
```

| | | |
|---|---|---|
| 1 | Q. | Do you remember when the accident occurred? |
| 2 | A. | No, I don't. |
| 3 | Q. | The accident involved the tow truck? |
| 4 | A. | Yes. |
| 5 | Q. | Where did you work next? |
| 6 | A. | KAM Towing. |
| 7 | Q. | Were you paid hourly? |
| 8 | A. | No. |
| 9 | Q. | Were you a contractor? |
| 10 | A. | Yes. |
| 11 | Q. | How were you compensated? |
| 12 | A. | With a check. |
| 13 | Q. | And how did they determine how much you were |
| 14 | paid? | |
| 15 | A. | By how many calls I ran. |
| 16 | Q. | Were you paid a flat fee per call or -- |
| 17 | A. | I was paid 30 percent of the tows that the truck |
| 18 | did in a pay period. | |
| 19 | Q. | When did you start working at KAM? |
| 20 | A. | I don't remember the exact date. |
| 21 | Q. | Do you know what year? |
| 22 | A. | No.  It was really quick.  I didn't stay there |
| 23 | long. | |
| 24 | Q. | How long were you there? |
| 25 | A. | A few months. |

```
1    Q.      Why did you leave?

2    A.      Better pay.

3    Q.      Where did you work after that?

4    A.      Ideal Towing.

5    Q.      What year did you start there?

6    A.      2010.

7    Q.      And when did you leave Ideal Towing?

8    A.      Maybe '13.

9    Q.      Do you know what month?

10   A.      No.

11   Q.      You say you were terminated?

12   A.      Yes.

13   Q.      Why?

14   A.      I -- something pertaining to a member and how

15   much they paid for a tow, and I didn't write them a

16   receipt.

17   Q.      Did you read your lawsuit in this case?

18   A.      Briefly.

19   Q.      Did you provide any of the information that went

20   into drafting that lawsuit?

21   A.      Rephrase that for me.

22   Q.      Did you provide any of the factual information

23   that went into that lawsuit?

24           MR. CALDWELL:  Are you asking him to --

25   because we're the ones who wrote the complaint.
```

```
 1   Q.      (By Mr. Mahoney)  Okay.  So I don't know if I've

 2   already made this clear, but I don't want you to tell me

 3   anything that you discussed with your attorneys, the

 4   specifics of those conversations?

 5   A.      That's what you just asked me.

 6   Q.      I'm asking you did you provide the facts in the

 7   complaint?

 8   A.      Yes, I did.

 9   Q.      And you're not seeking any money in your

10   complaint from 2010, are you?

11           MR. CALDWELL:  What is your question?

12           MR. MAHONEY:  He's not seeking any damages in

13   this complaint, money in this complaint from 2010?

14           MR. CALDWELL:  I don't even know if he knows

15   that.

16   A.      I don't.  I don't know that.

17   Q.      (By Mr. Mahoney)  You don't know?

18           MR. CALDWELL:  Yes, we can only go back three

19   years.

20           MR. MAHONEY:  I'm just making sure that he --

21           MR. CALDWELL:  Okay.

22   Q.      (By Mr. Mahoney)  How about from 2011, are you

23   seeking any money from 2011?

24   A.      I'm seeking money from the time that I was

25   employed with Ideal Towing.
```

```
1    Q.       For all the years you were there?

2    A.       Yes.

3    Q.       Okay.

4    A.       I mean, my attorney just said it couldn't be but

5    three.

6             THE WITNESS:  Correct?

7             MR. CALDWELL:  Three years before the filing

8    of the complaint, yes.

9    Q.       (By Mr. Mahoney)  At DJV, what were your hours?

10   A.       Seven to seven.

11   Q.       A.m. or p.m.?

12   A.       Both.  It varied.

13   Q.       How about D&S, what were your hours?

14   A.       Seven to seven.

15   Q.       A.m. or p.m.?

16   A.       It varied.

17   Q.       How about at KAM Towing?

18   A.       Seven to seven.

19   Q.       A.m. or p.m.?

20   A.       It varied.

21   Q.       Who was your manager at DJV Towing?

22   A.       Abby.

23   Q.       Who is the owner of D&J Towing.

24   A.       Isaac.

25   Q.       What's his last name?
```

```
 1   A.      I'm not sure.

 2   Q.      How about D&S, who was the manager?

 3   A.      Mr. Demessa.

 4   Q.      How about the owner?

 5   A.      Mr. Demessa.

 6   Q.      How about KAM Towing?

 7   A.      Mike Demessa.

 8   Q.      Is he Mr. Demessa's son?

 9   A.      Yes.

10   Q.      And who is the owner?

11   A.      Mike Demessa.

12   Q.      Do you have any plans to sue any of those tow

13   companies?

14   A.      No, I don't.

15           MR. CALDWELL:  You just gave me an idea.

16           MR. MAHONEY:  It's too late.

17           MR. CALDWELL:  It probably is.

18   Q.      (By Mr. Mahoney)  Would you say being a tow

19   driver is your occupation?

20   A.      Yes.

21   Q.      Have you ever had another occupation?

22   A.      No.

23   Q.      Would you say you're in the tow driving

24   business?

25   A.      Pretty much, yes.
```

| | | |
|---|---|---|
| 1 | Q. | Where have you worked after Ideal Towing? |
| 2 | A. | Clark Towing. |
| 3 | Q. | What years did you work there? |
| 4 | A. | It was briefly. |
| 5 | Q. | How long? |
| 6 | A. | '16, maybe last year. |
| 7 | Q. | You say you worked there in 2016? |
| 8 | A. | Yes. |
| 9 | Q. | And for how many months? |
| 10 | A. | About two. |
| 11 | Q. | Why did you leave? |
| 12 | A. | Better pay. |
| 13 | Q. | And were you paid a commission there? |
| 14 | A. | Yes. |
| 15 | Q. | How much? |
| 16 | A. | Thirty percent.  I was also paid an hourly wage. |
| 17 | Q. | How much per hour? |
| 18 | A. | Minimum wage. |
| 19 | Q. | What hours did you work? |
| 20 | A. | Seven to seven. |
| 21 | Q. | Where did you work after Clark Towing? |
| 22 | A. | Bravo Towing. |
| 23 | Q. | What dates did you work there? |
| 24 | A. | At Bravo Towing? |
| 25 | Q. | Yes. |

| | | |
|---|---|---|
| 1 | A. | From April 2016 to right now. |
| 2 | Q. | Are you paid commission? |
| 3 | A. | Yes. |
| 4 | Q. | How much? |
| 5 | A. | Thirty percent. |
| 6 | Q. | And what are your hours? |
| 7 | A. | From seven to seven. |
| 8 | Q. | At DJV did you punch a clock? |
| 9 | A. | No. |
| 10 | Q. | At D&S did you punch a clock? |
| 11 | A. | No. |
| 12 | Q. | At KAM Towing did you punch a clock? |
| 13 | A. | No. |
| 14 | Q. | At Clark Towing did you punch a clock? |
| 15 | A. | Yes. |
| 16 | Q. | At DJV Towing were you allowed to exit the |
| 17 | premises while you're on duty? | |
| 18 | A. | Rephrase that question for me. |
| 19 | Q. | You got to answer it. |
| 20 | A. | Was I allowed -- |
| 21 | Q. | Unless you don't understand it? |
| 22 | A. | I don't understand it. |
| 23 | Q. | Were allowed to leave DJV? |
| 24 | A. | Yes. |
| 25 | Q. | Okay.  Where did DJV operate out of? |

```
1    A.      Everything in the inside of I-285.

2    Q.      Did they have a building?

3    A.      Yes.

4    Q.      And do they keep tow trucks in that building?

5    A.      Yes.

6    Q.      When you clocked in, were you allowed to leave

7    that premises?

8    A.      I didn't clock in.  And yes, we were allowed to

9    leave the premises.  We can't run a Triple A call at the

10   shop.

11   Q.      Right.  And when you had downtime between your

12   jobs, did you have to come back to the shop?

13   A.      No.

14   Q.      What did you do between jobs?

15   A.      Wait for the next one.

16   Q.      Did you have a designated area?

17   A.      Yes.

18   Q.      And what was that designated area?

19   A.      Everything on the inside of I-285.

20   Q.      Where were you living at the time?

21   A.      In Lithonia.

22   Q.      Outside of the perimeter?

23   A.      Yes.

24   Q.      At D&S, between your jobs, were you allowed to

25   stay off the premises?
```

```
 1   A.      Yes.

 2   Q.      And what did you do during that time?

 3   A.      Wait for the next call.

 4   Q.      Did the trucks have GPS?

 5   A.      Yes.

 6   Q.      Where were you living at the time?

 7   A.      In Lithonia.

 8   Q.      What was your designated area?

 9   A.      Snellville to Liliburn, Georgia, Gwinnett

10   County.

11   Q.      What was your designated area when you worked

12   for KAM Towing?

13   A.      Gwinnett County, Snellville.

14   Q.      Where did you live at the time?

15   A.      Lithonia.

16   Q.      Did you have to return to the shop between tow

17   jobs?

18   A.      No.

19   Q.      What did you do during your downtime?

20   A.      Wait for the next call.

21   Q.      When you worked for Ideal Towing, did you have

22   to return between your tow jobs?

23   A.      No.

24   Q.      What did you do during your downtime?

25   A.      Wait for the next call.
```

```
 1    Q.      Do you recall taking any time off when you
 2    worked for Ideal Towing?
 3    A.      Yes.
 4    Q.      When?
 5    A.      When my father died -- excuse me.  My father got
 6    killed.
 7    Q.      And you took time off?
 8    A.      Yes.
 9    Q.      From when to when?
10    A.      It was about four days.
11    Q.      Do you know when, what year?
12    A.      2015 -- excuse me '14.
13    Q.      I thought you said you left Ideal Tow in 2013?
14    A.      Excuse me?
15    Q.      I thought you said you left Ideal Tow in 2013?
16    A.      No.  If I did, that's incorrect.
17    Q.      Okay.  Were you terminated from Ideal Tow
18    sometime in 2013?
19    A.      I don't remember exactly.
20    Q.      Were you hired at that time?
21    A.      No.
22    Q.      At Clark Towing, what did you do between tow
23    jobs?
24    A.      Wait for the next one.
25    Q.      Where?
```

```
1    A.      In our coverage area.

2    Q.      Did you have a quota of how many tows you had to

3    do per month?

4    A.      No.  There wasn't a quota.

5    Q.      Did you have a quota at Ideal Towing?

6    A.      No.  There wasn't a quota.

7    Q.      At KAM Towing?

8    A.      No.

9    Q.      How about at Bravo Towing?

10   A.      No.

11   Q.      What did you do between tow jobs at Bravo

12   Towing?

13   A.      Wait for the next job.

14   Q.      Where did you wait?

15   A.      In our coverage area.

16   Q.      What's your designated area at Bravo Towing?

17   A.      Everything on the inside of I-285, Buckhead.  As

18   far as downtown Decatur, North Druid Hills, Piedmont.

19   Q.      From Buckhead to downtown?

20   A.      Excuse me?

21   Q.      From Buckhead to where?

22   A.      Everything on the inside of I-285, Buckhead, the

23   downtown area.  As far as downtown Decatur, North Druid

24   Hill.

25   Q.      What's your full address?
```

```
1    A.       2252 Ann Lane, Lithia Springs, Georgia 31 --

2    30122.

3    Q.       What county?

4    A.       Douglas.

5    Q.       Where did you live when you were working for

6    Ideal Towing?

7    A.       2252 Ann Lane, Lithia Springs, Georgia 30122.

8    Q.       What was your designated area?

9    A.       Dekalb County, Ellenwood.  Downtown Decatur, as

10   far as Peachtree Industrial.

11   Q.       Why did you enter the towing business?

12   A.       Because I needed a job.

13   Q.       Did you understand the difference between

14   earning hourly wages and earning commission?

15   A.       No.

16   Q.       What's your understanding of an hourly wage?

17   A.       It's my understanding of an hourly wage that

18   you're paid regardless by the hour, no matter how many

19   calls you bring.

20   Q.       What's your understanding of commission?

21   A.       A commission is you're paid a percentage of how

22   much your truck grossed doing the work period.

23   Q.       Did you understand that distinction in 2016?

24   A.       I tend to understand, yes.

25   Q.       2015?
```

```
 1   A.      I didn't know the legal ramification behind it.

 2   Q.      Right.  But did you understand the distinction

 3   between it, not legal?

 4   A.      I mean, yes.

 5   Q.      2014?

 6   A.      Not so much.

 7   Q.      2013?

 8   A.      Not so much.

 9   Q.      How about 2012?

10   A.      Not so much.

11   Q.      Between 2011 and 2014, did you understand you

12   weren't being paid by the hour?

13   A.      I understand I wasn't being paid properly.

14   Q.      At the time?

15   A.      I mean I guess that's a -- I guess that's a no.

16   Q.      So no, you didn't know that you weren't being

17   paid properly?

18   A.      No, I didn't.

19   Q.      Did you know you weren't being paid by the hour

20   from 2011 to 2014?

21   A.      Yes, I did.

22   Q.      Did you know that you were being paid a

23   percentage of the jobs that you worked?

24   A.      Yes.

25   Q.      Did you ever calculate what your percentage was?
```

```
 1   A.      No, I didn't.

 2   Q.      Did you keep track of your hours?

 3   A.      Yes, I did.

 4   Q.      How?

 5   A.      From seven to seven, it's 12 hours, six days a

 6   week.

 7   Q.      How did you keep track of it?

 8   A.      By working.

 9   Q.      Did you write it down anywhere?

10   A.      No, I didn't.

11   Q.      At DJV you didn't do any time sheets?

12   A.      No, sir.

13   Q.      D&S?

14   A.      No.

15   Q.      At KAM?

16   A.      No.

17   Q.      Ideal?

18   A.      No.

19   Q.      Was it a policy at Ideal Towing that you were

20   supposed to do time sheets?

21   A.      No.

22   Q.      Did you clock in at Ideal Towing?

23   A.      No.

24   Q.      Did you log in any device that would keep track

25   of your hours?
```

1    A.      Yes.

2    Q.      How do you know it was keeping track of your

3    hours?

4    A.      Because it kept track of every call I did.

5    Q.      But did it keep track of the hours that you were

6    there?

7    A.      Yes, because we logged on when we start and we

8    logged off when we were done.

9    Q.      How do you know it recorded that?

10   A.      When you can log on to a tablet and you'll see

11   the messages from the day before, I just think you can

12   see the calls too.

13   Q.      So you could see the time when a call came in?

14   A.      Yes.

15   Q.      Could they see the entire duration that you were

16   logged in?

17   A.      Yes.

18   Q.      And you saw that before?

19   A.      I mean, we go en route, on location, and in tow.

20   Each time it breaks down by a time.

21   Q.      How long does the device save that information?

22   A.      I'm not sure.  I don't know.

23   Q.      Does it send that information anywhere else?

24   A.      I suppose to Triple A.

25   Q.      Now I want to be clear.  We don't want you to

```
1    guess or --
2              MR. CALDWELL:  I was just going to say that.
3    A.      I don't know.
4              MR. CALDWELL:  Don't guess or assume.
5    A.      I understand.
6    Q.      (By Mr. Mahoney)  Right.  So do you know if that
7    information goes to Triple A?
8    A.      No.
9    Q.      At the time you started working for Ideal
10   Towing, were you an experienced tow truck driver?
11   A.      Yes.
12   Q.      You know how to operate a tow truck?
13   A.      Yes.
14   Q.      Did you have any family or friends that were
15   aware you were a tow truck driver?
16   A.      Yes.
17   Q.      Did they ever call you and ask you for help when
18   they needed a tow job?
19   A.      No.
20   Q.      In total, how many years would you say you've
21   been a tow truck driver?
22   A.      Ten.
23   Q.      Have you ever advertised yourself as a tow truck
24   driver?
25   A.      Yes.
```

```
 1   Q.      To whom?

 2   A.      Every member that I pulled up on during a Triple

 3   A call.

 4   Q.      Anyone else?

 5   A.      No.

 6   Q.      What did you use to advertise?

 7   A.      The truck itself, the name of the towing

 8   company, the Triple A signs on the truck, the uniform

 9   that I had on, the gloves that I put on, and the fact

10   that I, you know -- I mean that's.

11   Q.      Did you pay for your uniform?

12   A.      Yes.

13   Q.      Did you pay for your gloves?

14   A.      Yes.

15   Q.      Did you pay for the truck?

16   A.      No.

17   Q.      What year do you claim you learned that you

18   weren't getting paid properly?

19   A.      2014.

20   Q.      How did you learn?

21   A.      Word of mouth.

22   Q.      Who told you?

23   A.      I don't remember.

24   Q.      Was it someone in the towing industry?

25   A.      I don't remember.
```

```
1    Q.       In 2014, from you're knowledge, was the common
2    practice to pay based on jobs performed?
3    A.       I don't remember.
4    Q.       Based on your own personal knowledge, based on
5    the tow truck companies you worked with?
6    A.       It was commission.
7    Q.       Were there any tools that you used when you
8    performed your tow services at Ideal Towing?
9    A.       Tow truck.
10   Q.       Did you have a lockout kit?
11   A.       No.
12   Q.       How about a jack?
13   A.       No.
14   Q.       How about a jump box?
15   A.       No.
16   Q.       Did the company require you to have these
17   things?
18   A.       No.
19   Q.       Do you own any of these things personally?
20   A.       Yes.
21   Q.       What do you own?
22   A.       A jump box.
23   Q.       Do you own a lockout kit?
24   A.       No.
25   Q.       How about a jack?
```

```
1    A.      No.

2    Q.      Wrench?

3    A.      No.

4    Q.      You don't own any wrenches?

5    A.      No.

6    Q.      What kind of residents do you currently live in?

7    A.      I'm a homeowner.

8    Q.      Who lives with you?

9    A.      My family.

10   Q.      Can you please state every one that lives in the

11   home?

12   A.      Julia Hill, Jacara Reed, and Jayda Reed.

13   Q.      Do you own a screw driver?

14   A.      No.

15   Q.      How many rooms are at the house?

16   A.      Four.

17   Q.      What was your commission at Ideal Towing?

18   A.      Thirty percent.

19   Q.      Did you ever receive a $400 stipend?

20   A.      Yes.

21   Q.      Could you earn more than the $400 during that

22   time period?

23   A.      No.

24   Q.      Why couldn't you earn more?

25   A.      Because that's what we was told.  We were
```

```
 1   getting paid to run nights.  While the owner sleep
 2   comfortable, he wanted to make sure he slept
 3   comfortable.
 4   Q.      Someone told you he wanted you to make sure he
 5   sleep comfortable?
 6   A.      I didn't say no one told me nothing.
 7   Q.      So the owner told you he wanted to sleep
 8   comfortable?
 9   A.      He offered us $400 to run nights and we took it.
10   Q.      What time period did you run nights?
11   A.      Seven to seven.
12   Q.      What time period?  What year did you run nights?
13   A.      I'm not sure.
14   Q.      It's your testimony that during that time period
15   you never earned more than $400 in a week?
16           MR. CALDWELL:  Would you ask that question
17   again?
18   Q.      (By Mr. Mahoney)  Is it your testimony that
19   during that time period, you never earned more than $400
20   in a week?
21   A.      No.  Just $400.
22   Q.      Did Ideal Towing ever provide business cards to
23   the employees?
24   A.      Yes.
25   Q.      Did they offer business cards to the
```

1  contractors?

2  A.     Yes.

3  Q.     Did those business cards have a blank space

4  where you could put your name?

5  A.     Yes.

6  Q.     What else was on that business card?

7  A.     Ideal Towing, the company's address, the Triple

8  A logo, the name of the owner.

9  Q.     Any telephone numbers?

10 A.     Not that I recall.  I'm not sure.

11 Q.     Did you ever receive any of those?

12 A.     Yes.

13 Q.     Did you ever use them?

14 A.     No.

15 Q.     Did you have a lunch hour at Ideal Towing?

16 A.     No.

17 Q.     When did you eat?

18 A.     Whenever I could.

19 Q.     Same for dinner?

20 A.     Whenever I could.

21 Q.     And did what shift you were working matter?

22 A.     Excuse me?

23 Q.     Does what shift you're working matter?

24 A.     No, it doesn't.

25 Q.     Was there any rule against eating when you're on

```
 1   call?

 2   A.      No.

 3   Q.      Between calls, sorry?

 4   A.      No.

 5   Q.      Was there a rule against leaving the designated

 6   area?

 7   A.      Yes.

 8   Q.      What other rules were there that restricted you

 9   while you were on call?

10   A.      I don't remember.

11   Q.      Can you think of any?

12   A.      I don't remember.

13   Q.      So no, you can't think of any as you sit here

14   today?

15   A.      I don't remember.

16   Q.      Was there a rule against using your cell phone

17   while you were on call?

18   A.      No.

19   Q.      You couldn't drink when you were on call, could

20   you?

21   A.      Meaning?

22   Q.      Drink alcohol?

23   A.      No.

24   Q.      Is there a rule against sleeping while you're on

25   call?
```

```
 1    A.      No.
 2    Q.      As long as you could respond to a call, you
 3    could do whatever you wanted?
 4    A.      No, I didn't -- no.
 5    Q.      So what were the restrictions?
 6    A.      If you're not on a call, you're in the coverage
 7    area waiting on a call to cover.
 8    Q.      And were there any restrictions on what you
 9    could do while you were waiting?
10    A.      I don't recall.
11    Q.      Can you give me one example?
12    A.      I don't recall.
13    Q.      Do you have an example or not?
14    A.      No, I don't.
15    Q.      Do you have any restrictions or not?
16            MR. CALDWELL:  Which restrictions, on what?
17            MR. MAHONEY:  Actions that can be taken.
18    Q.      (By Mr. Mahoney)  Of actions that can be taken
19    while waiting?
20            MR. CALDWELL:  Meaning actions that he can?
21            MR. MAHONEY:  That he can do?
22            MR. CALDWELL:  Meaning restrictions of what he
23    can do while waiting for a call?
24            MR. MAHONEY:  Right.
25            MR. CALDWELL:  Okay.
```

```
1    A.      Sitting in the truck and waiting for your next
2    call?
3    Q.      My question is, do you know of any restrictions
4    or not?
5    A.      No, I don't.
6    Q.      Based on your understanding, if you went and
7    visited a friend while you're on call, but waiting for a
8    call, would you be disciplined?
9           MR. CALDWELL:  Okay.  Wait a minute.  That was
10   -- I actually did listen to that and I did not --
11          MR. MAHONEY:  Still couldn't get it?
12          MR. CALDWELL:  Right.  Yes.  Do it again.  Do
13   you mind rephrasing that?
14          MR. MAHONEY:  Can you repeat the question,
15   first, please?
16          COURT REPORTER:  Yes.
17          (Whereupon the court reporter reads back the
18   last question.)
19          MR. CALDWELL:  If you know?
20          MR. MAHONEY:  I'll rephrase it based on that.
21   Q.      (By Mr. Mahoney)  If you went and visited a
22   friend, while you were waiting for a call, would you be
23   subject to discipline?
24   A.      Do you mean inside or outside of the territory?
25   Q.      Inside the territory?
```

```
1    A.      No.

2    Q.      No.  If you run an errand while you were inside

3    the designated area, on call, but waiting for a call,

4    would you be disciplined?

5    A.      On call but waiting for a call?

6    Q.      Right.  While waiting for a call?

7    A.      No.

8    Q.      If you were waiting for a call and you fell

9    asleep and no one called, would you be disciplined?

10   A.      That never happened to me.  I wouldn't know.

11   Q.      Would you expect to be disciplined?

12   A.      It never happened to me.  I wouldn't know.

13   Q.      Did anyone ever tell you you'd be disciplined

14   for sleeping while waiting for a call?

15   A.      No.

16   Q.      What's the least amount of tow jobs you've done

17   in a day while you were --

18   A.      Two.

19   Q.      Sorry -- while you were clocked in?

20   A.      I never was clocked in, but two.

21   Q.      Okay.  Did you have any quota or was there any

22   disciplined that you could have for doing too few jobs?

23   A.      Yes.  You can lose your job.

24   Q.      Who told you that?

25   A.      The owner.
```

```
 1   Q.      And what was the quota?  What was the number

 2   that would cause you to lose your job?

 3   A.      I mean, I wouldn't know the exact quota.  I

 4   don't know the exact quota.

 5   Q.      Did you get disciplined for doing two jobs in a

 6   day?

 7   A.      No, I didn't.

 8   Q.      Did you get disciplined for doing three jobs in

 9   a day?

10   A.      No, I didn't.

11   Q.      Was there any maximum amount of downtime you

12   could have between jobs?

13   A.      Maximum amount of downtime?

14   Q.      Yes.

15   A.      It varied.

16   Q.      Could you be disciplined for having too much

17   downtime in between jobs?

18   A.      You're not in control of your downtime, no.

19   Q.      So the question was, would you be disciplined,

20   and your answer was?

21   A.      No.

22   Q.      Was there any restrictions on where you could

23   drive the truck as long as it was in the area?

24   A.      No.

25   Q.      Did you use a DDS?
```

```
1    A.      Yes.

2    Q.      What does a DDS do?

3    A.      It's a portable dispatch station that Triple A

4    sends the calls to the towing company.

5    Q.      Did you receive the tow jobs on the DDS?

6    A.      Yes.

7    Q.      Do you know from who?

8    A.      From Triple A.

9    Q.      How does the DDS determine which driver gets a

10   specific call?

11   A.      They go by who is the closest driver to the

12   call.

13   Q.      Did you ever use a tablet rather than a DDS?

14   A.      Yes.

15   Q.      Was it the same system?

16   A.      The same, exact same.  It was the same.

17   Q.      What does DDS stand for?

18   A.      I'm not sure.

19           MR. CALDWELL:  Bathroom break?

20           MR. MAHONEY:  That's fine.

21                   (Off the record.)

22           MR. MAHONEY:  Would you read back the last

23   question?

24           (Whereupon the court reporter reads back the

25   last question.)
```

```
1    Q.      (By Mr. Mahoney)  Was the DDS equipped with a
2    GPS?
3    A.      Yes.
4    Q.      A tablet?
5    A.      Yes.
6            MR. CALDWELL:  Today is Wednesday, right?
7            MR. MAHONEY:  Yes.
8            MR. CALDWELL:  Okay.
9    Q.      (By Mr. Mahoney)  What's the process of loading
10   a car onto the truck to be towed?
11   A.      You turn on your PTO to your tow truck, then you
12   move your bed out and you extend your winch to the hook
13   points on the car.  If that car is an automatic, you
14   don't have to use your park brake.  If it's a manual,
15   you do use your park brakes to keep it from rolling.
16   You engage your winch and you pull the car up on the
17   bed, set the bed back up and you strap the tires.  You
18   put yourself in tow and you pull out.
19   Q.      Are there situations where maybe a damaged tire
20   can change that process?
21   A.      Yes.
22   Q.      Tell me about that.
23   A.      For example, if your tire rod broke, meaning
24   your tire disconnected from the axle.  If I don't have a
25   floor jack, I can't pull that car because Triple A don't
```

1    allow us to drag the car onto the bed.

2    Q.       Did you have that tool?

3    A.       No.

4    Q.       So what would you do in that situation?

5    A.       A different truck would come with a different

6    driver that either has a jack or a different kind of

7    truck.

8    Q.       Would they be employed by Ideal Towing?

9    A.       Yes.

10   Q.       So there was another driver employed by Ideal

11   Towing that would come in your stead to move that?

12   A.       Yes.

13   Q.       About how long did it take to load the car onto

14   the truck?

15   A.       Depending on the car.

16   Q.       Can you give me a time window frame?

17   A.       Ten minutes.

18   Q.       Could it ever take longer than ten minutes?

19   A.       Yes, depending on what kind of car.

20   Q.       What kind of car would take longer than ten

21   minutes?

22   A.       A Maserati or a Lamborghini or an Aston Martin

23   or anything that's not clear on the ground but a couple

24   of inches.

25   Q.       How long would those take?

A.      It had took me as long as 45 minutes.

Q.      Was there a function on the truck that forced
you to accept a call coming in?

        MR. CALDWELL:  Wait a minute.  Did -- a
function on the truck?

A.      I don't understand that question.

Q.      (By Mr. Mahoney)  Was there -- okay.  I'll
rephrase it.

        Was there a function on the DDS where you
could accept the call?

A.      Yes.

Q.      Was there a function on the DDS where you could
decline the call?

A.      Yes.

Q.      Was there a function on the tablet where you
could accept the call?

A.      Yes.

Q.      Was there a function on the tablet where you
could decline the call?

A.      Yes.

Q.      Tell me a scenario when you would have to
decline a call.

A.      I never declined a call.

Q.      Tell me a situation where you would accept a
call but then you couldn't tow it?

```
1    A.       For example, if your tire is off of your car and
2    you only have three wheels and your axle is on the
3    ground, I can't drag your car onto my bed.  Therefore, I
4    would have to get a different kind of truck or a
5    different driver that's equipped better to move it.
6    Q.       Did you ever receive calls from a Triple A
7    representative asking you if you could do a job?
8    A.       A few times.
9    Q.       And did you accept all of those?
10   A.       If I could do it.
11   Q.       Did you decline any of those?
12   A.       No, I never declined them.
13   Q.       So you accepted all of them?
14   A.       Yes.
15   Q.       And did you ever receive calls from individuals?
16   A.       Meaning outside of Triple A?
17   Q.       Yes.
18   A.       Sometimes.
19   Q.       Did you accept all of those calls?
20   A.       No, I didn't.
21   Q.       Did you ever take cash from individuals?
22   A.       Yes, I did.
23   Q.       Have you ever used a lockout kit before?
24   A.       Yes, I have.
25   Q.       When?
```

```
1    A.      At DJV.

2    Q.      Any other times?

3    A.      No.

4    Q.      Have you ever been able to assist a customer

5    while working at Ideal Towing without towing their car?

6    A.      Yes.

7    Q.      Give me an example.

8    A.      I pull up on a Triple A member and her car is

9    not in park and she can't understand why it won't crank.

10   Q.      And?

11   A.      I put the car in park and she go about her way.

12   Q.      My question is did that actually happen or --

13   A.      Yes.

14   Q.      Do you have any other examples?

15   A.      They can't release their emergency brakes.

16   Q.      How about if they had a lose capable on their

17   battery?

18   A.      No, we don't go up under the hoods of the cars.

19   Q.      Who is we?

20   A.      When I say "we," the tow truck drivers, the

21   service techs.  We're not mechanics.

22   Q.      And who told you that?

23   A.      The owner of the company.

24   Q.      There is a rule preventing you from going up

25   under the hood of a car?
```

```
1   A.      Yes.

2   Q.      Is it written down?

3   A.      Yes.

4   Q.      Where?

5   A.      I guess that comes from Triple A.

6   Q.      When you say "company," for clarification, are

7   you referring to Triple A or are you referring to Ideal

8   Towing?

9   A.      I'm referring to Ideal Towing.

10  Q.      Okay.  So is this a rule from Triple A or from

11  Ideal Towing?

12  A.      I was just told we don't go up under the hood of

13  cars.  We're service techs.  We're not mechanics.

14  Q.      And the only place that's written is by Triple

15  A?

16  A.      I don't know.

17  Q.      Well do you know if it's written anywhere?

18  A.      I mean, no, I don't.

19  Q.      When were you told that?

20  A.      I don't recall the day.

21  Q.      Who else was present when you were told that?

22  A.      Every other contractor and employee that was

23  there in the meeting.

24  Q.      What was the discipline for going under the hood

25  of a car?
```

```
1    A.       The discipline for going under the hood of a car
2    was, if you caused further damage by going up under the
3    hood of that car, you were made to pay for it.
4    Q.       You didn't have to pay for damage done to a car
5    while you were loading it up on the tow truck?
6    A.       Yes.
7    Q.       So there was no discipline for going under the
8    hood of a car, if no damage was caused?
9    A.       No.
10   Q.       Did you ever change a tire while you were
11   working for Ideal Towing?
12   A.       No, I didn't.
13   Q.       Did you ever have to?
14   A.       Yes, I do.
15   Q.       What would you do if a customer needed a tire
16   change?
17   A.       I'm not equipped to change tires.
18   Q.       So what would you do?
19   A.       They would have Triple A units that will change
20   tires.
21   Q.       Are they separate departments?
22   A.       Yes.
23   Q.       And what other department?
24   A.       Light service.
25   Q.       And what department are you in?
```

```
1    A.      Towing.

2    Q.      Did Ideal Towing do any light service?

3    A.      Yes.

4    Q.      Just not you?

5    A.      Not me.

6    Q.      Did you know any Ideal Towing contractors that

7    did light service?

8    A.      Yes.

9    Q.      And did you know that there was a light service

10   department in Triple A?

11   A.      Excuse me?

12   Q.      Do you know if there was a light service

13   department of Triple A?

14           MR. CALDWELL:  Light service department of

15   Triple A?

16           MR. MAHONEY:  Yes.  The testimony so far is

17   that Triple A has light service and towing.

18           MR. CALDWELL:  I thought it was the company

19   did.  I don't know.

20   Q.      (By Mr. Mahoney)  Explain.

21   A.      I mean, you just asked me did Ideal Towing have

22   light service and I said, yes.

23   Q.      Correct.

24   A.      And then you asked me do I know anyone that did

25   light service at Ideal Towing.
```

```
 1    Q.      And you said yes?

 2    A.      Yes.

 3    Q.      Prior to this, I asked you did Triple A have

 4    different departments for light service and towing?

 5    A.      Yes.

 6    Q.      I want to know do the Ideal Towing contract that

 7    perform light service, are they in the Triple A light

 8    department?

 9    A.      Yes.

10    Q.      How do you know?

11    A.      We work off the same call regiment.

12    Q.      Can you explain that?

13    A.      On a dispatch tablet, when a call comes across,

14    that call would say light service, re-dispatch towing.

15    Q.      What does light service re-dispatch towing?

16    A.      Meaning a light service unit was on location and

17    couldn't get the car started or couldn't change the tire

18    or whatever service they couldn't provide.  It wasn't

19    good enough that they would need to be towed.

20    Q.      And how did you know that Ideal Towing

21    contractors were performing the light service duty?

22    A.      Sometimes a light service truck will still be on

23    location when the tow truck get there, and we work out

24    of the same business location.  So you see the light

25    service truck every day when you come to work.
```

```
1    Q.      Did you generally use the same truck?

2    A.      Yes.

3    Q.      Every day?

4    A.      Yes.

5    Q.      How about Jawanza Smith?

6    A.      I can't speak for Jawanza Smith.

7    Q.      How about Carlon Burney?

8    A.      I can't speak for Carlon Burney either.

9    Q.      You can't speak for anyone except yourself?

10   A.      Pretty much.

11   Q.      Who can -- as you sit here today, who have you

12   seen driving a light service truck as a plaintiff in

13   this matter?

14   A.      Carlon Burney.

15   Q.      Is he the only one?

16   A.      Yes.

17   Q.      Did he ever drive a tow truck as opposed to a

18   light service truck?

19   A.      Yes.

20   Q.      So he drove both trucks?

21   A.      Yes.

22   Q.      Did Carlon Burney take either of those trucks

23   home?

24   A.      I wouldn't know.

25   Q.      Do the light service trucks say Ideal Towing on
```

1   them?

2   A.      No.  It says All American Roadside Assistance.

3   Q.      And you believe Ideal Towing provide light

4   service because the same driver that works for Ideal

5   Towing was driving that truck?  Where as -- are there

6   other reasons why you think there was an Ideal Towing

7   truck?

8   A.      Every day that when come to work, there is seven

9   or eight light service units parked on the same lot with

10  the tow trucks.  The seven or eight service techs that

11  get in those light service trucks every day, and they

12  service calls before the tow truck service calls.  If

13  they can't fix what's going on, the tow truck shows up

14  after the fact.

15  Q.      Do you have any knowledge of whether or not

16  those truck are owned by Ideal Towing?

17  A.      They're in the same business location, same

18  person in charge.

19  Q.      As you sit here today, do you know whether or

20  not those tow trucks are owned by Ideal Towing?

21  A.      Yes, I do.

22  Q.      Based on what you just said?

23  A.      Yes.

24  Q.      Do you drive your personal vehicle to Ideal

25  Towing's location?

```
 1    A.      Yes, I do.

 2    Q.      And do you leave it there when you pick up the

 3    truck?

 4    A.      Yes, I do.

 5    Q.      Does Ideal Towing own your personal vehicle?

 6    A.      No, they don't.

 7    Q.      Is it possible that another company parks their

 8    trucks at Ideal truck location?

 9    A.      No, it isn't.

10    Q.      Why not?

11    A.      Same person is in charge.

12    Q.      In charge of what?

13    A.      Light service.

14    Q.      Is that person Ideal Towing, LLC?

15    A.      Michael James.

16    Q.      Do you know how to -- scratch that.

17            Who taught you the skills that you use to tow

18    trucks?

19    A.      Jawanza Smith.

20    Q.      When?

21    A.      2006.

22    Q.      Who were you working for at the time?

23    A.      DJV.

24    Q.      Who was Jawanza Smith working for at the time?

25    A.      DJV.
```

| | |
|---|---|
| 1 | Q.      If an individual gives you money, how would the |
| 2 | company know that? |
| 3 | A.      Let me make sure I'm understanding you.  If an |
| 4 | individual customer gives me money, how would the |
| 5 | company know about it? |
| 6 | Q.      Yes. |
| 7 | A.      The company set the price. |
| 8 | Q.      They give you cash, how would they know? |
| 9 | A.      The company set the price. |
| 10 | Q.      Do you have to report it to them? |
| 11 | A.      Yes. |
| 12 | Q.      Do you have to get a receipt? |
| 13 | A.      Yes. |
| 14 | Q.      If you didn't report it or give them a receipt, |
| 15 | how would they know? |
| 16 | A.      Again, the company sets the price. |
| 17 | Q.      If you were to charge the individual customer |
| 18 | less than the price, how would the company know? |
| 19 | A.      I never charged an individual less than the |
| 20 | price that the company set, so I wouldn't know about |
| 21 | that. |
| 22 | Q.      If you charged them more than the price, how |
| 23 | would they know? |
| 24 | A.      I mean, due to a receipt. |
| 25 | Q.      And if you didn't give them a receipt? |

A.    A phone call.

Q.    You would have to tell them yourself?

A.    Yes, I would.

Q.    Other than Triple A members and private
individuals, did you serve anyone else while you worked
at Ideal Towing?

A.    No.

Q.    Have you ever provided tow truck services for a
police department?

A.    No.

Q.    What's your understanding of what happens when a
customer's car is out of commission, who would they call
first?

A.    Triple A.

Q.    And then what happens?

A.    Triple A finds a service provider according to
what their member needs.

Q.    When you say "service provider," do you mean a
service tech?

A.    A service provider means a tow company.

Q.    A tow company?

A.    Yes.

Q.    And then what happens?

A.    In turn the tow company will find the closet
driver to that location.

```
 1   Q.      Does Triple A notify them through the DDS or how
 2   to they do it?
 3   A.      The tablet does it on its on.
 4   Q.      What about for an individual that's not a Triple
 5   A customer, what's the process?
 6   A.      I call it into the office and let them know that
 7   you have a private tow.
 8   Q.      So the individual calls you first?
 9   A.      No, they don't call the driver.  If you see
10   someone or someone flags you down or you're not on a
11   Triple A call or they see the truck.
12   Q.      And then what do you do?
13   A.      You call the office and you let them know and
14   get a price.
15   Q.      And then what do you do?
16   A.      If the private customer agree to the price of
17   the tow, we load the car and you take it where it needs
18   to go.
19   Q.      And then what?
20   A.      Come back to your service area and wait for the
21   next call.
22   Q.      And how do they pay for that service?
23   A.      A lot of times they pay over the phone with a
24   credit card.  A lot of times they pay the service tech.
25   Q.      And then what do you do?
```

A.      If they pay the service tech, you turn the money
in with your paperwork.  If they pay the office, you
turn your receipt in with the paperwork.

Q.      Has your driver's license ever been suspended?

A.      Yes.

Q.      When?

A.      Last year.

Q.      2016?

A.      Yes.

Q.      For what?

A.      Child support.

Q.      Any other time?

A.      No.

Q.      What licenses do you have?

A.      C.

Q.      Any others?

A.      No.

Q.      How did you find out your license were
suspended?

A.      Mail.

Q.      Did Tishja James handle all of the clerical
matters in the office?

A.      When you say "clerical," what do you mean by
clerical?

Q.      Would she record information?

```
1   A.       I don't know.

2   Q.       How did you keep track of the tows you

3   performed?

4   A.       I wrote them down.

5   Q.       On?

6   A.       A call sheet.

7   Q.       If you didn't get any calls for two hours, what

8   would stop you from taking a nap?

9   A.       The fact that you're at work.

10  Q.       If you didn't get any calls for two hours, what

11  would have stopped you from visiting a friend?

12  A.       The fact that you was at work.

13  Q.       Would you be disciplined?

14  A.       That has never happened to me.  I wouldn't know.

15  Q.       Is that your personal professionalism that you

16  wouldn't sleep on the job?

17  A.       I mean, you can't run calls if you're sleep.  If

18  you don't run calls, you don't get paid.

19  Q.       If you didn't get any calls for two hours, could

20  you pick up your laundry from the dry cleaners?

21  A.       I've never done that.  I couldn't -- I don't

22  know.

23  Q.       Could you?

24  A.       I don't know.

25  Q.       If you were ready to answer the call at any
```

1    time?

2    A.      No.

3    Q.      Why not?

4    A.      I mean me, personally, I wouldn't ride around

5    with my laundry in a tow truck.

6    Q.      So that's why?

7            MR. CALDWELL:  Laundry is not that heavy.

8    A.      Yes.  But if you only have so much room in a tow

9    truck, and when you're running Triple A, you might have

10   three people running calls with you.

11   Q.      (By Mr. Mahoney)  And just a because you

12   wouldn't want to put your laundry in a tow truck?

13   A.      I --

14   Q.      Would you be disciplined for doing that?

15   A.      I never had to do it, so I wouldn't know if you

16   got disciplined for that or not.

17   Q.      Did anyone ever tell you that you would be

18   disciplined for doing it?

19   A.      I don't recall.

20   Q.      If you did that, what kind of discipline would

21   you expect?

22   A.      I don't recall.  I don't know.  I never done it.

23   Q.      Did you pay for the business cards that were

24   given to you?

25   A.      No, I didn't.

1    Q.      Did you ever keep the truck after you clocked

2    out?

3    A.      I never used the time clock.

4    Q.      Okay.  Did you ever keep the truck over 7:00

5    p.m.?

6    A.      If I had a run that was going to South Carolina

7    or Alabama or Chattanooga or something like that,

8    sometimes we was allowed to take the truck home to keep

9    from commuting, depending upon where you lived, to keep

10   from commuting back to Lithonia, to our shop.  So I

11   guess that would be yes.

12   Q.      How many times did that happen?

13   A.      I don't recall.

14   Q.      How many times did you have a long run?

15   A.      Quite a few.

16   Q.      To Chattanooga?

17   A.      All over.

18   Q.      But Chattanooga specifically?

19   A.      Alabama, Tennessee, South Carolina, North

20   Carolina.

21   Q.      Did you ever request time off other than the --

22   did you ever request time off?

23   A.      When my father was killed.

24   Q.      Any other time?

25   A.      No.

```
 1    Q.      Did you ever take any holidays?

 2    A.      No.  Unless they was worked into my schedule

 3    already, no.

 4    Q.      When you say "worked into your schedule" --

 5    A.      Meaning if I'm set to be off Sunday and

 6    Christmas is that Sunday, I'm lucky.

 7    Q.      And did you have an opportunity to set your

 8    schedule?

 9    A.      No.  My schedule was given to me.

10    Q.      Did you have an opportunity to change your

11    schedule?

12    A.      No.

13    Q.      Did you get a call from outside of your

14    designated area?

15    A.      Only if the shop approved it.

16    Q.      Did that ever happen?

17    A.      Yes.

18    Q.      Did your designated area ever change while you

19    were employed at Ideal Towing?

20    A.      No.

21    Q.      You never lost any coverage while you were

22    there?

23    A.      Not that I know of.

24    Q.      Did you ever receive tips?

25    A.      Yes.
```

```
1    Q.      How many?

2    A.      I don't remember.

3    Q.      Did you record them?

4    A.      Did I report them?

5    Q.      Record them?

6    A.      No, I didn't.

7    Q.      Did you report them?

8    A.      No, I didn't.

9    Q.      How were you paid, with cash, check?

10   A.      A check.

11   Q.      Were you ever paid cash?

12   A.      No.

13   Q.      Did customers ever travel with you on the tow

14   truck?

15   A.      Yes.

16   Q.      Out of state?

17   A.      Yes.

18   Q.      What percentage -- what percentage of your trips

19   took you out of state?

20   A.      I wouldn't recall.

21   Q.      What's your best estimate?

22   A.      I don't recall.

23   Q.      Were you restricted from working other jobs

24   while you were at Ideal Towing, personal to any rule or

25   policy or regulation?
```

```
 1    A.       No.

 2    Q.       Did you sign an employment contract?

 3    A.       No.

 4    Q.       I have here what's marked as Defendant's Exhibit

 5    Number 1.

 6             (Defendant's Exhibit Number 1 marked for

 7    identification.)

 8    Q.       (By Mr. Mahoney)  Take a moment to look at that.

 9    A.       (Witness complying.)  This is the application.

10             MR. CALDWELL:  That's what it looks like to

11    me.  If you recognize it?

12    Q.       (By Mr. Mahoney)  What's that document?

13    A.       An application.

14    Q.       Do you recognize it?

15    A.       Yes, I recognize it.

16    Q.       Is that your handwriting?

17    A.       Yes, it is.

18    Q.       What's the date on that document?

19    A.       6/30/12.

20    Q.       Did you apply for employment with Ideal Towing,

21    LLC on that date?

22    A.       Yes, I did.

23             MR. CALDWELL:  Do you remember?

24    A.       No, I don't know the exact date, but I did fill

25    out one.
```

```
 1   Q.      (By Mr. Mahoney)  And that is your handwriting,
 2   correct?
 3   A.      Yes.
 4           MR. MAHONEY:  Can we go off the record for a
 5   moment?
 6                    (Off the record.)
 7   Q.      (By Mr. Mahoney)  Was that your address on that
 8   date?
 9   A.      Yes.
10   Q.      Was that your phone number?
11   A.      Yes.  That's an old phone number.  Yes.
12   Q.      Did you circle no when asked have you ever
13   worked for this company?
14   A.      Yes, I did.
15   Q.      Would you -- your desired salary, what is that?
16   A.      Percentage.
17   Q.      And what does that mean?
18           MR. CALDWELL:  Can I take a break for a
19   second -- no, never mind.  I lost it.
20           MR. MAHONEY:  My apologies.
21           MR. CALDWELL:  That's okay.
22   Q.      (By Mr. Mahoney)  What does that mean, that
23   percentage sign?
24           MR. CALDWELL:  What are we talking about?
25   A.      This right here.  That means a percentage.
```

```
 1    Q.      Under education --

 2            MR. CALDWELL:  Off the record.

 3                      (Off the record.)

 4    Q.      (By Mr. Mahoney)  Okay.  Under education, did

 5    you circle that you graduated?

 6    A.      Yes.

 7    Q.      Was that true?

 8    A.      I mean, I had a GED.

 9    Q.      But did you graduate?

10    A.      No, I didn't graduate.

11    Q.      So that was a lie?

12    A.      No.

13    Q.      How come you didn't circle the degree option?

14            MR. CALDWELL:  Actually, it is not a degree.

15    A.      I didn't feel like it was relevant.

16    Q.      (By Mr. Mahoney)  Have you ever worked at J&J

17    Accounting?

18    A.      No.

19    Q.      Have you ever worked for Julia Thompson?

20    A.      That's my wife.

21    Q.      Have you ever worked for her business?

22    A.      I guess you can sort of say yes.

23    Q.      When?

24    A.      I do it all the time now.

25    Q.      When did you start?
```

A.      When I met her.

Q.      Do you know what year that was?

A.      2006.

Q.      Were you paid?

A.      Yes.

Q.      How?

A.      Thank you.

        MR. CALDWELL:  Don't go there.

Q.      (By Mr. Mahoney)  Were you paid monetarily?

A.      No.

        MR. MAHONEY:  Can we go off the record for a moment?

                        (Off the record.)

Q.      (By Mr. Mahoney)  On the next page, you left DJV, you say because of a lost of contracts?

A.      Yes.  They did lose they contracts back in the day.

Q.      Who was their contract with?

A.      Triple A.

Q.      What happened to the business?

A.      I see something I'd like to correct, too.

        MR. CALDWELL:  Let me consult with him a minute.

                        (Off the record.)

Q.      (By Mr. Mahoney)  All right.  So one of the

```
1    things I was going to ask, and I also asked you is, do
2    you have any reason to correct your testimony?  And I'll
3    give you an opportunity to do that.
4    A.      Okay.
5    Q.      So if you want to correct something that you
6    previously testified about?
7    A.      Yes.  I missed called a name of a towing
8    company.  Instead of D&S, I believe it's LPD.
9    Q.      Is there anything about that company that you
10   need to correct?
11   A.      No.
12   Q.      All right.
13   A.      Not that I know of.
14   Q.      So what happened to DJV when they lost the
15   Triple A contract?
16   A.      I'm not sure.
17   Q.      So how did that cause you to leave?
18   A.      If you don't have a contract, you don't have a
19   car regiment.  And if you don't have a car regiment,
20   then your driver can't make no money.
21   Q.      Did DJV force you to leave or did you leave on
22   your own?
23   A.      I left on my own.
24   Q.      Is that your signature at the bottom?
25   A.      Yes.
```

```
 1   Q.      And is that the date that you wrote right there?

 2   A.      I'm not sure about the date.

 3   Q.      Did you write it?

 4   A.      I'm not sure.  It looks like it.

 5   Q.      Is that your name?

 6   A.      That's my name right there.

 7   Q.      Where it says date, is that your handwriting?

 8   A.      I'm not sure.

 9           MR. CALDWELL:  He's got the best handwriting

10   I've ever seen.

11           MR. MAHONEY:  You said what now?

12           MR. CALDWELL:  He's got the best handwriting

13   I've ever seen.

14           MR. MAHONEY:  That's good penmanship.

15           MR. CALDWELL:  That's applauding.

16           MR. MAHONEY:  Good penmanship.

17           MR. CALDWELL:  That's amazing.

18           MR. MAHONEY:  Better than mine.

19           MR. CALDWELL:  We are lawyers.  We have secret

20   handwriting.

21   Q.      (By Mr. Mahoney)  I have here what I'd like to

22   mark as Defendant's Exhibit Number 2.

23           (Defendant's Exhibit Number 2 marked for

24   identification.)

25   Q.      (By Mr. Mahoney)  Take a moment to look at that
```

```
 1   document.

 2   A.       (Witness complying.)

 3   Q.       Do you recognize that document?

 4   A.       No, I don't.

 5   Q.       Ever received it before?

 6   A.       I don't remember.

 7   Q.       Did you ever possess a cell phone while on duty

 8   at Ideal Towing?

 9   A.       Yes, my own.

10   Q.       Did you possess a flashlight?

11   A.       No.

12   Q.       A jack?

13   A.       No.

14   Q.       A jump box?

15   A.       No.

16   Q.       Lockout kit?

17   A.       No.

18   Q.       Four-way plug wrench?

19   A.       No.

20   Q.       Safety vest?

21   A.       Yes.

22   Q.       Gloves?

23   A.       Yes.

24   Q.       Safety goggles?

25   A.       No.  I never had one.
```

```
 1   Q.      A safety vest?

 2   A.      No.

 3   Q.      Gloves?

 4   A.      No.

 5   Q.      I have here what I'd like to mark as Defendant's

 6   Exhibit Number 3 -- I'm sorry, I think that's the wrong

 7   one.

 8           MR. CALDWELL:  This is the wrong folder?

 9           MR. MAHONEY:  I'm sorry?

10           MR. CALDWELL:  The wrong folder?

11           MR. MAHONEY:  Yes.

12           MR. CALDWELL:  Do you want yours back?

13           MR. MAHONEY:  Yes.

14           MR. CALDWELL:  I wrote on the top, I'm sorry.

15           MR. MAHONEY:  You wrote some of your notes on

16   it?

17           MR. CALDWELL:  Yes.

18           MR. MAHONEY:  If you want, you can keep it.

19   It's no longer going to be D-3.  I'll give you that

20   much.  You don't have to keep it.  If you want to -- we

21   produced it already.

22           Well, you know what?  I'll leave it as an

23   exhibit, as Exhibit 3.  Does one of them have a sticker

24   on there or not?

25               (Defendant's Exhibit Number 3 marked for
```

```
 1   identification.)

 2   Q.      (By Mr. Mahoney)   Now you've never seen that

 3   before?

 4   A.      What?

 5   Q.      That document?

 6   A.      This?

 7   Q.      Yes.

 8   A.      This is a Triple A call sheet.

 9   Q.      Okay.  So do you recognize it?

10   A.      I recognize the sheet, but I don't recognize the

11   handwriting.

12   Q.      Understood.  All right.  And you said it's a

13   Triple A what sheet?  Repeat that.  What is it?

14   A.      This is what we write our calls on and turn them

15   in to Ideal Towing.

16   Q.      Okay.  And you use one of them for each day?

17   A.      Each day a different sheet.  It's the same

18   sheet, different calls.

19   Q.      Are you identifiable by a service tech number?

20   A.      Yes, we were, but I don't remember my number.

21   Q.      Would you be disciplined for failing to turn in

22   this log sheet?

23   A.      You don't get paid if you don't turn in a log

24   sheet, so I guess that's yes.

25   Q.      All right.  I'm almost done.
```

```
 1              Have you ever filed for bankruptcy before?

 2   A.      No.

 3   Q.      Can you take a look at Defendant's Exhibit

 4   Number 1?

 5   A.      (Witness complying.)

 6   Q.      Look at the second page.  Did you read that

 7   disclaimer?

 8   A.      (Witness complying.)

 9              No, I didn't.

10   Q.      Do you dispute that you signed it?

11   A.      No, I don't.

12   Q.      Is there anything else in your testimony that

13   you want to correct at this time?

14              MR. CALDWELL:  Can you give us a minute or

15   two.

16                   (Off the record.)

17   A.      This is not the original paper.  This is the

18   original, but this is not.

19              MR. MAHONEY:  Well because it was a sticker on

20   this one.  Wait a minute.  That's page -- that's page 2

21   of this?

22              MR. CALDWELL:  Yes.  That's the rates.  That's

23   the prior way to do it.

24   A.      Okay.  I just want to make sure.

25              MR. CALDWELL:  Yes.  That's okay.
```

```
 1              MR. MAHONEY:  You said you want to take a

 2    break?

 3              MR. CALDWELL:  Are you about the close up?

 4              MR. MAHONEY:  We can take that break now, but

 5    I'm not necessarily done with my questions.

 6              MR. CALDWELL:  Okay.  I thought you were done.

 7              MR. MAHONEY:  Okay.  That's fine.

 8    Q.    (By Mr. Mahoney)  Did anyone at Ideal Towing

 9    show you how to tow?

10    A.    No.

11    Q.    Did you file taxes in 2011?

12    A.    I don't remember.

13    Q.    2012?

14    A.    My wife handles all the tax stuff.  I don't

15    remember.

16    Q.    What date were you married?

17    A.    August 22.

18    Q.    What year?

19    A.    2015.

20    Q.    In 2012, did you file taxes?

21    A.    I don't remember.

22    Q.    In 2013, did you file taxes?

23    A.    I don't remember.

24    Q.    In 2014, did you file taxes?

25    A.    I don't remember the specific year.
```

```
 1   Q.      Did you file taxes prior to being married?

 2   A.      Yes, I did.

 3   Q.      But you don't remember the specific year?

 4   A.      No, I don't.  I have 1099s, though.

 5   Q.      Did you produce them?

 6   A.      Yes.

 7           MR. MAHONEY:  Michael, do you mind

 8   double-checking to make sure that the 1099s were

 9   produced?

10           MR. CALDWELL:  Let me check.

11           MR. MAHONEY:  You don't have to do it right

12   this second.

13           MR. CALDWELL:  Yes.

14           MR. MAHONEY:  Go ahead, if you can.

15           MR. CALDWELL:  Okay.  I'll see if I got them.

16                      (Off the record.)

17   Q.      (By Mr. Mahoney)  What 1099s do you claim you

18   received from Ideal Towing, what years?

19   A.      I'm not sure.  I don't want to guess, but I'm

20   sure I have them.

21   Q.      Do you know for sure if you have them for 2015?

22   A.      I'm not sure.

23   Q.      '14?

24   A.      I'm not sure.

25   Q.      '13?
```

```
 1   A.      I'm not sure about the dates on the 1099s.

 2   Q.      Okay.  So you don't know if it's '12, '11 or

 3   '10?

 4   A.      I'm not sure.

 5   Q.      All right.

 6           MR. CALDWELL:  May I ask:  When you say you're

 7   sure you have them, are you sure you still have them?

 8   A.      No, no, no.  I'm sure I gave you guys two of

 9   them, and I couldn't locate the third one.

10           MR. CALDWELL:  Okay.  That's -- I want to make

11   sure.

12   A.      Yes.

13   Q.      (By Mr. Mahoney)  All right.  And you're not

14   looking at it right now, I understand, but with respect

15   to the 1099, do you dispute the amount that was listed

16   on that 1099?

17   A.      I don't remember the amount.

18   Q.      Do you recall having a dispute with the amount

19   at the time you received it?

20   A.      No.

21   Q.      And at the you received each 1099, did you

22   believe that you shouldn't have been receiving them,

23   that form?

24   A.      No.

25   Q.      All right.
```

```
 1            MR. MAHONEY:  No further questions.

 2            MR. CALDWELL:  Okay.  Let me talk to him one

 3   minute and then --

 4                      (Off the record.)

 5                      EXAMINATION

 6   Q.    (By Mr. Caldwell)  When you advertised yourself

 7   as a -- you talked about advertising yourself?

 8   A.    Yes.

 9   Q.    Did you do anything other than wear the

10   company's uniform and drive the company's truck to

11   advertise yourself?

12   A.    No.

13   Q.    Okay.  When you were on duty, but not actually

14   responding to a call --

15   A.    Yes.

16   Q.    -- was there any time that was set aside for you

17   to eat or take care of personal errands or business,

18   where you did not have to respond to a call as soon as

19   you came in?

20   A.    No.

21   Q.    So was there any time during your downtime that

22   you did not have to respond to a call as soon as it came

23   in?

24   A.    No, sir.

25   Q.    Did you have to keep your radio -- did you or
```

1    did you not have to keep your radio nearby?

2    A.      Yes.

3    Q.      And for your --

4    A.      Tablet.

5    Q.      Cell phone?

6    A.      Yes.

7    Q.      Nearby to respond?

8    A.      Yes.

9    Q.      You did?

10   A.      Yes.

11   Q.      All right.

12              MR. CALDWELL:  That's all I have.

13              MR. MAHONEY:  That's fine.

14              MR. CALDWELL:  And we'll do our best to clear

15   up that 1099.

16              MR. MAHONEY:  These things happen.

17              (Whereupon proceedings were concluded at 5:13

18   p.m.)

19

20              (Pursuant to Rule 30 (e) of the Federal Rules of

21   Civil Procedure and/or O.C.G.A. 91130 (e), signature of

22   the witness has been reserved.)

23

24

25

```
 1                      CERTIFICATE

 2          STATE OF GEORGIA

 3          COUNTY OF FULTON

 4              I hereby certify that the foregoing transcript

 5     was taken down as stated in the caption, and the

 6     questions and answers thereto were reduced to

 7     typewriting under my discretion; that the foregoing

 8     pages 1 through 78 represent a true, complete and

 9     correct transcript of the evidence given upon said

10     hearing.  And I further certify that I am not of kin or

11     counsel to the parties in the case; am not in the

12     regular employ of counsel for any said parties; nor am I

13     in anywise interested in the results of said case.

14

15              This 10th day of July 2017.

16

17          Tamika M. Burnette, RPR, CCR2870

18

19

20

21

22

23

24

25
```

Pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia which states: "Each court reporter shall tender a disclosure form at the time of the taking of the deposition stating the arrangements made for the reporting services of the certified court reporter, by the court reporter's employer, or the referral source for the deposition, with any party to the litigation, counsel to the parties or other entity. Such form shall be attached to the deposition transcript." I make the following disclosure:

I am a Georgia Certified Court Reporter. I am here as a representative of Tamika Burnette. Tamika Burnette was contacted to provide court reporting services for the deposition. Tamika Burnette will not be taking this deposition under any contract that is prohibited by O.C.G.A. 91128 (c).

Tamika Burnette has no contract/agreement to provide court reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition. Tamika Burnette will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to

1    any party to this litigation.

2

3                    Tamika M. Burnette, RPR, CCR2870

INSTRUCTIONS TO WITNESS

2          Please read your deposition over carefully and

3     make any necessary corrections.  You should state the

4     reason the in the appropriate space on the errata sheet

5     for any corrections that are made.

6          After doing so, please sign the errata sheet and

7     date it.  You are signing same subject to the changes

8     you have noted on the errata sheet, which will be

9     attached to your deposition.

10          It is imperative that you return the original

11     errata sheet to the deposing attorney within thirty (30)

12     days receipt of the deposition transcript by you.  If

13     you fail to do so, the deposition transcript may be

14     deemed to be accurate and may be used in court.

15

16

17

18

19

20

21

22

23

24

25

```
 1                    E R R A T A

 2          PAGE          LINE          CHANGE

 3          _____        _____        _____

 4          Reason for

 5          Change:_____

 6

 7          _____       _____        _____

 8          Reason for

 9          Change:_____

10

11          _____       _____        _____

12          Reason for

13          Change:_____

14

15          _____     _____       _____

16          Reason for

17          Change:_____

18

19          _____        _____        _____

20          Reason for

21          Change:_____

22

23          _____       _____      _____

24          Reason for

25          Change:_____
```

```
 1              ACKNOWLEDGEMENT OF DEPONENT

 2         I, _____, do hereby certify

 3    that I have read the foregoing pages _____ to

 4    _____ and that the same is a correct transcript of

 5    the answers given by me to the questions therein

 6    propounded, except for corrections or changes in form or

 7    substances, if any, noted in the attached Errata Sheet.

 8

 9         _____        _____

10         Date                  Signature

11

12         Subscribed and sworn before me this _____

13    day of _____, 2016.

14

15         My Commission Expires:_____

16         _____Notary Public.

17

18

19

20

21

22

23

24

25
```

## $

**$400** [6] - 34:19, 34:21, 35:9, 35:15, 35:19, 35:21

## '

**'10** [1] - 76:3
**'11** [1] - 76:2
**'12** [1] - 76:2
**'13** [2] - 17:8, 75:25
**'14** [2] - 25:12, 75:23
**'16** [1] - 21:6
**'88** [1] - 12:19
**'89** [2] - 12:19
**'92** [1] - 12:19
**'93** [1] - 11:25
**'96** [1] - 12:8
**'98** [2] - 9:12, 11:25
**'99** [2] - 8:19, 9:12

## 1

**1** [5] - 3:9, 64:5, 64:6, 73:4, 79:8
**10.B** [1] - 80:2
**101** [2] - 1:21, 2:6
**1099** [4] - 76:15, 76:16, 76:21, 78:15
**1099s** [4] - 75:4, 75:8, 75:17, 76:1
**10th** [1] - 79:15
**12** [1] - 29:5
**199** [1] - 2:14
**1992** [1] - 8:7
**1993** [1] - 14:5
**1997** [1] - 13:19
**1:16-CV-0139-TWT** [1] - 1:9

## 2

**2** [4] - 3:10, 69:22, 69:23, 73:20
**2000** [1] - 8:19
**2005** [2] - 13:18, 13:19
**2006** [2] - 54:21, 67:3
**2007** [2] - 14:1, 15:4
**2010** [3] - 17:6, 18:10, 18:13
**2011** [5] - 18:22, 18:23, 28:11, 28:20, 74:11
**2012** [3] - 28:9, 74:13, 74:20
**2013** [5] - 25:13, 25:15, 25:18, 28:7, 74:22
**2014** [6] - 28:5, 28:11,

28:20, 32:19, 33:1, 74:24
**2015** [4] - 25:12, 27:25, 74:19, 75:21
**2016** [5] - 21:7, 22:1, 27:23, 58:8, 84:13
**2017** [2] - 1:21, 79:15
**22** [2] - 14:21, 74:17
**2252** [2] - 27:1, 27:7
**2:27** [1] - 1:21

## 3

**3** [5] - 1:21, 3:11, 71:6, 71:23, 71:25
**30** [4] - 15:17, 16:17, 78:20, 82:11
**30122** [2] - 27:2, 27:7
**30303** [1] - 2:7
**30313** [1] - 2:16
**31** [1] - 27:1
**3100** [2] - 1:21, 2:5

## 4

**4** [1] - 3:4
**404** [1] - 2:18
**45** [1] - 45:1

## 5

**5:13** [1] - 78:17

## 6

**6/30/12** [1] - 64:19
**64** [1] - 3:9
**680-0416** [1] - 2:8
**688-1210** [1] - 2:18
**69** [1] - 3:10

## 7

**71** [1] - 3:11
**77** [1] - 3:5
**78** [1] - 79:8
**7:00** [1] - 61:4

## 8

**888** [1] - 2:8

## 9

**91128** [1] - 80:18
**91130** [1] - 78:21

## A

**a.m** [3] - 19:11, 19:15, 19:19

**Abby** [1] - 19:22
**able** [1] - 47:4
**accept** [6] - 45:3, 45:10, 45:16, 45:24, 46:9, 46:19
**accepted** [1] - 46:13
**accident** [3] - 15:25, 16:1, 16:3
**according** [1] - 56:16
**Accounting** [1] - 66:17
**accurate** [1] - 82:14
**ACKNOWLEDGEME NT** [1] - 84:1
**ACTION** [1] - 1:8
**actions** [3] - 38:17, 38:18, 38:20
**address** [3] - 26:25, 36:7, 65:7
**advertise** [2] - 32:6, 77:11
**advertised** [2] - 31:23, 77:6
**advertising** [1] - 77:7
**afford** [1] - 15:22
**afternoon** [1] - 9:18
**agency** [1] - 80:22
**agree** [2] - 5:25, 57:16
**agreement** [1] - 1:17
**ahead** [1] - 75:14
**Alabama** [2] - 61:7, 61:19
**alcohol** [1] - 37:22
**allow** [1] - 44:1
**allowed** [7] - 22:16, 22:20, 22:23, 23:6, 23:8, 23:24, 61:8
**almost** [1] - 72:25
**amazing** [1] - 69:17
**American** [1] - 53:2
**amount** [6] - 40:16, 41:11, 41:13, 76:15, 76:17, 76:18
**Ann** [2] - 27:1, 27:7
**answer** [5] - 5:16, 5:22, 22:19, 41:20, 59:25
**answering** [1] - 5:15
**answers** [3] - 5:19, 79:6, 84:5
**anywise** [1] - 79:13
**apologies** [1] - 65:20
**APPEARANCES** [1] - 2:1
**applauding** [1] - 69:15
**APPLICATION** [1] - 3:9
**application** [2] - 64:9, 64:13

**applied** [1] - 7:10
**apply** [2] - 7:11, 64:20
**appropriate** [1] - 82:4
**approved** [1] - 62:15
**April** [1] - 22:1
**area** [22] - 10:1, 10:12, 10:18, 10:20, 10:23, 11:6, 23:16, 23:18, 24:8, 24:11, 26:1, 26:15, 26:16, 26:23, 27:8, 37:6, 38:7, 40:3, 41:23, 57:20, 62:14, 62:18
**armed** [1] - 8:9
**arrangements** [1] - 80:6
**arrested** [1] - 8:4
**arrests** [2] - 8:16, 9:9
**Article** [1] - 80:2
**arts** [3] - 12:2, 12:5, 12:7
**aside** [1] - 77:16
**asleep** [1] - 40:9
**assist** [1] - 47:4
**Assistance** [1] - 53:2
**assume** [1] - 31:4
**Aston** [1] - 44:22
**ATLANTA** [1] - 1:3
**Atlanta** [9] - 1:22, 2:7, 2:16, 9:25, 10:12, 10:20, 10:23, 11:6, 12:15
**attached** [3] - 80:11, 82:9, 84:7
**attend** [2] - 12:18, 13:2
**attorney** [1] - 19:4, 82:11
**attorneys** [1] - 18:3
**August** [1] - 74:17
**automatic** [1] - 43:13
**aware** [1] - 31:15
**axle** [2] - 43:24, 46:2

## B

**bankruptcy** [1] - 73:1
**Barter** [1] - 7:4
**based** [6] - 33:2, 33:4, 39:6, 39:20, 53:22
**bathroom** [1] - 42:19
**battery** [1] - 47:17
**bed** [3] - 43:12, 43:17, 44:1, 46:3
**begin** [3] - 5:15, 5:16, 5:18
**BEHALF** [2] - 2:2, 2:11
**behind** [1] - 28:1
**BENJAMIN** [1] - 2:3
**best** [4] - 63:21, 69:9,

69:12, 78:14
**better** [5] - 14:25, 17:2, 21:12, 46:5, 69:18
**between** [14] - 13:19, 23:11, 23:14, 23:24, 24:16, 24:22, 25:22, 26:11, 27:13, 28:3, 28:11, 37:3, 41:12, 41:17
**bit** [1] - 4:19
**Black** [1] - 7:3
**blank** [1] - 36:3
**Board** [1] - 80:3
**bottom** [1] - 68:24
**box** [3] - 33:14, 33:22, 70:14
**brake** [1] - 43:14
**brakes** [2] - 43:15, 47:15
**bravo** [1] - 21:22
**Bravo** [4] - 21:24, 26:9, 26:11, 26:16
**break** [5] - 5:23, 42:19, 65:18, 74:2, 74:4
**breaks** [1] - 30:20
**BRIAN** [1] - 1:5
**BRIDGERS** [1] - 2:3
**briefly** [2] - 17:18, 21:4
**bring** [1] - 27:19
**broke** [1] - 43:23
**brothers** [1] - 10:23
**Buckhead** [4] - 26:17, 26:19, 26:21, 26:22
**building** [2] - 23:2, 23:4
**BURKE** [1] - 2:12
**Burnette** [8] - 1:19, 79:17, 80:14, 80:15, 80:16, 80:19, 80:23, 81:3
**Burney** [4] - 52:7, 52:8, 52:14, 52:22
**BURNEY** [1] - 1:4
**business** [12] - 20:24, 27:11, 35:22, 35:25, 36:3, 36:6, 51:24, 53:17, 60:23, 66:21, 67:20, 77:17

## C

**c)** [1] - 80:18
**calculate** [1] - 28:25
**Caldwell** [1] - 77:6
**CALDWELL** [70] - 2:3, 2:4, 3:5, 4:21, 4:24, 5:3, 5:6, 5:9, 6:3,

6:6, 6:8, 9:16, 9:20, 17:24, 18:11, 18:14, 18:18, 18:21, 19:7, 20:15, 20:17, 31:2, 31:4, 35:16, 38:16, 38:20, 38:22, 38:25, 39:9, 39:12, 39:19, 42:19, 43:6, 43:8, 45:4, 50:14, 50:18, 60:7, 64:10, 64:23, 65:18, 65:21, 65:24, 66:2, 66:14, 67:8, 67:22, 69:9, 69:12, 69:15, 69:17, 69:19, 71:8, 71:10, 71:12, 71:14, 71:17, 73:14, 73:22, 73:25, 74:3, 74:6, 75:10, 75:13, 75:15, 76:6, 76:10, 77:2, 78:12, 78:14
**CALL** [1] - 3:11
**capable** [1] - 47:16
**caption** [1] - 79:5
**car** [26] - 43:10, 43:13, 43:16, 43:25, 44:1, 44:13, 44:15, 44:19, 44:20, 46:1, 46:3, 47:5, 47:8, 47:11, 47:25, 48:25, 49:1, 49:3, 49:4, 49:8, 51:17, 56:12, 57:17, 68:19
**card** [2] - 36:6, 57:24
**cards** [4] - 35:22, 35:25, 36:3, 60:23
**care** [1] - 77:17
**carefully** [1] - 82:2
**Carlon** [4] - 52:7, 52:8, 52:14, 52:22
**CARLON** [2] - 1:4, 1:5
**Carolina** [3] - 61:6, 61:19, 61:20
**carrier** [1] - 9:8
**cars** [2] - 47:18, 48:13
**case** [7] - 10:15, 17:17, 79:11, 79:13, 80:21, 80:25
**cash** [4] - 46:21, 55:8, 63:9, 63:11
**caught** [1] - 9:2
**caused** [2] - 49:2, 49:8
**CCR2870** [2] - 79:17, 81:3
**cell** [3] - 37:16, 70:7, 78:5
**Centennial** [2] - 1:21, 2:5
**CERTIFICATE** [1] - 79:1
**Certified** [2] - 1:19,
80:13
**certified** [1] - 80:7
**certify** [3] - 79:4, 79:10, 84:2
**CHANGE** [1] - 83:2
**change** [8] - 43:20, 49:10, 49:16, 49:17, 49:19, 51:17, 62:10, 62:18
**Change** [6] - 83:5, 83:9, 83:13, 83:17, 83:21, 83:25
**changes** [2] - 82:7, 84:6
**charge** [6] - 8:19, 53:18, 54:11, 54:12, 55:17, 80:24
**charged** [2] - 55:19, 55:22
**Chattanooga** [3] - 61:7, 61:16, 61:18
**check** [4] - 16:12, 63:9, 63:10, 75:10
**checking** [1] - 75:8
**child** [1] - 58:11
**Christmas** [1] - 62:6
**circle** [3] - 65:12, 66:5, 66:13
**citations** [1] - 9:1
**CIVIL** [1] - 1:8
**Civil** [1] - 78:21
**claim** [2] - 32:17, 75:17
**clarification** [1] - 48:6
**Clark** [4] - 21:2, 21:21, 22:14, 25:22
**cleaners** [1] - 59:20
**clear** [4] - 18:2, 30:25, 44:23, 78:14
**clerical** [3] - 58:21, 58:23, 58:24
**client** [1] - 6:5
**clock** [7] - 22:8, 22:10, 22:12, 22:14, 23:8, 29:22, 61:3
**clocked** [4] - 23:6, 40:19, 40:20, 61:1
**close** [1] - 74:3
**closest** [1] - 42:11
**closet** [1] - 56:24
**Cobb** [1] - 10:9
**cocaine** [3] - 9:9, 9:13, 9:14
**comfortable** [4] - 35:2, 35:3, 35:5, 35:8
**coming** [1] - 45:3
**commencing** [1] - 1:20
**Commission** [1] -

84:15
**commission** [8] - 21:13, 22:2, 27:14, 27:20, 27:21, 33:6, 34:17, 56:12
**common** [2] - 5:20, 33:1
**commuting** [2] - 61:9, 61:10
**companies** [2] - 20:13, 33:5
**company** [21] - 8:2, 32:8, 33:16, 42:4, 47:23, 48:6, 50:18, 54:7, 55:2, 55:5, 55:7, 55:9, 55:16, 55:18, 55:20, 56:20, 56:21, 56:24, 65:13, 68:8, 68:9
**company's** [3] - 36:7, 77:10
**compensated** [1] - 16:11
**complaint** [6] - 17:25, 18:7, 18:10, 18:13, 19:8
**complete** [1] - 79:8
**complying** [4] - 64:9, 70:2, 73:5, 73:8
**concluded** [1] - 78:17
**consist** [2] - 8:14, 14:6
**consult** [1] - 67:22
**contacted** [1] - 80:15
**CONTRACT** [1] - 3:10
**contract** [7] - 13:11, 51:6, 64:2, 67:18, 68:15, 68:18, 80:17
**contract/agreement** [1] - 80:19
**contractor** [5] - 14:18, 15:7, 15:13, 16:9, 48:22
**contractors** [3] - 36:1, 50:6, 51:21
**contracts** [2] - 67:15, 67:16
**control** [3] - 7:24, 8:1, 41:18
**conversation** [1] - 5:20
**conversational** [1] - 5:1
**conversations** [2] - 6:18, 18:4
**convicted** [1] - 8:12
**correct** [10] - 19:6, 50:23, 65:2, 67:21, 68:2, 68:5, 68:10, 73:13, 79:9, 84:4

**corrections** [3] - 82:3, 82:5, 84:6
**Council** [1] - 80:4
**counsel** [7] - 1:17, 6:16, 6:18, 79:11, 79:12, 80:10, 80:21
**counties** [2] - 10:7, 10:11
**County** [4] - 8:11, 24:10, 24:13, 27:9
**COUNTY** [1] - 79:3
**county** [1] - 27:3
**couple** [1] - 44:23
**court** [10] - 5:11, 5:21, 39:17, 42:24, 80:4, 80:7, 80:8, 80:15, 80:20, 82:14
**COURT** [3] - 1:1, 39:16, 80:1
**Court** [1] - 1:19, 80:3, 80:13
**cover** [3] - 15:22, 38:7, 80:23
**coverage** [4] - 26:1, 26:15, 38:6, 62:21
**crank** [1] - 47:9
**credit** [1] - 57:24
**credits** [1] - 14:12
**criminal** [1] - 11:14
**culinary** [3] - 12:2, 12:5, 12:7
**customary** [1] - 80:24
**customer** [4] - 47:4, 49:15, 55:4, 55:17, 57:5, 57:16
**customer's** [1] - 56:12
**customers** [1] - 63:13

# D

**D&J** [1] - 19:23
**d&S** [2] - 7:7, 29:13
**D&S** [8] - 15:2, 15:19, 19:13, 20:2, 22:10, 23:24, 68:8
**D-3** [1] - 71:19
**damage** [3] - 49:2, 49:4, 49:8
**damaged** [1] - 43:19
**damages** [1] - 18:12
**Date** [1] - 84:10
**date** [10] - 16:20, 64:18, 64:21, 64:24, 65:8, 69:1, 69:2, 69:7, 74:16, 82:7
**dates** [2] - 21:23, 76:1
**day-to-day** [1] - 8:1
**days** [3] - 25:10, 29:5, 82:12
**DDS** [10] - 41:25, 42:2,

42:5, 42:9, 42:13, 42:17, 43:1, 45:9, 45:12, 57:1
**decal** [1] - 9:7
**Decatur** [3] - 26:18, 26:23, 27:9
**decline** [4] - 45:13, 45:19, 45:22, 46:11
**declined** [2] - 45:23, 46:12
**deemed** [1] - 82:14
**DEFENDANT** [1] - 2:11
**Defendant's** [5] - 64:4, 69:22, 71:5, 71:25, 73:3
**defendant's** [2] - 64:6, 69:23
**Defendants** [1] - 1:13
**degree** [5] - 12:2, 12:5, 12:7, 66:13, 66:14
**degrees** [1] - 11:21
**Dekalb** [3] - 8:11, 10:6, 27:9
**DELONG** [1] - 2:3
**Demessa** [4] - 20:3, 20:5, 20:7, 20:11
**Demessa's** [1] - 20:8
**department** [7] - 49:23, 49:25, 50:10, 50:13, 50:14, 51:8, 56:9
**departments** [2] - 49:21, 51:4
**DEPONENT** [1] - 84:1
**deposing** [1] - 82:11
**deposition** [1] - 1:16, 1:19, 4:12, 6:13, 6:19, 80:6, 80:9, 80:11, 80:16, 80:17, 80:23, 82:2, 82:9, 82:12, 82:13
**described** [1] - 10:18
**DESCRIPTION** [1] - 3:8
**designated** [10] - 23:16, 23:18, 24:8, 24:11, 26:16, 27:8, 37:5, 40:3, 62:14, 62:18
**desired** [1] - 65:15
**detail** [1] - 14:3
**determine** [2] - 16:13, 42:9
**device** [2] - 29:24, 30:21
**died** [1] - 25:5
**difference** [1] - 27:13
**different** [8] - 44:5,

44:6, 46:4, 46:5, 51:4, 72:17, 72:18
**dinner** [1] - 36:19
**discipline** [5] - 39:23, 48:24, 49:1, 49:7, 60:20
**disciplined** [15] - 39:8, 40:4, 40:9, 40:11, 40:13, 40:22, 41:5, 41:8, 41:16, 41:19, 59:13, 60:14, 60:16, 60:18, 72:21
**disclaimer** [1] - 73:7
**DISCLOSURE** [1] - 80:1
**disclosure** [2] - 80:5, 80:12
**disconnected** [1] - 43:24
**discount** [1] - 80:25
**discretion** [1] - 79:7
**discussed** [2] - 11:15, 18:3
**dismissed** [1] - 9:10
**dispatch** [4] - 42:3, 51:13, 51:14, 51:15
**dispute** [3] - 73:10, 76:15, 76:18
**distinction** [2] - 27:23, 28:2
**distribution** [1] - 9:14
**DISTRICT** [2] - 1:1, 1:2
**DIVISION** [1] - 1:3
**dJV** [1] - 13:13
**DJV** [20] - 13:15, 13:17, 13:25, 14:14, 14:16, 14:24, 15:1, 19:9, 19:21, 22:8, 22:16, 22:23, 22:25, 29:11, 47:1, 54:23, 54:25, 67:15, 68:14, 68:21
**document** [5] - 64:12, 64:18, 70:1, 70:3, 72:5
**documents** [2] - 6:21, 6:24
**done** [8] - 30:8, 40:16, 49:4, 59:21, 60:22, 72:25, 74:5, 74:6
**double** [1] - 75:8
**double-checking** [1] - 75:8
**Douglas** [1] - 27:4
**down** [8] - 5:12, 5:21, 29:9, 30:20, 48:2, 57:10, 59:4, 79:5
**downtime** [8] - 23:11, 24:19, 24:24, 41:11, 41:13, 41:17, 41:18,

77:21
**downtown** [5] - 26:18, 26:19, 26:23, 27:9
**drafting** [1] - 17:20
**drag** [2] - 44:1, 46:3
**drink** [2] - 37:19, 37:22
**drive** [4] - 41:23, 52:17, 53:24, 77:10
**driver** [15] - 20:19, 31:10, 31:15, 31:21, 31:24, 34:13, 42:9, 42:11, 44:6, 44:10, 46:5, 53:4, 56:25, 57:9, 68:20
**driver's** [1] - 58:4
**drivers** [1] - 47:20
**driving** [3] - 20:23, 52:12, 53:5
**drove** [1] - 52:20
**Druid** [2] - 26:18, 26:23
**dry** [1] - 59:20
**due** [2] - 12:22, 55:24
**duly** [1] - 4:5
**duration** [2] - 13:23, 30:15
**during** [8] - 24:2, 24:19, 24:24, 32:2, 34:21, 35:14, 35:19, 77:21
**duty** [4] - 22:17, 51:21, 70:7, 77:13

### E

**earn** [3] - 14:12, 34:21, 34:24
**earned** [2] - 35:15, 35:19
**earning** [2] - 27:14
**eat** [2] - 36:17, 77:17
**eating** [1] - 36:25
**eburke@burkelawatl .com** [1] - 2:17
**education** [2] - 66:1, 66:4
**educational** [1] - 11:21
**eight** [2] - 53:9, 53:10
**either** [3] - 44:6, 52:8, 52:22
**Ellenwood** [1] - 27:9
**emergency** [1] - 47:15
**employ** [1] - 79:12
**employed** [6] - 7:19, 13:21, 18:25, 44:8, 44:10, 62:19
**employee** [1] - 48:22
**employees** [1] - 35:23

**employer** [1] - 80:8
**employment** [3] - 13:14, 64:2, 64:20
**en** [1] - 30:19
**end** [2] - 10:16, 15:4
**engage** [1] - 43:16
**enter** [1] - 27:11
**entire** [1] - 30:15
**entity** [1] - 80:10
**Equipment** [1] - 7:4
**equipped** [3] - 43:1, 46:5, 49:17
**errand** [1] - 40:2
**errands** [1] - 77:17
**errata** [4] - 82:4, 82:6, 82:8, 82:11
**Errata** [1] - 84:7
**ESQUIRE** [2] - 2:4, 2:13
**estimate** [1] - 63:21
**evidence** [1] - 79:9
**exact** [5] - 16:20, 41:3, 41:4, 42:16, 64:24
**exactly** [1] - 25:19
**EXAMINATION** [3] - 3:2, 4:8, 77:5
**examined** [1] - 4:6
**example** [5] - 38:11, 38:13, 43:23, 46:1, 47:7
**examples** [1] - 47:14
**except** [3] - 6:1, 52:9, 84:6
**excluding** [1] - 1:18
**excuse** [9] - 6:23, 10:21, 11:25, 25:5, 25:12, 25:14, 26:20, 36:22, 50:11
**exhibit** [8] - 64:4, 64:6, 69:22, 69:23, 71:6, 71:23, 71:25, 73:3
**exhibit** [2] - 3:8, 71:23
**EXHIBIT** [3] - 3:9, 3:10, 3:11
**exit** [1] - 22:16
**expect** [2] - 40:11, 60:21
**experienced** [1] - 31:10
**Expires** [1] - 84:15
**Explain** [1] - 50:20
**explain** [1] - 51:12
**extend** [1] - 43:12

### F

**fact** [4] - 32:9, 53:14, 59:9, 59:12
**facts** [1] - 18:6

**factual** [1] - 17:22
**fail** [1] - 82:13
**failing** [1] - 72:21
**family** [10] - 5:4, 5:5, 9:25, 10:16, 10:17, 10:19, 10:22, 11:5, 31:14, 34:9
**far** [4] - 26:18, 26:23, 27:10, 50:16
**father** [4] - 10:24, 25:5, 61:23
**Federal** [1] - 78:20
**fee** [1] - 16:16
**fell** [1] - 40:8
**few** [6] - 4:17, 16:25, 40:22, 46:8, 61:15
**FILE** [1] - 1:9
**file** [5] - 74:11, 74:20, 74:22, 74:24, 75:1
**filed** [1] - 73:1
**filing** [1] - 19:7
**fill** [1] - 64:24
**financial** [1] - 80:25
**fine** [4] - 9:22, 42:20, 74:7, 78:13
**finish** [2] - 5:14, 5:16
**fire** [1] - 7:22
**first** [9] - 4:5, 6:2, 7:3, 13:5, 13:7, 13:10, 39:15, 56:13, 57:8
**FITZPATRICK** [1] - 2:3
**five** [1] - 8:15
**fix** [1] - 53:13
**flags** [1] - 57:10
**flashlight** [1] - 70:10
**flat** [1] - 16:16
**floor** [1] - 43:25
**folder** [2] - 71:8, 71:10
**following** [1] - 80:12
**follows** [1] - 4:7
**force** [1] - 68:21
**forced** [1] - 45:2
**foregoing** [1] - 79:4, 79:7, 84:3
**form** [5] - 6:1, 76:23, 80:5, 80:11, 84:6
**formalities** [1] - 1:17
**four** [4] - 5:8, 25:10, 34:16, 70:18
**four-way** [1] - 70:18
**frame** [1] - 44:16
**friend** [3] - 39:7, 39:22, 59:11
**friends** [1] - 31:14
**full** [2] - 4:9, 26:25
**Fulton** [1] - 10:8
**FULTON** [1] - 79:3
**function** [6] - 45:2, 45:5, 45:9, 45:12,

45:15, 45:18

### G

**GED** [3] - 11:23, 12:3, 66:8
**generally** [1] - 52:1
**GEORGIA** [2] - 1:2, 79:2
**Georgia** [12] - 1:20, 1:22, 2:7, 2:16, 8:11, 9:24, 12:15, 24:9, 27:1, 27:7, 80:4, 80:13
**given** [5] - 60:24, 62:9, 79:9, 80:25, 84:5
**gloves** [1] - 32:9, 32:13, 70:22, 71:3
**goggles** [1] - 70:24
**GPS** [2] - 24:4, 43:2
**graduate** [3] - 12:20, 66:9, 66:10
**graduated** [1] - 66:5
**grandmother** [1] - 11:7
**grossed** [3] - 14:22, 15:18, 27:22
**ground** [4] - 4:17, 5:11, 44:23, 46:3
**GROUP** [1] - 2:12
**guess** [10] - 5:2, 28:15, 31:1, 31:4, 48:5, 61:11, 66:22, 72:24, 75:19
**guys** [1] - 76:8
**Gwinnett** [2] - 24:9, 24:13

### H

**handle** [1] - 58:21
**handles** [1] - 74:14
**handwriting** [7] - 64:16, 65:1, 69:7, 69:9, 69:12, 69:20, 72:11
**happy** [1] - 5:24
**hard** [1] - 5:21
**head** [2] - 5:19, 5:20
**hear** [1] - 4:20
**hearing** [1] - 79:10
**heavy** [1] - 60:7
**help** [4] - 4:18, 31:17
**hereby** [2] - 79:4, 84:2
**high** [4] - 12:12, 12:16, 13:5, 13:7
**High** [1] - 12:17
**Hill** [3] - 11:9, 26:24, 34:12
**HILL** [4] - 1:6, 1:16,

3:3, 4:4
**Hills** [2] - 4:11, 26:18
**hired** [1] - 25:20
**holidays** [1] - 62:1
**home** [3] - 34:11, 52:23, 61:8
**homeowner** [1] - 34:7
**hood** [6] - 47:25, 48:12, 48:24, 49:1, 49:3, 49:8
**hoods** [1] - 47:18
**hook** [1] - 43:12
**hour** [5] - 21:17, 27:18, 28:12, 28:19, 36:15
**hourly** [7] - 14:16, 15:9, 16:7, 21:16, 27:14, 27:16, 27:17
**hours** [12] - 19:9, 19:13, 21:19, 22:6, 29:2, 29:5, 29:25, 30:3, 30:5, 59:7, 59:10, 59:19
**house** [1] - 34:15

**I-285** [4] - 23:1, 23:19, 26:17, 26:22
**idea** [1] - 20:15
**IDEAL** [1] - 1:10
**Ideal** [52] - 7:16, 17:4, 17:7, 18:25, 21:1, 24:21, 25:2, 25:13, 25:15, 25:17, 26:5, 27:6, 29:17, 29:19, 29:22, 31:9, 33:8, 34:17, 35:22, 36:7, 36:15, 44:8, 44:10, 47:5, 48:7, 48:9, 48:11, 49:11, 50:2, 50:6, 50:21, 50:25, 51:6, 51:20, 52:25, 53:3, 53:4, 53:6, 53:16, 53:20, 53:24, 54:5, 54:8, 54:14, 56:6, 62:19, 63:24, 64:20, 70:8, 72:15, 74:8, 75:18
**identifiable** [1] - 72:19
**identification** [3] - 64:7, 69:24, 72:1
**immediate** [2] - 10:19, 10:22
**imperative** [1] - 82:10
**important** [1] - 5:18
**improper** [1] - 9:7
**IN** [1] - 1:1
**incarceration** [1] - 8:15

**inches** [1] - 44:24
**including** [1] - 13:6
**incorrect** [1] - 25:16
**INDEX** [1] - 3:1
**individual** [6] - 55:1, 55:4, 55:17, 55:19, 57:4, 57:8
**individuals** [3] - 46:15, 46:21, 56:5
**Industrial** [1] - 27:10
**industry** [1] - 32:24
**information** [6] - 17:19, 17:22, 30:21, 30:23, 31:7, 58:25
**inside** [7] - 23:1, 23:19, 26:17, 26:22, 39:24, 39:25, 40:2
**instead** [1] - 68:8
**INSTRUCTIONS** [1] - 82:1
**insurance** [1] - 15:23
**interested** [1] - 79:13
**involved** [1] - 16:3
**Isaac** [1] - 19:24
**itself** [1] - 32:7

## J

**J&J** [1] - 66:16
**Jacara** [1] - 34:12
**jack** [5] - 33:12, 33:25, 43:25, 44:6, 70:12
**James** [7] - 7:2, 7:3, 7:9, 7:15, 9:3, 54:15, 58:21
**JAMES** [2] - 1:11, 1:12
**Janey** [1] - 11:9
**January** [1] - 6:14
**JAWANZA** [1] - 1:4
**Jawanza** [4] - 52:5, 52:6, 54:19, 54:24
**Jayda** [1] - 34:12
**job** [12] - 7:8, 7:12, 13:5, 13:7, 13:10, 26:13, 27:12, 31:18, 40:23, 41:2, 46:7, 59:16
**jobs** [18] - 14:2, 23:12, 23:14, 23:24, 24:17, 24:22, 25:23, 26:11, 28:23, 33:2, 40:16, 40:22, 41:5, 41:8, 41:12, 41:17, 42:5, 63:23
**JORDAN** [1] - 2:13
**Jr** [1] - 4:11
**JR** [3] - 1:16, 3:3, 4:4
**Judicial** [1] - 80:4
**Julia** [2] - 34:12, 66:19
**July** [1] - 79:15

**jump** [3] - 33:14, 33:22, 70:14
**jury** [1] - 10:17

## K

**KAM** [8] - 16:6, 16:19, 19:17, 20:6, 22:12, 24:12, 26:7, 29:15
**keep** [15] - 23:4, 29:2, 29:7, 29:24, 30:5, 43:15, 59:2, 61:1, 61:4, 61:8, 61:9, 71:18, 71:20, 77:25, 78:1
**keeping** [1] - 30:2
**kept** [1] - 30:4
**killed** [2] - 25:6, 61:23
**kin** [1] - 79:10
**kind** [6] - 34:6, 44:6, 44:19, 44:20, 46:4, 60:20
**kit** [4] - 33:10, 33:23, 46:23, 70:16
**knowledge** [3] - 33:1, 33:4, 53:15
**knows** [1] - 18:14

## L

**laid** [2] - 15:20, 15:21
**Lamborghini** [1] - 44:22
**Lane** [2] - 27:1, 27:7
**large** [1] - 5:5
**last** [8] - 19:25, 21:6, 39:18, 42:22, 42:25, 58:7
**late** [1] - 20:16
**lately** [2] - 6:10, 6:11
**laundry** [1] - 59:20, 60:5, 60:12
**Laundry** [1] - 60:7
**LAW** [1] - 2:12
**lawsuit** [5] - 11:12, 11:13, 17:17, 17:20, 17:23
**lawyers** [1] - 69:19
**learn** [4] - 6:12, 7:15, 7:17, 32:20
**learned** [2] - 5:7, 32:17
**least** [1] - 40:16
**leave** [16] - 12:22, 12:25, 13:25, 14:24, 15:19, 17:1, 17:7, 21:11, 22:23, 23:6, 23:9, 54:2, 68:17, 68:21, 71:22
**leaving** [1] - 37:5

**left** [4] - 25:13, 25:15, 67:14, 68:23
**legal** [5] - 6:16, 12:22, 13:1, 28:1, 28:3
**less** [2] - 55:18, 55:19
**LEWIS** [1] - 1:5
**license** [2] - 58:4, 58:18
**licenses** [1] - 58:14
**lie** [1] - 66:11
**life** [1] - 11:22
**light** [25] - 49:24, 50:2, 50:7, 50:9, 50:12, 50:14, 50:17, 50:22, 50:25, 51:4, 51:7, 51:14, 51:15, 51:16, 51:21, 51:22, 51:24, 52:12, 52:18, 52:25, 53:3, 53:9, 53:11, 54:13
**likewise** [1] - 5:15
**Liliburn** [1] - 24:9
**LINE** [1] - 83:2
**listed** [2] - 13:3, 76:15
**listen** [1] - 39:10
**Lithia** [3] - 9:24, 27:1, 27:7
**Lithonia** [4] - 23:21, 24:7, 24:15, 61:10
**litigation** [2] - 80:10, 81:1
**live** [6] - 9:23, 10:18, 11:5, 24:14, 27:5, 34:6
**lived** [1] - 61:9
**lives** [5] - 9:25, 10:20, 10:23, 34:8, 34:10
**living** [2] - 23:20, 24:6
**LLC** [5] - 1:10, 2:3, 2:12, 54:14, 64:21
**load** [2] - 44:13, 57:17
**loading** [2] - 43:9, 49:5
**locate** [1] - 76:9
**location** [8] - 30:19, 51:16, 51:23, 51:24, 53:17, 53:25, 54:8, 56:25
**lockout** [4] - 33:10, 33:23, 46:23, 70:16
**log** [4] - 29:24, 30:10, 72:22, 72:23
**logged** [3] - 30:7, 30:8, 30:16
**logo** [1] - 36:8
**look** [4] - 64:8, 69:25, 73:3, 73:6
**looking** [1] - 76:14
**looks** [2] - 64:10, 69:4
**lose** [4] - 40:23, 41:2,

47:16, 67:16
**lost** [4] - 62:21, 65:19, 67:15, 68:14
**loud** [1] - 5:7
**low** [1] - 4:25
**LPD** [1] - 68:8
**lucky** [1] - 62:6
**lunch** [1] - 36:15

## M

**MAHONEY** [47] - 2:13, 3:4, 4:23, 5:1, 5:5, 5:8, 5:25, 6:4, 6:7, 6:10, 9:19, 9:22, 18:12, 18:20, 20:16, 38:17, 38:21, 38:24, 39:11, 39:14, 39:20, 42:20, 42:22, 43:7, 50:16, 65:4, 65:20, 67:11, 69:11, 69:14, 69:16, 69:18, 71:9, 71:11, 71:13, 71:15, 71:18, 73:19, 74:1, 74:4, 74:7, 75:7, 75:11, 75:14, 77:1, 78:13, 78:16
**Mahoney** [34] - 4:9, 5:10, 6:12, 9:23, 18:1, 18:17, 18:22, 19:9, 20:18, 31:6, 35:18, 38:18, 39:21, 43:1, 43:9, 45:7, 50:20, 60:11, 64:8, 64:12, 65:1, 65:7, 65:22, 66:4, 66:16, 67:9, 67:14, 67:25, 69:21, 69:25, 72:2, 74:8, 75:17, 76:13
**mail** [1] - 58:20
**manager** [2] - 19:21, 20:2
**manual** [1] - 43:14
**Marietta** [2] - 1:22, 2:6
**marijuana** [2] - 8:19, 8:20
**mark** [2] - 69:22, 71:5
**Mark** [1] - 4:11
**MARK** [3] - 1:16, 3:3, 4:4
**marked** [4] - 64:4, 64:6, 69:23, 71:25
**married** [2] - 74:16, 75:1
**Martin** [1] - 44:22
**Maserati** [1] - 44:22
**matter** [5] - 4:6, 27:18, 36:21, 36:23, 52:13
**matters** [2] - 11:14, 58:22

4

**maximum** [1] - 41:11

**Maximum** [1] - 41:13

**MC** [2] - 9:7

**McNair** [1] - 12:17

**mean** [19] - 7:19, 9:17, 19:4, 28:4, 28:15, 30:19, 32:10, 39:24, 41:3, 48:18, 50:21, 55:24, 56:18, 58:23, 59:17, 60:4, 65:17, 65:22, 66:8

**meaning** [8] - 13:20, 37:21, 38:20, 38:22, 43:23, 46:16, 51:16, 62:5

**means** [2] - 56:20, 65:25

**mechanics** [2] - 47:21, 48:13

**meet** [2] - 6:8, 7:2

**meeting** [1] - 48:23

**member** [4] - 17:14, 32:2, 47:8, 56:17

**members** [4] - 10:16, 10:18, 11:5, 56:4

**message** [1] - 9:21

**messages** [1] - 30:11

**met** [2] - 7:3, 67:1

**metro** [4] - 10:12, 10:20, 10:23, 11:6

**MICHAEL** [2] - 1:11, 2:4

**Michael** [8] - 5:25, 7:2, 7:3, 7:9, 7:15, 9:3, 54:15, 75:7

**Michael@dcbflegal. com** [1] - 2:9

**middle** [1] - 5:6

**might** [2] - 60:9, 80:22

**Mike** [2] - 20:7, 20:11

**mind** [3] - 39:13, 65:19, 75:7

**mine** [1] - 69:18

**minimum** [1] - 21:18

**minute** [6] - 39:9, 45:4, 67:23, 73:14, 73:20, 77:3

**minutes** [4] - 44:17, 44:18, 44:21, 45:1

**missed** [1] - 68:7

**moment** [4] - 64:8, 65:5, 67:12, 69:25

**monetarily** [1] - 67:9

**money** [8] - 18:9, 18:13, 18:23, 18:24, 55:1, 55:4, 58:1, 68:20

**month** [2] - 17:9, 26:3

**months** [2] - 16:25, 21:9

**mother** [1] - 10:24

**motor** [1] - 9:8

**mouth** [1] - 32:21

**move** [3] - 43:12, 44:11, 46:5

**MR** [116] - 2:4, 2:13, 3:4, 3:5, 4:21, 4:23, 4:24, 5:1, 5:3, 5:5, 5:6, 5:8, 5:9, 5:25, 6:3, 6:4, 6:6, 6:7, 6:8, 6:10, 9:16, 9:19, 9:20, 9:22, 17:24, 18:11, 18:12, 18:14, 18:18, 18:20, 18:21, 19:7, 20:15, 20:16, 20:17, 31:2, 31:4, 35:16, 38:16, 38:17, 38:20, 38:21, 38:22, 38:24, 38:25, 39:9, 39:11, 39:12, 39:14, 39:19, 39:20, 42:19, 42:20, 42:22, 43:6, 43:7, 43:8, 45:4, 50:14, 50:16, 50:18, 60:7, 64:10, 64:23, 65:4, 65:18, 65:20, 65:21, 65:24, 66:2, 66:14, 67:8, 67:11, 67:22, 69:9, 69:11, 69:12, 69:14, 69:15, 69:16, 69:17, 69:18, 69:19, 71:8, 71:9, 71:10, 71:11, 71:12, 71:13, 71:14, 71:15, 71:17, 71:18, 73:14, 73:19, 73:22, 73:25, 74:1, 74:3, 74:4, 74:6, 74:7, 75:7, 75:10, 75:11, 75:13, 75:14, 75:15, 76:6, 76:10, 77:1, 77:2, 78:12, 78:13, 78:14, 78:16

## N

**name** [14] - 4:10, 10:5, 11:1, 11:5, 11:8, 12:16, 13:12, 19:25, 32:7, 36:4, 36:8, 68:7, 69:5, 69:6

**names** [1] - 10:17

**nap** [1] - 59:8

**nearby** [2] - 78:1, 78:7

**necessarily** [1] - 74:5

**necessary** [1] - 82:3

**need** [7] - 5:12, 5:13, 5:23, 9:18, 10:15, 51:19, 68:10

**needed** [4] - 7:12,

27:12, 31:18, 49:15

**needs** [2] - 56:17, 57:17

**never** [18] - 9:9, 35:15, 35:19, 40:10, 40:12, 40:20, 45:23, 46:12, 55:19, 59:14, 59:21, 60:15, 60:22, 61:3, 62:21, 65:19, 70:25, 72:2

**next** [11] - 5:16, 16:5, 23:15, 24:3, 24:20, 24:25, 25:24, 26:13, 39:1, 57:21, 67:14

**nights** [4] - 35:1, 35:9, 35:10, 35:12

**NO** [4] - 1:9, 3:9, 3:10, 3:11

**none** [1] - 10:16

**North** [3] - 26:18, 26:23, 61:19

**NORTHERN** [1] - 1:2

**Notary** [1] - 84:16

**noted** [2] - 82:8, 84:7

**notes** [1] - 71:15

**nothing** [1] - 35:6

**notify** [1] - 57:1

**number** [6] - 9:7, 41:1, 65:10, 65:11, 72:19, 72:20

**Number** [7] - 64:5, 64:6, 69:22, 69:23, 71:6, 71:25, 73:4

**numbers** [1] - 36:9

## O

**O.C.G.A** [2] - 78:21, 80:18

**objections** [1] - 6:1

**obviously** [1] - 5:3

**occupation** [2] - 20:19, 20:21

**occurred** [1] - 16:1

**OF** [6] - 1:2, 2:2, 2:11, 79:2, 79:3, 84:1

**offer** [1] - 35:25

**offered** [1] - 35:9

**office** [4] - 57:6, 57:13, 58:2, 58:22

**old** [1] - 65:11

**ON** [2] - 2:2, 2:11

**one** [19] - 5:24, 9:2, 9:16, 23:15, 25:24, 34:10, 35:6, 38:11, 40:9, 52:15, 64:25, 67:25, 70:25, 71:7, 71:23, 72:16, 73:20, 76:9, 77:2

**ones** [1] - 17:25

**operate** [2] - 22:25, 31:12

**operations** [1] - 8:1

**opportunity** [4] - 6:4, 62:7, 62:10, 68:3

**opposed** [1] - 52:17

**option** [1] - 66:13

**original** [3] - 73:17, 73:18, 82:10

**outside** [4] - 23:22, 39:24, 46:16, 62:13

**own** [10] - 33:4, 33:19, 33:21, 33:23, 34:4, 34:13, 54:5, 68:22, 68:23, 70:9

**owned** [2] - 53:16, 53:20

**owner** [7] - 7:16, 7:17, 7:20, 19:23, 20:4, 20:10, 35:1, 35:7, 36:8, 40:25, 47:23

## P

**p.m** [6] - 1:21, 9:11, 19:15, 19:19, 61:5, 78:18

**PAGE** [4] - 3:1, 3:2, 3:8, 83:2

**page** [4] - 67:14, 73:6, 73:20

**pages** [2] - 79:8, 84:3

**paid** [25] - 14:10, 15:11, 16:7, 16:14, 16:16, 16:17, 17:15, 21:13, 21:16, 22:2, 27:18, 27:21, 28:12, 28:13, 28:17, 28:19, 28:22, 32:18, 35:1, 59:18, 63:9, 63:11, 67:4, 67:9, 72:23

**paper** [1] - 73:17

**paperwork** [2] - 58:2, 58:3

**park** [4] - 43:14, 43:15, 47:9, 47:11

**parked** [1] - 53:9

**parks** [1] - 54:7

**part** [1] - 10:14

**parties** [2] - 79:11, 79:12, 80:10, 80:24

**party** [5] - 11:12, 11:13, 80:9, 80:20, 81:1

**pay** [19] - 7:24, 14:23, 14:25, 15:18, 16:18, 17:2, 21:12, 32:11, 32:13, 32:15, 33:2, 49:3, 49:4, 57:22,

57:23, 57:24, 58:1, 58:2, 60:23

**Peachtree** [1] - 27:10

**penmanship** [2] - 69:14, 69:16

**people** [1] - 60:10

**per** [3] - 16:16, 21:17, 26:3

**percent** [8] - 14:20, 14:21, 14:22, 15:17, 16:17, 21:16, 22:5, 34:18

**percentage** [13] - 14:17, 14:18, 14:19, 15:12, 15:15, 27:21, 28:23, 28:25, 63:18, 65:16, 65:23, 65:25

**percentage-wise** [1] - 15:12

**perform** [1] - 51:7

**performed** [3] - 33:2, 33:8, 59:3

**performing** [1] - 51:21

**perimeter** [1] - 23:22

**period** [9] - 14:23, 15:18, 16:18, 27:22, 34:22, 35:10, 35:12, 35:14, 35:19

**person** [2] - 53:18, 54:11, 54:14

**personal** [6] - 33:4, 53:24, 54:5, 59:15, 63:24, 77:17

**personally** [2] - 33:19, 60:4

**pertaining** [1] - 17:14

**Peters** [1] - 2:14

**phone** [7] - 37:16, 56:1, 57:23, 65:10, 65:11, 70:7, 78:5

**pick** [2] - 54:2, 59:20

**Piedmont** [1] - 26:18

**place** [1] - 48:14

**plaintiff** [2] - 11:15, 52:12

**PLAINTIFF** [1] - 2:2

**Plaintiffs** [1] - 1:7

**plans** [1] - 20:12

**plug** [1] - 70:18

**points** [1] - 43:13

**police** [1] - 56:9

**policy** [2] - 29:19, 63:25

**portable** [1] - 42:3

**possess** [2] - 70:7, 70:10

**possession** [2] - 9:13, 9:15

**possible** [1] - 54:7

**power** [1] - 7:22

5

**practice** [1] - 33:2
**practicing** [1] - 6:11
**premises** [4] - 22:17, 23:7, 23:9, 23:25
**preparation** [2] - 6:21, 6:24
**present** [1] - 48:21
**pretty** [2] - 20:25, 52:10
**preventing** [1] - 47:24
**previously** [1] - 68:6
**price** [8] - 55:7, 55:9, 55:16, 55:18, 55:20, 55:22, 57:14, 57:16
**prison** [5] - 12:4, 12:6, 13:6, 14:2, 14:3
**private** [3] - 56:4, 57:7, 57:16
**Procedure** [1] - 78:21
**proceedings** [1] - 78:17
**process** [4] - 4:18, 43:9, 43:20, 57:5
**produce** [1] - 75:5
**produced** [2] - 71:21, 75:9
**professional** [1] - 12:9
**professionalism** [1] - 59:15
**prohibited** [1] - 80:18
**properly** [3] - 28:13, 28:17, 32:18
**propounded** [1] - 84:6
**provide** [8] - 17:19, 17:22, 18:6, 35:22, 51:18, 53:3, 80:15, 80:20
**provided** [1] - 56:8
**provider** [3] - 56:16, 56:18, 56:20
**PTO** [1] - 43:11
**Public** [1] - 84:16
**pull** [4] - 43:16, 43:18, 43:25, 47:8
**pulled** [1] - 32:2
**punch** [2] - 22:8, 22:10, 22:12, 22:14
**Pursuant** [1] - 78:20
**pursuant** [2] - 1:17, 80:2
**put** [5] - 32:9, 36:4, 43:18, 47:11, 60:12

## Q

**questions** [5] - 10:14, 74:5, 77:1, 79:6, 84:5
**quick** [1] - 16:22
**quite** [1] - 61:15

**quota** [8] - 26:2, 26:4, 26:5, 26:6, 40:21, 41:1, 41:3, 41:4

## R

**radio** [1] - 77:25, 78:1
**ramification** [1] - 28:1
**ran** [1] - 16:15
**rates** [2] - 73:22, 80:24
**rather** [2] - 5:19, 42:13
**re** [2] - 51:14, 51:15
**re-dispatch** [2] - 51:14, 51:15
**read** [7] - 6:6, 6:9, 17:17, 42:22, 73:6, 82:2, 84:3
**reading** [1] - 1:18
**reads** [2] - 39:17, 42:24
**ready** [1] - 59:25
**really** [1] - 16:22
**Reason** [4] - 83:4, 83:8, 83:12, 83:16, 83:20, 83:24
**reason** [3] - 12:23, 68:2, 82:4
**reasons** [1] - 53:6
**receipt** [7] - 17:16, 55:12, 55:14, 55:24, 55:25, 58:3, 82:12
**receive** [7] - 11:24, 34:19, 36:11, 42:5, 46:6, 46:15, 62:24
**received** [5] - 11:22, 70:5, 75:18, 76:19, 76:21
**receiving** [1] - 76:22
**recognize** [7] - 64:11, 64:14, 64:15, 70:3, 72:9, 72:10
**record** [15] - 4:10, 42:21, 58:25, 63:3, 63:5, 65:4, 65:6, 66:2, 66:3, 67:11, 67:13, 67:24, 73:16, 75:16, 77:4
**recorded** [1] - 30:9
**reduced** [1] - 79:6
**Reed** [2] - 34:12
**referral** [2] - 80:9, 80:22
**referring** [3] - 48:7, 48:9
**regardless** [1] - 27:18
**regiment** [3] - 51:11, 68:19
**regular** [1] - 79:12
**regulation** [1] - 63:25
**Regulations** [1] - 80:3

**related** [1] - 9:9
**release** [1] - 47:15
**relevant** [1] - 66:15
**remember** [24] - 7:14, 13:9, 13:10, 13:14, 16:1, 16:20, 25:19, 32:23, 32:25, 33:3, 37:10, 37:12, 37:15, 63:2, 64:23, 70:6, 72:20, 74:12, 74:15, 74:21, 74:23, 74:25, 75:3, 76:17
**repeat** [2] - 39:14, 72:13
**rephrase** [4] - 17:21, 22:18, 39:20, 45:8
**rephrasing** [1] - 39:13
**report** [4] - 55:10, 55:14, 63:4, 63:7
**reporter** [7] - 5:11, 5:21, 39:17, 42:24, 80:5, 80:8, 80:21
**REPORTER** [2] - 39:16, 80:1
**Reporter** [2] - 1:20, 80:13
**reporter's** [1] - 80:8
**Reporting** [1] - 80:3
**reporting** [4] - 80:7, 80:15, 80:20, 80:22
**represent** [1] - 79:8
**representative** [2] - 46:7, 80:14
**request** [2] - 61:21, 61:22
**require** [1] - 33:16
**reserve** [1] - 5:25
**reserved** [1] - 78:22
**residents** [1] - 34:6
**respect** [1] - 76:14
**respond** [4] - 38:2, 77:18, 77:22, 78:7
**responding** [1] - 77:14
**responsiveness** [1] - 6:1
**restricted** [2] - 37:8, 63:23
**restrictions** [7] - 38:5, 38:8, 38:15, 38:16, 38:22, 39:3, 41:22
**results** [1] - 79:13
**return** [3] - 24:16, 24:22, 82:10
**review** [2] - 6:21, 6:24
**ride** [1] - 60:4
**Roadside** [1] - 53:2
**robbery** [1] - 8:9
**rod** [1] - 43:23
**rolling** [1] - 43:15

**room** [1] - 60:8
**rooms** [1] - 34:15
**route** [1] - 30:19
**RPR** [2] - 79:17, 81:3
**rule** [7] - 36:25, 37:5, 37:16, 37:24, 47:24, 48:10, 63:24
**Rule** [1] - 78:20
**rules** [3] - 4:17, 5:11, 37:8
**Rules** [2] - 78:20, 80:2
**run** [10] - 23:9, 35:1, 35:9, 35:10, 35:12, 40:2, 59:17, 59:18, 61:6, 61:14
**running** [2] - 60:9, 60:10

## S

**S-H-A-N-I-E-S-H-A** [1] - 11:4
**safety** [3] - 70:20, 70:24, 71:1
**salary** [1] - 65:15
**save** [1] - 30:21
**saw** [1] - 30:18
**scenario** [1] - 45:21
**schedule** [5] - 62:2, 62:4, 62:8, 62:9, 62:11
**school** [4] - 12:12, 12:16, 13:5, 13:7
**School** [1] - 12:17
**schools** [1] - 13:2
**scratch** [1] - 54:16
**screw** [1] - 34:13
**second** [4] - 9:16, 65:19, 73:6, 75:12
**secret** [1] - 69:19
**see** [9] - 30:10, 30:12, 30:13, 30:15, 51:24, 57:9, 57:11, 67:21, 75:15
**seeking** [4] - 18:9, 18:12, 18:23, 18:24
**send** [2] - 9:20, 30:23
**sends** [1] - 42:4
**Senior** [1] - 12:17
**sentence** [1] - 8:14
**separate** [1] - 49:21
**serve** [1] - 56:5
**service** [39] - 47:21, 48:13, 49:24, 50:2, 50:7, 50:9, 50:12, 50:14, 50:17, 50:22, 50:25, 51:4, 51:7, 51:14, 51:15, 51:16, 51:18, 51:21, 51:22, 51:25, 52:12, 52:18,

52:25, 53:4, 53:9, 53:10, 53:11, 53:12, 54:13, 56:16, 56:18, 56:19, 56:20, 57:20, 57:22, 57:24, 58:1, 72:19
**services** [5] - 33:8, 56:8, 80:7, 80:16, 80:20
**set** [7] - 43:17, 55:7, 55:9, 55:20, 62:5, 62:7, 77:16
**sets** [1] - 55:16
**seven** [17] - 5:6, 19:10, 19:14, 19:18, 21:20, 22:7, 29:5, 35:11, 53:8, 53:10
**shaking** [1] - 5:19
**shall** [2] - 80:5, 80:11
**Shaniesha** [1] - 11:2
**SHEET** [1] - 3:11
**sheet** [12] - 59:6, 72:8, 72:10, 72:13, 72:17, 72:18, 72:22, 72:24, 82:4, 82:6, 82:8, 82:11
**Sheet** [1] - 84:7
**sheets** [2] - 29:11, 29:20
**shift** [2] - 36:21, 36:23
**shop** [5] - 23:10, 23:12, 24:16, 61:10, 62:15
**show** [1] - 74:9
**shows** [1] - 53:13
**siblings** [1] - 5:8
**sign** [5] - 6:6, 6:9, 64:2, 65:23, 82:6
**Signature** [1] - 84:10
**signature** [3] - 6:5, 68:24, 78:21
**signed** [1] - 73:10
**signing** [2] - 1:18, 82:7
**signs** [1] - 32:8
**sister** [1] - 10:25
**sisters** [1] - 10:23
**sit** [3] - 37:13, 52:11, 53:19
**sitting** [1] - 39:1
**situation** [2] - 44:4, 45:24
**situations** [1] - 43:19
**six** [1] - 29:5
**skills** [1] - 54:17
**sleep** [5] - 35:1, 35:5, 35:7, 59:16, 59:17
**sleeping** [2] - 37:24, 40:14
**slept** [1] - 35:2

smaller [1] - 5:4
SMITH [1] - 1:4
Smith [4] - 52:5, 52:6, 54:19, 54:24
smoothly [1] - 4:18
Snellville [2] - 24:9, 24:13
so.. [1] - 5:8
softly [1] - 4:21
someone [6] - 11:17, 11:19, 32:24, 35:4, 57:10
sometime [1] - 25:18
sometimes [3] - 46:18, 51:22, 61:8
son [1] - 20:8
soon [2] - 77:18, 77:22
sorry [6] - 4:20, 37:3, 40:19, 71:6, 71:9, 71:14
sort [1] - 66:22
source [1] - 80:9
South [2] - 61:6, 61:19
Southwest [1] - 2:14
space [2] - 36:3, 82:4
specific [4] - 6:17, 42:10, 74:25, 75:3
specifically [1] - 61:18
specifics [1] - 18:4
spell [1] - 11:3
Springs [3] - 9:24, 27:1, 27:7
stand [1] - 42:17
stands [1] - 9:8
STANLEY [4] - 1:6, 1:16, 3:3, 4:4
Stanley [1] - 4:11
start [6] - 13:17, 15:3, 16:19, 17:5, 30:7, 66:25
started [2] - 31:9, 51:17
State [1] - 1:20
state [5] - 4:9, 34:10, 63:16, 63:19, 82:3
STATE [1] - 79:2
STATES [1] - 1:1
states [1] - 80:4
stating [1] - 80:6
station [2] - 7:5, 42:3
stay [2] - 16:22, 23:25
stead [1] - 44:11
sticker [2] - 71:23, 73:19
still [3] - 39:11, 51:22, 76:7
stipend [1] - 34:19
stop [1] - 59:8

stopped [1] - 59:11
straining [2] - 4:22, 4:23
strap [1] - 43:17
Street [2] - 2:6, 2:14
stuff [1] - 74:14
subject [2] - 39:23, 82:7
Subscribed [1] - 84:12
substances [1] - 84:7
sue [1] - 20:12
sued [2] - 11:17, 11:19
Suite [1] - 2:15
Sunday [2] - 62:5, 62:6
support [1] - 58:11
suppose [1] - 30:24
supposed [1] - 29:20
suspended [2] - 58:4, 58:19
sworn [3] - 4:3, 4:5, 84:12
system [1] - 42:15

## T

tablet [1] - 30:10, 42:13, 43:4, 45:15, 45:18, 51:13, 57:3, 78:4
Tamika [8] - 1:19, 79:17, 80:14, 80:16, 80:19, 80:23, 81:3
taught [1] - 54:17
tax [1] - 74:14
taxes [3] - 74:11, 74:20, 74:22, 74:24, 75:1
tech [4] - 56:19, 57:24, 58:1, 72:19
techs [3] - 47:21, 48:13, 53:10
telephone [1] - 36:9
ten [4] - 31:22, 44:17, 44:18, 44:20
tend [1] - 27:24
tender [1] - 80:5
Tennessee [1] - 61:19
terminated [2] - 17:11, 25:17
territory [2] - 39:24, 39:25
testified [3] - 4:7, 4:15, 68:6
testimony [5] - 35:14, 35:18, 50:16, 68:2, 73:12
text [1] - 9:21
THE [5] - 1:1, 2:2,

2:11, 2:12, 19:6
therefore [1] - 46:3
therein [1] - 84:5
thereto [1] - 79:6
third [1] - 76:9
thirty [5] - 15:16, 21:16, 22:5, 34:18, 82:11
Thompson [1] - 66:19
three [6] - 18:18, 19:5, 19:7, 41:8, 46:2, 60:10
tips [1] - 62:24
tire [7] - 43:19, 43:23, 43:24, 46:1, 49:10, 49:15, 51:17
tires [2] - 43:17, 49:17, 49:20
Tishja [1] - 58:21
TISHJA [1] - 1:11
TO [1] - 82:1
today [6] - 6:22, 6:25, 37:14, 43:6, 52:11, 53:19
took [4] - 25:7, 35:9, 45:1, 63:19
tool [1] - 44:2
tools [1] - 33:7
top [1] - 71:14
total [1] - 31:20
Tow [2] - 25:13, 25:15, 25:17
tow [46] - 9:7, 16:3, 17:15, 20:12, 20:18, 20:23, 23:4, 24:16, 24:22, 25:22, 26:11, 30:19, 31:10, 31:12, 31:15, 31:18, 31:21, 31:23, 33:5, 33:8, 33:9, 40:16, 42:5, 43:11, 43:18, 45:25, 47:20, 49:5, 51:23, 52:17, 53:10, 53:12, 53:13, 53:20, 54:17, 56:8, 56:20, 56:21, 56:24, 57:7, 57:17, 60:5, 60:8, 60:12, 63:13, 74:9
towed [2] - 43:10, 51:19
Tower [2] - 1:21, 2:5
towing [11] - 27:11, 32:7, 32:24, 42:4, 47:5, 50:1, 50:17, 51:4, 51:14, 51:15, 68:7
Towing [71] - 7:7, 7:16, 13:13, 13:25, 14:24, 15:2, 15:19, 16:6, 17:4, 17:7,

18:25, 19:17, 19:21, 19:23, 20:6, 21:1, 21:2, 21:21, 21:22, 21:24, 22:12, 22:14, 22:16, 24:12, 24:21, 25:2, 25:22, 26:5, 26:7, 26:9, 26:12, 26:16, 27:6, 29:19, 29:22, 31:10, 33:8, 34:17, 35:22, 36:7, 36:15, 44:8, 44:11, 47:5, 48:8, 48:9, 48:11, 49:11, 50:2, 50:6, 50:21, 50:25, 51:6, 51:20, 52:25, 53:3, 53:5, 53:6, 53:16, 53:20, 54:5, 54:14, 56:6, 62:19, 63:24, 64:20, 70:8, 72:15, 74:8, 75:18
TOWING [1] - 1:10
Towing's [1] - 53:25
tows [3] - 16:17, 26:2, 59:2
track [7] - 29:2, 29:7, 29:24, 30:2, 30:4, 30:5, 59:2
traffic [2] - 8:24, 9:1
training [1] - 12:10
transcript [6] - 79:4, 79:9, 80:12, 82:12, 82:13, 84:4
travel [1] - 63:13
trial [1] - 10:15
TRIPLE [1] - 3:11
triple [3] - 13:11, 56:16, 67:19
Triple [33] - 15:7, 23:9, 30:24, 31:7, 32:2, 32:8, 36:7, 42:3, 42:8, 43:25, 46:6, 46:16, 47:8, 48:5, 48:7, 48:10, 48:14, 49:19, 50:10, 50:13, 50:15, 50:17, 51:3, 51:7, 56:4, 56:14, 57:1, 57:4, 57:11, 60:9, 68:15, 72:8, 72:13
trips [1] - 63:18
troubles [2] - 12:22, 13:1
Truck [1] - 7:4
truck [52] - 9:7, 14:22, 15:18, 16:3, 16:17, 27:22, 31:10, 31:12, 31:15, 31:21, 31:23, 32:7, 32:8, 32:15, 33:5, 33:9, 39:1, 41:23, 43:10, 43:11,

44:5, 44:7, 44:14, 45:2, 45:5, 46:4, 47:20, 49:5, 51:22, 51:23, 51:25, 52:1, 52:12, 52:17, 52:18, 53:5, 53:7, 53:12, 53:13, 53:16, 54:3, 54:8, 56:8, 57:11, 60:5, 60:9, 60:12, 61:1, 61:4, 61:8, 63:14, 77:10
trucks [10] - 23:4, 24:4, 52:20, 52:22, 52:25, 53:10, 53:11, 53:20, 54:8, 54:18
true [2] - 66:7, 79:8
truth [1] - 4:6
turn [7] - 43:11, 56:24, 58:1, 58:3, 72:14, 72:21, 72:23
twenty [2] - 14:20, 14:22
twenty-two [2] - 14:20, 14:22
two [11] - 14:20, 14:22, 21:10, 40:18, 40:20, 41:5, 59:7, 59:10, 59:19, 73:15, 76:8
typewriting [1] - 79:7

## U

under [11] - 47:18, 47:25, 48:12, 48:24, 49:1, 49:2, 49:7, 66:1, 66:4, 79:7, 80:17
understood [1] - 72:12
unemployed [2] - 7:13, 13:23
uniform [2] - 32:8, 32:11, 77:10
unit [1] - 51:16
UNITED [1] - 1:1
units [2] - 49:19, 53:9
unless [2] - 22:21, 62:2
up [19] - 4:19, 5:13, 9:19, 10:16, 12:19, 32:2, 43:16, 43:17, 47:8, 47:18, 47:24, 48:12, 49:2, 49:5, 53:13, 54:2, 59:20, 74:3, 78:15
usual [1] - 80:24

7

## V

**varied** [4] - 19:12, 19:16, 19:20, 41:15
**various** [1] - 14:8
**vehicle** [2] - 53:24, 54:5
**verbalize** [2] - 5:18, 5:22
**vest** [2] - 70:20, 71:1
**violation** [1] - 9:6
**visited** [2] - 39:7, 39:21
**visiting** [1] - 59:11
**vocational** [1] - 12:9
**voice** [1] - 4:25
**VS** [1] - 1:8

## W

**wage** [4] - 21:16, 21:18, 27:16, 27:17
**wages** [1] - 27:14
**wait** [11] - 23:15, 24:3, 24:20, 24:25, 25:24, 26:13, 26:14, 39:9, 45:4, 57:20, 73:20
**waiting** [12] - 38:7, 38:9, 38:19, 38:23, 39:1, 39:7, 39:22, 40:3, 40:5, 40:6, 40:8, 40:14
**waived** [1] - 1:18
**wear** [1] - 77:9
**Wednesday** [1] - 43:6
**week** [3] - 29:6, 35:15, 35:20
**wheels** [1] - 46:2
**whole** [2] - 4:6, 5:14
**wife** [2] - 66:20, 74:14
**winch** [2] - 43:12, 43:16
**window** [1] - 44:16
**wise** [1] - 15:12
**Witness** [1] - 73:5
**WITNESS** [3] - 3:2, 19:6, 82:1
**witness** [8] - 4:3, 4:15, 4:24, 6:2, 64:9, 70:2, 73:8, 78:22
**word** [1] - 32:21
**WORK** [1] - 3:10
**works** [1] - 53:4
**worse** [1] - 4:24
**wrench** [2] - 34:2, 70:18
**wrenches** [1] - 34:4
**write** [4] - 17:15, 29:9, 69:3, 72:14
**written** [3] - 48:2, 48:14, 48:17
**wrote** [5] - 17:25, 59:4, 69:1, 71:14, 71:15
**WYNN** [1] - 1:5

## Y

**year** [17] - 9:4, 9:5, 9:11, 12:7, 13:17, 14:4, 16:21, 17:5, 21:6, 25:11, 32:17, 35:12, 58:7, 67:2, 74:18, 74:25, 75:3
**years** [8] - 8:15, 12:18, 18:19, 19:1, 19:7, 21:3, 31:20, 75:18
**yourself** [7] - 31:23, 43:18, 52:9, 56:2, 77:6, 77:7, 77:11